JUDGE GARDEPHE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09 CV 8285

-------------------------------------------------x

BROOKFIELD ASSET MANAGEMENT, INC.,
f/k/a Hees International Bancorp Inc., and

BRYSONS INTERNATIONAL, LTD.,
f/k/a Brysons International Bank, Ltd.,

Plaintiffs,

v.

AIG FINANCIAL PRODUCTS CORP. and

AMERICAN INTERNATIONAL GROUP, INC.,

Defendants.

-------------------------------------------------x



Case No.

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs Brysons International, Ltd. ("Brysons") and its parent Brookfield Asset Management, Inc. ("Brookfield") (collectively, "Plaintiffs"), by their attorneys Jenner & Block LLP, for their Complaint against Defendants AIG Financial Products Corp. ("AIG-FP") and its parent American International Group, Inc. ("AIG") (collectively, "Defendants"), allege upon knowledge with respect to themselves and their own acts, and upon information and belief with respect to all other matters, as follows:

### NATURE OF THE ACTION

1.      Brysons and Brookfield bring this declaratory judgment action against AIG-FP and AIG to confirm that two interest rate swaps entered into between Brysons and AIG-FP in 1990 have automatically terminated as a result of AIG's recent financial collapse.  The swap agreement between the parties – based on the 1987 standard form drafted by leading swap dealers such as AIG – was designed to protect each party from its counter-party's severe financial distress and from the complications of bankruptcy proceedings.  Thus, the swap

agreement provides for automatic early termination in a wide range of circumstances indicative of severe financial distress, including a party's insolvency or inability to pay its debts when due; winding-up, liquidation or dissolution; seeking or becoming subject to the appointment of a trustee; acts that are analogous to these events; or, critically, "tak[ing] any action in furtherance" of any of those acts.

2.    AIG's recent financial collapse – an unprecedented cataclysm in American corporate history – has plainly triggered several of these default provisions.  For example, AIG's own securities filings show that before the government rescue, AIG was, in the words of the swap agreement, "unable . . . generally to pay its debts as they bec[a]me due"; otherwise, AIG would not have transferred 79.9% of its stock ownership to the government as part of an $80 billion emergency rescue plan.  Likewise, Brookfield believes that discovery will confirm that AIG was balance-sheet insolvent at various points since 2008.

3.    AIG has taken various actions that triggered additional Events of Default.  For example, AIG took action "in furtherance of" filing for bankruptcy, including when its management prepared an immediate bankruptcy filing before its board chose to accept the last-minute federal rescue package instead.  AIG has also begun winding-up, dissolving, or liquidating AIG-FP, Brysons' counter-party in the swaps; AIG-FP has stopped conducting new business, and instead has devoted its efforts to terminating its outstanding contracts.

4.    Under the standard 1987 contract, any one of these Events of Default triggers the "automatic early termination" provision of the swap agreement.  "Automatic early termination" means that the contract is terminated once an Event of Default occurs, regardless of whether the other party notices the event, regardless of how long the event lasts, or whether the event is subsequently cured.

5.    Upon early termination, the parties are required to apply the agreement's close-out provision.  The close-out provision provides that upon early termination, the non-defaulting party – here, Brysons – has no further obligations to the defaulting party – here, AIG-FP.  This provision, which was the industry standard until 1992, was drafted by leading swap dealers to protect them from their weaker customers and counterparties; swap dealers did not want a customer's financial collapse to accelerate the swap dealer's obligation, thereby requiring the swap dealer to raise funds unexpectedly to pay otherwise unmatured obligations.  These provisions should have protected Brookfield from AIG's cataclysm; instead, AIG's refusal to agree that the swap agreement has terminated and its obvious massive liquidity needs forced Brookfield to preserve considerable liquidity potentially to pay AIG on the swaps, at a time when liquidity was particularly valuable.

6.    Despite these undisputed events, and the clarity of the swap agreement's provisions, AIG-FP and AIG have refused to concede the occurrence of an Event of Default under the swap agreement.  Accordingly, Brysons and Brookfield bring this action for a declaration that (a) at least one Event of Default has occurred; (b) an early termination occurred upon the occurrence of such Event of Default(s); and (c) Brysons and Brookfield on the one hand and AIG and AIG-FP on the other have no remaining obligations to each other, other than Brookfield's obligation to return swap payments received since October 2008 that Brookfield has placed in escrow. Brysons and Brookfield also seek judgment awarding them their costs and attorneys fees, as required by the swap agreement.

## PARTIES

7.    Plaintiff Brookfield is a foreign corporation incorporated under the laws of Ontario, Canada with its principal place of business in Ontario.  Brookfield is a publicly traded asset manager focused on property, power, and other infrastructure assets.  Brookfield is the successor

3

to Hees International Bancorp., Inc. ("Hees"), the guarantor of Brysons' obligations under the swaps, and the original issuer of certain related debentures described below.

8.    Plaintiff Brysons is a foreign corporation incorporated under the laws of Barbados with its principal place of business in Barbados.  Brysons is wholly owned by Brookfield and its subsidiaries, and is a successor to Brysons International Bank, Ltd., the original counterparty to the two interest rate swaps with AIG-FP.

9.    Defendant AIG-FP is a corporation incorporated under the laws of Delaware with its principal place of business in Connecticut.  AIG-FP is a subsidiary of AIG that engaged in derivative transactions outside AIG's core insurance business, including the swaps with Brysons.

10.    Defendant AIG is a corporation incorporated in Delaware with its principal place of business in New York.  AIG is primarily in the business of writing insurance policies through its subsidiary insurance companies.  AIG also provided credit support to AIG-FP on the swaps.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) because Brookfield and Brysons are each a citizen of a foreign state, AIG and AIG-FP are each a citizen of a State, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

12.    Venue is proper in this judicial district under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this district, and also because the swap agreement provides for venue in this district.  Swap Agreement, § 13(b).

## FACTUAL ALLEGATIONS

**I.    The 1990 Transactions**

   **A.    The Overall Structure of the Transactions**

4

13.    In 1990, Brookfield sought to borrow $200 million from AIG. Instead of a traditional loan or other standard commercial lending facility, AIG offered financing via a complex structure composed of three transactions – a sale of debentures and two "fixed for floating" interest rate swaps. All three transactions were dated as of October 18, 1990.

14.    To document their agreement with respect to the debentures, the parties entered into, among other documents, a Purchase Agreement between Hees International Bancorp Inc. and AIG Financial Securities Corp., dated October 18, 1990 (the "Debenture Agreement"), and a Trust Indenture between Hees International Bancorp Inc. and Central Guaranty Trust Co., dated October 18, 1990 (the "Indenture").

15.    To document their agreement with respect to the two swaps, the parties entered into: (a) a Confirmation between AIG Financial Products Corp. and Brysons International Bank Ltd., dated October 18, 1990, which set forth the primary economic terms of the swaps (the "Confirmation"); (b) the 1987 International Swaps and Derivatives Association ("ISDA") Interest Rate and Currency Exchange Agreement, which contained certain standard provisions concerning swaps (the "1987 ISDA Form"); and (c) the Schedule to the ISDA Agreement between AIG Financial Products Corp. and Brysons International Bank Ltd., dated October 18, 1990, which amended the 1987 ISDA Form to reflect terms specifically negotiated by the parties (the "Schedule"). Together, the Confirmation, the 1987 ISDA Form, and the Schedule are referred to as the "Swap Agreement," attached hereto as Exhibit A.

16.    In the first transaction, Brookfield issued and sold its floating rate debentures due October 2015 for $200 million to a non-party AIG subsidiary known as AIG Financial Securities Corp. ("AIG-FS"). Brookfield was obligated to repay the $200 million in principal on the maturity date and in the interim pay interest every six months at LIBOR. In 2000, Brookfield

redeemed the debentures early, repaying the $200 million in full, with interest. Accordingly, the debentures are not at issue in this action.

17.    As part of AIG-FP's loan to Brookfield, and at the insistence of AIG-FP, Brysons and AIG-FP entered into two swap transactions. The first was a "Zero-Coupon Swap," meaning that neither party was required to make any payment until the termination date 25 years later, in 2015. Under the terms of the Zero-Coupon Swap, AIG-FP's payment to Brysons in 2015 would be computed by compounding LIBOR every six months from inception on a notional amount of $200 million, and Brysons' payment to AIG-FP in 2015 would be computed by compounding a fixed rate of 9.61% every six months on the same notional amount. On October 18, 1990, LIBOR was 8.25%.

18.    The second swap transaction was a "Coupon Swap" between Brysons and AIG-FP. Pursuant to the Coupon Swap, every six months AIG-FP would pay Brysons a fixed amount calculated at an annual rate of 9.61% on $200 million, and every five years Brysons would pay AIG-FP an amount calculated at LIBOR on $200 million, compounded every six months.

19.    A key aspect of this complex structure was that the final net payment to be made in 2015 on the Zero-Coupon Swap would be based on the variance between LIBOR and 9.61% over the intervening twenty-five years. In general, so long as LIBOR remained below 9.61% on average, Brysons would likely have a final net payment obligation to make to AIG-FP, but if LIBOR on average moved above 9.61%, then AIG-FP would likely accrue a net payment obligation to Brysons in 2015.

20.    AIG-FP may have suggested this swap structure because a party to a swap, unlike a lender of a loan, could take advantage of "mark-to-market" accounting. Under mark-to-market accounting, a party could book the present value of its expected future profits as immediate income. When applied to an investment with a term of twenty-five years, the difference between

6

mark-to-market and accrual accounting could be significant, because it encompasses the present value of twenty-five years of profits (or losses). A traditional lender, by contrast, could book interest income each period only to the extent the interest has accrued to date.

21. The Swap Agreement also gave AIG-FP (and only AIG-FP) a bi-annual right beginning in 1995 to cancel the two swaps (the "Cancellation Right"). Confirmation, § 2(A). Upon AIG-FP's exercise of this right, the party who was "out-of-the-money" (that is, owed money to the other on a net present value basis) would have to make a final payment to the other, but only of the amounts attributable to the period from inception of the swaps in 1990 through the date of cancellation, not the mark-to-market value of amounts that would have been attributable to the remaining term of the swaps through 2015.

22. The Cancellation Right gave AIG-FP an extremely valuable option. If current and projected LIBOR remained below the fixed rate of 9.61% during the tenure of the swaps, then Brysons would have a net obligation to AIG-FP in 2015, which AIG-FP could book as immediate mark-to-market profits. But if current and projected LIBOR was above 9.61% during the term of the swaps, and AIG-FP had a potential net obligation to Brysons in 2015 on the swaps, then AIG-FP could terminate them by exercising its unilateral Cancellation Right. In that case, AIG-FP would not have to pay to Brysons the mark-to-market value attributable to the period after the exercise of the Cancellation Right. Thus, the Cancellation Right gave AIG-FP the possibility of booking accelerated mark-to-market profits without the risk of having to book significant mark-to-market losses.

### B.  The Swap Agreement's Event of Default and Close-Out Provisions

23. Because AIG-FP chose to use swaps in structuring these transactions, the swaps were governed by the standard swap form contract in use in 1990, which had been published in 1987 by the International Swaps and Derivatives Association, Inc. ("ISDA"), of which AIG-FP

was a member. Under the 1987 ISDA Form, the Swap Agreement terminates automatically and immediately upon the occurrence of any one of several specified "Events of Default." If an Event of Default occurs, one party is the "defaulting party," and the other is the "non-defaulting party."

24.    Because Brysons' and AIG-FP's obligations under the swaps were each guaranteed by their corporate parents, Brookfield and AIG are each listed as a "Specified Entity" on the Schedule containing the parties' amendments to the 1987 ISDA Form.

25.    Various circumstances cause an Event of Default under § 5(a) of the Swap Agreement, including the following:

      A.      When either party or any applicable Specified Entity "is dissolved," Swap Agreement, § 5(a)(vii)(1);

      B.      When either party or any applicable Specified Entity "becomes insolvent or fails or is unable or admits in writing its inability generally to pay its debts as they become due," *id.*, § 5(a)(vii)(2);

      C.      When either party or any applicable Specified Entity "institutes . . . a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights," *id.*, § 5(a)(vii)(4);

      D.      When either party or applicable Specified Entity "has a resolution passed for its winding-up or liquidation," *id.*, § 5(a)(vii)(5);

      E.      When either party or applicable Specified Entity "seeks or becomes subject to the appointment of [a] . . . trustee . . . or other similar official for it or for all or substantially all its assets," *id.*, § 5(a)(vii)(6);

F.      When any event occurs that "has an analogous effect to any of the events

specified" under subsections (1) through (6) of section 5(a)(vii), *id.*, §

5(a)(vii)(7);

G.      When either party or applicable Specified Entity "takes any action in

furtherance of, or indicating its consent to, approval of, or acquiescence in,

any of the foregoing acts" identified by section 5(a)(vii). *Id.*, §

5(a)(vii)(8).

