UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BROOKFIELD ASSET MANAGEMENT,
INC., f/k/a Hees International Bancorp Inc.,
and BRYSONS INTERNATIONAL, LTD.,
f/k/a Brysons International Bank, Ltd.,

                    Plaintiffs,

            -against-                                    09 Civ. 8285 (PGG)

AIG FINANCIAL PRODUCTS CORP. and
AMERICAN INTERNATIONAL GROUP,
INC.,

                    Defendants.

---

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS .....................................................................................5

    A.     The Swap ...................................................................................5

    B.     Bankruptcy Events of Default & Early Termination ................................7

    C.     AIG's Financial Difficulties ...........................................................9

    D.     The Parties' Dispute....................................................................12

ARGUMENT ....................................................................................................13

I.     THE COMPLAINT FAILS TO ALLEGE PLAUSIBLY THAT ANY
      BANKRUPTCY EVENT OF DEFAULT HAS OCCURRED .......................................15

    A.     The Complaint Fails To Allege Facts That Would Constitute A
         Bankruptcy Filing Event Of Default Under Section 5(a)(vii)(4, 8) Of The
         Swap Agreement........................................................................15

    B.     The Complaint Fails To Allege Facts That Would Constitute A
         Dissolution, Winding-Up, or Liquidation, Related Event Of Default Under
         Section 5(a)(vii)(1, 5, 7, or 8) Of The Swap Agreement .......................18

         1.     The Complaint does not allege plausibly that a dissolution related
              Event of Default has occurred....................................................19

         2.     The Complaint does not allege plausibly that a winding-up or
              liquidation related Event of Default has occurred .....................20

         3.     The Complaint does not allege plausibly that an "analogous effect"
              Event of Default has occurred....................................................21

    C.     The Complaint Fails To Allege Facts That Would Constitute A Trustee
         Related Event of Default Under Section 5(a)(vii)(6, 7) Of The Swap
         Agreement................................................................................22

    D.     The Complaint Fails To Allege Facts That Would Constitute An
         Insolvency or Inability to Pay Event Of Default Under Section 5(a)(vii)(2)
         Of The Swap Agreement ...............................................................25

         1.     The Complaint does not plausibly allege that either AIG or AIG-
              FP was unable generally to pay its debts as they became due ..................26

2.    The Complaint does not plausibly allege that either AIG or AIG-
        FP was insolvent ....................................................................................31

II.    EVEN IF A BANKRUPTCY EVENT OF DEFAULT HAS OCCURRED,
       PLAINTIFFS STILL HAVE OBLIGATIONS TO AIG AND AIG-FP BECAUSE
       SECTION 6(e) OF THE SWAP AGREEMENT IS AN UNENFORCEABLE
       PENALTY CLAUSE....................................................................................36

CONCLUSION.......................................................................................................40

# TABLE OF AUTHORITIES

**Page**

## Cases

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)................................................................33

*In re Adelphia Commc'ns Corp.*,
   Bankr. No. 02-41729 (REG), 2006 WL 687153 (Bankr. S.D.N.Y. March 6, 2006)..............29

*Ascension Health v. Am. Int'l Group, Inc.*,
   No. 08 Civ. 7765 (PGG), 2009 WL 2195916 (S.D.N.Y. July 23, 2009)............................5, 13

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009)..........................................................................13, 30

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).......................................................................... 13, 32, 35

*In re Bridgeport Holdings, Inc.*,
   388 B.R. 548 (Bankr. D. Del. 2008) ................................................................17

*Bristol Inv. Fund v. Carnegie Int'l Corp.*,
   310 F. Supp. 2d 556 (S.D.N.Y. 2003)............................................................38

*Broder v. Cablevision Sys. Corp.*,
   418 F.3d 187 (2d Cir. 2005)........................................................................14

*Brownsville Cmty. Council, Inc. v. Banco De Ponce*,
   567 F. Supp. 849 (S.D.N.Y. 1983)................................................................12

*Cary Oil Co., Inc. v. MG Ref. & Mkt., Inc.*,
   230 F. Supp. 2d 439 (S.D.N.Y. 2002)............................................................29

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)..................................................................14, 24

*In re Charter Communications*,
   No. 09-11435 (JMP), 2009 WL 3841971 (Bankr. S.D.N.Y. Nov. 17, 2009)...............4, 27, 28

*Chicago Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp.*,
   302 U.S. 120 (1937)....................................................................................21

*Coblentz v. State*,
   166 A. 45 (Md. 1933) ..................................................................................29

*Re a Company (No.000314 of 1989)*,
   [1990] B.C.C. 221, 226 (U.K. Ch. D. 1989).................................................22

*Crane Co. v. Coltec Indus., Inc.*,
   171 F.3d 733 (2d Cir. 1999).........................................................................14

*Drexel Burnham Lambert Prods. Corp. v. Midland Bank PLC*,
   92 Civ. 3098 (MP), 1992 Dist. LEXIS 21223 (S.D.N.Y. Nov. 9, 1992) ................................39

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) .........................................................................................13, 32

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
   375 F.3d 168 (2d Cir. 2004) .......................................................................................14, 20

*Fingerlakes Aquaculture, LLC v. Progas Welding Supply, Inc.*,
   825 N.Y.S.2d 559 (N.Y. App. Div. 2006) .........................................................................38

*Howard Johnson Int'l Inc. v. HBS Family, Inc.*,
   No. 96 CIV. 7687 (SS), 1998 WL 411334 (S.D.N.Y. July 22, 1998) ........................36, 37, 39

*Huntington Towers, Ltd. v. Franklin Nat'l Bank*,
   559 F.2d 863 (2nd Cir. 1977) ..........................................................................................29

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*,
   476 F. Supp. 2d 913 (N.D. Ill. 2007) ................................................................................29

*JMD Holding Corp. v. Congress Fin. Corp.*,
   4 N.Y.3d 373 (2005) ......................................................................................................37

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991) ...........................................................................................14

*Re Lafayette Elecs. Europe Ltd*,
   [2007] B.C.C. 890, 895 (U.K. Ch. D. 2006) ......................................................................22

*LNC Invs., Inc. v. First Fidelity Bank*,
   247 B.R. 38 (Bankr. S.D.N.Y. 2000) ................................................................................22

*Lowrance v. Hacker*,
   866 F.2d 950 (7th Cir. 1989) ..........................................................................................29

*In re MarketXT Holdings Corp.*,
   376 B.R. 390 (Bankr. S.D.N.Y. 2007) ..............................................................................38

*Marketing/Trademark Consultants, Inc. v. Caterpillar, Inc.*,
   No. 98 Civ. 2570 (AGS), 2000 WL 648162 (S.D.N.Y. May 19, 2000) ...................................14

*Matsumura v. Benihana Nat'l Corp.*,
   542 F. Supp. 2d 245 (S.D.N.Y. 2008) ...............................................................................34

*In re McGregor*,
   182 B.R. 96 (Bankr. S.D.N.Y. 1995) ................................................................................21

*In re Medaglia*,
   52 F.3d 451 (2d Cir. 1995) .............................................................................................22

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
   716 F. Supp. 1504 (S.D.N.Y. 1989) .................................................................................17

*Michelsen v. Penney*,
    135 F.2d 409 (2d Cir. 1943)...................................................................................29

*In re Musicland Holding Corp.*,
    386 B.R. 428 (S.D.N.Y. 2008)...............................................................................13

*In re Northwest Airlines Corp.*,
    393 B.R. 352 (Bankr. S.D.N.Y. 2008)....................................................................38

*In re O.P.M. Leasing Servs., Inc.*,
    23 B.R. 104 (Bankr. S.D.N.Y. 1982)......................................................................38

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
    507 U.S. 380 (1993)................................................................................................22

*In re Plastech Engineered Prods., Inc.*,
    382 B.R. 90 (Bankr. E.D. Mich. 2008)...................................................................29

*In re Revere Copper & Brass, Inc.*,
    60 B.R. 887 (Bankr. S.D.N.Y. 1985)................................................................15, 16

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...................................................................................34

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)...............................................................................14, 34

*S. Cherry St., LLC v. Hennessee Group LLC*,
    573 F.3d 98 (2d Cir. 2009).....................................................................................13

*Savasta v. Newport Assocs.*,
    579 N.Y.S.2d 167 (2d Dep't 1992) .........................................................................12

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
    691 F.2d 1039 (2d Cir. 1982)..................................................................................14

*In re Solutia, Inc.*,
    No. 03-17949, 2007 WL 1302609 (Bankr. S.D.N.Y. May 1, 2007) ..................15, 16

*Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*,
    41 N.Y.2d 420 (1977).............................................................................................36

*U.S. Trust Co. of New York v. Alpert*,
    10 F. Supp. 2d 290 (S.D.N.Y. 1998)......................................................................17

*Unigard Sec. Ins. Co. v. North River Ins. Co.*,
    4 F.3d 1049 (2d Cir. 1993)......................................................................................14

*Union Bank of Switzerland v. Deutsch Fin. Servs. Corp.*,
    No. 98 Civ. 3251 (HB), 2000 WL 178278 (S.D.N.Y. Feb 16, 2000)......................15

*Vestron, Inc. v. Nat'l Geographic Soc'y*,
    750 F. Supp. 586 (S.D.N.Y. 1990)..........................................................................31

## Statutes

11 U.S.C. § 101 ........................................................................................................................23

11 U.S.C. § 301 ........................................................................................................................21

11 U.S.C. § 530 ........................................................................................................................29

11 U.S.C. § 704 ........................................................................................................................23

11 U.S.C. § 1106 ......................................................................................................................23

11 U.S.C. § 1108 ......................................................................................................................23

8 Del. Code § 275 ....................................................................................................................19

8 Del. Code § 278 ....................................................................................................................20

8 Del. Code § 284 ....................................................................................................................20

## Rules

Fed. R. Civ. P. 9(b) .................................................................................................................35

Fed. R. Civ. P. 12(b)(6) ...................................................................................................... 2, 14

Fed. R. Ev. 201 ........................................................................................................................14

## Foreign Statutes

Insolvency Act 1986 (UK), § 14 .............................................................................................23

Insolvency Act 1986 (UK), § 29 .............................................................................................23

Insolvency Act 1986 (UK), § 42 .............................................................................................23

Insolvency Act 1986 (UK), § 129 ...........................................................................................20

Insolvency Act 1986 (UK), Sch. 1 ..........................................................................................23

Defendants American International Group, Inc. ("AIG") and AIG Financial Products Corp. ("AIG-FP") (collectively "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Complaint filed by plaintiffs Brookfield Asset Management, Inc. (successor to Hees International Bankcorp Inc.) ("Brookfield") and Brysons International Limited (f/k/a Brysons International Bank Ltd.) ("Brysons") (collectively "Plaintiffs").