26.     As is clear from the language of the standard Event of Default provisions in the

1987 ISDA Form, market participants specifically intended automatic early termination to be

triggered well in advance of a bankruptcy proceeding. Swap dealers wanted to avoid the

uncertainties of resolving their obligations in bankruptcy.

27.     Accordingly, the 1987 ISDA Form also provides that "an Early Termination Date

*will be deemed to have occurred* in respect of all Swap Transactions immediately upon the

occurrence of any Event of Default specified [above]." Swap Agreement, § 6(a) (emphasis

added). This automatic termination provision means that the subset of the contract's Events of

Default that trigger automatic termination are incurable – once they occur, the agreement is

terminated even if the circumstances that created the Event of Default are subsequently resolved.

28.     Section 6(e) of the 1987 ISDA Form is the close-out provision that sets forth the

consequences of an Event of Default. Section 6(e)(i)(1) does not impose any obligation on a

non-defaulting party. Thus, a defaulting party may not recover future payments potentially owed

by the non-defaulting party, even if the present value of those amounts exceeds the present value

of the future payments the defaulting party potentially owes the non-defaulting party. This

provision protects a non-defaulting party from suffering any adverse consequences from its

counterparty's insolvency or other default, such as the sudden acceleration of amounts that otherwise would not have been payable until years later, if ever.

29.    Historically, these broad Event of Default provisions and section 6(e)(i)(1) of the 1987 ISDA Form favored swap dealers like AIG-FP over their corporate counterparties and other "end users" like Brysons, because swap dealers generally had stronger credit ratings than their customers and viewed themselves as less likely to be the defaulting party.  AIG itself epitomized the one-sidedness of these provisions.  When the Swap Agreement was executed, AIG was AAA-rated and considered one of the most secure non-governmental credits in the world; Brookfield's senior unsecured debt was rated AA (low) and A+.  AIG-FP surely believed that if an Event of Default occurred in the ensuing 25 years, it was far more likely to be Brysons' than AIG-FP's. And if Brysons had defaulted at any point after 1990, then AIG-FP would not have had to make any further payments to Brysons.

### C.    Post-Closing Events With Respect to the Swaps

30.    Soon after the swaps were executed, interest rates declined precipitously, giving Brysons a potentially substantial payment obligation to AIG-FP in 2015.  By 1993, AIG-FP had booked significant mark-to-market profits based on its valuation of the swaps.

31.    In 1992, leading swap dealers such as AIG-FP agreed to revise the ISDA Form. Two of the revisions are relevant to this dispute.  First, the 1992 ISDA Form provided that certain Events of Default that had previously triggered automatic early termination – and were therefore not subject to any notice or opportunity to cure – would no longer trigger automatic early termination.  The 1992 revision provided that such Events of Default would lead to termination only if the other party took action to issue a notice of termination before the default had been cured.  This revision was made to the Events of Default involving insolvency and

"action[s] in furtherance," because it was potentially difficult to determine exactly whether or when those types of Events of Default had occurred.

32.   The 1992 ISDA Form also revised the close-out provision in Section 6(e)(i)(1) by changing its terms but giving swap parties the option to choose the 1987 Form's terms instead.

33.   Over the years, the parties discussed restructuring the swaps, primarily because AIG did not want to have such a large long-dated receivable from a single counterparty like Brookfield. At times, AIG aggressively pressured Brookfield to agree to a one-sided settlement of the swaps.

34.   But AIG never asked Brookfield to substitute the 1992 ISDA Form (or the subsequent 2002 ISDA Form) for the 1987 ISDA Form, even though it was common practice for swap dealers and their existing counterparties to re-document their outstanding swaps under the new forms. AIG-FP's choice not to seek to modify the documentation of its swap transaction with Brookfield shows that AIG-FP believed that the 1987 ISDA Form favored its interests.

35.   On or about April 11, 2000, Brookfield paid back in full the $200 million it had borrowed from AIG-FS on the debentures, together with the accrued and unpaid interest through the date of its redemption of the debentures. Despite Brookfield's prepayment of the original principal amount that it had borrowed from AIG, the swaps between Brysons and AIG-FP remained in effect.

## II.   AIG's Collapse and the Federal Bail-Outs

36.   In September 2008, AIG endured a historic financial collapse. That collapse has triggered multiple Events of Default under the Swap Agreement.

### A.   The September 2008 Collapse, Bail-Out, and Wind-Up

37.   After reaping millions of dollars of profits for AIG via credit default swaps and other financial engagements that leveraged AIG's triple-A rating, AIG-FP's reckless exposure to

the subprime mortgage market brought financial ruin to AIG and AIG-FP. As the subprime

mortgage crisis unfolded in 2008, AIG and AIG-FP suffered billions of dollars of losses. In the

first, second, and third quarters of 2008, AIG reported losses of $7.8 billion, $5.36 billion, and

$24.47 billion, respectively. In total, $21.65 billion of this $37.63 billion was attributable to

AIG-FP.

38.    AIG's crisis came to a head in mid-September. On September 12, 2008, AIG was

plainly unable to pay its debts as they came due: "Given the liquidity constraints and its inability

to raise new funds, AIG contacted FRBNY [the Federal Reserve Bank of New York] on

September 12, 2008, to seek assistance, fearing that low cash reserves could soon cause its

failure." United States Government Accountability Office, *Troubled Asset Relief Program:*

*Status of Government Assistance Provided to AIG* 16, Sept. 2009.

39.    On September 13th, there continued to be no private-sector remedy for AIG's

inability to pay, and AIG also did not have any remedy from the public sector; on that day, the

FRBNY informed AIG that governmental assistance was not available. James B. Stewart, *Eight*

*Days*, THE NEW YORKER, Sept. 21, 2009, at 66 ("[AIG's CEO Robert] Willumstad estimated that

A.I.G. needed $40 billion . . . . To raise that kind of money, he needed government support.

[Then-President of the FRBNY Timothy] Geithner said that none would be forthcoming.").

40.    AIG's inability to pay its debts continued on September 14th. Willumstad was

again advised on that date that "[t]here would be no public money for AIG." Lauren T. LaCapra,

*AIG Ex-CEO Breaks Down the Final Days*, THESTREET.COM, Sept. 25, 2009,

http://www.thestreet.com/story/10603344/5/aig-ex-ceo-breaks-down-the-final-days.html

[hereinafter *Final Days*] ("On Sunday, Sept. 14 . . . . Willumstad heard the same message from

regulators that he had heard for several months: 'There would be no public money for AIG.'").

41.    Thus, on that same day, AIG's "[l]awyers began drawing up papers for what would have seemed impossible only days before: a bankruptcy of the world's largest insurance company." Eric Dash & Andrew Ross Sorkin, *Throwing A Lifeline To A Troubled Giant,* N.Y. TIMES, Sept. 18, 2008.

42.    AIG's inability to pay its debts continued on September 15th and 16th.  The FRBNY reiterated that AIG would receive no emergency public funds on September 15th. *Eight Days*, at 70 ("'There will be no public support' for A.I.G., Geithner announced."). As AIG admitted in a public securities filing, "[b]y early Tuesday afternoon on September 16, 2008," AIG's losses had become so severe that it "estimated that it had an immediate need for cash in excess of its available liquid resources." AIG Nov. 10, 2008 10-Q, at 50.

43.    Also on September 16th, AIG initiated the drawdown of the last of its credit lines in anticipation of its bankruptcy. *Final Days*; Monica Langley, Deborah Solomon & Matthew Karnitschnig, *Bad Bets and Cash Crunch Pushed Ailing AIG to Brink,* WALL ST. J., Sept. 18, 2008, at A1 ("On Tuesday [September 16th], AIG executives decided it was time to drain their revolving credit lines, the kind of last-ditch move companies typically make before filing for bankruptcy.").

44.    The government subsequently changed its position regarding emergency assistance for AIG.  AIG received a rescue proposal from the government on the afternoon of September 16th.  Willumstad acknowledged that by that point AIG lacked any alternative but bankruptcy: "'We are faced with two bad choices,' [Willumstad] told the [AIG] board, according to someone present at the meeting. 'File for bankruptcy tomorrow morning or take the Fed's deal [for governmental assistance] tonight.'" *Bad Bets and Cash Crunch Pushed Ailing AIG to Brink,* at A1.

45.    On September 16th, AIG accepted the proposal and FRBNY made an unprecedented $85 billion "loan" to AIG to prevent AIG's failure from adversely affecting the broader financial system.  At a private meeting with the House and Senate leadership that same day, "[Secretary of the Treasury Henry] Paulson announced that the Fed had decided to loan A.I.G. $85 billion and essentially seize control of the company under the Fed's emergency powers." *Eight Days*, at 73.

46.    The emergency $85 billion "loan" had a two-year term, and an interest rate per annum of three-month LIBOR plus 850 basis points (equivalent to a rate of roughly 11.5% in September 2008) on the full $85 billion amount, even if AIG did not draw down the entire facility.  The "loan" was collateralized by all of AIG's assets and those of its primary nonregulated subsidiaries.

47.    As part of the "loan," the FRBNY received a 79.9% equity interest in AIG (the "Trust Stock"), and AIG was required to use future cash receipts from asset sales, equity issuances, indebtedness, and other sources to repay amounts outstanding under the government's credit facility.  The 79.9% equity interest was issued to a government-created trust that is intended to act for the ultimate benefit of the Treasury and the FRBNY.  AIG 10-Q, Nov. 10, 2008, at 24, 59; AIG Credit Facility Trust Agreement 7, Jan. 16, 2009.

48.    The government also replaced AIG's existing CEO with the government's own chosen executive, Edward Liddy.  Statement of Robert B. Willumstad to the United States House of Representatives Committee on Oversight and Government Reform 5, Oct. 7, 2008 ("As part of th[e] [bail-out] plan, I was asked by the Treasury Department and the Federal Reserve to step down as CEO.").  Liddy was personally selected by the Secretary of the Treasury.  Brady Dennis, *In Long Fight, AIG Braces for Losing Round*, WASH. POST, Feb. 26, 2009 at D01.

49.    The FRBNY appointed three Trustees to vote the Trust Stock it obtained from the government's bail-out in January 2009.  In the months following their appointment, the Trustees arranged to replace more than half of AIG's Board of Directors.

50.    Soon after the government's initial emergency rescue, AIG declared its subsidiary AIG-FP to be in wind-up, dissolution, or liquidation.  In an October 3, 2008 call with shareholders and analysts, Edward Liddy stated: "We do intend to wind down [AIG-FP]. . . . [T]hat business is not in business as you would normally think about it." *See also* AIG Nov. 10, 2008 10-Q, at 54-55, 100.

51.    To effectuate the winding up, AIG prohibited AIG-FP from conducting any new business, and AIG is now in the process of running off AIG-FP's obligations.  AIG Form 8-K, Exhibit 99.1, Nov. 10, 2008 ("AIG Financial Products Corp., currently in run-off . . . .").  As AIG's CEO, Edward Liddy, subsequently explained: "we are shutting [AIG-FP] down – we are winding it down in a very orderly way." CNBC Interview with Edward Liddy, Mar. 2, 2009, available at http://www.cnbc.com/id/15840232?video=1049950178&play=1 (8:13).

52.    AIG-FP's newly hired CEO, Gerry Pasciucco, was tasked with winding up AIG-FP. "As Liddy and Pasciucco sat in the office . . .  Liddy spelled out what he needed from Pasciucco: To identify Financial Products' outstanding obligations, resolve those transactions as profitably and quickly as possible, and then close the doors and turn out the lights."  Robert O'Harrow Jr. & Brady Dennis, *Downgrades and Downfall*, WASH. POST, Dec. 31, 2008 at A01; *see also* Richard Teitelbaum & Hugh Son, *Unwinding at AIG Prompts Pasciucco to Ponder Systemic Failure*, Bloomberg.com, July 1, 2009, http://www.bloomberg.com/apps/news?pid= 20601091&sid=afDX3.N1Kdgw ("It was October 2008, and Edward Liddy . . . had just asked Pasciucco to head . . . AIG Financial Products Corp.  The mission: unwind AIGFP's portfolio . . . close the unit, then fire what remained of its 428 employees and resign.").

**B.    The November 2008 Crisis and Bail-Out**

53.    AIG quickly drew down $61 billion of the $85 billion rescue line, raising questions about how much additional cash AIG would need.  It also became apparent that AIG was still unable to pay its debts as they came due, including to the FRBNY.