## PRELIMINARY STATEMENT

Notwithstanding that AIG and AIG-FP have performed all their obligations under the parties' swap agreement, have never filed for bankruptcy, and continue as going concerns, Plaintiffs contend that certain bankruptcy events of default have been triggered under the parties' standard-form swap agreement. Seizing on AIG's liquidity concerns in Fall 2008, Plaintiffs seek to walk away from their $1.2 billion obligation to AIG-FP—*over $700 million of which has already accrued over the course of 19 years*—and to obtain a windfall at the expense of AIG and its stakeholders.  Plaintiffs' argument that a counterparty that *resolves* liquidity constraints nevertheless triggers a bankruptcy event of default is novel to say the least, and its implications are staggering:  Defendants are aware of no other counterparty that has alleged that AIG or any of the numerous other financial institutions that resolved their own liquidity concerns during the Fall 2008 downturn have defaulted under swap agreements containing identical or nearly identical provisions.  The market continues to trade credit default swaps referencing AIG, notwithstanding that these agreements contain credit event triggers with terms almost identical to the event of default provisions relied on by Plaintiffs here.  Given the many billions of dollars of payment obligations that would be affected if AIG or any of these other financial institutions were deemed to have triggered a bankruptcy default on account of their respective liquidity

issues,[1] if Plaintiffs' position had merit, it would be inexplicable that not a single other counterparty has sought to assert the same position as Plaintiffs do here. Moreover, Plaintiffs' position flies directly in the face of the federal government's goal in deciding to provide financial assistance to AIG: to prevent AIG from triggering the very kinds of defaults that Plaintiffs now claim were nonetheless triggered. Under Plaintiffs' theory, the billions that the federal government has invested in AIG was for naught.

In this context, the extraordinary nature of Plaintiffs' claims becomes clear. Desperate to avoid a $1.2 billion obligation—an obligation arising because Plaintiffs chose to take an ill-advised position on interest rates almost 20 years ago—Plaintiffs are now throwing up every conceivable assertion, however farfetched or implausible, in the hope that one might stick. This motivation both animates and explains Plaintiffs' cynical attempt to seize upon the collapse of world financial markets and AIG's particular difficulties during that collapse, in an opportunistic effort to escape their clear contractual obligations. Put simply, believing that they have nothing to lose and potentially over a billion dollars to gain, Plaintiffs have purchased a litigation "lottery ticket" and hope to pull off a massive and inequitable $1.2 billion windfall, notwithstanding the fact that their claims lack a legal or factual basis. Recent Supreme Court precedent indicates that this is exactly the type of situation in which a Rule 12(b)(6) dismissal is warranted—where unsubstantiated allegations in a complaint are implausible, and permitting the claim to proceed into enormously costly, distracting and burdensome discovery would be entirely unjust.

Plaintiffs' claims suffer from a series of fatal legal flaws, and the Complaint should be dismissed for failure to allege plausibly that a Bankruptcy Event of Default occurred under the

---

[1]    As of June 2008, the notional amount outstanding under derivative contracts governed by ISDA Master Agreements was $531.2 trillion. *See* International Swaps & Derivatives Association, Inc., *ISDA Research Notes*, No. 1 (Autumn 2008), at 2, *available at* <http://www.isda.org/>.

2

parties' swap agreement.  *First*, Plaintiffs do not (because they cannot) allege that either AIG or AIG-FP has "institute[d] or ha[d] instituted against it a proceeding seeking a judgment of insolvency or bankruptcy."  Master Agreement § 5(a)(vii)(4).  In addition, the case law is clear that conduct falling short of a board resolution directing such a filing is insufficient to trigger a default based on action taken "in furtherance" of a bankruptcy filing.  Master Agreement § 5(a)(vii)(4, 8).  However, Plaintiffs do not (again because they cannot) allege the existence of any such board resolution or authorization.

*Second*, Plaintiffs fail to allege plausibly that AIG-FP "is dissolved" or has had "a resolution passed for its winding-up or liquidation."  Master Agreement § 5(a)(vii)(1, 5).  Nor do Plaintiffs allege plausibly that AIG-FP has taken action "in furtherance" of its dissolution or the passing of such a resolution.  Master Agreement § 5(a)(vii)(8).  Moreover, the Complaint ignores the fact that the "winding-up" trigger was intended to apply to companies subject to United Kingdom-based insolvency regimes, and, as a matter of law, has no application to Delaware corporations such as AIG and AIG-FP, which are unable to pass a resolution for their winding up.  Plaintiffs also fail to allege plausibly that an event has occurred with respect to AIG-FP "which, *under the applicable laws of any jurisdiction,* has an analogous effect to any of the events" described above.  Master Agreement § 5(a)(vii)(7) (emphasis added).  At most, the Complaint alleges that AIG-FP is in the informal, voluntary process of "winding down" business activities without court supervision in an orderly manner over a substantial period of time.  This conduct has no legal effect under *any* applicable laws of *any* jurisdiction, let alone a legal effect analogous to dissolution, winding-up, or liquidation.

*Third*, Plaintiffs do not (because they cannot) allege facts sufficient to show that AIG has become "subject to the appointment of an administrator, receiver, trustee, custodian or other

similar official for it or for all or substantially all its assets." Master Agreement § 5(a)(vii)(6). Rather, the Complaint attempts to convert the federal government's establishment of a trust arrangement, under which the government's equity stake in AIG is held and voted, into a default under the Swap Agreement. This artful pleading ignores the plain language of the provision, which, as a matter of law, applies only where an official is appointed pursuant to statute to manage a company's day-to-day operations and to dispose of or restructure its assets in a liquidation or restructuring.

*Fourth*, Plaintiffs do not (because they cannot) allege facts sufficient to show that AIG "[became] insolvent or … [was] unable … generally to pay its debts as they bec[a]me due." Master Agreement § 5(a)(vii)(2). Instead, Plaintiffs seek to re-write Section 5(a)(vii)(2) so that it applies to a party's prospective inability to pay debts "*that are coming due*." Compl. ¶ 62 (emphasis added). Plaintiffs' allegation is inconsistent not only with that section's plain language, but also with Judge Peck's recent carefully reasoned decision in *In re Charter Communications*, No. 09-11435 (JMP), 2009 WL 3841971 (Bankr. S.D.N.Y. Nov. 17, 2009), that rejected just that argument when interpreting nearly identical language. Moreover, Plaintiffs' reliance on AIG's 2008 third quarter Form 10-Q report, which stated that, on September 16, 2008, AIG had "estimated that it had an immediate need for cash in excess of its available liquid resources," Compl. ¶ 42, provides no support for Plaintiffs' allegation of insolvency or inability generally to pay debts that had come due. In fact, the immediately preceding sentences in the same quarterly report make clear that AIG was in a "liquidity crisis" (as opposed to insolvent) and that AIG had already received "the terms of a secured lending agreement" from the Federal Reserve Bank of New York, which its Board of Directors approved later that day. *See* AIG Form 10-Q report for the third quarter of 2008, filed Nov. 10, 2008

("AIG 2008 3Q Report"), at 49-50 (Declaration of Jonathan E. Pickhardt, dated December 17, 2009 ("Pickhardt Decl."), Exhibit A).  As explained herein, numerous courts have recognized the significant difference between resolved liquidity issues and an inability generally to pay debts when due.

   *Fifth*, even if Plaintiffs had sufficiently alleged that an event of default has occurred, they are still not entitled to their requested declaration.  Plaintiffs may not simply walk away from their substantial obligations to AIG-FP, as applying the swap agreement's close-out provision under the circumstances presented here would constitute an unenforceable penalty under New York law.  Thus, as explained more fully below, AIG's motion should be granted.

## STATEMENT OF FACTS[2]

**A.    The Swap**

   As part of a larger transaction pursuant to which AIG-FP (AIG's subsidiary) provided $200 million of financing to Brookfield, AIG-FP and Brysons (Brookfield's subsidiary) entered into two related interest rate swap transactions, dated October 18, 1990, both of which have a notional amount of $200 million (referred to collectively as the "Swap").  Compl. ¶¶ 13, 17, 18. The Swap is memorialized in two documents: (1) a Master Agreement in the form of a 1987 ISDA Interest Rate and Currency Exchange Agreement (the "Master Agreement"), including a Schedule thereto containing modifications to the form negotiated by the parties (the "Schedule"); and (2) a transaction Confirmation setting forth the primary economic terms of the Swap (the "Confirmation").  *Id.* ¶ 15.  The Master Agreement, Schedule, and Confirmation are collectively referred to as the "Swap Agreement."  As is customary in swap transactions of this nature, each

---

[2]    The Statement of Facts is principally drawn from the factual allegations in the Complaint, which, unlike the Complaint's numerous "legal conclusions" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," must be accepted as true for purposes of this motion to dismiss. *Ascension Health v. Am. Int'l Group, Inc.*, No. 08 Civ. 7765 (PGG), 2009 WL 2195916, at *1 (S.D.N.Y. July 23, 2009) (Gardephe, J.).

party's obligations under the Swap Agreement are fully guaranteed by its respective parent company. Thus, the obligations of AIG-FP to Brysons are guaranteed by AIG, and, likewise, the obligations of Brysons to AIG-FP are guaranteed by Brookfield. *Id.* ¶¶ 7, 10. The Swap is governed by New York law. Schedule, pt. 4(2).

Under the first interest rate swap, AIG-FP agreed to make a single floating interest payment to Brysons, calculated based on LIBOR (compounded semi-annually), in exchange for Brysons' agreement to make a single payment to AIG-FP at a flat rate of 9.61% per annum (also compounded semi-annually). Compl. ¶ 17. These payments are due on October 20, 2015. *Id.* Under the second interest rate swap, Brysons agreed to pay AIG-FP floating interest rate payments, calculated based on LIBOR, on October 20, 1995, 2000, 2005, 2010 and 2015, in exchange for AIG-FP agreeing to make semiannual payments to Brysons at a flat rate of 9.61%. Compl. ¶ 18. The net effect of the terms of the Swap is that AIG-FP is obligated to make, and has been making since 1990, fixed rate payments to Brysons twice a year, and Brysons is obligated to make a floating rate payment to AIG-FP every five years and then a final net "balloon" payment in 2015.

The Swap Agreement also provides AIG-FP with a bi-annual right, beginning in 1995, to cancel the Swap on terms that would require the payment of only accrued fixed and floating amounts. Compl. ¶ 21 (citing Confirmation, § 2(A)). Were AIG-FP to exercise this right, each party would be obligated to pay all amounts that had accrued from inception of the Swaps in 1990 through the date of cancellation but had not yet been paid out. *Id.* Thus, if AIG-FP

exercised this cancelation right, Plaintiffs would not be able to walk away without paying the hundreds of millions of dollars they *already owe* AIG-FP, as they seek to do here.[3]

As a result of the structure and the current interest rate environment,[4] Brysons will owe the vast majority of its payment obligations to AIG-FP in 2015 at the end of the life of the Swap. Compl. ¶¶ 17, 19. Indeed, Brysons will be obliged at maturity to make a single payment of approximately $1.93 billion, which will be offset and reduced in part by an amount owed by AIG-FP (approximately $380 million assuming current interest rates). The sizable amount ultimately payable by Brysons reflects the power of interest *compounding over a full 25 years* at a contracted rate of 9.61% per annum. Compl. ¶ 17. Given the parties' other payment obligations, the overall net present value of the Swap is approximately $1.2 billion in AIG-FP's favor, representing value that AIG-FP bargained for fairly.[5] In light of how interest rates have changed since 1990, Plaintiffs have long had, and continue to have, *zero* credit exposure to AIG-FP or AIG.