54.    On November 10, 2008, AIG announced that it had reached agreements with the Treasury Department and the FRBNY to restructure its debt and to provide AIG with even more cash on easier terms.  The restructuring included a reduction of the FRBNY's original $85 billion loan to $60 billion, and a separate infusion by the Treasury Department of $40 billion in exchange for preferred shares.  These financing arrangements were conducted at substantially lower interest rates, and on a longer repayment schedule, than the original infusion.  Thus, in the November 2008 bail-out, the government gave AIG even more assistance but got nothing in return – other than again forestalling a bankruptcy filing.

55.    The November 10, 2008 restructuring also included the creation of two new government-created entities designed to limit AIG-FP's losses.  The two entities were capitalized with a $52.5 billion loan from the FRBNY (as well as funds from AIG itself).  These new entities were created to purchase assets on which AIG-FP had written credit default swap contracts, thereby relieving AIG-FP of its potential payment obligations on those swaps.  The creation and funding of these entities were significant additional steps toward winding up AIG-FP.

**C.    The March 2009 Crisis and Bail-Out**

56.    Although the government had provided a total of approximately $152.5 billion to keep AIG afloat as of November 10, 2008, AIG continued to be unable to pay its debts as they came due.  On March 2, 2009, AIG announced a loss of $61.7 billion for the fourth quarter of 2008, the largest quarterly loss by any company in history.  AIG announced that for all of 2008, it had suffered approximately $99 billion in total net losses.  AIG Mar. 2, 2009 10-K, at 64-65.

57.    Recognizing the possibility that the government had reached the limit of its generosity, AIG again instructed its attorneys to prepare for an imminent bankruptcy.  Paritosh Bansal, *AIG in Talks With U.S. Government, Sees $60 Billion Loss: Source*, CNBC.com, Feb. 24, 2009, at http://www.reuters.com/article/innovationNews/idUSTRE51M6LT20090224.

58.    But at the last minute the government again rescued AIG from having to make a bankruptcy filing.  A new facility allowed AIG to draw up to $30 billion over five years from the Treasury Department in exchange for non-cumulative preferred stock.  The Treasury Department also exchanged $40 billion of its existing, perpetual preferred shares in AIG for shares more akin to common equity.  Finally, the Federal Reserve agreed to reduce and restructure AIG's outstanding debt on terms more favorable to AIG.  AIG Mar. 2, 2009 10-K, at 42-44.

59.    By March 2, 2009, the government had provided a total of approximately $182.5 billion to keep AIG afloat.

## III.    The Events of Default Under the Swap Agreement

60.    As a result of the events described above, at least one Event of Default occurred under the Swap Agreement.

### A.    Swap Agreement, § 5(a)(vii)(2):  Insolvency and Inability to Pay Debts

61.    AIG and AIG-FP were each "insolvent … or unable . . . to pay [their] debts as they bec[a]me due."  Swap Agreement, § 5(a)(vii)(2).

62.    At various times since September 2008, AIG and AIG-FP have been unable to pay their debts as they were coming due.  Inability to pay one's debts occurs if the debtor has no means to pay debts that are coming due; it is not based on whether the party has actually failed to pay a debt that has already come due (which is covered by a separate clause in the same provision).  AIG has admitted that in mid-September 2008, it was unable to pay its debts as they were coming due.

63.    Even after the governmental infusion of cash, AIG and AIG-FP continued to be unable to pay their debts as they came due. Although AIG received an $85 billion loan in the initial bail-out, that loan itself had onerous payment terms and restrictions, reflecting the government's belief that it was dealing with an insolvent entity. AIG and the government both quickly recognized that the loan would have to be restructured.

64.    In addition to having been unable to pay its debts as they came due, AIG's need for the government's ultimate infusion of $182.5 billion strongly suggests that AIG was balance-sheet insolvent. Stated otherwise, it is highly likely that the fair value of AIG's assets was less than their liabilities. For example, more than half the assets on AIG's 2008 financial statement were valued using subjective indicators that were vulnerable to manipulation. AIG reduced the valuation of those assets by a startling $83 billion in the 90 days after September 30, 2008 (AIG Mar. 2, 2009 10-K at 192; AIG Nov. 10, 2008 10-Q at 1), suggesting that the prior valuations were materially inflated.

65.    AIG's pattern of severe accounting misconduct supports the inference that AIG inflated the value of these assets. In 2004, AIG paid $126 million in fines and restitution to the Securities and Exchange Commission ("SEC") and the Department of Justice following investigations into accounting issues relating to AIG's relationship with PNC Financial Services Group. In 2005, AIG restated its previous five annual financial statements to reduce income by $3.9 billion dollars. In 2006, AIG paid the SEC $1.6 billion dollars to settle claims of accounting fraud, bid-rigging and improper workers' compensation accounting. AIG also reported in February 2008 that its auditors had determined that AIG had failed to maintain an effective system of internal control over financial reporting for swaps. AIG Feb. 11, 2008 8-K, Item 8.01. In February 2008, AIG's vice president of reinsurance was found guilty of federal criminal charges in connection with AIG's actions in assisting an accounting fraud at another

company.  Moreover, a Vice President of Accounting Policy at AIG-FP publicly questioned the valuation of AIG-FP's Super Senior Credit Default Swap portfolio after he had been excluded from the valuation process by AIG-FP's CEO, Joseph Cassano.  Letter of Joseph St. Denis to U.S. House Committee on Oversight and Government Reform 5, Oct. 4, 2008.

66.    Thus, Brookfield and Brysons believe that discovery in this action will establish that AIG was balance-sheet insolvent on or about September 15, 2008 and at other times.

### B.    Swap Agreement, § 5(a)(vii)(4, 8):  Actions in Furtherance of Bankruptcy

67.    AIG repeatedly took "action[s] in furtherance of" the institution of "a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights."  Swap Agreement, § 5(a)(vii)(4, 8).

68.    On at least two occasions, AIG's management directed that its bankruptcy lawyers prepare papers for an imminent bankruptcy filing, and its Board of Directors reviewed management's plans to file a bankruptcy petition.  In both instances, management specifically presented the Board with the option of declaring bankruptcy.

69.    AIG also initiated the drawdown of its existing credit lines to support its future operations, because those credit lines would become unavailable in a bankruptcy.  *Eight Days*, at 71 ("Willumstad gave the order to draw down [the last of the credit] lines.").  Because the Swap Agreement's Event of Default provisions are designed to trigger a default in advance of bankruptcy, these acts are sufficient to constitute an Event of Default under the Swap Agreement.

### C.    Swap Agreement, § 5(a)(vii)(1, 5, 8):  Actions in Furtherance of Winding-Up, Liquidation, or Dissolution of AIG-FP

70.    AIG-FP has had "a resolution passed for its winding-up or liquidation," or, at a minimum, has taken "any action in furtherance of, or indicating its consent to, approval of, or

acquiescence in," a winding-up, liquidation, or dissolution. Swap Agreement, § 5(a)(vii)(1, 5, 8).

71.    As detailed above at ¶¶ 50-52, AIG has repeatedly announced that it was "winding down" AIG-FP and "shutting down" its business, and AIG has taken a number of substantial steps in furtherance of that plan.

**D.    Swap Agreement, § 5(a)(vii)(6, 8):  Actions Analogous to Seeking or Becoming Subject to the Appointment of a Trustee**

72.    The government does not have the technical legal authority to put AIG into conservatorship in the same way it did Fannie Mae and Freddie Mac.  Instead, the government accomplished an equivalent arrangement through the unique terms of its unprecedented bail-outs of AIG.  The FRBNY's 79.9% equity interest, the FRBNY's appointment of the Trustees to vote the FRBNY's controlling stock ownership, the Trustees' replacement of a majority of the members of AIG's board of directors, the Treasury Secretary's personal selection of AIG's new CEO, and the government's day-to-day review of AIG's business were unlike the terms of assistance the government provided to any other entity during the credit crisis of 2008.  In substance, following the September bail-out AIG is being managed to maximize the chances of repaying the government, not to maximize its profits.

73.    In mid-September 2008, Secretary Paulson informed the House and Senate leadership that the Federal Reserve had decided to "essentially seize control of the company under the Fed's emergency powers." *Eight Days*, at 73.  As one elected federal official later put it, "[w]e presently have Freddie and Fannie and AIG in forms of conservatorship . . . ."  Bill Swindell, *Frank: Resolution Authority Need Is Urgent*, NATIONAL JOURNAL, Sept. 24, 2009 (quoting Rep. Jeb Hensarling, ranking member of the House Subcommittee on Financial Institutions and Consumer Credit).

74.    Accordingly, "event[s] occur[red] with respect to" AIG that had analogous effects to AIG's "seek[ing] or bec[oming] subject to the appointment of an administrator, receiver, trustee, custodian or other similar official for it of for all or substantially all its assets." Swap Agreement, § 5(a)(vii)(6, 7).

## IV.    Post-Default Events

75.    After the federal bail-out of AIG, Plaintiffs communicated with AIG-FP to confirm Plaintiffs' belief that at least one Event of Default had occurred, and that Brysons, the non-defaulting party, had no further obligations to AIG-FP.

76.    Defendants repeatedly denied the occurrence of any Event of Default.

77.    On or about October 20, 2008 and April 20, 2009, AIG-FP made semi-annual payments of $9.56 million and $9.61 million respectively pursuant to the Coupon Swap. Because Plaintiffs believed that the Swap Agreement had already terminated by its terms, Brysons placed those amounts in an escrow account (and has so informed AIG and AIG-FP). The second payment was escrowed by agreement with AIG and AIG-FP.

78.    Plaintiffs and Defendants entered into a "standstill" agreement on May 19, 2009, pursuant to which they agreed to seek to resolve this dispute and not to resort to litigation during the standstill period.  The agreement terminated by its terms at noon on September 30, 2009 and the dispute has not been resolved.

79.    These events have given rise to a justiciable controversy between the parties.

## CLAIM FOR DECLARATORY JUDGMENT

80.    Plaintiffs incorporate and reallege in full the preceding paragraphs of this Complaint as if fully set forth herein.

81.    Pursuant to 28 U.S.C. § 2201(a), Plaintiffs seek a declaration of this Court that at least one Event of Default has occurred under the Swap Agreement because: (a) AIG-FP has

"become[] insolvent or . . . [was] unable or admit[ted] in writing its inability generally to pay its debts as they bec[a]me due"; (b) AIG-FP has had "a resolution passed for its winding-up or liquidation" or is in dissolution, or has taken "action in furtherance of, or indicating its consent to, approval of, or acquiescence in" either of these Events of Default; (c) AIG has taken "action in furtherance of, or indicating its consent to, approval of, or acquiescence in" instituting a "proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights"; or (d) an event has occurred with respect to AIG-FP or AIG that "has an analogous effect to any" of these Events of Default, as well as to "seek[ing] or becom[ing] subject to the appointment of [a] . . . trustee . . . or other similar official . . . ."

82.    Plaintiffs seek a further declaration that an Early Termination Date occurred immediately upon the occurrence of any such Event of Default.

83.    Plaintiffs seek a further declaration that they have no further obligations to AIG-FP or AIG under Section 6(e)(i)(1) of the Swap Agreement or any associated contract or guarantee, other than to return the escrowed October 2008 and April 2009 payments. Brysons' next payment obligation to AIG-FP is set by the Swap Agreement to occur on October 20, 2010, in the approximate amount of $30 million. Plaintiffs request that a "speedy hearing" of this action be ordered pursuant to Rule 57 of the Federal Rules of Civil Procedure, so that the parties can obtain the requested declaratory relief prior to that date.

84.    Plaintiffs also seek a judgment awarding them their costs in this action, including reasonable attorneys' fees, pursuant to § 11 of the 1987 ISDA Form, which provides that the defaulting party will "on demand, indemnify and hold harmless" the other party against "all reasonable out-of-pocket expenses, including legal fees . . . incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or by reason of the

early termination of any Swap Transaction, including, but not limited to, costs of collection."
Swap Agreement, § 11.

85.    Declaratory relief is appropriate because the parties have an actual justiciable controversy of sufficient immediacy to justify the relief sought.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment:

1.    Declaring that Plaintiffs have no further obligations to AIG-FP or AIG under the Swap Agreement or any associated contract or guarantee, other than to return the escrowed October 20, 2008 and April 20, 2009 payments;

2.    Awarding Plaintiffs their costs in this action, including reasonable attorneys' fees, pursuant to § 11 of the 1987 ISDA Form; and

3.    Granting such other and further relief as the Court may deem just and proper.


Dated: September 30, 2009
        New York, New York

                            BROOKFIELD ASSET MANAGEMENT, INC.
                            BRYSONS INTERNATIONAL LTD.