### B.    Bankruptcy Events of Default & Early Termination

The Master Agreement, which includes the Bankruptcy Event of Default provisions at the center of this dispute, is a standard form pre-printed agreement that was published by ISDA. Its terms were not negotiated by the parties. Rather, the Bankruptcy Event of Default provision in

---

[3]    AIG-FP has not exercised this cancelation right because doing so would require it to surrender the value of future payments to become due under the Swap.

[4]    While six-month LIBOR was 8.25% per annum at the time of the Swap (Compl. ¶ 17), today it is 0.4531% per annum (*see* LIBOR, <http://www.wsjprimerate.us/libor/libor_news.htm> (last visited Dec. 16, 2009)).

[5]    At the same time that the Swap was consummated, AIG-FP also purchased $200 million of floating rate debentures due in 2015 from Brookfield. Compl. ¶¶ 14, 16. The interest rate on the debentures—LIBOR flat—was well below the level that Brookfield normally would have been required to pay for such financing because LIBOR flat equals a lender's cost of funds without any "spread" or profit element. AIG-FP was willing to provide this advantageous financing to Brookfield only the condition that Brookfield entered into the swap.

Section 5(a)(vii) of the Master Agreement is a typical "boilerplate" clause. Specifically, this provision, which is tellingly entitled "Bankruptcy," provides that an "Event of Default" occurs where a party or "Specified Entity" (including AIG and Brookfield, as guarantors):

> (1) is dissolved;
>
> (2) becomes insolvent or fails or is unable or admits in writing its inability generally to pay its debts as they become due;
> …
> (4) institutes … a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights …;
>
> (5) has a resolution passed for its winding-up or liquidation;
>
> (6) seeks or becomes subject to the appointment of an administrator, receiver, trustee, custodian or other similar official for it or for all or substantially all of its assets …;
>
> (7) any event occurs with respect to the [counterparty or guarantor] which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (6) (inclusive); or
>
> (8) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts …

Master Agreement § 5(a)(vii). As explained below, these provisions were designed to avoid having derivative contracts become subject to bankruptcy proceedings by triggering an Event of Default (and thus a termination) shortly before a formal bankruptcy filing.

Accordingly, the Swap Agreement addresses the consequences of a Bankruptcy Event of Default in Section 6(a), which states in relevant part:

> [A]n Early Termination Date will be deemed to have occurred in respect of all Swap Transactions *immediately upon* the occurrence of any Event of Default specified in Section 5(a)(vii)(1), (2), (3), (5), (6), (7) or (8) and as of the time *immediately preceding* the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence of any Event of Default specified in Section 5(a)(vii)(4).

Master Agreement § 6(a) (emphasis added). The two parts of Section 6(a) are consistent in that (i) the listed Events of Default in lines 3 and 4 above occur "immediately upon" the occurrence of one of those events to establish that the event occurred shortly before the start of a formal proceeding and (ii) the events described in clause (4) of Section 5(a)(vii) trigger an Event of Default "immediately preceding" the start of a formal proceeding. In this way, the 1987 Master Agreement was drafted to trigger a default immediately prior to the commencement of an actual bankruptcy filing.[6]

In addition, Brookfield contends that Section 6(e)(i) of the Swap Agreement provides that a non-defaulting party is not obligated to pay the defaulting party a termination payment, regardless of the value of the Swap. Swap Agreement § 6(e)(i).

### C.    AIG's Financial Difficulties

In September 2008, AIG—like many other financial institutions—was faced with significant liquidity concerns as a result of its exposure to the subprime mortgage market and the resulting downgrade of its credit rating. Compl. ¶ 37. In light of its low cash reserves, AIG sought financing from the Federal Reserve Bank of New York ("FRBNY") on September 12, 2008. *Id.* ¶ 38. The following day, the FRBNY informed AIG that governmental assistance was not then available, which it reiterated on September 14 and 15. *Id.* ¶¶ 40, 42. Plaintiffs allege

---

[6]   The process described in Section 6 of the 1987 ISDA Master Agreement providing for early termination and valuation of all transactions then outstanding under that agreement to produce one net exposure is referred to as "close-out netting." This is the fundamental credit risk management tool in that agreement. If it is enforceable, a Master Agreement governing hundreds of transactions, some with positive values and some with negative values, will produce one net exposure and not hundreds of separate exposures. In 1987, the enforceability of close-out netting under the U.S. Bankruptcy Code and in other major jurisdictions was uncertain. The adoption of laws in the U.S. and many other countries since 1989 establishing the enforceability of close-out netting has eliminated this uncertainty. Thus the basic purpose of automatic early termination under Section 6(a) was to provide for early termination shortly before the start of a formal proceeding. Otherwise, based on the law in effect when the 1987 Master Agreement was adopted, there was a significant chance that a bankruptcy trustee would be able to "cherry-pick" transactions by assuming profitable ones and rejecting those that were unprofitable.

that on September 14, AIG's counsel began preparing papers for a bankruptcy filing should that action have become necessary. *Id.* ¶ 41. But those papers were never needed because the government elected to provide emergency financing:

> By early Tuesday afternoon on September 16, 2008, it was clear that AIG had no viable private sector solution to its liquidity crisis. At this point, AIG received the terms of a secured lending agreement that the [Federal Reserve Bank of New York] was prepared to provide. AIG estimated that it had an immediate need for cash in excess of its available liquid resources. That night, AIG's Board of Directors approved borrowing from the NY Fed based on a term sheet that set forth the terms of the secured credit agreement and related equity participation.

AIG 2008 3Q Report, at 50 (Pickhardt Decl. Ex. A); *see also* Compl. ¶ 42 (quoting AIG 2008 3Q Report); *id.* ¶ 44. AIG accepted the FRBNY's proposal on September 16, and it received an $85 billion loan from the FRBNY. Compl. ¶ 45. As part of the loan, AIG agreed to issue a 79.9% equity interest (in the form of 100,000 shares of Series C Perpetual, Convertible, Participating Preferred Stock) to a trust intended to act for the benefit of the United States Treasury (the "Trust").[7] *Id.* ¶ 47; AIG 2008 3Q Report at 59. Analyst comments and credit rating agencies' updates show that the markets concluded that the federal government's intervention and support resolved the company's liquidity needs. *See, e.g.*, "Status of Most AIG Ratings Revised to Developing; Short-Term Ratings Raised," Standard & Poor's, Sept. 17, 2008 ("The Fed's action will provide AIG with substantial relief from its near-term liquidity constraints … [Standard & Poor's] believe[s] that the size of the facility greatly exceeds any near-term needs for liquidity.").

Because of AIG-FP's role in AIG's liquidity difficulties (*see* Compl. ¶ 37), in early October 2008, AIG announced that it was unilaterally (and without court supervision) planning to wind down some business activities of AIG-FP and that AIG-FP was not taking on new

---

[7] The FRBNY has appointed three trustees to vote its equity interest. Compl. ¶ 49.

business.  Compl. ¶¶ 50-51; *see also* AIG Business Update Call Transcript (Oct. 3, 2008), *available at* http://seekingalpha.com/article/98457-american-international-group-business-update-call-transcript.  More recently, AIG has explained that AIG-FP is engaged in a multi-step process of unilaterally winding down its businesses and portfolios over a substantial period of time.  Compl. ¶¶ 51-52.

In November 2008 and March 2009, AIG and the FRBNY restructured and refinanced the credit facility.  Compl. ¶¶ 53-59.  Specifically, on November 10, 2008, the FRBNY reduced its original loan of $85 billion to $60 billion, and AIG received a separate loan of $40 billion in exchange for preferred shares.  *Id.* ¶ 54.  At the same time, the FRBNY also lent $52.5 billion to two entities that were created to purchase both residential mortgage-backed securities from AIG life insurance companies and debt securities on which AIG-FP had written credit default swap contracts.  *Id.* ¶ 55.  And in March 2009, in addition to restructuring their earlier agreements, AIG and the U.S. Treasury Department entered into a new facility that allowed AIG to draw up to $30 billion over five years in exchange for non-cumulative preferred stock.  *Id.* ¶¶ 57-58.

Notwithstanding AIG's financial difficulties, AIG-FP at all times continued to make its required payments under the Swap as and when due.  Indeed, the Complaint does not allege that AIG or AIG-FP failed to make any required payment under the Swap or under any other agreement to which either AIG or AIG-FP is a party.  Most recently, AIG-FP made its regularly scheduled payments under the Swap of $9.56 million on October 20, 2008, $9.61 million on April 20, 2009, and $9.61 million on October 20, 2009.  Compl. ¶ 77.  Brysons accepted the October 2008 payment without any reservation of rights and only later, in a post hoc, unilateral

action, placed that payment in an escrow account. *Id.*[8]  By contrast, Brysons escrowed the April

2009 and October 2009 payment pursuant to an agreement with Defendants. *Id.*

###    D.    The Parties' Dispute

On December 19, 2008, Brookfield and Brysons contended in a letter to AIG that a

Bankruptcy Event of Default had likely been triggered under Section 5(a)(vii) of the Master

Agreement because of AIG's liquidity constraints in Fall 2008 and that they had no further

obligations to AIG or AIG-FP.  Compl. ¶ 75.  Since that letter, AIG has consistently denied that

any event has occurred that would give rise to such a default.  *See, e.g.*, *id.* ¶ 76.

After the parties' standstill agreement expired on September 30, 2009,  Plaintiffs filed the

underlying Complaint, which principally seeks a declaration that: (i) a Bankruptcy Event of

Default has occurred under Section 5(a)(vii)(1, 2, 4, 5, 6, 7, or 8) of the Swap Agreement; (ii) an

Early Termination Date occurred immediately upon the occurrence of that Bankruptcy Event of

Default; and (iii) Plaintiffs have no further obligations to Defendants under the Swap Agreement

other than to return AIG-FP's October 2008 and April 2009 payments.  Compl. ¶¶ 81-83; *see

also id.* ¶¶ 60-74 (explaining basis for alleged Bankruptcy Event of Default).  As explained

below, the Complaint should be dismissed because it does not plausibly allege that any

Bankruptcy Event of Default has occurred.

---

[8]  Having accepted payment from AIG-FP on October 20, 2008, without a reservation of rights, Plaintiffs are estopped from asserting that the Swap has been terminated based on events that were publicly disclosed before that date. *See, e.g.*, *Brownsville Cmty. Council, Inc. v. Banco De Ponce*, 567 F. Supp. 849, 857 (S.D.N.Y. 1983) (when plaintiff "has accepted the benefits of a transaction … [it] may not subsequently take an inconsistent position to avoid the corresponding obligations or effects") (internal quotation omitted); *Savasta v. Newport Assocs.*, 579 N.Y.S.2d 167, 169 (2d Dep't 1992) (plaintiffs estopped from asserting right to terminate when they had continued to accept payments following the occurrence of the event on which the alleged termination was based).  However, because this issue presents factual questions not appropriate for resolution on a motion to dismiss, AIG reserves its right to raise this argument in the event any of Plaintiffs' claims proceed.