                            By: _____

                            Richard F. Ziegler
                            Stephen L. Ascher
                            Luke P. McLoughlin
                            Danielle Tarantolo
                            JENNER & BLOCK LLP
                            919 Third Avenue, 37th Floor
                            New York, New York 10022-3908
                            *Counsel for Plaintiffs*

# EXHIBIT A

**AIG  Financial  Products  Corp.**

667 Madison Avenue, 21st Floor, New York, NY 10021
(212) 750-8000   (800) 248-SWAP
Fax: (212) 486-2184   Telex: 910-2409432   AIG FPC

**DATE:**       October 18, 1990

**TO:**         Mr. John Warren and Ms. Karen MacFee
               Brysons International Bank Ltd.
               P.O. Box 350
               Long Street
               St. Johns, Antigua
               Tel: (809) 462-1200
               Fax: (809) 462-0320

**CC:**         John Osborn
               Cadwalader, Wickersham & Taft
               Fax: 212-504-6666

**FROM:**       Charles Schwartz
               AIG Financial Products Corp.

**SUBJECT:**    INTEREST RATE SWAP TRANSACTIONS

---

Dear Mr. Warren and Ms. MacFee:

The purpose of this letter agreement is to set forth the terms and conditions of the two interest rate swap transactions entered into on the Trade Date referred to below (the "Swap Transactions"), between AIG Financial Products Corp. ("AIG-FP") (guaranteed by American International Group, Inc.) and Brysons International Bank Ltd. ("Brysons"). This letter agreement constitutes a "Confirmation" as referred to in the Swap Agreement specified below.

1. This Confirmation is subject to and incorporates the 1987 Interest Rate and Currency Exchange Definitions (the "Definitions"), published by the International Swap Dealers Association, Inc. ("ISDA"). If you and we are parties to an ISDA Interest Rate and Currency Exchange agreement that (i) incorporates the Definitions and (ii) sets forth general terms and conditions applicable to interest rate and currency exchange transactions between us (the "Swap Agreement"), this Confirmation supplements, forms a part of and is subject to such Swap Agreement. If you and we are not yet parties to such Swap Agreement, this Confirmation will supplement, form a part of, and be subject to, such Swap Agreement upon its execution by you and us. All provisions contained in, or incorporated by reference to, such Swap Agreement shall govern this Confirmation except as expressly modified below. In addition, if such Swap Agreement has not yet been executed by you and us, this Confirmation shall itself evidence a complete and binding agreement between you and us as to the terms and conditions of the Swap Transactions to which this Confirmation relates.

1

2. The terms of the Swap Transactions to which this Confirmation relates are as follows:

A.  Swap Transaction One:

Trade Date:                          September 19, 1990.

Effective Date:                      October 18, 1990.

Termination Date:                    Initially, the Termination Date shall be October 20, 2015.
                                     In consideration for AIG-FP's entering into the Swap
                                     Transactions, Brysons has granted AIG-FP the right (the
                                     "Cancellation Right") to cancel the Swap Transactions
                                     without penalty on any of the following dates (which are
                                     subject to adjustment in accordance with the Modified
                                     Following Business Day convention):

                                     October 20, 1995          October 20, 2005
                                     October 20, 1997          October 20, 2007
                                     October 20, 1999          October 20, 2009
                                     October 20, 2001          October 20, 2011
                                     October 20, 2003          October 20, 2013

                                     Upon AIG-FP's exercise of the Cancellation Right on
                                     any of the foregoing dates, such date of exercise shall
                                     become the Termination Date for both Swap
                                     Transactions. AIG-FP must notify Brysons in writing of
                                     its intention to exercise the Cancellation Right between
                                     9:00 a.m. and 5:00 p.m. (New York City time) on, or
                                     before, the day that is ninety (90) days prior to the date
                                     of exercise (unless such 90th prior day is not a New York
                                     Business Day, in which case AIG-FP shall have until
                                     5:00 p.m. (New York City time) on the first New York
                                     Business Day following such day to notify Brysons of its
                                     intention to exercise the Cancellation Right). For the
                                     avoidance of doubt, the Cancellation Right may only be
                                     exercised with respect to both of Swap Transaction One
                                     and Swap Transaction Two simultaneously and may not
                                     be exercised with respect to only one of the Swap
                                     Transactions. For the avoidance of doubt, no termination
                                     payment will be due from either party upon AIG-FP's
                                     exercise of the Cancellation Right, other than payment

2

(on a Net Payments-Corresponding Payment Dates basis) of the Fixed Amount and Floating Amount with respect to each Swap Transaction accrued or accreted to the Termination Date as of which the Cancellation Right is being exercised.

| | |
|---|---|
| Notional Amount: | USD 200,000,000. |
| Fixed Rate Payor: | Brysons. |
| Fixed Rate Payment Date: | The Termination Date, such date being subject to adjustment in accordance with the Modified Following Business Day convention. |
| Fixed Rate: | 9.61%. |
| Fixed Rate Day Count Fraction: | 30/360. |
| Compounding: | Applicable. For the purposes of applying "Compounding" to the calculation of a Fixed Amount under this Swap Transaction: |

   (i)  the provisions of Article 6 of the Definitions shall apply to such calculation (in lieu of the provisions of Article 5 of the Definitions);

   (ii)  each reference to the word "Floating" in such Article 6 shall be deemed to refer to the word "Fixed"; and

   (iii)  notwithstanding Section 6.3(f) of the Definitions, the "Fixed Rate Day Count Fraction" shall be calculated in accordance with Section 5.2(b)(iv) of the Definitions;

provided that (i) the reference in Section 5.2(b)(iv) of the Definitions to the phrase "Calculation Period" shall be deemed to be a reference to the phrase "Compounding Period", and (ii) the phrase "or in respect of which a Compounding Period Amount in being calculated" shall be added to Section 5.2(b)(iv) after the word "made".

Compounding Dates:          Each April 20 and October 20, beginning on April 20, 1991 and ending on the Termination Date, such dates being subject to adjustment in accordance with the Modified Following Business Day convention.

Floating Rate Payor:        AIG-FP.

Floating Rate
Payment Date:               The Termination Date, such date being subject to adjustment in accordance with the Modified Following Business Day convention.

Floating Rate Option:       USD-LIBOR-BBA (Telerate Page 3750).

Floating Rate for the
initial Compounding Period: 8.25%.

Floating Rate Reset Dates:  Each Compounding Date, exclusive of the last Compounding Date.

Designated Maturity:        Six (6) months.

Spread:                     None.

Floating Rate
Day Count Fraction:         Actual/360.

Compounding:                Applicable.

Compounding Dates:          Each April 20 and October 20, beginning on April 20, 1991 and ending on the Termination Date subject to adjustment in accordance with the Modified Following Business Day convention.

4

B. Swap Transaction Two:

| | |
|---|---|
| Trade Date: | September 19, 1990. |
| Effective Date: | October 18, 1990. |
| Termination Date: | Initially, the Termination Date shall be October 20, 2015; provided, however, that if AIG-FP exercises the Cancellation Right, the Termination Date of Swap Transaction Two shall occur on the Termination Date of Swap Transaction One. |
| Notional Amount: | USD 200,000,000. |
| Fixed Rate Payor: | AIG-FP. |
| Fixed Rate Payment Dates: | Each April 20 and October 20, beginning on April 20, 1991, and ending on the Termination Date, such dates being subject to adjustment in accordance with the Modified Following Business Day convention. |
| Fixed Rate: | 9.61%. |
| Fixed Rate Day Count Fraction: | 30/360. |
| Compounding: | Inapplicable. |
| Additional Fixed Payment: | USD 2,000,000 shall be payable on October 18, 1990. |
| Floating Rate Payor: | Brysons. |
| Floating Rate Payment Dates: | October 20, 1995; October 20, 2000; October 20, 2005; October 20, 2010; and the Termination Date, such dates being subject to adjustment in accordance with the Modified Following Business Day convention. |
| Floating Rate for the initial Compounding Period: | 8.25%. |

| | |
|---|---|
| Floating Rate Reset Dates: | Each Compounding Date, exclusive of the last Compounding Date. |
| Floating Rate Option: | USD-LIBOR-BBA (Telerate Page 3750). |
| Floating Rate Designated Maturity: | Six (6) months. |
| Spread: | None. |
| Floating Rate Day Count Fraction: | Actual/360. |
| Compounding: | Applicable. |
| Compounding Dates: | Each April 20 and October 20, beginning on April 20, 1991 and ending on the Termination Date subject to adjustment in accordance with the Modified Following Business Day convention. |

C. <u>Provisions Applicable to Both Swap Transactions:</u>

| | |
|---|---|
| Business Day: | Toronto, New York and London. |
| Documentation: | The Swap Agreement. |
| Credit Support Documents: | Those documents set forth in Section 8 of Part 4 of the Schedule to the Swap Agreement. |
| Governing Law: | New York Law. |
| Calculation Agent: | AIG-FP. |
| Payment instructions for AIG-FP: | Swiss Bank Corp., New York ABA # 0260-07993 A/C AIG Financial Products Corp. A/C # 101-WA-657,328.000 |

6

AIG-FP Settlements:                        Steven Homscheid
                                           Vice President
                                           New York
                                           Tel: (212) 750-8015


Payment instructions
for Brysons:                               First National Bank of Chicago
                                           ABA # 071 000013
                                           For further credit:
                                               DES Clearing AC #247-165
                                               favoring Brysons International Bank Ltd.


Brysons Settlements:                       Karen MacFee
                                           Controller
                                           St. Johns, Antigua
                                           Tel: (809) 462-1200

7

3.  Please confirm that the foregoing correctly sets forth the terms of our agreement with respect to the Swap Transactions by signing in the space provided below and sending a copy of the executed Confirmation to Philip J. Quagliariello, Vice President and Counsel, AIG Financial Products Corp.

It has been a pleasure working with you on this transaction and we look forward to working with you again in the future.

Very truly yours,
AIG Financial Products Corp.

By: _____
    Name: Charles Schwartz
    Title: Vice President

Agreed & Accepted by:
Brysons International Bank Ltd.

By:_____
    Name:
    Title:

CS/JH/GN/la

8

3. Please confirm that the foregoing correctly sets forth the terms of our agreement with respect to the Swap Transactions by signing in the space provided below and sending a copy of the executed Confirmation to Philip J. Guagnariello, Vice President and Counsel, AIG Financial Products Corp.

It has been a pleasure working with you on this transaction. working with you again in the future.

Very truly yours,
AIG Financial Products Corp.

By: _____
Name: Charles Schwartz
Title: Vice President

Agreed & Accepted by:
Brysons International Bank Ltd.

By: _____
Name: JOHN C WARREN
Title: MANAGING DIRECTOR
By: _____
Name: KENNETH A. ISAAC
Title: SECRETARY



# ISDA ®

International Swap Dealers Association, Inc.

# INTEREST RATE
# AND
# CURRENCY EXCHANGE AGREEMENT

Dated as of....October 18, 1990.......

AIG FINANCIAL PRODUCTS CORP. and BRYSONS INTERNATIONAL BANK LTD.

have entered and/or anticipate entering into one or more transactions (each a ''Swap Transaction''). The parties agree that each Swap Transaction will be governed by the terms and conditions set forth in this document (which includes the schedule (the ''Schedule'')) and in the documents (each a ''Confirmation'') exchanged between the parties confirming such Swap Transactions. Each Confirmation constitutes a supplement to and forms part of this document and will be read and construed as one with this document, so that this document and all the Confirmations constitute a single agreement between the parties (collectively referred to as this ''Agreement''). The parties acknowledge that all Swap Transactions are entered into in reliance on the fact that this document and all Confirmations will form a single agreement between the parties, it being understood that the parties would not otherwise enter into any Swap Transactions.

Accordingly, the parties agree as follows:—

1.    **Interpretation**

(a)    *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Agreement.

(b)    *Inconsistency.* In the event of any inconsistency between the provisions of any Confirmation and this document, such Confirmation will prevail for the purpose of the relevant Swap Transaction.

2.    **Payments**

(a)    *Obligations and Conditions.*

(i)    Each party will make each payment specified in each Confirmation as being payable by it.

(ii)    Payments under this Agreement will be made not later than the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency.

(iii)    Each obligation of each party to pay any amount due under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing and (2) each other applicable condition precedent specified in this Agreement.

(b)    *Change of Account.* Either party may change its account by giving notice to the other party at least five days prior to the due date for payment for which such change applies.

Copyright © 1987 by International Swap Dealers Association, Inc.