## ARGUMENT

The Supreme Court recently held that "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009); *see also Ascension Health v. Am. Int'l Group, Inc.*, No. 08 Civ. 7765(PGG), 2009 WL 2195916, at *1 (S.D.N.Y. July 23, 2009) (Gardephe, J.) ("In accordance with the Supreme Court's decision in [*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)], this Court must apply a 'plausibility standard.'") (quoting *Iqbal*). Thus, as a general matter, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *S. Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (internal quotation omitted). A complaint must therefore provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Determining whether a complaint states a plausible claim for relief "will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ascension Health*, 2009 WL 2195916, at *1 (quoting *Harris v. Mills*, No. 07-2283-CV, 2009 WL 1956176, at *4 (2d Cir. July 9, 2009)). The plausibility standard is intended to avoid the "potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support [plaintiff's] claim." *Twombly*, 550 U.S. at 559-560 (internal quotation omitted); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50, n.4 (2d Cir. 2007) (plausibility standard designed to ensure district courts "retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed") (internal quotation marks omitted).

"Whether or not a contract is ambiguous is a matter of law properly decided on a motion to dismiss." *In re Musicland Holding Corp.*, 386 B.R. 428, 437 (S.D.N.Y. 2008) (citing *Crane*

13

*Co. v. Coltec Indus., Inc.*, 171 F.3d 733, 737 (2d Cir. 1999)).  When assessing whether a contractual provision is ambiguous, a court must be "cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 173 (2d Cir. 2004) (internal quotation omitted).[9]  Likewise, "the meaning of boilerplate provisions,"—*i.e.*, "provisions which are standard in a certain genre of contracts,"—"is … a matter of law rather than fact."  *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982); *see also Unigard Sec. Ins. Co. v. North River Ins. Co.*, 4 F.3d 1049, 1071 (2d Cir. 1993) ("The meaning of such [boilerplate] provisions is not an issue of fact to be litigated anew each time a dispute goes to court.").  Thus, where, as here with the standard-form Master Agreement, "a contract shows unambiguously on its face that the relief prayed for is not merited, dismissal is both justified and appropriate."  *See Marketing/Trademark Consultants, Inc. v. Caterpillar, Inc*., No. 98 Civ. 2570 (AGS), 2000 WL 648162, at *3 (S.D.N.Y. May 19, 2000) (quotation omitted); *see also Broder v. Cablevision Sys. Corp*., 418 F.3d 187, 197 (2d Cir. 2005) (upholding Rule 12(b)(6) dismissal because "the contract language still unambiguously foreclose[d] [plaintiff's] claims.").

---

[9]    In addition, when resolving a motion to dismiss a contract-based claim, a court may consider: (i) the facts alleged in the complaint; (ii) documents "attached to the complaint as exhibits or incorporated in the complaint by reference;" (iii) documents that "the plaintiffs either possessed or knew about and upon which they relied in bringing the suit;" (iv) documents that are "integral" to the complaint because it "relies heavily upon [their] terms and effect;" and (v) "matters of which judicial notice may be taken under [Federal Rule of Evidence] 201."  *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).  *Accord Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

I.    **THE COMPLAINT FAILS TO ALLEGE PLAUSIBLY THAT ANY BANKRUPTCY EVENT OF DEFAULT HAS OCCURRED**

A.    **The Complaint Fails To Allege Facts That Would Constitute A Bankruptcy Filing Event Of Default Under Section 5(a)(vii)(4, 8) Of The Swap Agreement**

Unable to allege that AIG or AIG-FP defaulted under the Swap Agreement by "institut[ing] … a proceeding seeking a judgment of insolvency or bankruptcy" (Swap Agreement, § 5(b)(vii)(4)), the Complaint suggests, in a cursory fashion, that an event of default was nevertheless triggered by AIG taking "action in furtherance" of a bankruptcy filing (Swap Agreement, § 5(a)(vii)(8)).  Compl. ¶¶ 67-69.  The sum total of the Complaint's allegations are that AIG's lawyers began to prepare for a potential bankruptcy filing, AIG's management "presented the [AIG] Board with the option of declaring bankruptcy," and AIG "initiated the drawdown of its existing credit lines."  Compl. ¶¶ 68-69.  However, these allegations, even if accepted as true, are insufficient as a matter of law to support Plaintiffs' claim.

It is well established under New York law that an actual board of directors' resolution directing or approving a bankruptcy filing is required to trigger a default based on action taken "in furtherance" of such a filing.  *See, e.g.*, *In re Revere Copper & Brass, Inc.*, 60 B.R. 887, 891 n.1 (Bankr. S.D.N.Y. 1985) (ruling that an actual board of directors resolution to file for bankruptcy is required); *Union Bank of Switzerland v. Deutsch Fin. Servs. Corp.* ("*UBS*"), No. 98 Civ. 3251 (HB), 2000 WL 178278, at *11-12 (S.D.N.Y. Feb 16, 2000) (no corporate action in furtherance of bankruptcy where board "did not implement or authorize any action"); *In re Solutia, Inc.*, No. 03-17949, 2007 WL 1302609, at *14 (Bankr. S.D.N.Y. May 1, 2007) (same).[10]

_____

[10]    While these cases deal with contract provisions concerning "corporate action" in furtherance of bankruptcy proceedings, their holdings are equally applicable to the "action in furtherance of" Event of Default at issue in this case.  The phrase "any action" in Section 5(a)(vii)(8) does not expand the scope of this Event of Default beyond the provisions interpreted in *Revere Copper & Brass*, *UBS*, and *Solutia*.  Rather, "any" is simply an entity-neutral term reflecting the fact that the 1987 ISDA Master Agreement was designed for use by various types of counterparties, including corporations, banks, partnerships, trusts, sovereigns, supra-nationals

In particular, discussions concerning the possibility of a bankruptcy filing, the retention of counsel to act in respect of such a filing, and entering into transactions due to financial distress (such as a "drawdown on … credit lines"), are all insufficient as a matter of law, even in combination, to constitute action "in furtherance" of the commencement of bankruptcy proceedings. *See, e.g.*, *UBS*, 2000 WL 178278, at *11-12 (board discussion of "possible future action," including discussion of the "*possibility* of a bankruptcy filing," and "retention of [bankruptcy counsel]" does not amount to taking corporate action 'in furtherance' of an event of default) (emphasis in original); *Solutia,* 2007 WL 1302609, at *14 (entering into transactions as a result of financial distress and "general contingency planning do not amount to 'corporate action' in furtherance of a bankruptcy filing"); *Revere Copper & Brass,* 60 B.R. at 891 n.1 ("contingency planning and discussions prior thereto" are insufficient to trigger "in furtherance" default). Nowhere does the Complaint allege that the AIG Board passed any resolution directing or approving an AIG bankruptcy filing.

The courts' interpretation of the "in furtherance" trigger is consistent with the structure and purpose of the Bankruptcy Event of Default provision in the Master Agreement, which, as explained above, was drafted to trigger a default just before the commencement of a bankruptcy filing. The precise language in Section 5(a)(vii)(4) requires the "institut[ion]" of an actual court "proceeding seeking a judgment of insolvency or bankruptcy." Thus, an "action in furtherance" of the actual "institut[ion]" of such a court proceeding means a board resolution authorizing the institution of such a proceeding. Moreover, the courts' narrow reading of the "in furtherance" trigger in the context of Section 5(a)(vii)(4) is necessary to avoid significant contractual

---

(*e.g.*, the World Bank and the European Investment Bank), and others. Where, as in this case, the counterparty is a corporation, "any action" must be read as requiring an actual board of directors' resolution directing or approving a bankruptcy filing, for the simple reason that "[a] corporation acts through its board of directors." *Solutia,* 2007 WL 1302609, at *14.

uncertainty and market disruption, and the creation of disincentives for responsible corporate governance. Under Plaintiffs' interpretation, an ISDA Master Agreement would be terminable when a counterparty *merely considered* the possibility of a bankruptcy filing or *merely instructed* its bankruptcy counsel to prepare for a filing, even if that counterparty was able to resolve its financial difficulties and avert the need for such a filing. The market turmoil that would result from such an interpretation is complete anathema to the goals of certainty and consistency embodied in the ISDA Master Agreement's boilerplate bankruptcy default provision. Plaintiffs' interpretation should be rejected for this reason. *See e.g.*, *U.S. Trust Co. of New York v. Alpert*, 10 F. Supp. 2d 290, 305 (S.D.N.Y. 1998), *aff'd*, 168 F.3d 630 (2d Cir. 1999) (declining to adopt an interpretation of the indentures at issue that "would send shock waves to the markets"); *Metro. Life Ins. Co. v. RJR Nabisco, Inc*., 716 F. Supp. 1504, 1520 (S.D.N.Y. 1989) (rejecting plaintiffs' interpretation of an indenture because it "would interfere with and destabilize the market").

Plaintiffs' interpretation also would create a perverse incentive for corporate boards to simply do nothing in the face of liquidity constraints. If the consideration of a bankruptcy filing triggered a Bankruptcy Event of Default, there would be a strong disincentive for corporate boards to engage in responsible contingency planning when confronted with liquidity constraints. Indeed, if Plaintiffs were right, the very consideration of a bankruptcy filing could itself create the inexorable conditions requiring the filing in order to address defaults under a company's ISDA Master Agreements. Any such disincentive would be in significant tension with directors' fiduciary duties, as directors might not engage in an orderly and robust discussion of a corporation's options when facing liquidity constraints simply to avoid triggering an event of default under the corporation's swap agreements. *See, e.g., In re Bridgeport Holdings, Inc.*, 388

B.R. 548, 559, 564-565 (Bankr. D. Del. 2008) (failure to respond promptly to a liquidity crisis may constitute a breach of directors' fiduciary duty of loyalty).  Plaintiffs' interpretation should be rejected for this reason also.

Given the ramifications of Plaintiffs' interpretation of the Event of Default for "action in furtherance" of a bankruptcy filing, it is not surprising that *not a single other counterparty* has made Plaintiffs' audacious claim.  In fact, notwithstanding the widely reported news of AIG's financial difficulties, none of AIG-FP's numerous other ISDA Master Agreement counterparties has claimed that either AIG-FP or AIG has triggered this (or any) bankruptcy event of default.  Similarly, to Defendants' knowledge, Plaintiffs' interpretation has not been raised by counterparties to swap agreements with other entities that experienced analogous, if not worse, financial difficulties, such as Bear Stearns or Merrill Lynch, which were also widely reported to have considered bankruptcy filings, retained bankruptcy counsel, and prepared filing papers.  Plaintiffs thus stand alone, among a multitude of sophisticated market participants, in what boils down to nothing more than an opportunistic attempt to subvert settled authority and manufacture a default where none exists in order to avoid significant obligations for which Defendants fairly contracted.  Consistent with the settled case law, Plaintiffs are not entitled to their requested declaration regarding the Event of Default for "action[s] in furtherance" of a bankruptcy filing.