(c)  *Netting.* If on any date amounts would otherwise be payable:—

    (i)  in the same currency; and

    (ii)  in respect of the same Swap Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

If the parties specify "Net Payments — Corresponding Payment Dates" in a Confirmation or otherwise in this Agreement, sub-paragraph (ii) above will cease to apply to all Swap Transactions with effect from the date so specified (so that a net amount will be determined in respect of all amounts due on the same date in the same currency, regardless of whether such amounts are payable in respect of the same Swap Transaction); *provided that*, in such case, this Section 2(c) will apply separately to each Office through which a party makes and receives payments as set forth in Section 10.

(d)  *Deduction or Withholding for Tax.*

    (i)  *Gross-Up.*  All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)  promptly notify the other party ("Y") of such requirement;

        (2)  pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)  promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)  if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)  the failure by Y to comply with or perform any agreement contained in Section 4(a)(i) or 4(d); or

            (B)  the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for a Change in Tax Law.

    (ii)  *Liability.*  If:—

        (1)  X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

        (2)  X does not so deduct or withhold; and

        (3)  a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i) or (d)).

(e)  *Default Interest.* A party that defaults in the payment of any amount due will, to the extent permitted by law, be required to pay interest (before as well as after judgment) on such amount to the other party on demand in the same currency as the overdue amount, for the period from (and including)

ISDA 1987

the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

3.     Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Swap Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:-

(a)     *Basic Representations.*

    (i)     *Status.*  It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)     *Powers.*  It has the power to execute and deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)     *No Violation or Conflict.*  Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)     *Consents.*  All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)     *Obligations Binding.*  Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)     *Absence of Certain Events.*  No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)     *Absence of Litigation.*  There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that purports to draw into question, or is likely to affect, the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)     *Accuracy of Specified Information.*  All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in paragraph 2 of Part 3 of the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)     *Payer Tax Representation.*  Each representation specified in Part 2 of the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)     *Payee Tax Representations.*  Each representation specified in Part 2 of the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.     Agreements

Each party agrees with the other that, so long as it has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:-

3

(a)     *Furnish Specified Information.* It will deliver to the other party:—

    (i)     any forms, documents or certificates relating to taxation specified in Part 3 of the Schedule or any Confirmation; and

    (ii)    any other documents specified in Part 3 of the Schedule or any Confirmation,

by the date specified in Part 3 of the Schedule or such Confirmation or, if none is specified, as soon as practicable.

(b)     *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)     *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)     *Payment of Stamp Tax.* It will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.     Events of Default and Termination Events

(a)     *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Specified Entity of such party, of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

    (i)     *Failure to Pay.* Failure by the party to pay, when due, any amount required to be paid by it under this Agreement if such failure is not remedied on or before the third Business Day after notice of such failure to pay is given to the party;

    (ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to pay any amount required to be paid by it under this Agreement or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

    (iii)   *Credit Support Default.*

        (1)     Failure by the party or any applicable Specified Entity to comply with or perform any agreement or obligation to be complied with or performed by the party or such Specified Entity in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

        (2)     the expiration or termination of such Credit Support Document, or the ceasing of such Credit Support Document to be in full force and effect, prior to the final Scheduled Payment Date of each Swap Transaction to which such Credit Support Document relates without the written consent of the other party; or

        (3)     the party or such Specified Entity repudiates, or challenges the validity of, such Credit Support Document;

    (iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any applicable Specified Entity in this Agreement or any Credit Support Document relating to this Agreement proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

    (v)     *Default under Specified Swaps.* The occurrence of an event of default in respect of the party or any applicable Specified Entity under a Specified Swap which, following the giving of any

4

applicable notice or the lapse of any applicable grace period. has resulted in the designation or occurrence of an early termination date in respect of such Specified Swap;

(vi)   *Cross Default.* If "Cross Default" is specified in Part 1 of the Schedule as applying to the party. (1) the occurrence or existence of an event or condition in respect of such party or any applicable Specified Entity under one or more agreements or instruments relating to Specified Indebtedness of such party or any such Specified Entity in an aggregate amount of not less than the Threshold Amount (as specified in Part 1 of the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared. due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) the failure by such party or any such Specified Entity to make one or more payments at maturity in an aggregate amount of not less than the Threshold Amount under such agreements or instruments (after giving effect to any applicable grace period);

(vii)   *Bankruptcy.* The party or any applicable Specified Entity:—

(1)   is dissolved; (2) becomes insolvent or fails or is unable or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for the winding-up or liquidation of the party or any such Specified Entity, and. in the case of any such proceeding or petition instituted or presented against it. such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for the winding-up or liquidation of the party or such Specified Entity or (B) is not dismissed. discharged. stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up or liquidation; (6) seeks or becomes subject to the appointment of an administrator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets (regardless of how brief such appointment may be. or whether any obligations are promptly assumed by another entity or whether any other event described in this clause (6) has occurred and is continuing); (7) any event occurs with respect to the party or any such Specified Entity which. under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (6) (inclusive); or (8) takes any action in furtherance of. or indicating its consent to. approval of. or acquiescence in. any of the foregoing acts;

other than in the case of clause (1) or (5) or, to the extent it relates to those clauses. clause (8). for the purpose of a consolidation. amalgamation or merger which would not constitute an event described in (viii) below; or

(viii)   *Merger Without Assumption.* The party consolidates or amalgamates with, or merges into. or transfers all or substantially all its assets to. another entity and. at the time of such consolidation. amalgamation. merger or transfer:—

(1)   the resulting, surviving or transferee entity fails to assume all the obligations of such party under this Agreement by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)   the benefits of any Credit Support Document relating to this Agreement fail to extend (without the consent of the other party) to the performance by such resulting. surviving or transferee entity of its obligations under this Agreement.

(b)   *Termination Events.* The occurrence at any time with respect to a party or. if applicable. any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below. a Tax Event if the event is specified in (ii) below. a Tax Event Upon Merger if the event is specified in (iii) below or a Credit Event Upon Merger if the event is specified in (iv) below:—

(i)   *Illegality.* Due to the adoption of. or any change in, any applicable law after the date on which such Swap Transaction is entered into. or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

(1) to perform any absolute or contingent obligation to make a payment or to receive a payment in respect of such Swap Transaction or to comply with any other material provision of this Agreement relating to such Swap Transaction; or

(2) to perform, or for any applicable Specified Entity to perform, any contingent or other obligation which the party (or such Specified Entity) has under any Credit Support Document relating to such Swap Transaction;

(ii) *Tax Event.*

(1) The party (which will be the Affected Party) will be required on the next succeeding Scheduled Payment Date to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2 (e)) as a result of a Change in Tax Law; or

(2) there is a substantial likelihood that the party (which will be the Affected Party) will be required on the next succeeding Scheduled Payment Date to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e)) and such substantial likelihood results from an action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which such Swap Transaction was entered into (regardless of whether such action was taken or brought with respect to a party to this Agreement);

(iii) *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount, in either case as a result of a party consolidating or amalgamating with, or merging into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii); or

(iv) *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in Part 1 of the Schedule as applying to the party, such party ("X") consolidates or amalgamates with, or merges into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity (which will be the Affected Party) is materially weaker than that of X immediately prior to such action.

(c) *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

6. **Early Termination**

(a) *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Swap Transactions. However, an Early Termination Date will be deemed to have occurred in respect of all Swap Transactions immediately upon the occurrence of any Event of Default specified in Section 5(a)(vii)(1), (2), (3), (5), (6), (7) or (8) and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence of any Event of Default specified in Section 5(a)(vii)(4).

(b) *Right to Terminate Following Termination Event.*

(i) *Notice.* Upon the occurrence of a Termination Event, an Affected Party will, promptly upon becoming aware of the same, notify the other party thereof, specifying the nature of such Termination Event and the Affected Transactions relating thereto. The Affected Party will also give such other information to the other party with regard to such Termination Event as the other party may reasonably require.

(ii) *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will as a condition to its right to designate an Early Termination Date under Section 6(b)(iv) use all reasonable efforts (which

ISDA 1987

will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its offices, branches or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into swap transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.*   If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action that would cause such Termination Event to cease to exist.

(iv)    *Right to Terminate.* If:—

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2) or a Credit Event Upon Merger occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event, or the party which is not the Affected Party in the case of a Credit Event Upon Merger, may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i)    If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is continuing on the relevant Early Termination Date.

(ii)    Upon the effectiveness of notice designating an Early Termination Date (or the deemed occurrence of an Early Termination Date), the obligations of the parties to make any further payments under Section 2(a)(i) in respect of the Terminated Transactions will terminate, but without prejudice to the other provisions of this Agreement.

(d)    *Calculations.*

(i)    *Statement.* Following the occurrence of an Early Termination Date, each party will make the calculations (including calculation of applicable interest rates) on its part contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations) and (2) giving details of the relevant account to which any payment due to it under Section 6(e) is to be made. In the absence of written confirmation of a quotation obtained in determining a Market Quotation from the source providing such quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Due Date.* The amount calculated as being payable under Section 6(e) will be due on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or deemed to occur as a result of an Event of Default) and not later than the day which is two Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon in the Termination Currency from (and including) the relevant Early Termination Date to (but excluding) the relevant due date, calculated as follows:—

(1)    if notice is given designating an Early Termination Date or if an Early Termination Date is deemed to occur, in either case as a result of an Event of Default, at the Default Rate; or

ISDA 1987

(2)    if notice is given designating an Early Termination Date as a result of a Termination Event, at the Default Rate minus 1% per annum.

Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)    *Payments on Early Termination.*

(i)    *Defaulting Party or One Affected Party.* If notice is given designating an Early Termination Date or if an Early Termination Date is deemed to occur and there is a Defaulting Party or only one Affected Party, the other party will determine the Settlement Amount in respect of the Terminated Transactions and:—

(1)    if there is a Defaulting Party, the Defaulting Party will pay to the other party the excess, if a positive number, of (A) the sum of such Settlement Amount and the Termination Currency Equivalent of the Unpaid Amounts owing to the other party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party; and

(2)    if there is an Affected Party, the payment to be made will be equal to (A) the sum of such Settlement Amount and the Termination Currency Equivalent of the Unpaid Amounts owing to the party determining the Settlement Amount (''X'') less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the party not determining the Settlement Amount (''Y'').

(ii)    *Two Affected Parties.* If notice is given of an Early Termination Date and there are two Affected Parties, each party will determine a Settlement Amount in respect of the Terminated Transactions and the payment to be made will be equal to (1) the sum of (A) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount (''X'') and the Settlement Amount of the party with the lower Settlement Amount (''Y'') and (B) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (2) the Termination Currency Equivalent of the Unpaid Amounts owing to Y.

(iii)    *Party Owing.* If the amount calculated under Section 6(e)(i)(2) or (ii) is a positive number, Y will pay such amount to X; if such amount is a negative number, X will pay the absolute value of such amount to Y.

(iv)    *Adjustment for Bankruptcy.* In circumstances where an Early Termination Date is deemed to occur, the amount determined under Section 6(e)(i) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(v)    *Pre-Estimate of Loss.* The parties agree that the amounts recoverable under this Section 6(e) are a reasonable pre-estimate of loss and not a penalty. Such amounts are payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Subject to Section 6(b) and to any exception provided in the Schedule, neither this Agreement nor any interest or obligation in or under this Agreement may be transferred by either party without the prior written consent of the other party (other than pursuant to a consolidation or amalgamation with, or merger into, or transfer of all or substantially all its assets to, another entity) and any purported transfer without such consent will be void.

## 8.    Contractual Currency

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the ''Contractual Currency''). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts due in respect of this Agreement. If for any reason the amount in the Contractual Currency so received

8

falls short of the amount in the Contractual Currency due in respect of this Agreement. the party required to make the payment will. to the extent permitted by applicable law. immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency due in respect of this Agreement. the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law. if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement. (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above. the party seeking recovery. after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order. will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able. acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency. to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term ''rate of exchange'' includes. without limitation. any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law. these indemnities constitute separate and independent obligations from the other obligations in this Agreement. will be enforceable as separate and independent causes of action. will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums due in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8. it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

9.    Miscellaneous

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment. modification or waiver in respect of this Agreement will be effective unless in writing and executed by each of the parties or confirmed by an exchange of telexes.

(c)    *Survival of Obligations.* Except as provided in Section 6(c)(ii). the obligations of the parties under this Agreement will survive the termination of any Swap Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement. the rights. powers. remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights. powers. remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement may be executed in counterparts. each of which will be deemed an original.