### B.    The Complaint Fails To Allege Facts That Would Constitute A Dissolution, Winding-Up, or Liquidation, Related Event Of Default Under Section 5(a)(vii)(1, 5, 7, or 8) Of The Swap Agreement

The Complaint similarly fails to allege facts sufficient to support Plaintiffs' claims that AIG-FP (1) "is dissolved," (2) has had a resolution passed for its winding-up or liquidation; (3) has taken "action in furtherance" of its dissolution or the passing of a resolution for its winding-up or liquidation; or (4) has had an event occur which, under the applicable laws of any jurisdiction, has an analogous effect to (1) or (2).

18

### 1. The Complaint does not allege plausibly that a dissolution related Event of Default has occurred

The Complaint fails to allege plausibly that a dissolution related Event of Default has occurred under Section 5(a)(vii)(1). As a threshold matter, that section states that an event of default occurs where a party "is dissolved." The trigger is thus stated in the past tense ("dissolved"), rather than in the current tense (*i.e.*, "is in dissolution"). Accordingly, because the Complaint does not—and could not—allege that AIG-FP has been dissolved, this claim should be dismissed.

Even if the plain language of section 5(a)(vii)(1) was distorted to read "is in dissolution," as set forth in the Complaint, Plaintiffs nevertheless fail to allege plausibly that AIG-FP is in dissolution or has taken action in furtherance of dissolution. *See* Compl. ¶¶ 70-71, 81. Dissolution is a formal statutory process governed by state corporation law. AIG-FP, as a Delaware corporation, can only be dissolved by (i) a resolution of the board of directors subsequently approved by a majority of the stockholders entitled to vote or (ii) the unanimous written consent of all of the stockholders entitled to vote. 8 Del. Code §275(a)-(c) (2009). Even then, dissolution does not become effective until a certificate of dissolution is filed with the Delaware Secretary of State. *Id*., §275(f). Nowhere does the Complaint allege that a resolution to dissolve AIG-FP has been presented to—let alone passed by—its board, or approved or consented to by its stockholders; that AIG-FP has filed a certificate of dissolution with the Delaware Secretary of State; or that AIG-FP has taken any action in furtherance of such activities. Plaintiffs have thus failed to state a plausible claim that any dissolution related Event of Default has been triggered.

**2.    The Complaint does not allege plausibly that a winding-up or liquidation related Event of Default has occurred**

The Complaint also fails to allege plausibly that a winding-up related Event of Default has occurred.  Section 5(a)(vii)(5) specifically requires that "a resolution [be] passed for [the party's] winding-up."  Nowhere does the Complaint allege that AIG-FP has passed such a resolution, or that AIG-FP has taken any action in furtherance of the passing of such a resolution. Nor could Plaintiffs make such an allegation, because Delaware law does not provide for the voluntary winding-up of a corporation by resolution.[11]  As the "customs, practices, usages and terminology" of the swaps industry make clear, *Eternity Global*, 375 F.3d at 173, the winding-up trigger was intended to apply to corporations chartered in countries governed by United Kingdom-based insolvency regimes, which include a mechanism for the voluntary winding-up of a corporation by resolution.[12]  To this end, the reference to a winding-up resolution in section 5(a)(vii)(5) mirrors Part IV of the U.K. Insolvency Act 1986, which provides that the "winding-up of [a] company is deemed to have commenced at the time of the passing of [a shareholder] resolution."  Insolvency Act 1986, § 129(1).  Plaintiffs have thus failed to state a plausible claim that any winding-up related Event of Default has been triggered.

---

[11]    Under Delaware law, corporations can only be wound-up involuntarily, in one of two ways.  First, corporations that "expire by their own limitation or are otherwise dissolved" are required to be continued as bodies corporate for a period of three years in order to allow for the "winding up" of their affairs. 8 Del. Code § 278 (2009).  Second, corporations whose charter has been revoked by the Court of Chancery for abuse, misuse or nonuse of their corporate powers, privileges or franchises may be wound up by the Court of Chancery.  *Id.* § 284 (2009).

[12]    The User's Guide to ISDA's 1987 standard-form agreements explains that Section 5(a)(vii) of the 1987 Interest Rate and Currency Exchange Agreement contains provisions expressly designed to cover United States and United Kingdom insolvency laws.  *User's Guide to the Standard Form Agreements: 1987 Edition*, (International Swap Dealers Association 1987) ("1987 User's Guide"), at 7 (Pickhardt Decl. Ex. B).  Within Section 5(a)(vii), clauses (4) and (5) target the technical requirements of the U.S. Bankruptcy Code and the U.K. Insolvency Act 1986.

The Complaint also fails to allege plausibly that AIG-FP has had a resolution passed for its liquidation, or that it has taken action in furtherance of the passing of such a resolution. Compl. ¶¶ 70-71, 81. Liquidation is a formal statutory process governed by federal bankruptcy law.[13] Nowhere does the Complaint allege that AIG-FP has passed a resolution for its liquidation, or that it has taken action in furtherance of such a resolution. Plaintiffs have thus failed to state a plausible claim that any liquidation related Event of Default has been triggered.

### 3. The Complaint does not allege plausibly that an "analogous effect" Event of Default has occurred

Nor does the Complaint plausibly allege that an event has occurred with respect to AIG-FP or AIG "which, *under the applicable laws of any jurisdiction,* has an analogous effect to any of the events" described above. Section 5(a)(vii)(7) (emphasis added). The allegations that purportedly support these claims, Compl. ¶ 50-52, even if accepted as true, at best establish that AIG-FP is in the process of voluntarily running off transactions and business segments in an orderly manner, a process that is expected to "take a substantial period of time." AIG Form 10-Q report for the third quarter of 2009, filed Nov. 6, 2009 ("AIG 2009 3Q Report"), at 94 (Pickhardt Decl. Ex. C). Plaintiffs' claims fail in light of the critical language—"under the applicable laws of any jurisdiction"—since AIG-FP's alleged actions have no legal effect under *any* applicable laws of *any* jurisdiction, let alone a legal effect analogous to dissolution,[14]

---

[13] A U.S. corporation enters voluntary liquidation by filing a petition under Chapter 7 of the Bankruptcy Code with a bankruptcy court. 11 U.S.C. § 301.

[14] Dissolution "puts an end to [a corporation's] existence, the result of which may be likened to the death of a natural person." *Chicago Title & Trust Co. v. Forty-One Thirty-Six Wilcox Bldg. Corp.*, 302 U.S. 120, 125 (1937); *see also In re McGregor*, 182 B.R. 96, 100 (Bankr. S.D.N.Y. 1995) ("a corporation's dissolution ends its existence….").

winding-up,[15] or liquidation.[16]  Plaintiffs have thus failed to state a plausible claim that any

"analogous" Event of Default has been occurred with respect to any of these triggers.

### C.    The Complaint Fails To Allege Facts That Would Constitute A Trustee Related Event of Default Under Section 5(a)(vii)(6, 7) Of The Swap Agreement

Plaintiffs' request for a declaration that the appointment of three individual trustees (the

"AIG Trustees") to vote the FRBNY's equity interest in AIG constitutes an event of default

under Section 5(a)(vii)(6, 7) of the Swap Agreement should also be dismissed.  Compl. ¶ 74.  As

explained below, the private trust arrangement respecting the control of the federal government's

equity stake in AIG falls well outside of any conceivable intended ambit of this provision.

The meaning of Section 5(a)(vii)(6) is unambiguous and apparent on its face.  The

section triggers a default upon the appointment of "an administrator, receiver, trustee, custodian

or other similar official" for a party "or for all or substantially all its assets." This concept is

drawn from the insolvency and bankruptcy regimes of the United Kingdom and the United

States.[17]  The distinguishing characteristic of the officials listed in section 5(a)(vii)(6) is that each

is empowered by statute to manage the day-to-day operations of a debtor corporation in the

context of an insolvency, including the power to dispose of the debtor's assets.  For instance, in

---

[15]    Winding-up under United Kingdom insolvency law is a "fast remedy," *Re Lafayette Elecs. Europe Ltd*, [2007] B.C.C. 890, 895 (U.K. Ch. D. 2006), constituting a "death sentence" for a corporation.  *Re a Company (No.000314 of 1989)*, [1990] B.C.C. 221, 226 (U.K. Ch. D. 1989).

[16]  Liquidation under Chapter 7 of the Bankruptcy Code results in "the prompt closure and distribution" of the corporation's property.  *In re Medaglia*, 52 F.3d 451, 457 (2d Cir. 1995) (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 389 (1993)); *see also LNC Invs., Inc. v. First Fidelity Bank*, 247 B.R. 38, 48 (Bankr. S.D.N.Y. 2000) (observing that liquidation under Chapter 7 of the Bankruptcy Code results in a corporation's "dismemberment and death.").

[17]    This is not surprising, given that the drafters' intention was to incorporate the technical insolvency requirements of both jurisdictions into the Master Agreement's default provisions.  *See* 1987 User's Guide, at 7 (Pickhardt Decl. Ex. B).

the United Kingdom, an "administrator" and an "administrative receiver" (defined as a "receiver … of the whole (or substantially the whole) of a company's property") are each empowered by statute to "do all such things as may be necessary for the management of the affairs, business and property of the company," including to "sell or otherwise dispose of the property of the company." U.K. Insolvency Act 1986 §§ 14(1), 29(2), 42(1)-(2), Sch. 1.

Likewise, the third and fourth officials—"trustee" and "custodian"—are defined under the U.S. Bankruptcy Code, and each is vested with explicit statutory power to manage the day-to-day operations of the debtor's business and to dispose of debtor property. Under Chapter 7 of the Bankruptcy Code, for example, a "trustee" is appointed or elected to liquidate the debtor's assets and his duties include: "(1) collect[ing] and reduc[ing] to money the property of the estate for which such trustee serves, … clos[ing] such estate as expeditiously as is compatible with the best interests of parties in interest," and being "accountable for all property received." 11 U.S.C. § 704(a)(1, 2) (2009). Similarly, a trustee appointed in a bankruptcy case commenced under Chapter 11 has the duty to "be accountable for all property received" as well as the power, unless a court orders otherwise, to "operate the debtor's business." *Id.* §§ 1106(a)(1), 1108. Finally, "custodian" is likewise defined under the U.S. Bankruptcy Code to mean a "receiver or trustee of any of the property of the debtor, appointed in a case or proceeding not under [Title 11 of the U.S. Code]," *id.* § 101(11)(A), or a "trustee, receiver, or agent under applicable law … that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtor's creditors." *Id.* § 101(11)(C).

Here, in contrast, the AIG Trustees effectively act solely as the controlling shareholder of AIG, as they may not displace management or operate AIG, and they do not have the power to

acquire, manage or dispose of AIG's property. The terms of the Trust, including the powers and duties of the AIG Trustees, are governed by the AIG Credit Facility Trust Agreement, dated January 16, 2009 (the "Trust Agreement") (Pickhardt Decl. Ex. D).[18] According to this Agreement, the FRBNY established the Trust empowering the AIG Trustees to manage the Federal Reserve's equity stake in AIG to avoid "any possible conflict" between the FRBNY's "supervisory and monetary policy functions," on the one hand, and its voting and consent rights as AIG's majority shareholder, on the other. *See* Trust Agreement, at 2.