(ii)    A Confirmation may be executed in counterparts or be created by an exchange of telexes. which in either case will be sufficient for all purposes to evidence a binding supplement to this Agreement. Any such counterpart or telex will specify that it constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver. and a single or partial exercise of any right. power or privilege will not be presumed to preclude any subsequent or further exercise of that right. power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

9

10.    **Multibranch Parties**

If a party is specified as a Multibranch Party in Part 4 of the Schedule, such Multibranch Party may make and receive payments under any Swap Transaction through any of its branches or offices listed in the Schedule (each an "Office"). The Office through which it so makes and receives payments for the purpose of any Swap Transaction will be specified in the relevant Confirmation and any change of Office for such purpose requires the prior written consent of the other party. Each Multibranch Party represents to the other party that, notwithstanding the place of payment, the obligations of each Office are for all purposes under this Agreement the obligations of such Multibranch Party. This representation will be deemed to be repeated by such Multibranch Party on each date on which a Swap Transaction is entered into.

11.    **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or by reason of the early termination of any Swap Transaction, including, but not limited to, costs of collection.

12.    **Notices**

(a)    *Effectiveness.* Any notice or communication in respect of this Agreement will be sufficiently given to a party if in writing and delivered in person, sent by certified or registered mail (airmail, if overseas) or the equivalent (with return receipt requested) or by overnight courier or given by telex (with answerback received) at the address or telex number specified in Part 4 of the Schedule. A notice or communication will be effective:—

    (i)    if delivered by hand or sent by overnight courier, on the day it is delivered (or if that day is not a day on which commercial banks are open for business in the city specified in the address for notice provided by the recipient (a "Local Banking Day"), or if delivered after the close of business on a Local Banking Day, on the first following day that is a Local Banking Day);

    (ii)    if sent by telex, on the day the recipient's answerback is received (or if that day is not a Local Banking Day, or if after the close of business on a Local Banking Day, on the first following day that is a Local Banking Day); or

    (iii)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), three Local Banking Days after despatch if the recipient's address for notice is in the same country as the place of despatch and otherwise seven Local Banking Days after despatch.

(b)    *Change of Addresses.* Either party may by notice to the other change the address or telex number at which notices or communications are to be given to it.

13.    **Governing Law and Jurisdiction**

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in Part 4 of the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

    (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

    (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in Part 4 of the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will

ISDA 1987

promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)   *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

14.   **Definitions**

As used in this Agreement:—

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Swap Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Swap Transactions.

"*Affiliate*" means, subject to Part 4 of the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Burdened Party*" has the meaning specified in Section 5(b).

"*Business Day*" means (a) in relation to any payment due under Section 2(a)(i), a day on which commercial banks and foreign exchange markets are open for business in the place(s) specified in the relevant Confirmation and (b) in relation to any other payment, a day on which commercial banks and foreign exchange markets are open for business in the place where the relevant account is located and, if different, in the principal financial centre of the currency of such payment.

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Swap Transaction is entered into.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument which is specified as such in this Agreement.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) of funding the relevant amount plus 1% per annum.

"*Defaulting Party*" has the meaning specified in Section 6(a).

"*Early Termination Date*" means the date specified as such in a notice given under Section 6(a) or 6(b)(iv).

"*Event of Default*" has the meaning specified in Section 5(a).

"*Illegality*" has the meaning specified in Section 5(b).

"*Indemnifiable Tax*" means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment

11

under, or enforced, this Agreement or a Credit Support Document).

"*law*" includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and "*lawful*" and "*unlawful*" will be construed accordingly.

"*Loss*" means, with respect to a Terminated Transaction and a party, an amount equal to the total amount (expressed as a positive amount) required, as determined as of the relevant Early Termination Date (or, if an Early Termination Date is deemed to occur, as of a time as soon thereafter as practicable) by the party in good faith, to compensate it for any losses and costs (including loss of bargain and costs of funding but excluding legal fees and other out-of-pocket expenses) that it may incur as a result of the early termination of the obligations of the parties in respect of such Terminated Transaction. If a party determines that it would gain or benefit from such early termination, such party's Loss will be an amount (expressed as a negative amount) equal to the amount of the gain or benefit as determined by such party.

"*Market Quotation*" means, with respect to a Terminated Transaction and a party to such Terminated Transaction making the determination, an amount (which may be negative) determined on the basis of quotations from Reference Market-makers for the amount that would be or would have been payable on the relevant Early Termination Date, either by the party to the Terminated Transaction making the determination (to be expressed as a positive amount) or to such party (to be expressed as a negative amount), in consideration of an agreement between such party and the quoting Reference Market-maker and subject to such documentation as they may in good faith agree, with the relevant Early Termination Date as the date of commencement of such agreement (or, if later, the date specified as the effective date of such Terminated Transaction in the relevant Confirmation), that would have the effect of preserving for such party the economic equivalent of the payment obligations of the parties under Section 2(a)(i) in respect of such Terminated Transaction that would, but for the occurrence of the relevant Early Termination Date, fall due after such Early Termination Date (excluding any Unpaid Amounts in respect of such Terminated Transaction but including, without limitation, any amounts that would, but for the occurrence of the relevant Early Termination Date, have been payable (assuming each applicable condition precedent had been satisfied) after such Early Termination Date by reference to any period in which such Early Termination Date occurs). The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent practicable as of the same time (without regard to different time zones) on the relevant Early Termination Date (or, if an Early Termination Date is deemed to occur, as of a time as soon thereafter as practicable). The time as of which such quotations are to be obtained will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties. If more than three such quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the quotations having the highest and lowest values. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction cannot be determined.

"*Office*" has the meaning specified in Section 10.

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant swap market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Relevant Jurisdiction*" means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where a branch or office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

"*Scheduled Payment Date*" means a date on which a payment is due under Section 2(a)(i) with respect to a Swap Transaction.

ISDA 1987

*"Settlement Amount"* means. with respect to a party and any Early Termination Date. the sum of:—

(a)   the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction for which a Market Quotation is determined; and

(b)   for each Terminated Transaction for which a Market Quotation is not. or cannot be. determined. the Termination Currency Equivalent of such party's Loss (whether positive or negative);

*provided that* if the parties agree that an amount may be payable under Section 6(e) to a Defaulting Party by the other party. no account shall be taken of a Settlement Amount expressed as a negative number.

*"Specified Entity"* has the meaning specified in Part 1 of the Schedule.

*"Specified Indebtedness"* means. subject to Part 1 of the Schedule. any obligation (whether present or future. contingent or otherwise. as principal or surety or otherwise) in respect of borrowed money.

*"Specified Swap"* means. subject to Part 1 of the Schedule. any rate swap or currency exchange transaction now existing or hereafter entered into between one party to this Agreement (or any applicable Specified Entity) and the other party to this Agreement (or any applicable Specified Entity).

*"Stamp Tax"* means any stamp. registration. documentation or similar tax.

*"Tax"* means any present or future tax. levy. impost. duty. charge. assessment or fee of any nature (including interest. penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp. registration. documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means (a) with respect to any Early Termination Date occurring as a result of a Termination Event. all Affected Transactions and (b) with respect to any Early Termination Date occurring as a result of an Event of Default. all Swap Transactions. which in either case are in effect as of the time immediately preceding the effectiveness of the notice designating such Early Termination Date (or. in the case of an Event of Default specified in Section 5(a)(vii). in effect as of the time immediately preceding such Early Termination Date).

*"Termination Currency"* has the meaning specified in Part 1 of the Schedule.

*"Termination Currency Equivalent"* means. in respect of any amount denominated in the Termination Currency. such Termination Currency amount and. in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"). the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11.00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value the relevant Early Termination Date. The foreign exchange agent will. if only one party is obliged to make a determination under Section 6(e). be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality. a Tax Event. a Tax Event Upon Merger or a Credit Event Upon Merger.

*"Unpaid Amounts"* owing to any party means. with respect to any Early Termination Date. the aggregate of the amounts that became due and payable (or that would have become due and payable but for Section 2(a)(iii)) or the designation or occurrence of such Early Termination Date) to such party under Section 2(a)(i) in respect of all Terminated Transactions by reference to all periods ended on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date. together with (to the extent permitted under applicable law and in lieu of any interest calculated under Section 2(e)) interest thereon. in the currency of such amounts. from (and including) the date such amounts became due and payable or would have become due and payable to (but excluding) such Early Termination Date. calculated as follows:—

(a)   in the case of notice of an Early Termination Date given as a result of an Event of Default:—

ISDA 1987

(i) interest on such amounts due and payable by a Defaulting Party will be calculated at the Default Rate; and

(ii) interest on such amounts due and payable by the other party will be calculated at a rate per annum equal to the cost to such other party (as certified by it) if it were to fund such amounts (without proof or evidence of any actual cost); and

(b) in the case of notice of an Early Termination Date given as a result of a Termination Event, interest on such amounts due and payable by either party will be calculated at a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party and regardless of whether due and payable by such party) if it were to fund or of funding such amounts.

Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

IN WITNESS WHEREOF the parties have executed this document as of the date specified on the first page of this document.


AIG FINANCIAL PRODUCTS CORP.          BRYSONS INTERNATIONAL BANK LTD.
          (Name of party)                              (Name of party)


By: _Joseph J. Cassano_                By: ...........................

Name: Joseph J. Cassano                Name: .........................

Title: Vice President and              Title: ........................
       Chief Financial Officer

ISDA 1987

(i)  interest on such amounts due and payable by a Defaulting Party will be calculated at the Default Rate; and

(ii)  interest on such amounts due and payable by the other party will be calculated at a rate per annum equal to the cost to such other party (as certified by it) if it were to fund such amounts (without proof or evidence of any actual cost); and

(b)  in the case of notice of an Early Termination Date given as a result of a Termination Event, interest on such amounts due and payable by either party will be calculated at a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party and regardless of whether due and payable by such party) if it were to fund or of funding such amounts.

Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

IN WITNESS WHEREOF the parties have executed this document as of the date specified on the first page of this document.


AIG FINANCIAL PRODUCTS CORP.                 BRYSONS INTERNATIONAL BANK LTD.
_____            _____
            (Name of party)                              (Name of party)

By: _____            By: _____

Name:  Joseph J. Cassano                     Name:  John C. Warin

Title:  Vice President and                   Title:  Managing Director
        Chief Financial Officer

SCHEDULE

to the

Interest Rate and Currency Exchange Agreement

dated October 18, 1990

between

AIG FINANCIAL PRODUCTS CORP.
(together with its successors
and permitted assigns,
"Party A")

and

BRYSONS INTERNATIONAL BANK LTD.
(together with its successors
and permitted assigns,
"Party B")

Part 1

Termination Provisions

In this Agreement:-

(1)    "Specified Entity" means in relation to Party A for the purpose of:-

Sections 5(a)(iii), (iv), (vi), and (vii) and Section 5(b)(i), American International Group, Inc. (together with its successors, "AIG")

Section 5(a)(v), AIG and any subsidiary of Party A

and in relation to Party B for the purpose of:-

Sections 5(a)(iii), (iv), (vi) and (vii) and Section 5(b)(i) Hees International Bancorp Inc. (together with its successors, "Hees")

Section 5(a)(v), Hees and any subsidiary of Party B

(2)    "Specified Swap" means, in lieu of the meaning specified in Section 14, any Swap Instrument now existing or hereafter entered into between one party to this Agreement (or any applicable Specified Entity with

respect to such party) and the other party (or any
applicable Specified Entity with respect to such other
party).

"Swap Instrument" means any currency and/or interest
rate swap agreement, asset swap, future rate or forward
rate agreement, interest cap, collar and/or floor
agreement or any combination thereof or other similar
transaction.

(3)  The "Cross Default" provisions of Section 5(a)(vi)
     will apply to Party A
     will apply to Party B.

To the extent such provisions apply:-

"Threshold Amount" shall mean:  (i) with respect to
Party A and AIG and any event or condition which
constitutes, relates to or arises from the failure of
Party A or AIG to make a payment or payments pursuant
to Specified Indebtedness when due (whether on the
scheduled due date or payment date or maturity thereof,
upon call for redemption, upon acceleration, upon
designation or deemed occurrence of an Early
Termination Date, or otherwise) U.S. $100 million (or
its equivalent in any other currency or currencies);
(ii) with respect to Party A and AIG and any event or
condition other than those specified in the immediately
preceding clause, U.S. $200 million (or its equivalent
in any other currency or currencies); (iii) with
respect to Party B and Hees and any event or condition
which constitutes, relates to or arises from the
failure of Party B or Hees to make a payment or
payments pursuant to Specified Indebtedness when due
(whether on the scheduled due date or payment date or
maturity thereof, upon call for redemption, upon
acceleration, upon designation or deemed occurrence of
an Early Termination Date, or otherwise), the lesser of
C$125 million and 5% of Hees' Consolidated Base Capital
(or the equivalent of either such amount in any other
currency or currencies); (iv) with respect to Party B
and Hees and any event or condition other than those
specified in the immediately preceding clause, the
lesser of C$250 million and 10% of Hees' Consolidated
Base Capital (or the equivalent of either such amount
in any other currency or currencies).