The Trustees' powers under the Trust Agreement are expressly circumscribed. In particular, while the Trustees may vote the stock held by the Trust and exercise the rights flowing from their power as majority shareholder, such as removing and replacing AIG directors (*see* Trust Agreement, § 2.04) (Pickhardt Decl. Ex. D), unlike the officials listed in Section 5(a)(vii)(6), *the Trustees are explicitly prohibited from becoming directors of AIG or managing AIG's day-to-day operations. See, e.g.*, Trust Agreement, p. 2 ("*[T]he FRBNY anticipates that the Trustees will leave the day-to-day management of the Company to the persons charged with such management ….*") (emphasis added); Trust Agreement, § 2.04(f) ("*In no event shall the Trustees* become directors of the Company or otherwise *become responsible for directing or managing the day-to-day operations of the Company or any of its subsidiaries.*") (emphasis added) (Pickhardt Decl. Ex. D). Nor does the Trust Agreement provide the AIG Trustees with power over "all or substantially all [of AIG's] assets," as required to trigger the default in Section 5(a)(vii)(6). Thus, the role that the AIG Trustees have vis-à-vis the company is distinct, both conceptually and in practice, from that of the officials enumerated in Section 5(a)(vii)(6).

---

[18]   The Court may consider the Trust Agreement because the Complaint "relies heavily upon its terms and effect" and this public document is "integral" to Plaintiffs' claim that a default has been triggered under section 5(a)(vii)(6) (*see* Compl. ¶¶ 47, 49). *See, e.g.*, *Chambers*, 282 F.3d at 152-53.

The AIG Trustees are therefore neither a "trustee" nor a "similar official" as those terms are used in Section 5(a)(vii)(6).

Consequently, Plaintiffs' reliance on the "analogous effects" clause in Section 5(a)(vii)(7) also fails. Compl. ¶ 74. As explained above, the appointment of the AIG Trustees is not comparable or in any way analogous to AIG "becom[ing] subject to the appointment of an administrator, receiver, trustee, custodian or other similar official." Swap Agreement, § 5(a)(vii)(6). If anything, their appointment is akin to a change in the majority shareholder control of a company, which never has and should not trigger a Bankruptcy Event of Default so long as that arrangement occurs outside bankruptcy or insolvency proceedings. As such, the trust arrangement between the FRBNY and the AIG Trustees falls outside the scope of Section 5(a)(vii)(6, 7), and, consequently, this portion of the requested declaration should also be dismissed.

### D.    The Complaint Fails To Allege Facts That Would Constitute An Insolvency or Inability to Pay Event Of Default Under Section 5(a)(vii)(2) Of The Swap Agreement

The Complaint also fails to allege plausibly that either AIG or AIG-FP was ever "insolvent or … unable … generally to pay its debts as they bec[a]me due." Master Agreement § 5(a)(vii)(2). As a threshold matter, while the Complaint seeks a declaration that "*AIG-FP* has 'become[] insolvent or … [was] unable or admit[ted] in writing its inability generally to pay its debts as they bec[a]me due," Compl. ¶ 81 (emphasis added), the Complaint focuses exclusively on *AIG*, and it does not contain a single factual allegation about AIG-FP's solvency or its ability to pay its debts as they became due. *See* Compl. ¶¶ 36-47, 53-59, 61-66. This facial deficiency provides a clear ground for dismissing this portion of Plaintiffs' claim for declaratory relief.

Moreover, as explained below, the Complaint's own allegations undermine Plaintiffs' claim, as it is readily apparent that, by accepting the federal government's credit facility, AIG

resolved its short-term liquidity constraints *before* it was unable generally to pay its debts. Tellingly, the Complaint does not (because it cannot) identify a single debt that AIG or AIG-FP failed to pay, or a single debt they were unable to pay, let alone debts that they were "generally" unable to pay. Master Agreement, § 5(a)(vii)(2). Similarly, the Complaint contains no plausible allegations that either AIG or AIG-FP was balance-sheet insolvent—only entirely unrelated accusations of distant malfeasance, which Plaintiffs desperately invoke in an attempt to justify a fishing expedition into the reliability of AIG's audited financial statements.

### 1. The Complaint does not plausibly allege that either AIG or AIG-FP was unable generally to pay its debts as they became due

The Complaint fails to allege plausibly that an inability to pay Event of Default has occurred. Section 5(a)(vii)(2) states that an Event of Default occurs when a "party or any applicable Specified Entity … is unable or admits in writing its inability generally to pay its debts *as they become due*." (emphasis added). Nowhere does the Complaint allege that either AIG or AIG-FP has not paid its debts as they have become due, or that AIG or AIG-FP has admitted in writing its inability to pay its debts as they have become due. Rather—unable to make such allegations—Plaintiffs instead claim that AIG and AIG-FP have triggered an Event of Default by virtue of the fact they "have been unable to pay their debts *as they were coming due*," Compl. ¶ 62 (emphasis added). This prospective interpretation of the inability to pay Event of Default is, however, inconsistent with the plain language of the provision, the purpose of the Master Agreement, and substantial legal authority.

Most fundamentally, in suggesting that Section 5(a)(vii)(2) was triggered because "AIG and AIG-FP have been unable to pay their debts *as they were coming due*" (Compl. ¶ 62 (emphasis added)), the Complaint does significant injustice to the actual text of that section, which states that an event of default occurs when either AIG or AIG-FP "is unable or admits in

writing its inability generally to pay its debts *as they become due*." Master Agreement § 5(a)(vii)(2) (emphasis added). The words "as they become due" plainly signify that a party must be unable to pay its debts at a point in time when payment is actually due. Mere uncertainty as to whether a party *will* be able to pay debts due at some time in the future—even the near future— is not sufficient.

This plain reading of Section 5(a)(vii)(2) as not being triggered by a prospective inability to pay debts is squarely supported by Judge Peck's recent carefully reasoned decision in *Charter Communications*, 2009 WL 3841971. In that case, JPMorgan Chase Bank ("JPMorgan") claimed that, notwithstanding that Charter Communications ("Charter") had never failed to pay a debt, its liquidity problems in November 2008 triggered a default in a credit agreement. The provision in question provided—in language virtually identical to that at issue here—that there would be an event of default if Charter ever "shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due." *Id.* at *16. However, the court flatly rejected JPMorgan's interpretation of the covenant as having "forward-looking" application to debts Charter *might* be unable to pay in the future—the same interpretation Plaintiffs seek to advance here—instead reasoning:

> [T]he Court is convinced that ***the language is not prospective*** and that, fairly read, ***the covenant deals with a present inability to pay debts as they come due, not one that may occur at some point in the future***. A covenant tied to events that might or might not come to pass lacks specificity and is virtually impossible to apply in practice. The forward-looking reading suggested by JPMorgan is not the best way to construe the language…. ***The provision is most logically read as addressing the actual as opposed to the possible future inability to pay a debt that shall come due.***

*Id.* at *7 (emphasis added). The court further concluded that "a prospective reading of [the 'inability to pay' provision] is so speculative, so impractical and so potentially problematic in its application as to be unworkable and implausible," such that "the most logically and

27

commercially realistic reading ... is that it relates to the *actual* inability to pay a debt that shall become due." *Id.* at *16-17.[19]

The reasoning in *Charter Communications* is directly applicable to Section 5(a)(vii)(2). If, as Plaintiffs contend, the "unable to pay" Bankruptcy Event of Default provision was triggered by AIG's short-term liquidity concerns, which did not result in an *actual* inability to pay any debt when it became due, it would present an entirely unworkable and implausible standard. For example, under Plaintiffs' interpretation of the provision, a company facing the routine expiration of a credit facility that is needed to meet prospective obligations could be deemed "unable" to meet debts as they become due—irrespective of whether the company thereafter successfully renewed the facility or found a replacement facility—and would thus default under its ISDA Master Agreements and its other financing agreements as well.[20] In practice, there would be no bright-line differentiating between such a routine occurrence and the type of facts alleged by Plaintiffs here with regard to AIG. Plaintiffs' interpretation is thus entirely inconsistent with the overall goals of certainty and consistency embodied in the ISDA Master Agreement's boilerplate Bankruptcy Event of Default provision.

Furthermore, contrary to the Complaint's premise, numerous courts have recognized in a variety of contexts that a short-term liquidity crisis is not an automatic step towards cash-flow insolvency (and therefore does not amount to an inability generally to pay debts when due);

---

[19]     The court further took note of the fact that no witnesses "could identify an instance where a lender had declared an event of default based on a prospective assessment of what *may* occur at an unspecified time in the future" and that "JPMorgan's own witness, who has 29 years of banking experience, had never called a default based upon a prospective reading of a clause like [the 'inability to pay' loan covenant], nor is she aware of JPMorgan's ever having called such a default." *Id.* at *16.

[20]     Were Plaintiffs correct, companies would be obligated to maintain excess liquid assets at all times to avoid the risk of default, as any reliance on an outside capital infusion or new financing from either private or public sources at a time of liquidity demands could be evidence of cash flow insolvency.

rather, a short-term liquidity crisis points only to the need for a company to *raise financing*, which is exactly what AIG did here.[21]  In fact, the principle that a "temporary cash shortage" does not constitute insolvency on the basis of an inability to meet debts as they become due has existed in this Circuit for over sixty-five years.[22]

In light of this legal authority and the plain language of Section 5(a)(vii)(2), the Complaint falls well shy of alleging plausibly that AIG was ever unable to pay any debt that had become due so as to trigger a default under this provision.  To the contrary, the public AIG statements cited in the Complaint demonstrate that, starting in September 2008, the federal government intervened to provide financing to AIG for the express purpose of *averting* insolvency and *preserving* AIG's and AIG-FP's ability to pay their debts as they became due by providing the liquidity they were lacking.  For example, while the Complaint quotes selectively

---

[21]    *See, e.g.*, *Huntington Towers, Ltd. v. Franklin Nat'l Bank*, 559 F.2d 863, 866, 868-69 (2nd Cir. 1977) (declining to review Federal Reserve Bank conclusion that a bank "had severe credit and liquidity problems, but was adjudged to be solvent"); *Lowrance v. Hacker*, 866 F.2d 950, 955 (7th Cir. 1989) (rejecting defendant's defense of satisfaction and accord, finding that "while [defendant] may have had a cash flow problem at the time he spoke with [plaintiff], his situation did not indicate he was insolvent."); *In re Plastech Engineered Prods., Inc.*, 382 B.R. 90, 101 (Bankr. E.D. Mich. 2008) (identifying factual dispute as to whether, in addition to "experiencing significant liquidity difficulties," entity was also insolvent at relevant time); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 476 F. Supp. 2d 913, 923 (N.D. Ill. 2007), *vacated in part on other grounds*, 529 F.3d 371 (7th Cir. 2008) (statement that company was experiencing cash flow difficulties was not sufficient evidence that company was insolvent); *In re Adelphia Commc'ns Corp.*, Bankr. No. 02-41729 (REG), 2006 WL 687153, at *12 (Bankr. S.D.N.Y. March 6, 2006) (agreeing with plaintiff that company's cash flow issues are not necessarily indicative of insolvency, including an inability to pay debts as they become due); *Cary Oil Co., Inc. v. MG Ref. & Mkt., Inc.*, 230 F. Supp. 2d 439, 444 (S.D.N.Y. 2002) (observing that company was plunged into "a severe liquidity crisis … pushing it to the brink of insolvency").