"Specified Indebtedness" will mean, in lieu of the
definition specified in Section 14:  any obligation
(whether present or future, contingent or otherwise, as
principal, guarantor, surety or otherwise) (i) in
respect of borrowed money or (ii) to make payment

(including both scheduled payments and payments due upon designation or deemed occurrence of an Early Termination Date) pursuant to any Swap Instrument.

For the avoidance of doubt, and without limitation, any failure by a party or a Specified Entity of such party (i) to make a payment due and payable under a Swap Instrument, (2) to make a termination payment due on designation or deemed occurrence of an Early Termination Date under a Swap Instrument, (3) to make a payment under a guarantee when required to be made by the terms of such guarantee, (4) to pay principal and interest due upon acceleration of any debt instrument or obligation, or (5) to pay the Applicable Resale Price or Special Resale Price when due under the Debenture Purchase Agreement shall be deemed to be a failure by such party or such Specified Entity to make one or more payments at maturity under agreements or instruments relating to Specified Indebtedness for purposes of clause (2) of Section 5(a)(vi) of this Agreement.

For the avoidance of doubt, any event, condition or failure which constitutes an Event of Default under any provision of Section 5(a) of this Agreement other than Section 5(a)(vi) shall constitute an Event of Default without regard to the Threshold Amount limitations or other limitations set forth in such Section 5(a)(vi) even if such event, condition or failure is of a type contemplated by the provisions of such Section 5(a)(vi).

(4)    "Termination Currency" means United States Dollars.

(5)    In addition to the Events of Default specified in Section 5(a), it will be an Event of Default under Section 5(a) with respect to Party A if AIG consolidates or amalgamates with, or merges into, or transfers all or substantially all its assets to, another entity unless, at the time of such consolidation, amalgamation, merger, or transfer the resulting, surviving, or transferee entity assumes all the obligations of AIG under the Guarantee referred to in Part 4(8)(a) of this Schedule either by operation of law or pursuant to an agreement reasonably satisfactory to Party B.

(6)    In addition to the Events of Default specified in Section 5(a), it will be an Event of Default under Section 5(a) with respect to Party B if Hees consolidates or amalgamates with, or merges into, or transfers all or substantially all its assets to, another entity unless, at the time of such consolidation, amalgamation, merger, or transfer the resulting, surviving, or transferee entity assumes all the obligations of Hees under the

Agreement referred to in Part 4(8)(b) of this Schedule either by operation of law or pursuant to an agreement reasonably satisfactory to Party A.

(7)  Section 5(a)(iii)(1) is hereby amended by adding at the end thereof the following:

; provided, however, that in respect of the Credit Support Document listed in Part 4(8)(c) of the Schedule, such failure to perform or comply is a failure to perform or comply in a material respect.

(8)  **Credit Ratings Failure and Resale Event.**

(a)  The introductory paragraph of Section 5(b) is hereby deleted in its entirety and replaced by the following:

(b)  **Termination Events.**  The occurrence at any time with respect to a party or, if applicable, any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below, a Tax Event Upon Merger if the event is specified in (iii) below, a Credit Event Upon Merger if the event is specified in (iv) below, a Credit Ratings Failure if the event is specified in (v) below, or a Resale Event if the event is specified in (vi) below:-

(b)  Section 5(b) is hereby amended by:  (1) deleting the word "or" at the end of Subsection (iii) thereof; (2) deleting the period at the end of Subsection (iv) thereof and replacing it with ";"; and (3) adding the following Subsections (v) and (vi) at the end of such Section:

(v)  **Credit Ratings Failure.**

(1)  It shall constitute a Credit Ratings Failure with respect to Party A if at any time the rating issued by either Standard & Poor's Corporation (together with its successors and assigns, "S&P") or Moody's Investors Service, Inc. (together with its successors and assigns, "Moody's") as the case may be, with respect to the long-term, unsecured, unsubordinated debt securities ("Debt Securities") of AIG is issued below or revised downward below either "BBB" (or its equivalent successor rating) by S&P or "Baa2" (or its equivalent successor rating) by Moody's. It shall also constitute a "Credit Ratings Failure" with respect to Party A if at any time there are no Debt Securities of AIG that are rated by at least one of such credit rating agencies unless (i) AIG has long-term unsecured subordinated debt

-4-

securities ("Subordinated Debt") outstanding which are rated by S&P or Moody's and (ii) all of such ratings on Subordinated Debt of AIG are at all times equal to or higher than the ratings specified in the preceding sentence.   For all purposes of this Agreement, if any Credit Ratings Failure described in this paragraph 5(b)(v)(1) occurs, Party A will be the sole Affected Party, unless there is a Two-Party Credit Ratings Failure (as hereinafter defined), in which case both parties will be Affected Parties.

(2)  It shall constitute a Credit Ratings Failure with respect to Party B if at any time on or before the Fifth Year Anniversary Date both, and at any time thereafter either, (i) the rating, if any, issued by Canadian Bond Rating Service (together with its successors and assigns, "CBRS") with respect to the Debt Securities of Hees is issued below or revised downward below "B++" (or its equivalent successor rating) by CBRS and/or (ii) the rating, if any, issued by Dominion Bond Rating Service (together with its successors and assigns, "DBRS") with respect to the Debt Securities of Hees is issued below or revised downward below "BBB" (or its equivalent successor rating) by DBRS.   It shall also constitute a Credit Ratings Failure with respect to Party B if at any time on or before the Fifth Year Anniversary Date (i) the rating, if any, issued by either CBRS or DBRS with respect to the Debt Securities of Hees is issued below or revised downward below "B++" (or its equivalent successor rating), in the case of CBRS, or "BBB" (or its equivalent successor rating), in the case of DBRS, and (ii) the rating, if any, issued by the other of such credit rating agencies has been withdrawn or the other of such credit rating agencies is not then rating the Debt Securities of Hees. It shall also constitute a "Credit Ratings Failure" with respect to Party B if at any time there are no Debt Securities of Hees that are rated by at least one of CBRS or DBRS unless either (A) both (i) Hees has Subordinated Debt outstanding which is rated by at least one of such credit rating agencies and (ii) on or before the Fifth Year Anniversary Date one of, and thereafter, if applicable, both of, such ratings on Subordinated Debt are at all times equal to or higher than the relevant ratings specified in the preceding sentence, or (B) Hees shall obtain a rating with respect to the Debentures of "B++" (or its equivalent successor rating) from CBRS or "BBB" (or its equivalent successor rating) from DBRS, within 30 days after the date on which Hees does not have any Debt Securities that are rated by at least one of CBRS or DBRS or any Subordinated Debt that meets the requirements of clause (A) of this sentence. Hees agrees that it will use its best efforts to obtain a rating of the Debentures as provided in clause (B) of the preceding sentence.   For all purposes of this Agreement, if any Credit Ratings Failure described in this paragraph 5(b)(v)(2) occurs, Party B will be the sole Affected Party, unless there is a Two-Party Credit Ratings Failure, in which case both parties will be Affected Parties.

(3) If one of the credit rating agencies referred to in Section 5(b)(v)(1) or 5(b)(v)(2) ceases to be in the business of rating Debt Securities (or, if applicable, Subordinated Debt) at a time when such credit rating agency was rating the Debt Securities or Subordinated Debt of Hees or AIG as the case may be, and such business is not continued by a successor or assign of such agency (the "Discontinued Agency") Party A and Hees (on behalf of Party B) will jointly (i) select a nationally recognized credit rating agency in substitution thereof and (ii) agree on the rating level issued by such substitute agency that is equivalent to the rating specified herein of the Discontinued Agency, whereupon such substitute agency and equivalent rating will replace the Discontinued Agency and the rating level thereof for all purposes of this Agreement; provided, however, that, except as otherwise provided in the next sentence of this Section 5(b)(v)(3), and except to the extent that such event gives rise to a Credit Ratings Failure under the third to last sentence of Section 5(b)(v)(2), in the case of Party B, or the second to last sentence of Section 5(b)(v)(1), in the case of Party A, a failure by Party A and Hees (on behalf of Party B) to so select a substitute credit rating agency or so agree on a rating level shall not constitute a "Credit Ratings Failure". If at any time all of the agencies specified herein with respect to AIG or Hees have become Discontinued Agencies and Party A and Hees (on behalf of Party B) have not previously agreed on at least one agency and equivalent rating in substitution for a Discontinued Agency and the applicable rating thereof (each party agreeing to act reasonably and in good faith and on a timely basis in this regard), a "Credit Ratings Failure" will be deemed to have occurred and both parties will be deemed to be Affected Parties; provided, however, that (i) if such Credit Ratings Failure occurs as a result of all of the agencies specified regarding AIG becoming Discontinued Agencies, Party B will be the "Non-Discontinued Party" for all purposes of this Agreement; (ii) if such Credit Ratings Failure occurs as a result of all of the agencies specified regarding Hees becoming Discontinued Agencies, Party A will be the "Non-Discontinued Party" for all purposes of this Agreement; and (iii) if such Credit Ratings Failure occurs as a result of all of the agencies specified regarding both parties becoming Discontinued Agencies, for all purposes of this Agreement, neither party will be a "Non-Discontinued Party"; or

(vi) "Resale Event", which will mean that, either (1) the Resale Right shall have been exercised pursuant to the Debenture Purchase Agreement and the Applicable Resale Price shall have been fully paid, or (2) the Special Resale Right shall have been exercised pursuant to the Debenture Purchase Agreement and the related Special Resale Price shall have been fully paid. Upon the occurrence of any Resale Event of the type described in clause (1) of the first sentence of this Section 5(b)(vi), Party B will be the sole Affected Party. Upon the occurrence of any Resale Event of the type described in clause (2) of the first

sentence of this Section 5(b)(vi), both parties will be Affected Parties and each party will obtain the related Market Quotation for the purposes of determining a Settlement Amount from Reference Market-makers each of which is reasonably acceptable to the other party.

(c)  Section 6(b)(iii) is hereby amended by: (i) adding in the first line of such Section after the word "Event" the words "or a Credit Ratings Failure under Section 5(b)(v)(3)" and (ii) adding in the second line of such Section after the word "Parties" the words "or a Credit Ratings Failure under Section 5(b)(v)(1) and a Credit Ratings Failure under Section 5(b)(v)(2) shall occur at the same time (a "Two-Party Credit Ratings Failure")".

(d)  Section 6(b)(iv) is hereby amended by: (i) adding in the first line of clause (2) thereof after the word "Merger" the words "or a Credit Ratings Failure (other than a Two-Party Credit Ratings Failure) under Section 5(b)(v)(1) or 5(b)(v)(2) or a Resale Event"; (ii) deleting the word "or" following the second comma in the eighth line of such Section; and (iii) adding in the ninth line of such Section, following the comma after the word "Merger" the words "the party which is not the Affected Party in the case of a Credit Ratings Failure (other than a Two-Party Credit Ratings Failure) under Section 5(b)(v)(1) or 5(b)(v)(2), either party in the case of a Two-Party Credit Ratings Failure, the Non-Discontinued Party (or, if there is no Non-Discontinued Party, either party) in the case of a Credit Ratings Failure under Section 5(b)(v)(3), or either party in the case of a Resale Event".

(8)  The **"Credit Event Upon Merger"** provisions of Section 5(b)(iv)

       will apply to Party A
       will apply to Party B.

(9)  Section 5(b)(iv) is hereby amended by: (a) adding in the third line thereof after the word "entity" the words "or another entity consolidates or amalgamates with, or merges into, or transfers all or substantially all its assets to, X"; and (b) deleting in the fifth and sixth lines thereof the words "materially weaker than that of X immediately prior to such action" and replacing them with the words "sufficiently weaker as to make its ability to fulfill its obligations doubtful".

-7-

## Part 2

### Tax Representations

**Representations of Party A**

(1) **Payer Tax Representation.** For the purpose of Section 3(e), Party A will make the following representation:-

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e)) to be made by it to the other party under this Agreement. In making this representation, it may rely on the satisfaction of the agreement of the other party contained in Section 4(a)(i) and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i).

**Representations of Party B**

(1) **Payer Tax Representation.** For the purpose of Section 3(e), Party B will make the following representation:-

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e)) to be made by it to the other party under this Agreement. In making this representation, it may rely on the satisfaction of the agreement of the other party contained in Section 4(a)(i) and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i).