[22]    *See Michelsen v. Penney*, 135 F.2d 409, 433 (2d Cir. 1943) ("[A] temporary cash shortage caused by unusual demand which led to no substantial delay or harm to the depositors" did not constitute insolvency); *see also Coblentz v. State*, 166 A. 45, 52 (Md. 1933) ("It is very rarely, indeed, that the financial situation of a corporation is so perfectly defined that it continues solvent up to a given instant, and is immediately thereafter insolvent.  In almost all such cases there is a period of struggle, during which efforts are made to rescue the enterprise from threatened insolvency") (internal quotation omitted).

from AIG's 2008 third-quarter Form 10-Q report to show that "[b]y early afternoon on September 16, 2008," AIG had "estimated that it had an immediate need for cash in excess of its available liquid resources," Compl. ¶ 42, it ignores the fact—stated in the *previous* sentence— that AIG had already received "the terms of a secured lending agreement" from the FRBNY, which its Board of Directors approved later that day.  AIG 2008 3Q Report, at 50 (Pickhardt Decl. Ex. A); *see also* Compl. ¶ 44 (AIG's then-CEO Robert Willumstad: "We are faced with two bad choices … File for bankruptcy tomorrow morning *or take the Fed's deal tonight*.") (emphasis added).  Thus, while AIG may in the near future have been unable to pay debts that were to come due had it not received the FRBNY's financing offer, critically, it was in fact always able to meet its immediate need for cash by accepting the federal government's credit facility, and thus was able to pay its debts as they became due.  The Complaint does not allege otherwise.

Nor are Plaintiffs able to convert the November 2008 and March 2009 refinancing of the federal credit facility into Bankruptcy Events of Default.  The Complaint states in conclusory fashion that it was "apparent [in November 2008] that AIG was still unable to pay its debts as they came due" and that in March 2009 "AIG continued to be unable to pay debts as they came due" (Compl. ¶¶ 53, 56)—but it offers no factual details to support those assertions.  Such threadbare "allegations" are plainly deficient as a matter of law.  *See, e.g., Iqbal*, 129 S. Ct. at 1949 (2009).  Moreover, the fact that the government and AIG entered into refinancing agreements with respect to the credit facility is not evidence that AIG lacked assets to pay its debts as they became due.  Instead, as the Complaint recognizes, the federal government consistently intervened to provide AIG with the necessary financing before it was unable to pay

its debts as they became due. Compl. ¶¶ 54-55, 58. Plaintiffs' allegation that this financing was provided at the "last minute" is irrelevant. *Id.* ¶ 58.

Thus, Plaintiffs' own allegations demonstrate that by accepting the federal government's secured credit facility, AIG resolved its cash flow constraints before it lacked the ability generally to pay its debts as they became due, and therefore did not, as a matter of law, trigger an Event of Default. Consequently, Plaintiffs' request for declaratory relief with respect to this Event of Default should be dismissed.

### 2.    The Complaint does not plausibly allege that either AIG or AIG-FP was insolvent

Nor does the Complaint plausibly allege that a Bankruptcy Event of Default was triggered because either AIG or AIG-FP was insolvent. *First*, although Plaintiffs contend that AIG triggered a default because it was purportedly balance sheet insolvent, Compl. ¶¶ 64-66, the Complaint meticulously avoids actually alleging that either AIG or AIG-FP has ever been insolvent on such a basis, and instead vaguely speculates that AIG *might* have been insolvent at one or more times since September 2008.[23] *See* Compl. ¶ 64 ("AIG's need for the government's ultimate infusion of $185.5 billion *strongly suggests* that AIG was balance-sheet solvent. Stated otherwise, it is *highly likely* that the fair value of AIG's assets was balance-sheet insolvent.") (emphasis added); *id.* ¶ 65 ("AIG's pattern of severe accounting misconduct *supports the inference* that AIG inflated the value of these assets.") (emphasis added); *id.* ¶ 66 ("Brookfield and Brysons believe that *discovery in this action will establish* that AIG was balance-sheet

---

[23]    As a threshold matter, there is a substantial question as to whether it is appropriate to apply a balance-sheet insolvency test under the Master Agreement. Because "becomes insolvent" in Section 5(a)(vii)(2) is not defined, the drafters' intent governs. *See, e.g.*, *Vestron, Inc. v. Nat'l Geographic Soc'y*, 750 F. Supp. 586, 592 (S.D.N.Y. 1990) ("Since the use of the word 'insolvency' is not derived from any statute, it is necessary to look to the intent of the parties to determine its significance.") In the context of derivatives contracts, ISDA was most concerned about a party's ability to meet its payment obligations, meaning that a cash flow test—rather than a balance sheet test—is the more appropriate test for a solvency-based default.

insolvent on or about September 15, 2008 and at other times.") (emphasis added). Where Plaintiffs fail, as they do here, to allege in a straightforward manner that AIG was insolvent on a balance sheet basis, the court should not permit them to engage in a vast fishing expedition for some unknown indicia of insolvency. Indeed, the Supreme Court intended the plausibility pleading standard to prevent precisely this type of expedition. *See, e.g.*, *Twombly*, 550 U.S. at 559-560 (explaining that the plausibility standard was designed to avoid the "potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support [plaintiff's] claim") (internal quotation omitted). *Accord Elevator Antitrust Litig.*, 502 F.3d at 50. Nowhere is the *Twombly* gate-keeping function more important than here, where discovery would impose an enormous financial and logistical burden on Defendants.[24]

*Second*, the possibility of balance sheet insolvency is inconsistent, in fact, with the allegations in the Complaint. These allegations reflect nothing more than that AIG suffered a short term *liquidity* crisis; the Complaint does not cite a single source suggesting either AIG or AIG-FP was ever *balance sheet* insolvent.[25] Plaintiffs' assertions to the contrary are particularly implausible given the intense public scrutiny to which AIG and AIG-FP have been subjected and the incredible volume of published material analyzing AIG and AIG-FP's financial condition during this critical period. *Cf.* Compl. ¶¶ 38-45, 47, 48, 47, 73 and sources cited therein.

---

[24]    Defendants would be required to provide discovery regarding the solvency of a multinational holding corporation that, at the time of the alleged insolvency, comprised at least 223 companies with assets exceeding $1 trillion and operations in over 130 countries and jurisdictions worldwide. *See* GAO Report, at 5 (Pickhardt Decl. Ex. E), *cited in* Compl. ¶ 38; AIG 2008 3Q Report, at 1-2 (Pickhardt Decl. Ex. A), *cited in* Compl. ¶ 64.

[25]    For example, when the alleged statement by former AIG CEO Robert Willumstad that AIG had to "[f]ile for bankruptcy tomorrow morning or take the Fed's deal tonight," Compl. ¶ 44, is read in conjunction with the passages cited from AIG's Form 10-Q report for the third quarter of 2008, *id.* ¶ 42, it is clear that Mr. Willumstad's alleged statement relates to AIG's liquidity crisis, not its balance sheet solvency.

Clearly, had AIG's balance sheet solvency been a serious question, Plaintiffs would have cited material in their Complaint claiming as much.

Nor can Plaintiffs find any support from AIG's financial statements, which are referenced in the Complaint and indicate that AIG's balance sheet reflected a positive stockholders' equity as of June 30, 2008, September 30, 2008, December 31, 2008, March 31, 2009, June 30, 2009, and September 30, 2009, demonstrating that AIG's total assets exceeded its liabilities at the date of those balance sheets. AIG Form 10-Q report for the second quarter of 2008, filed Aug. 6, 2008, at 2 (Pickhardt Decl. Ex. F); AIG 2008 3Q Report (Compl. ¶¶ 42, 47, 50, 64), at 2 (Pickhardt Decl. Ex. A); AIG 2008 Annual Report (Compl. ¶¶ 56, 58, 64), at 193 (Pickhardt Decl. Ex. G); AIG Form 10-Q report for the first quarter of 2009, filed May 7, 2009, at 4 (Pickhardt Decl. Ex. H); AIG Form 10-Q report of the second quarter of 2009, filed Aug. 7, 2009, at 4 (Pickhardt Decl. Ex. I); AIG 2009 3Q Report, at 4 (Pickhardt Decl. Ex. C).[26] Indeed, apart from lacking any factual basis, Plaintiffs' allegation that "it is highly likely that the *fair value* of AIG's assets was less than their liabilities," Compl. ¶ 64 (emphasis added), would not be sufficient to support the allegation that a default under the Swap Agreement had occurred, even if it were true. It was only in 2006 that accounting standard-setters defined the concept of "fair value" and developed a fair value measurement framework, almost twenty years after the Master Agreement was drafted, and over sixteen years after the parties executed the Swap Agreement. *See* Financial Accounting Standards Board, *Statement of Financial Accounting Standards No. 157: Fair Value Measurements* (issued Sept. 2006 and effective for financial statements issued for fiscal years beginning after Nov. 15, 2007), *available at*

---

[26]    On a motion to dismiss, the Court may consider any "legally required public disclosure documents filed with the SEC." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

<http://www.fasb.org/pdf/aop_FAS157.pdf>.     Consequently, the drafters of the Master Agreement clearly could not have intended a "fair value" analysis based on reported balance sheets to be the test for an insolvency-based default, and the Complaint's allegations are thus insufficient for this reason as well.

 *Third*, the Complaint's allegation that AIG "inflated" the value of its assets, Compl. ¶ 65, amounts to nothing more than a thinly disguised accusation of accounting fraud, which is utterly devoid of factual support.  Compl. ¶ 65.  This claim thus fails to meet the heighted pleading standard in Rule 9(b) applicable to allegations of fraudulent conduct.  *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (the wording of Rule 9(b) "is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."); *Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 252 (S.D.N.Y. 2008) (allegations of false omissions and representations held to constitute "a quintessential averment of fraud").     Moreover, the Complaint essentially asks the Court to disregard AIG's balance sheets because AIG took an $83 billion write-down of assets in the 90 days after September 30, 2008.  Compl. ¶ 64.  But fair value estimates by their very nature are subject to future revisions even in normal times, and a mere write-down (or write-up) of fair value in a subsequent period is hardly "startling," *id.*, let alone indicative of financial malfeasance, especially in the context of the financial crisis that rocked the United States during 2008.  It is undisputed that AIG's 2008 financial statements were audited by PricewaterhouseCoopers ("PwC"), one of the Big Four auditing firms, and that PwC gave an unqualified, clean opinion on these financial statements, concluding that they were fairly presented in accordance with GAAP.  AIG 2008 Annual Report, at 191 (Pickhardt Decl. Ex. G), *cited* Compl. ¶¶ 56, 58, 64.  The Complaint, moreover, points to nothing in AIG's 2008 10-K and

10-Q filings or its 2009 10-Q filings to date suggesting that AIG's accounting and reporting violated the applicable GAAP rules and disclosure requirements for these filings.  Indeed, by noting that PwC brought issues with respect to AIG's internal controls to the company's attention, Compl. ¶ 65, the Complaint actually demonstrates that PwC has been acting as a diligent, independent auditor, not simply a "rubber stamp" of AIG's financials.[27]