## Part 3

### Documents to be delivered

For the purpose of Section 4(a):-

(1) <u>**Tax forms, documents, or certificates to be delivered are:**</u>

Each party agrees to complete (accurately and in a manner reasonably satisfactory to the other party or any Specified Entity thereof), execute, arrange for any required certification of, and deliver to the other party (or any Specified Entity thereof) or such government or taxing authority as the other party (or any Specified Entity thereof) directs any form, document, or certificate that may be required or reasonably

-8-

requested in order to allow the other party (or any Specified Entity thereof) to make a payment under this Agreement (or a Credit Support Document of the other party or a Specified Entity thereof) without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate, promptly upon the earlier of (i) reasonable demand by the other party (or any Specified Entity thereof) and (ii) learning that the form or document is required.  In addition, Party B agrees to furnish Party A with a duly completed U.S. Internal Revenue Service Form 4224; (i) at the earlier of (a) the first date on which payments received by Party B under this Agreement become effectively connected with the conduct of a trade or business in the United States or (b) reasonable demand by Party A and (ii) annually thereafter for as long as such payments continue to be so connected.  For the purposes of this provision, Specified Entity will include AIG in respect of Party A and Hees in respect of Party B.

(2)  Other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A: | Guarantee of AIG referred to in Part 4(8)(a) of this Schedule | At Execution | No |
|  | Annual Financial Statements of AIG | Promptly following demand by Party B, in respect of the latest publicly available financial statements prior to the date of this Agreement and in respect of financial statements which hereafter become publicly available. | Yes |

-9-

| | | | |
|---|---|---|---|
| | A copy of a resolution of Party A approving the transactions contemplated by this Agreement and authorizing a specified person or persons to execute this Agreement, including the Confirmation on behalf of Party A | At Execution | Yes |
| | A copy of a resolution of AIG approving the issuance of guarantees of the same type as the Guarantee referred to in Part 4(8)(a) of this Schedule and authorizing a specified person or persons to execute such guarantees on behalf of AIG | At Execution | No |
| | Legal Opinion with respect to Party A (including tax opinion) | At Execution | No |
| | Legal Opinion with respect to AIG (including tax opinion) | At Execution | No |
| Party B: | Agreement of Hees referred to in Part 4(8)(b) of this Schedule | At Execution | No |

| | | |
|---|---|---|
| Annual Financial Statements of Hees | Promptly following demand by Party A, in respect of the latest publicly available financial statements prior to the date of this Agreement and in respect of financial statements which hereafter become publicly available. | Yes |
| A copy of a resolution of Party B approving the transactions contemplated by this Agreement and authorizing a specified person or persons to execute this Agreement, including the Confirmation, on behalf of Party B | At Execution | Yes |
| A copy of a resolution of Hees approving the transactions contemplated by the Agreement referred to in Part 4(8)(b) of this Schedule and authorizing a specified person or persons to execute such Agreement on behalf of Hees | At Execution | No |
| Legal Opinions with respect to Party B (including tax opinion) | At Execution | No |

|  |  |  |
|---|---|---|
| Legal Opinions with respect to Hees | At Execution | No |

## Part 4

### Miscellaneous

(1) **Transfer.** Section 7 is replaced in its entirety with the following:

(a) Subject to Section 6(b), and except as expressly provided herein, neither this Agreement nor any interest or obligation in or under this Agreement or any Swap Transaction may be transferred by Party B without the prior written consent of Party A (other than pursuant to a consolidation or amalgamation with, or merger into, or transfer of all or substantially all of Party B's assets to, another entity), and any purported transfer without such consent will be void. Party B may transfer this Agreement, any of its interests and obligations in and under this Agreement, or one or more Swap Transactions to another of Party B's offices, branches, or Affiliates on two Business Days' prior written notice; provided, however, that (i) if such transfer is to an entity other than Hees, such notice shall be accompanied by an Agreement of Hees with respect to such transferee's obligations in substantially the form of the Agreement of Hees referred to in Part 4(8)(b) of this Schedule or by an agreement in writing of Hees that the Agreement referred to in Part 4(8)(b) of this Schedule will apply to the obligations of such transferee under this Agreement, (ii) Party A will not, as a result of such transfer, be required on the next succeeding Scheduled Payment Date to pay to the transferee an amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of default interest) greater than the amount in respect of which Party A would have been required to pay to Party B in the absence of such transfer, (iii) the transferee will not, as a result of such transfer, be required on the next succeeding Scheduled Payment Date to withhold or deduct on account of Tax under Section 2(d)(i) (except in respect of default interest) amounts in excess of that which it would, on the next succeeding Scheduled Payment Date, have been required to so withhold or deduct in the absence of such transfer unless it would be required to make additional payments pursuant to Section 2(d)(i)(4) corresponding to such excess, and (iv) a Termination Event or an Event of Default does not occur as a result of such transfer. With respect to the result described in subclauses (ii) and (iii), Party B agrees to cause such transferee to make, and Party A agrees to make, such Payee Tax Representations and Payer Tax Representations as may be reasonably requested by the other party in order to permit such other party to determine that such result will not occur after such transfer.

-12-

(b) Subject to Section 6(b), and except as expressly provided herein, neither this Agreement nor any interest or obligation in or under this Agreement or any Swap Transaction may be transferred by Party A without the prior written consent of Party B (other than pursuant to a consolidation or amalgamation with, or merger into, or transfer of all or substantially all of Party A's assets to, another entity), and any purported transfer without such consent will be void. Party A may transfer this Agreement, any of its interests and obligations in and under this Agreement, or one or more Swap Transactions to another of Party A's offices, branches, or Affiliates on two Business Days' prior written notice; provided, however, that (i) if such transfer is to an entity other than AIG, such notice shall be accompanied by a Guarantee of AIG of such transferee's obligations in substantially the form of the Guarantee of AIG referred to in Part 4(8)(a) of this Schedule or by an agreement in writing of AIG that such Guarantee will apply to the obligations of such transferee under this Agreement, (ii) Party B will not, as a result of such transfer, be required on the next succeeding Scheduled Payment Date to pay to the transferee an amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of default interest) greater than the amount in respect of which Party B would have been required to pay to Party A in the absence of such transfer, (iii) the transferee will not, as a result of such transfer, be required on the next succeeding Scheduled Payment Date to withhold or deduct on account of Tax under Section 2(d)(i) (except in respect of default interest) amounts in excess of that which it would, on the next succeeding Scheduled Payment Date, have been required to so withhold or deduct in the absence of such transfer unless it would be required to make additional payments pursuant to Section 2(d)(i)(4) corresponding to such excess, and (iv) a Termination Event or an Event of Default does not occur as a result of such transfer. With respect to the result described in subclauses (ii) and (iii), Party A agrees to cause such transferee to make, and Party B agrees to make, such Payee Tax Representations and Payer Tax Representations as may be reasonably requested by the other party in order to permit such other party to determine that such result will not occur after such transfer.

(2) **Governing Law.**  This Agreement will be governed by, and construed and enforced in accordance with, the laws of the State of New York without reference to choice of law doctrine.

(3) **Process Agent.**  For the purpose of Section 13(c):-

Party B appoints as its Process Agent in New York City:

> Haythe & Curley
> 437 Madison Avenue
> New York, New York 10022
> Attention: Thomas M. Haythe, Esq.

-13-

Party A agrees to appoint a Process Agent in New York City if Party A ceases to have an office in such jurisdiction.

(4)  "**Affiliate**" will have the meaning specified in Section 14.

(5)  **Multibranch Party**.  For the purpose of Section 10:-

Party A is not a Multibranch Party.

Party B is not a Multibranch Party.

(6)  **Addresses for Notices**.  For the purpose of Section 12(a):-

Address for notices or communications to Party A:-

Address:  667 Madison Avenue - 21st Floor
          New York, New York  10021

Attention:  Chief Financial Officer

Facsimile:  (212) 486-2184

Address for notices or communications to Party B:-

Address:      P.O. Box 350
              Long Street
              Saint Johns, Antigua

Attention:    Karen MacFee
              809-462-1200

Facsimile:  (809) 462-0320

with two copies to: Hees International Bancorp Inc.

Address:      Suite 4400
              Commerce Court West
              Toronto, Ontario M5L 1K5

Facsimile:  416-865-1288

Attention:  Chief Financial Officer and Treasurer

(7)  **Netting of Payments**.  If indicated here, "Net Payments - Corresponding Payment Dates" will apply for the purpose of Section 2(c) with effect from the date of this Agreement:- <u>Yes</u>

(8)  **Credit Support Documents**.

   (a)  Guarantee of AIG, in the form of Exhibit A hereto, to be delivered by AIG to Party B.

-14-

(b)  Agreement of Hees, in the form of Exhibit B hereto, to be delivered by Hees to Party A.

(c)  Debenture Purchase Agreement, in the form of Exhibit C hereto, to be delivered by Hees.

## Part 5

## Other Provisions

### Definitions

(1)  This Agreement, the Confirmation, and each Swap Transaction are subject to the 1987 Interest Rate and Currency Exchange Definitions (as published by the International Swap Dealers Association, Inc.) (the "Definitions"), and will be governed in all respects by the provisions set forth in the Definitions, without regard to any amendments to the Definitions subsequent to the date thereof. The provisions of the Definitions are incorporated by reference in, and will be deemed to be part of, this Agreement and the Confirmation as if set forth in full in this Agreement or in the Confirmation. In the event of any inconsistency between the provisions of this Agreement and the Definitions, this Agreement will prevail. In the event of any inconsistency between the provisions of the Confirmation and this Agreement or the Definitions, the Confirmation will prevail for the purpose of the relevant Swap Transactions.

### Effective Date

(2)  This Agreement is deemed to have come into effect on October 18, 1990.

### Calculation Agent

(3)  The Calculation Agent will be AIG Financial Products Corp.

### Annual Financial Statements

(4)  "Annual Financial Statements" means, in respect of both AIG and Hees respectively, a copy of such party's audited consolidated financial statements for such party's fiscal year certified by independent certified public accountants and prepared in accordance with accounting principles that are generally accepted in the country in which the party is organized.

-15-

**Confirmation**

(5)  The Confirmation dated October 18, 1990 between Party A and Party B, in the form of Exhibit D hereto, constitutes the only Confirmation, and Swap Transaction One and Swap Transaction Two (as such terms are used in the Confirmation) constitute the only Swap Transactions, which will be subject to this Agreement.

**Early Termination**

(6)  Any event or occurrence which would give rise to a right of a party to designate an Early Termination Date in respect of any Swap Transaction under this Agreement shall be deemed to simultaneously give rise to such a right in respect of all such Swap Transactions, and a party may designate an Early Termination Date in respect of any such Swap Transaction only if the party makes such a designation in respect of all such Swap Transactions.

**Definitions**

(7)  Section 14 is hereby amended as follows:

(a)  The definition of "Termination Event" in Section 14 is hereby deleted in its entirety and replaced by the following:

"Termination Event" means an Illegality, a Tax Event, a Tax Event Upon Merger, a Credit Event Upon Merger, a Credit Ratings Failure or a Resale Event.

(b)  The following definitions are hereby added to the end of Section 14:

"Applicable Resale Price" has the meaning given to such term in the Debenture Purchase Agreement.

"Credit Ratings Failure" has the meaning specified in Section 5(b).

"Consolidated Base Capital" has the meaning given to such term in the Indenture.

"Debenture Purchase Agreement" means the Purchase Agreement dated the date hereof by and between Hees and AIG Financial Securities Corp. ("AIG-FS") relating to the sale of the Debentures to AIG-FS.

-16-

**"Debentures"** means the U.S.$200,000,000 Floating Rate Debentures due October 2015 being issued by Hees on the date hereof pursuant to the Indenture.

**"Fifth Year Anniversary Date"** has the meaning given to such term in the Debenture Purchase Agreement.

**"Indenture"** means the indenture dated the date hereof by and between Hees and Central Guaranty Trust Company pursuant to which the Debentures are being issued.

**"Resale Event"** has the meaning specified in Section 5(b).

**"Resale Right"** has the meaning given to such term in the Debenture Purchase Agreement.

**"Special Resale Price"** has the meaning given to such term in the Debenture Purchase Agreement.

**"Special Resale Right"** has the meaning given to such term in the Debenture Purchase Agreement.

IN WITNESS WHEREOF, the parties have executed this document as of the date specified on the first page hereof.

AIG FINANCIAL PRODUCTS CORP.

By: _____
    Name: Joseph J. Cassano
    Title: Vice President and
           Chief Financial Officer

BRYSONS INTERNATIONAL BANK LTD.

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties have executed this document as of the date specified on the first page hereof.

AIG FINANCIAL PRODUCTS CORP.

By: _____
    Name:
    Title:


BRYSONS INTERNATIONAL BANK LTD.

By: _____
    Name: JOHN C WARREN
    Title: MANAGING DIRECTOR


By: _____
    Name: KENNETH A. ISAAC
    Title: SECRETARY