*Fourth*, unable to directly challenge the validity of AIG's financial statements, the Complaint turns to distraction via a hodge-podge of dated or unsubstantiated accusations bearing no plausible connection to AIG's recent financial statements.  *See* Compl. ¶ 65.  For example, the fact that AIG had issues with the SEC *several years ago* regarding accounting practices unrelated to the valuation of assets says absolutely nothing about whether AIG misstated the value of its assets in its 2008 financial statements.  Nor does the fact that a reinsurance executive, without any asserted connection to AIG's 2008 financial statements, was found guilty of assisting an accounting fraud at another company plausibly have any bearing on the veracity of those financial statements.  Similarly, the fact that a former employee of AIG-FP, who acknowledges that he is "not an expert in the valuation of derivatives," questioned the valuation of certain swaps hardly lends any credibility to Plaintiffs' assertions of malfeasance.  *See* Letter of Joseph St. Denis to United States House of Representatives Committee on Oversight & Government Reform (Oct. 4, 2008), Compl. ¶ 65.  Simply put, these allegations in no way enhance the Complaint's otherwise bald assertions of balance sheet insolvency.  *See, e.g.*, *Twombly*, 550 U.S. at 556 ("Asking for plausible grounds to infer [existence of cause of action] … calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" to prove the claim in

---

[27]    Even if the Complaint were correct that certain assets were overvalued, it nowhere alleges that the correct valuation would have rendered AIG balance-sheet insolvent.  This glaring deficiency is yet another reason that the Complaint fails to state a claim for declaratory relief.

question).  Plaintiffs' request for a declaration that an event of default was triggered based on

AIG becoming "insolvent" should therefore be dismissed.

## II. EVEN IF A BANKRUPTCY EVENT OF DEFAULT HAS OCCURRED, PLAINTIFFS STILL HAVE OBLIGATIONS TO AIG AND AIG-FP BECAUSE SECTION 6(E) OF THE SWAP AGREEMENT IS AN UNENFORCEABLE PENALTY CLAUSE

Finally, even if a Bankruptcy Event of Default has occurred, Plaintiffs are not entitled to

a declaration "that they have no further obligations to AIG-FP or AIG under Section 6(e)(i)(1) of

the Swap Agreement or any associated contract or guarantee, other than to return the escrowed

October 2008 and April 2009 payments."  Compl. ¶ 83.  Plaintiffs contend Section 6(e)(i)(1)

provides that, upon termination of a swap transaction due to an event of default, a non-defaulting

party will not be obligated to pay the defaulting party a termination payment regardless of the

market value of the swap.  *Id.* ¶ 28.  Even assuming Plaintiffs' interpretation is correct,[28] because

the Swap is structured so that, in the foreseeable interest rate environment that has occurred, the

bulk of Brookfield's payment obligations do not arise until maturity, Section 6(e)(i)(1)

constitutes a void and unenforceable penalty clause under New York law.

New York has a strong public policy against the enforcement of penalty clauses.  A

contractual provision that provides specific consequences to a breaching party will be sustained

only when (1) the consequences from the breach bear a reasonable relationship to the amount of

damages that would be expected to result from the breach, that is, the consequence is not "plainly

or grossly disproportionate to the possible loss;" *and* (2) damages from the breach were difficult

to ascertain at the time the parties entered into the contract.  *Howard Johnson Int'l Inc. v. HBS*

*Family, Inc.*, No. 96 CIV. 7687 (SS), 1998 WL 411334, *5 (S.D.N.Y. July 22, 1998)

(Sotomayor, J.).  *Accord Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420,

---

[28] Defendants reserve the right to challenge Plaintiffs' interpretation of this provision.

424 (1977).  The public policy against contractual penalty provisions is so strong that "courts should resolve any reasonable doubt as to whether a provision constitutes an unenforceable penalty or a proper liquidated damages clause in favor of a construction which holds the provision to be a penalty."  *Howard Johnson*, 1998 WL 411334, at *5 (citing cases).  Whether a contractual provision "represents an enforceable liquidation of damages or an unenforceable penalty is a question of law, giving due consideration to the nature of the contract and the circumstances."  *JMD Holding Corp. v. Congress Fin. Corp.*, 4 N.Y.3d 373, 379-380 (2005).  In deciding this issue of law, "it is not material whether the parties themselves have chosen to call the provision one for 'liquidated damages' or have styled it as a penalty."  *Howard Johnson*, 1998 WL 411334 at *7.

Under the particular facts of the Swap alleged in the Complaint, Section 6(e)(i) fails both prongs of New York's test for penalty clauses.  *First*, under Plaintiffs' interpretation of the clause, Section 6(e)(i) does not produce a reasonable estimate of loss caused to the non-defaulting party.  Rather, it operates as a penalty against the defaulting party because it provides that no payments will be owed to that party *regardless of the severity of the breach, regardless of the amount owed on the Swap, and regardless of the unexpired time left under the Swap Agreement*.  In other words, Section 6(e)(i) permits a non-defaulting party to walk away from its obligations, no matter how large or small, and without regard to whether it has suffered *any* injury as a result of the breach.

For example, Section 6(e)(i) does not account for the fact that the Swap Agreement can be breached in varying degrees of severity but result in *no harm at all* to the non-defaulting party.  This is apparent from the facts here:  if Section 6(e)(i) is enforced to permit Plaintiffs to simply "walk away," AIG-FP will be penalized approximately $1.2 billion for its alleged

technical breach despite having fulfilled all its payment obligations, and Brookfield will simultaneously achieve a $1.2 billion windfall. Courts applying New York law routinely invalidate contractual provisions, like Section 6(e)(i), that exact the same punishment regardless of the severity of the breach or where the penalty imposed is not an agreed pre-estimate of damages. *See, e.g.*, *Bristol Inv. Fund v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556, 566 (S.D.N.Y. 2003) (clause contrary to public policy where "purpose is not to compensate injured party for the breach but rather to impose a penalty on the breaching party by requiring payment of a sum of money grossly disproportionate to the amount of actual damages"); *In re MarketXT Holdings Corp.*, 376 B.R. 390, 416-417 (Bankr. S.D.N.Y. 2007) (invalidating prepayment penalty because "it bore no reasonable relationship to any damages that could have been suffered by Defendants" from the breach); *Fingerlakes Aquaculture, LLC v. Progas Welding Supply, Inc.*, 825 N.Y.S.2d 559, 560 (N.Y. App. Div. 2006) (provision that fixes damages in amount grossly disproportionate to probable loss is an unenforceable penalty clause).[29]

And, perversely, under the circumstances presented here, the longer AIG makes its semiannual payments, the more it suffers from a technical breach that results in no harm at all to Brookfield. The parties were well aware at the time they entered into the Swap that there was every chance that the bulk of Brookfield's obligations would accrue on maturity of the Swap and that, consequently, early termination on the basis of an AIG-FP default could impose an increasing and significant penalty on AIG-FP over time. *See* Compl. ¶¶ 17-19. Yet, despite this

---

[29] The fact that the parties to the Swap Agreement are sophisticated does not render Section 6(e)(i) any less of a penalty clause. *See, e.g.*, *Bristol*, 310 F. Supp. 2d at 566 (invalidating penalty provision in investment fund's contract); *In re Northwest Airlines Corp.*, 393 B.R. 352, 358 (Bankr. S.D.N.Y. 2008) ("[T]here is no principle that a sophisticated party should be bound by a patently unreasonable liquidated damages provision."); *In re MarketXT*, 376 B.R. at 421 (invalidating $15.5 million penalty agreed to by corporate debtor); *In re O.P.M. Leasing Servs., Inc.*, 23 B.R. 104, 113 (Bankr. S.D.N.Y. 1982) (invalidating penalty provision in equipment leasing contract).

asymmetrical structure of the parties' payment obligations, Section 6(e)(i) does not account for the length of time remaining until maturity at the time of a default.  In a nearly identical circumstance, then-Judge Sotomayor ruled that a damages provision was "not a reasonable estimate of the potential loss likely to be suffered *because it does not take into account the length of time remaining on the unexpired [contract] at the time of default*."  *Howard Johnson*, 1998 WL 411334, at *7 (emphasis added).

Against these authorities, Plaintiffs are likely to rely on *Drexel Burnham Lambert Prods. Corp. v. Midland Bank PLC*, 92 Civ. 3098 (MP), 1992 Dist. LEXIS 21223 (S.D.N.Y. Nov. 9, 1992), where a court ruled that a close-out provision in a swap agreement, which was triggered by the bankruptcy filing of a parent guarantor, did not constitute a penalty clause.  That decision, however, is entirely devoid of substantive analysis, and its value has been questioned.  *See, e.g.*, ALI-ABA Course of Study Materials, Broker-Dealer Regulation, *Legal Aspects of "Netting" in Respect of Insolvent Derivative Product Counterparties* (Feb. 1998) ("*Drexel* is not a reasoned or published opinion and its precedential value may therefore be limited.").  Moreover, the circumstances of that case are far from those present here, as (i) the amount at issue there was only $373,000, far less than the $1.2 billion at issue here, (ii) there is no indication that the *Drexel* swap was asymmetrical, as the Swap is here and (iii) the event of default in *Drexel* was an actual bankruptcy filing, whereas AIG or AIG-FP have continued to meet every single one of their obligations as and when due, and there has been no filing.

In sum, because Section 6(e)(i) operates as a penalty on the purported defaulting party and bestows a windfall on the alleged non-defaulting party completely disproportionate to the breach committed or loss suffered, it fails the first prong of New York's test for penalty clauses.

*Second*, Section 6(e)(i), as interpreted by Plaintiffs, also fails to satisfy the second prong of New York's test because, at the time the parties entered into the Swap Agreement, damages from a future breach were not speculative or otherwise difficult to ascertain. In fact, the Swap Agreement itself establishes a straightforward method for calculating amounts owed upon a default or early termination of the Swap Agreement by way of the solicitation of market quotations from reference market makers, as is standard practice in ISDA Master Agreements. *See* Master Agreement, § 6(e). Therefore, under well-established penalty clause jurisprudence, Section 6(e)(i) is unenforceable to the extent that it permits a non-defaulting party to avoid making a termination payment, and Plaintiffs are therefore not entitled to a declaration absolving them of their obligations to AIG and AIG-FP.

## **CONCLUSION**

The Complaint should be dismissed in its entirety.

DATED:   New York, New York        QUINN EMANUEL URQUHART OLIVER &
           December 17, 2009          HEDGES, LLP

By: _____
Michael B. Carlinsky
Daniel Cunningham
Jonathan Pickhardt
William B. Adams
Simona Gory

51 Madison Avenue, 22nd Floor
New York, New York 10010-1601
(212) 849-7000
michaelcarlinsky@quinnemanuel.com
danielcunningham@quinnemanuel.com
jonpickhardt@quinnemanuel.com
williamadams@quinnemanuel.com
simonagory@quinnemanuel.com

*Attorneys for Defendants AIG Financial
Products Corp. and American International
Group, Inc.*

40