UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————x
:
BROOKFIELD ASSET MANAGEMENT, INC.,    :
f/k/a Hees International Bancorp Inc., and    :
:
BRYSONS INTERNATIONAL, LTD.,    :
f/k/a Brysons International Bank, Ltd.,    :
:
Plaintiffs,    :
:
v.    :    Case No. 09-CV-8285 (PGG)
:
AIG FINANCIAL PRODUCTS CORP. and    :
:
AMERICAN INTERNATIONAL GROUP, INC.,    :
:
Defendants.    :
————————————————————x


## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

RICHARD F. ZIEGLER
STEPHEN L. ASCHER
LUKE P. MCLOUGHLIN
DANIELLE F. TARANTOLO
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, NY 10022-3908
*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

THE COMPLAINT—AND AIG'S DISREGARD OF IT ............................................................ 7

    A.  The 1990 Transactions ........................................................................................ 7

    B.  AIG's Collapse and the Federal Bail-Outs ........................................................... 9

    C.  The Events of Default ......................................................................................... 11

ARGUMENT .................................................................................................................... 14

I.    THE COMPLAINT PLAUSIBLY ALLEGES EVENTS OF DEFAULT BY AIG ............. 14

    A.  The Complaint Plausibly Alleges an "Unable to Pay" Event of Default ...................... 14

    B.  The Complaint Plausibly Alleges a Balance-Sheet Insolvency Event of Default ......... 22

    C.  The Complaint Plausibly Alleges That AIG Defaulted by Taking Actions in Furtherance of Bankruptcy ..................................................................................... 25

    D.  The Complaint Plausibly Alleges an Event of Default Arising Out of the Dissolution, Winding-Up, and/or Liquidation of AIG-FP ............................................. 29

    E.  The Complaint Plausibly Alleges a Trustee-Related Event of Default ......................... 32

II.    THE COMPLAINT PRECLUDES AIG'S AFFIRMATIVE DEFENSE THAT THE 1987 ISDA FORM IS UNENFORCEABLE ................................................................. 33

CONCLUSION .................................................................................................................. 38

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ascension Health v. Am. Int'l Group, Inc.*,
No. 08-7765, 2009 WL 2195916 (S.D.N.Y. July 23, 2009)...................................................14

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009)..............................................................................................3, 14

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87, 98 (2d Cir. 2007)........................................................................................14

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)............................................................................................3, 14, 23

*Bigda v. Fischbach Corp.*,
849 F. Supp. 895 (S.D.N.Y. 1994)...................................................................................34

*Cary Oil Co., Inc. v. MG Ref. & Mkt., Inc.*,
230 F. Supp. 2d 439 (S.D.N.Y. 2002)..............................................................................22

*Drexel Burnham Lambert Prods. Corp. v. Midland Bank PLC*,
No. 92-3098, 1992 Dist. LEXIS 21223 (S.D.N.Y. Nov. 9, 1992)................................... passim

*Drexel Burnham Lambert Products Corp. v. MCorp*,
No. 88C-NO-80, 1989 Del. Super. LEXIS 69 (Sup. Ct. Del. Feb. 23, 1989), *reh'g denied*, 1991 Del Super. LEXIS 298 (Sup. Ct. Del. Aug. 13, 1991) .............................. passim

*Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*,
46 N.Y.2d 573 (1979) ..................................................................................................34

*Fin. One Public Co. Ltd. v. Lehman Bros. Special Fin., Inc.*,
No. 00-6739, 2003 WL 21638214 (S.D.N.Y. July 11, 2003).................................................34

*Howard Johnson Int'l Inc. v. HBS Family Inc.*,
No. 96-7687, 1998 WL 411334 (S.D.N.Y. July 22, 1998) ...................................................34

*Huntington Towers, Ltd. v. Franklin Nat'l Bank*,
559 F.2d 863 (2d Cir. 1977)...........................................................................................22

*In re Adelphia Commc'ns Corp.*,
Bankr. No. 02-41729, 2006 WL 687153 (Bankr. S.D.N.Y. March 6, 2006)...........................22

*In re AlphaStar Ins. Group, Ltd.*,
383 B.R. 231 (Bankr. S.D.N.Y. 2009) ..............................................................................24

*In re Baylies' Estate*,
    279 N.Y.S. 415 (N.Y. Sur. 1935)..........................................................................33

*In re Charter Communications,*
    419 B.R. 221 (Bankr. S.D.N.Y. 2009) .........................................................3, 20, 21

*In re City of Bridgeport*,
    129 B.R. 332 (Bankr. D. Conn. 1991) ...........................................................18, 19

*In re City of Vallejo, Cal.*,
    No. 08-26813-A-9, 2008 WL 4180008 (Bankr. E.D. Cal. Sept. 5, 2008), *aff'd*, 408
    B.R. 280 (9th Cir. B.A.P. 2009) ...................................................................18, 19

*In re Hamilton Creek Metro. Dist.*,
    143 F.3d 1381 (10th Cir. 1998) ...........................................................................18

*In re McCurtain Municipal Auth.*,
    No. 07-80363, 2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007) ....................18

*In re O.P.M. Leasing Servs*,
    23 B.R. 104, 111 (Bankr. S.D.N.Y. 1982) ............................................................36

*In re Pierce County Hous. Auth.*,
    414 B.R. 702 (Bankr. W.D. Wash. 2009) ..............................................................19

*In re Plastech Engineered Prods., Inc.*,
    382 B.R. 90 (Bankr. E.D. Mich. 2008) ..................................................................22

*In re Revere Copper & Brass, Inc.*,
    60 B.R. 887, 891 (Bankr. S.D.N.Y. 1985) ............................................................28

*In re Solutia, Inc.*,
    No. 03-17949, 2007 WL 1302609 (Bankr. S.D.N.Y. May 1, 2007) ....................28

*In re Teleglobe Commc'ns Corp.*,
    392 B.R. 561 (Bankr. D. Del. 2008) ...............................................................17, 18

*In re Town of Westlake, Tex.*,
    211 B.R. 860 (Bankr. N.D. Tex. 1997) ..................................................................18

*In re United Merchants & Mfrs., Inc.*,
    674 F.2d 134 (2d Cir. 1982)...................................................................................36

*Indus. Dev. Found. of Auburn v. U.S. Hoffman Mach. Corp.*,
    171 N.Y.S.2d 562 (Sup. Ct. 1958)........................................................................33

*Jama v. Immigration & Customs Enforcement*,
    543 U.S. 335 (2005)...............................................................................................16

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec,*
476 F. Supp. 2d 913 (N.D. Ill. 2007), *vacated in part on other grounds*, 529 F.3d 371
(7th Cir. 2008)...............................................................................................................22

*Kreiss v. McCown de Leeuw & Co.,*
131 F. Supp. 2d 428 (S.D.N.Y. 2001).........................................................................37

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.,*
424 F.3d 195 (2d Cir. 2005).........................................................................................15

*Lowrance v. Hacker,*
866 F.2d 950 (7th Cir. 1989) .......................................................................................22

*Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.,*
86 N.Y.2d 685 (1995) ..................................................................................................34

*Pacificorp Capital, Inc. v. Tano, Inc.,*
877 F. Supp. 180 (S.D.N.Y. 1995)...............................................................................34

*Pani v. Empire Blue Cross Blue Shield,*
152 F.3d 67 (2d Cir. 1998)...........................................................................................33

*Price v. New York State Bd. of Elections,*
540 F.3d 101 (2d Cir. 2008).........................................................................................14

*Re Lafayette Elecs. Europe Ltd,* [2007] B.C.C. 890, 892, 2006 WL 4852113 (U.K. Ch.D.
2006) .............................................................................................................................30

*Re a Company (No. 000314 of 1989),* [1990] B.C.C. 221, 223, 1990 WL 753980 (U.K.
Ch.D. 1989)..................................................................................................................30

*Rescuecom Corp. v. Google Inc.,*
562 F.3d 123 (2d Cir. 2009).........................................................................................14

*S.E.C. v. Am. Bd. of Trade,*
719 F. Supp. 186 (S.D.N.Y. 1989)...............................................................................31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
551 U.S. 308 (2007).....................................................................................................14

*Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.,*
41 N.Y.2d 420 (2d Cir. 1977).......................................................................................35

*Trustco Bank New York v. 37 Clark St., Inc.,*
599 N.Y.S.2d 404 (Sup. Ct. 1993)...............................................................................37

*United States v. Kerley,*
416 F.3d 176 (2d Cir. 2005).........................................................................................16

*Union Bank of Switzerland v. Deutsch fin. Servs. Corp.*,
No. 98-3251, 2000 WL 178278 (S.D.N.Y. Feb. 16, 2008)....................................................28

*Valentine Gardens Co-op., Inc. v. Oberman*,
237 N.Y.S.2d 535 (N.Y. Sup. 1963) ...................................................................................33

*Wilmington Trust Co. v. Aerovias de Mexico*,
893 F. Supp. 215 (S.D.N.Y. 1995)........................................................................................34

*Winston Personnel Agency, Inc. v. Abcon Indus. Inc.*,
438 N.Y.S.2d 669 (1980) ...................................................................................................36

STATUTES

8 DEL. CODE §§ 271-85 (2009)........................................................................................29, 30

11 U.S.C. § 101.........................................................................................................18, 19, 23

N.Y. DEBT. & CRED. LAW § 271 ..........................................................................................23

United Kingdom Insolvency Act of 1986.................................................................29, 30

OTHER AUTHORITIES

2003 ISDA Credit Definitions ............................................................................................9

BLACK'S LAW DICTIONARY (8th ed. 2004) .......................................................................29

Federal Rule of Civil Procedure 9 .....................................................................................24

Federal Rule of Civil Procedure 12 ...................................................................... passim

WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE
CORPORATIONS (2003) ...................................................................................................29

ANTHONY C. GOOCH & LINDA B. KLEIN, 2 DOCUMENTATION FOR DERIVATIVES (4TH ED.
2002) ...............................................................................................................................17

ISDA G6 Committee, *Commentary on Supplement Relating to Successor and Credit
Events to the 1999 ISDA Credit Derivatives Definitions*........................................27

Jongho Kim, *From Vanilla Swaps to Exotic Credit Derivatives: How to Approach the
Interpretation of Credit Events*, 13 FORDHAM J. CORP. & FIN. L. 705 (2008)........................26

Lauren T. LaCapra, *AIG Ex-CEO Breaks Down the Final Days*, THESTREET.COM,
Sept. 25, 2009 .................................................................................................................10

RICHARD A. LORD, WILLISTON ON CONTRACTS (4th ed. 2000) ....................................36

ROGER LOWENSTEIN, WHEN GENIUS FAILED: THE RISE AND FALL OF LONG-TERM CAPITAL MANAGEMENT (Random House 2000)........................................................................27

Stephanie J. Seligman, *Just-In-Case: Planning For A Potential Restructuring,* 793 PLI/CORP 703 (1992) ....................................................................................16, 26, 27

SIGTARP REPORT, FACTORS AFFECTING EFFORTS TO LIMIT PAYMENTS TO AIG COUNTERPARTIES 8 (Nov. 17, 2009)...........................................................................25

Deborah Solomon & Matthew Karnitschnig, *Bad Bets and Cash Crunch Pushed Ailing AIG to Brink*, WALL ST. J., Sept. 18, 2008...........................................................11

AARON ROSS SORKIN, TOO BIG TO FAIL (Viking 2009) ..................................................10

JANET TAVAKOLI, STRUCTURED FINANCE AND COLLATERALIZED DEBT OBLIGATIONS (2d ed. 2008) ...................................................................................................................26

JEFFREY S. TOLK, UNDERSTANDING THE RISKS IN CREDIT DEFAULT SWAPS 6 (Moody's Inv. Servs. March 16, 2001)........................................................................................26

United States Government Accountability Office, Troubled Asset Relief Program: Status of Government Assistance Provided to AIG, Sept. 2009 .......................................10

User's Guide to the Standard Form Agreements: 1987 Edition ...................................30

User's Guide to the ISDA 2002 Master Agreement: 2003 Edition ..............................38

Plaintiffs Brookfield Asset Management, Inc. and Brysons International, Ltd. (collectively, "Plaintiffs" or "Brookfield") respectfully submit this memorandum of law in opposition to the Motion by Defendants American International Group, Inc. and AIG Financial Products Corp. ("AIG-FP") (collectively, "AIG" or "Defendants") to Dismiss Brookfield's Complaint.[1]

## PRELIMINARY STATEMENT

AIG suffered a historic collapse in September 2008, and was transformed from perhaps the strongest AAA credit in the world to a ward of the federal government. The unprecedented $85 billion government bail-out (ultimately, $182.5 billion) was indisputably provided solely to prevent AIG from filing a bankruptcy petition the next day. Brookfield's Complaint alleges that these events constituted defaults by AIG under the plain language of the parties' then 18-year old Swap Agreement. The Swap Agreement incorporates industry-standard provisions from 1987 that were purposely designed both to trigger defaults well in advance of a bankruptcy filing or actual payment default and to terminate any future obligations of the non-defaulting party.

It is unsurprising that the extraordinary circumstances of AIG's economic meltdown constituted Events of Default of an Agreement purposely drafted to protect a party from continuing to have to do business with a counterparty who has suffered a severe financial reversal. AIG suffered far more than routine "resolved" "liquidity concerns," as AIG claims. Mem. 9-10. AIG's strident insistence that the Agreement remains in force despite AIG's fundamental economic transformation is, at best, implausible.

AIG's effort to dismiss Brookfield's complaint falls into two categories of argument: first, AIG attacks Brookfield for seeking to vindicate its contractual rights, going outside the

---

[1]   This memorandum references the same terms and definitions used in Brookfield's Complaint and references AIG's Memorandum of Law as "Mem."

record on this dismissal motion to argue that Brookfield has purchased a "lottery ticket" that, if successful, would cause havoc in the markets.  Mem. 1-2.  In doing so, AIG not only flaunts Rule 12 but disregards the Complaint's allegation that Brookfield's claim is likely unique because its 1987 ISDA Form is different than that used by current market participants.

Second, and more important, when addressing the Events of Default pleaded in the Complaint, AIG simply rewrites the Swap Agreement's text—claiming boldly, for example, that "unable to pay" means "fails to pay," that "any action" means "corporate action," and that "winding-up" means "winding-up . . . [only for] corporations chartered in countries governed by United Kingdom-based insolvency regimes."  Mem. 15, 20, 26.  But as the actual text of the Agreement and the pertinent cases show, Brookfield is entitled to enforcement of the Swap Agreement as written.

 Because AIG's collapse is perhaps the best-documented calamity in the financial history of the United States, the Complaint's allegations are extensively supported, including by AIG's own admissions in its securities filings and in the congressional testimony of its former CEO and then-current CEO.  The Complaint includes detailed allegations that AIG was both "unable to pay its debts" and balance-sheet insolvent, that AIG took "action in furtherance" of a bankruptcy filing, and that AIG triggered additional defaults by taking actions to close its subsidiary AIG-FP and submit to a tailor-made form of federal ownership and oversight.

Each of AIG's arguments regarding these Events of Default should be rejected as a matter of law:

Unable to Pay Debts.  AIG contests the sufficiency of Brookfield's allegation that AIG was unable to pay its debts on the eve of its massive federal government bail-outs, primarily by emphasizing that in the end it did not default on any payment obligation.  Mem. 4.  But AIG's

argument necessarily requires that the Swap Agreement's phrase "unable . . . to pay its debts" be interpreted to have the same meaning as the phrase "fails . . . to pay its debts."  Swap Agreement, § 5(a)(vii)(2).   That argument violates the fundamental rule of contract construction that all phrases should be meaningful, and accordingly several courts have rejected it and held that the "unable to pay debts" test is a prospective one.

AIG's reliance on a recent bankruptcy court decision, *In re Charter Communications*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009), is misplaced: That ruling held that certain creditors had proven at most a "speculative" inability to pay that may or may not have come to pass six months in the future.  *Id.* at 246.  Because *Charter* did not involve an inability to pay imminent debts, as Brookfield has pleaded here, its holding has no applicability.

Balance-Sheet Insolvency.   The Complaint alleges—among numerous other bases for balance-sheet insolvency—what most valuation experts would likely regard as common sense: An entity that reports a net worth of $78 billion but requires an emergency $182.5 billion bail-out was plausibly insolvent prior to the bail-out.   AIG cannot challenge this allegation of balance-sheet insolvency under the "plausibility" standard of *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).   AIG also contends that its financial statements, which do not admit its insolvency, are by themselves dispositive of Brookfield's claim.  Mem. 33-34.  But the Complaint's pleading of AIG's economic catastrophe, its huge, record-breaking write-downs, and its history of unreliable financial statements, amply overcome the AIG financial statements for pleading purposes.

Actions in Furtherance of Bankruptcy.   Although AIG took virtually every step in furtherance of bankruptcy short of a corporate resolution and the filing itself, AIG contends that only a Board resolution triggers the "in furtherance of bankruptcy" Event of Default.  Mem. 3.

Yet the plain language of the 1987 ISDA Form says no such thing, and the cases upon which

AIG relies construe the language "corporate action" in furtherance of bankruptcy, rather than the

1987 ISDA Form's "any action" language.  AIG also disregards the numerous commentators

who acknowledge the risk under the 1987 ISDA Form that a party's preparatory acts could

trigger an automatic "in furtherance of bankruptcy" default.  Notably, subsequent ISDA Forms

were revised to eliminate this risk, but AIG never sought to update the documentation for these

swaps to use those forms, as was market practice.

    AIG-FP's Dissolution, Winding-Up, and/or Liquidation.  The Complaint alleges that AIG

is in the process of "shutting down" and "winding up" its subsidiary AIG-FP, that it has

prohibited AIG-FP from conducting new business, and that it is running off its remaining

trades—yet AIG somehow argues that none of this is "in furtherance of" or "analogous to" any

of the several Events of Default that concern, colloquially, "going out of business."  First, AIG

argues that the 1987 ISDA Form applies only to "wind ups" in the United Kingdom, Mem. 3, a

proposition that is defied by the plain text of the 1987 ISDA Form.  AIG also argues that the

"informal, voluntary process of 'winding down' [AIG-FP's] business activities without court

supervision . . . over a substantial period of time" has no legal significance under the 1987 ISDA

Form.  Mem. 3.  This argument fails to grapple with the contract's "actions in furtherance" and

"analogous effect" provisions, which were designed to broaden the defaults under the contract

and preclude a party from avoiding a default by failing to obtain formal corporate or legal

authority for its actions.

    Trusteeship.  Finally, Brookfield alleges that the federal take-over of AIG was

"analogous to" "the appointment of an administrator, receiver, trustee, custodian or other similar

official for [AIG or AIG-FP] or for all of its assets," Compl. ¶ 81, because the government

replaced AIG's CEO with a hand-picked successor, tasked the new CEO with shutting down AIG-FP and restructuring AIG's obligations, and created a Trust run by federally appointed Trustees to manage the government's 79.9% interest in AIG's stock.  Here, AIG appears to contend, first, that the bail-out did not entail the "appointment" of a governmental official "pursuant to statute," and second—by simply ignoring the government's selection of AIG's CEO, Compl. ¶¶ 72-74—that no government-appointed official is "manag[ing AIG's] day-to-day operations and . . . dispos[ing] of or restructur[ing] its assets in a liquidation or restructuring." Mem.  4.  These contentions ignore the practical effect of the federal bail-out; the government is actually participating in the management of AIG's affairs.

Recognizing the likelihood that it will ultimately be found to have defaulted on the Swap Agreement, AIG also asserts the equitable defense that the Swap Agreement's close-out provision is unenforceable.  Mem. 5.  AIG claims that its default based on a collapse of epic proportions is somehow a mere technicality, and that Brookfield would achieve a windfall if the contract were enforced as written.  Mem. 36-39.  But Brookfield seeks nothing more than the well-established remedy for a default set forth in the 1987 ISDA Form.  Moreover, while AIG contends that Brookfield already owes it $700 million arising from the $200 million that Brookfield originally borrowed from AIG, Mem. 1, Brookfield long ago repaid the principal it borrowed, with interest.  Compl. ¶ 16.  The $700 million is simply AIG's present valuation of a contingent receivable that might have come due in 2015; how the parties have booked this future payment is of no moment.

Under these circumstances, the close-out provision cannot be considered a "penalty" or "forfeiture" as a matter of law.  The provision does not require AIG either to make any payment to Brookfield, or to forfeit any asset it currently holds; it merely eliminates a contingent

receivable that would not have matured until 2015. That result is precisely what AIG bargained for when it chose the 1987 ISDA Form. *See Drexel Burnham Lambert Prods. Corp. v. Midland Bank PLC*, No. 92-3098, 1992 Dist. LEXIS 21223 (S.D.N.Y. Nov. 9, 1992) (holding identical clause enforceable).

In any event, even if AIG could plead an affirmative defense of unenforceability in these circumstances, the defense would be too-fact intensive for a dismissal motion. This is particularly true because the Complaint specifically alleges facts that reinforce the enforceability of the close-out provision: AIG simply disregards Brookfield's allegations that AIG, not Brookfield, chose to structure these transactions as swaps incorporating the 1987 ISDA Form; that the symmetrical Event of Default and close-out provisions could have applied to either party and originally favored AIG, not Brookfield; and that AIG has repeatedly evidenced its continuing preference for these provisions by not seeking to update these transactions with the successor ISDA Forms, contrary to common market practice. A sophisticated party such as AIG cannot establish that a provision it negotiated for its own benefit is unenforceable because it was ultimately not to its advantage.

Finally, AIG's repeated theme that Brookfield's claim must be flawed because other market participants have not called defaults on agreements with terms "almost identical to the event of default provisions relied on by Plaintiffs here," Mem. 1, is not only procedurally improper but highly misleading. Most interest rate swaps originally based on the 1987 ISDA Form have long since terminated, and the few that have not terminated have likely been redocumented under subsequent ISDA Forms, which are notably different from the 1987 ISDA Form in pertinent respects. By the same token, credit default swaps cannot be compared to the Brookfield/AIG interest rate swaps because they have different Event of Default provisions and

settle differently.  Thus, the Court can—and must on this Rule 12(b)(6) motion—ignore AIG's hyperbolic claims that a ruling for Brookfield will render the governmental rescue of AIG "for naught," Mem. 2, or will cause "significant contractual uncertainty and market disruption," Mem. 16-17.

### THE COMPLAINT—AND AIG'S DISREGARD OF IT

On September 30, 2009, Brookfield filed the Complaint alleging that AIG's catastrophic financial collapse and tailor-made, ongoing federal bail-out triggered several contractual Events of Default in the 1987 ISDA Form.  The detailed, 85-paragraph Complaint cited AIG's admissions in three securities filings; statements or findings in three federal reports or proceedings; and reports in nine articles published in reputable sources.

AIG's brief acknowledges Brookfield's allegations only selectively, ignoring some allegations altogether and contradicting others with extrinsic contentions that should be disregarded on this motion to dismiss.  *See* Fed. R. Civ. P. 12(d).

### A.     The 1990 Transactions

In 1990, Brookfield and AIG entered into a Swap Agreement under which Brookfield and AIG exchanged floating-rate payments (tied to movements in LIBOR) for fixed-rate payments. Compl. ¶¶ 16-17.  The structure of the Swap was such that if interest rates remained well below 9.61% for any significant period of time, AIG would likely be entitled to a net payment in 2015. Conversely, if rates remained well above 9.61% for any significant period of time, Brookfield would likely receive a net payment in 2015, subject to AIG's having exercised its unilateral Cancellation Right.  *Id.* ¶¶ 19-22.  Following standard market practice in 1990, a symmetrical close-out provision (§ 6(e)(i)(1)) provided that if either party defaulted prior to 2015, the non-defaulting party would owe nothing to the other.  *Id.* ¶ 28.

The 1987 ISDA Form that the Agreement incorporated enumerates several possible defaults that either party to the swap could trigger, including being unable to pay debts as they become due; balance-sheet insolvency; winding up, liquidation or dissolution, or actions in furtherance thereof; actions in furtherance of bankruptcy; trusteeship; and events "analogous" to the enumerated events. *Id*. ¶ 25. None of the enumerated defaults at issue requires an actual bankruptcy filing. *Id*. ¶ 25. The Form also provided that upon the occurrence of any default, termination will be "deemed to have occurred immediately," and is not subject to notice or cure. *Id*. ¶ 27 (quoting Swap Agreement § 6(a)). Indeed, the Form's purpose was to trigger termination "well in advance of a bankruptcy proceeding," in order to "avoid the uncertainties of resolving [parties'] obligations in bankruptcy." *Id*. ¶ 25.

Both the provision for automatic termination and the symmetrical close-out provision were changed in subsequent ISDA Forms. *Id*. ¶¶ 31-32. In the 1992 ISDA Form, the Events of Default under § 5(a)(vii) that "had previously triggered automatic early termination—and were therefore not subject to any notice or opportunity to cure—would no longer trigger automatic early termination." *Id*. ¶ 31. The 1992 ISDA Form also revised the close-out provision so that an out-of-the-money non-defaulting party *would* have to make a payment to an in-the-money defaulting party, unless the parties specifically chose the different close-out provision set out in the 1987 Form. *Id*. ¶ 32.

Despite these changes in the years after the parties' deal was struck, AIG never asked Brookfield to substitute those forms for the 1987 Form governing the Swap Agreement, even though it was common practice for swap dealers to do so. *Id*. ¶ 34.

AIG selectively ignores some of these allegations, and contradicts others in its Memorandum of Law. For example, while AIG acknowledges the basic terms of the 1990

Transactions, AIG claims that the swaps were "asymmetrical" because it was always more likely that Brookfield would owe AIG money in 2015 rather than the reverse.  Mem. 39.  As the Complaint explains, however, under the terms of the parties' Swap Agreement, either party could potentially have been the beneficiary of the Early Termination and close-out provisions in the 1987 ISDA Form, depending on whether interest rates moved above or below 9.61%.  Compl. ¶¶ 19, 22.  The Complaint further alleges that in practice, AIG was far more likely to benefit from the Early Termination and close-out provisions than Brookfield, because AIG was clearly considered the more credit-worthy of the two parties.  *Id.* ¶¶ 5, 29.  Thus, it was AIG, not Brookfield, who chose to structure the 1990 Transactions as swaps subject to the 1987 ISDA Form.  *Id.* ¶¶ 17, 20.

AIG also tries to rely on unsupported, extrinsic facts, namely, that many other current swap agreements contain the same terms as the long-superseded 1987 ISDA Form.  *See* Mem. 1, 18, 19.  The Complaint explicitly alleges the contrary, however, Compl. ¶¶ 30-32, thereby negating AIG's argument that a decision for Brookfield will have catastrophic consequences for the swap markets.[2]

### B.    AIG's Collapse and the Federal Bail-Outs

In September 2008, AIG suffered a historic financial collapse, triggering multiple Events of Default under the Swap Agreement.  AIG-FP's reckless exposure to the subprime mortgage

---

[2]   Contrary to AIG's suggestion, credit default swaps are a different species from the 1987 interest rate swap at issue here.  Among other things, standard credit default swap agreements are not triggered by "actions in furtherance" of another listed Event of Default, *see* 2003 ISDA Credit Definitions § 4.2  (modifying standard default language to omit any "in furtherance" default) (Declaration of Luke P. McLoughlin, dated Feb. 3, 2010 ("McLoughlin Decl.") Ex. A), nor are they designed to "automatically" terminate, meaning cure is possible, Compl. ¶¶ 31, 33 (standard 1992 and 2002 ISDA Forms omit automatic early termination).  Credit default swaps also differ economically from interest rate swaps.

market brought billions of dollars of losses to AIG and AIG-FP in the first three quarters of 2008.  Compl. ¶ 37.

AIG's crisis came to a head in mid-September.  On September 12, AIG contacted the Federal Reserve Bank of New York ("FRBNY") to seek assistance, "'fearing that low cash reserves could soon cause its failure.'"  *Id.* ¶ 38 (quoting United States Government Accountability Office, Troubled Asset Relief Program: Status of Government Assistance Provided to AIG 16, Sept. 2009).  On September 13, the FRBNY informed AIG that government assistance was not available.  *Id.* ¶ 39.  AIG's CEO was again advised the following day that "'[t]here would be no public money for AIG.'"  *Id.* ¶ 40 (citing Lauren T. LaCapra, *AIG Ex-CEO Breaks Down the Final Days*, THESTREET.COM, Sept. 25, 2009).  Thus, on September 14, AIG's lawyers began drawing up bankruptcy papers.  *Id.* ¶ 41.

On September 15th and 16th, though AIG remained unable to pay its imminent debts, the federal government reiterated that it would provide no assistance.  *Id.* ¶ 42.  AIG initiated the drawdown of the last of its credit lines in anticipation of its bankruptcy.  *Id.* ¶ 43.  "As AIG admitted in a public securities filing, '[b]y early Tuesday afternoon on September 16, 2008,' AIG's losses had become so severe that it 'estimated that it had an immediate need for cash in excess of its available liquid resources.' AIG Nov. 10, 2008 10-Q, at 50."  *Id.* ¶ 42; *see* AARON ROSS SORKIN, TOO BIG TO FAIL 399 (Viking 2009) (Declaration of Luke P. McLoughlin, dated Feb. 3, 2010 ("McLoughlin Decl.") Ex. B) ("'I think we're about to be out of cash!' John Studzinski [advisor to AIG] announced at the teetering insurance giant's headquarters. It was nearly 1:00 p.m. [on September 16, 2008], and if Studzinski's math was correct, AIG was minutes away from bankruptcy.").

On the afternoon of September 16, the government abruptly and unexpectedly changed its position regarding emergency assistance for AIG. Compl. ¶ 44. AIG's CEO told its Board: "'We are faced with two bad choices . . . . File for bankruptcy tomorrow morning or take the Fed's deal [for governmental assistance] tonight.'" *Id.* (quoting Deborah Solomon & Matthew Karnitschnig, *Bad Bets and Cash Crunch Pushed Ailing AIG to Brink*, WALL ST. J., Sept. 18, 2008, at A1).

On September 16, AIG accepted the proposal and the FRBNY made an unprecedented $85 billion "loan" to AIG to prevent AIG's failure from adversely affecting the broader financial system. *Id.* ¶ 45. As part of the "loan," the government obtained a 79.9% equity interest in AIG, which it issued to a Trust run by federally appointed Trustees for the benefit of the Treasury and the FRBNY; replaced AIG's CEO; and tasked him with shutting down AIG-FP and restructuring AIG's obligations. *Id.* ¶¶ 47-52.

Despite the $85 billion infusion, AIG again tottered on the brink of bankruptcy in November 2008 and March 2009. Were it not for the government's last-minute infusions of cash at those times, which brought the total bail-out to $182.5 billion, AIG would immediately have filed for bankruptcy. *Id.* ¶¶ 53-58.

### C.    The Events of Default

The Complaint alleges that the events described above triggered several specific Events of Default:

> (1)    that AIG and AIG-FP have "become[] insolvent" and were "unable" to pay their debts as they became due, Compl. ¶¶ 37-59, 61-66);[3]

> (2)    that AIG-FP has had "a resolution passed for its winding-up or liquidation" or is in dissolution, or has taken "action in furtherance of, or indicating its

---

[3]    Swap Agreement § 5(a)(vii)(2) (The party or applicable Specified Entity "becomes insolvent or fails or is unable or admits in writing its inability generally to pay its debts as they become due.").

consent to, approval of, or acquiescence in" either of these Events of Default, *id*. ¶¶ 49-59, 70-71, 81;[4]

(3)     that AIG has taken "action in furtherance of, or indicating its consent to, approval of, or acquiescence in" instituting a "proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights," *id*. ¶¶ 41-43, 56-57, 67-69;[5] and

(4)     that an event has occurred with respect to AIG-FP or AIG that "has an analogous effect to any" of these Events of Default, as well as to "seek[ing] or becom[ing] subject to the appointment of [a] . . . trustee . . . or other similar official,"*id*. ¶¶ 45-55, 58, 72-74, 81.[6]

AIG's brief ignores or contradicts some of the most important allegations concerning these Events of Default.  For example, with respect to AIG's inability to pay its debts when due, AIG's brief side-steps the Complaint's detailed allegations concerning the period right before the first phase of the federal bail-out, describing AIG's circumstances as mere "[f]inancial [d]ifficulties," "liquidity concerns" like those of "many other financial institutions," and "resolved" liquidity needs.  Mem. 9-10.  But as described above, the government repeatedly advised AIG that it would not receive federal funding, and numerous parties (including AIG

---

[4]   *Id*. § 5(a)(vii)(5) (The party or applicable Specified Entity "has a resolution passed for its winding-up or liquidation."); *id*. § 5(a)(vii)(8) (The party or applicable Specified Entity "takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts.").

[5]   *Id*. § 5(a)(vii)(4) (The party or applicable Specified Entity "institutes . . . a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors rights."); *id*. § 5(a)(vii)(8).

[6]   *Id*. § 5(a)(vii)(6) (The party or applicable Specified Entity "seeks or becomes subject to the appointment of an administrator, receiver, trustee, custodian, or other similar official for it or for all or substantially all its assets (regardless of how brief such appointment may be, or whether any obligations are promptly assumed by another entity or whether any other event described in this clause (6) has occurred and is continuing).") (*id*. § 5(a)(vii)(7) ("[A]ny event occurs with respect to the party or any such Specified Entity which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (6) (inclusive).").

itself) acknowledged that as a result of obligations coming due imminently, AIG would have to declare bankruptcy as early as September 16, 2008. Compl. ¶¶ 38-45.

Similarly, with respect to AIG's balance-sheet insolvency, AIG challenges Brookfield's reference to AIG's checkered history of accounting fraud, but it ignores the most important and specific balance-sheet insolvency allegations in the Complaint, namely, AIG's auditors' finding that its swap accounting was materially deficient, and a subsequent write-down of that portfolio by $83 billion. Mem. 34; Compl. ¶ 64.[7] These allegations support an inference that AIG should have taken some portion of that write-down earlier, and contradict AIG's argument that the Court should rely conclusively on the face of AIG's financial statements.

As to Brookfield's allegation that AIG is winding-up AIG-FP, AIG ignores its own admissions that AIG-FP is being "shut[] . . . down," that it is no longer "'in business,'" and that it has been instructed to "close the doors and turn out the lights," Compl. ¶¶ 50-52, implausibly arguing that these acts are not even "in furtherance of" or "analogous" to winding-up.

With respect to the trusteeship Event of Default, AIG relies on the terms of the Trust Agreement, Mem. 24, but fails to grapple with the totality of the government's actions with respect to AIG, including its replacement of AIG's CEO, its role in changing several Board members, and its direction to close down AIG-FP. Compl. ¶¶ 45-49.

Finally, to blunt the effect of all Brookfield's allegations, AIG contends that no other swap market participant has claimed that AIG has suffered an Event of Default arising out of recent events. Mem at 1. This bald assertion is unaccompanied by any citation and disregards

---

[7]  AIG's contention that Brookfield "quoted selectively" from AIG's Third Quarter 10-Q is erroneous. Mem. 29-30. Brookfield alleged that both in the days prior to and again months after formal acceptance of the government's offer of aid on September 16, AIG was unable to pay its debts. Indeed, AIG does not contest this: "AIG may in the near future have been unable to pay debts that were to come due had it not received the FRBNY's financing offer." Mem. 30.

the difference in swap documentation the Complaint alleges, Compl. ¶¶ 30-32, as well as

obvious differences between interest rate swaps and credit default swaps, *see* n. 2 *supra*; this

extrinsic "fact" should not be credited on AIG's motion to dismiss.

## ARGUMENT

"[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.

Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The

complaint is to be read as whole.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322

(2007) ("[C]ourts must consider the complaint in its entirety . . . .").

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a court

must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences

from those allegations in the light most favorable to plaintiff, and construe the complaint

liberally."  *Rescuecom Corp. v. Google Inc*., 562 F.3d 123, 127 (2d Cir. 2009) (internal quotation

marks and citation omitted); *accord Ascension Health v. Am. Int'l Group, Inc*., No. 08-7765,

2009 WL 2195916, at *1 (S.D.N.Y. July 23, 2009) (Gardephe, J.).  Accordingly, "[d]ismissal is

only warranted if the facts as alleged are insufficient to 'raise a right to relief above the

speculative level.'" *Price v. New York State Bd. of Elections*, 540 F.3d 101, 107 (2d Cir. 2008)

(quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 98 (2d Cir. 2007)).

## I.     THE COMPLAINT PLAUSIBLY ALLEGES EVENTS OF DEFAULT BY AIG

### A.     The Complaint Plausibly Alleges an "Unable to Pay" Event of Default

Brookfield's Complaint amply alleges that AIG was unable to pay its debts on multiple

occasions in September 2008 and thereafter.  Compl. ¶¶ 37-59 (describing events of September

12, 13, 14, 15, and 16); *id*. ¶¶ 61-66 (describing events of November 2008 and March 2009).

Indeed, AIG has admitted the predicate facts for this Event of Default, stating in a public

securities filing that "[b]y early Tuesday afternoon on September 16, 2008," its losses had become so severe that it "estimated that it had an *immediate* need for cash *in excess of its available liquid resources*." *Id.* ¶ 42 (quoting AIG Nov. 10, 2008 10-Q, at 50 (emphasis added)). Because AIG could not pay its imminent and non-speculative obligations, it triggered an "unable to pay" Default under the plain language of § 5(a)(vii)(2) of the Swap Agreement providing for default where a party "is unable . . . to pay its debts as they become due."

AIG contends that Brookfield's pleading is insufficient to allege this Event of Default because the Complaint does not allege that AIG actually failed to pay debts that had already fallen due. Mem. 25-26. But the test for inability to pay debts necessarily has a prospective element that differentiates it from the separate test for failure to pay debts. *See Drexel Burnham Lambert Products Corp. v. MCorp ("MCorp")*, No. 88C-NO-80, 1989 Del. Super. LEXIS 69, at *12-15 (Sup. Ct. Del. Feb. 23, 1989), *reh'g denied*, 1991 Del Super. LEXIS 298 (Sup. Ct. Del. Aug. 13, 1991). The government's unexpected and last-minute intervention to provide AIG with funds to pay its counterparties does not affect the pre-existing occurrence of the "unable to pay" Event of Default.

Notably, the text of the ISDA Form expressly provides for Default where a party "fails *or* is unable . . . to pay its debts as they become due." Swap Agreement § 5(a)(vii)(2) (emphasis added). AIG's argument that "unable to pay" means the same thing as "fails to pay" would read one of clauses out of the contract entirely, violating basic principles of contract interpretation. *See LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("In interpreting a contract under New York law . . . [a] contract should be construed so as to give full meaning and effect to all of its provisions. An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . will be avoided . . . ."

(internal quotation marks, alteration, and citations omitted)).[8]  Where parties to an ISDA

Agreement wish to exclude the "unable to pay" defaults in their Schedules, they are free to do so,

but the parties did not do so here.[9]

       Although AIG argues that the Court must adhere strictly to case law in determining the

meaning of "boilerplate" forms, Mem. 14, AIG fails to cite cases that interpret the same language

that appears in the ISDA provision here.  Significantly, AIG fails to cite *MCorp*, which

considered the "unable to pay" Event of Default in a contract that incorporated the predecessor

to the 1987 ISDA Form and used the identical phrasing as the Swap Agreement.[10]  MCorp and

Drexel Burnham Lambert were parties to an interest-rate swap agreement, and after encountering

severe economic difficulties, MCorp announced on October 24, 1988 that it was declaring a

"moratorium on the payment of interest and principal on approximately $470 million of parent

company indebtedness, effective as of October 21, 1988."  1989 Del. Super. LEXIS 69, at *10.

---

[8]  AIG also assumes that "generally" in § 5(a)(vii)(2) modifies "unable . . . to pay its debts," *i.e.*,
Brookfield must allege that AIG was "generally unable to pay its debts."  Mem. 26.  This
interpretation is incorrect and beside the point.  The relevant portion of the section provides for
an Event of Default where a party "becomes insolvent or fails or is unable or admits in writing its
inability generally to pay its debts as they become due."  Under common rules of construction, "a
limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that
it immediately follows."  *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 343
(2005); *accord United States v. Kerley*, 416 F.3d 176, 180 (2d Cir. 2005).  Accordingly,
"generally" applies only to a party's admission in writing of its inability to pay its debts.  In any
event, inability "generally" to pay debts merely means "'more than prospective inability to pay
*only a few* of the debtor's liabilities when they fall due,'" *MCorp.*, 1991 Del. Super. LEXIS 298,
at *3 (emphasis added; quotation omitted), and Brookfield has alleged that AIG was
prospectively unable to pay many massive obligations, not merely a few.

[9]  *Cf.* Stephanie J. Seligman, *Just-In-Case: Planning For A Potential Restructuring*, 793
PLI/CORP 703, 731-32 (1992) (stating that market participants may make "adjustments" to
tighten "standard" ISDA language describing Events of Default) (McLoughlin Decl. Ex. C).

[10]  *See MCorp*, 1989 Del. Super. LEXIS 69, at *4 (contract specified defaults when either party
"'*fails or is unable to pay its debts*'"); *id.* at *4 n.2 ("As the market for interest rate swap
agreements increased, an organization known as the International Swap Dealers Association, Inc.
('ISDA') developed a standard interest rate swap agreement form. Although the Agreement [in
*MCorp*] predates the development of the ISDA agreement form, the Event of Default provision
is consistent with the default provision in the ISDA form.").

The Court granted summary judgment to Drexel on its claim that an "unable to pay debts" default was triggered by the moratorium announcement, even though MCorp's obligations "on debts subject to the moratorium through December 21, 1988 totaled $ 20.5 million and . . . MCorp had in excess of $ 200 million." *Id.* at *12-18.  Notably, in that case MCorp's chairman had admitted "a high probability that MCorp would be bankrupt within 30 days." 1989 Del. Super. LEXIS 69, at *16.

*MCorp* thus held that "[t]he use of the word 'unable' expands the opportunity to declare a default" beyond simply having failed to pay debts, to include the "prospective inability" to pay debts.  1991 Del. Super. LEXIS 298, at *3.  As the Court noted, "It is clear that the purpose of [the provision] was to afford one party the opportunity to get out of this Agreement before the other party goes bankrupt."  1989 Del Super. LEXIS 69, at *13.[11]

Authorities interpreting an "unable to pay debts" test in other contexts have interpreted it in the same way.  For example, Delaware law governing the fiduciary duties to creditors of directors of insolvent entities holds that the test for "inability to pay debts" (also called "cash flow" insolvency) is prospective and turns on a reasonable expectation of future cash flows.  *See In re Teleglobe Commc'ns Corp.*, 392 B.R. 561, 599, 601-02 (Bankr. D. Del. 2008).  Addressing a claim by creditors that a corporation was insolvent (and that accordingly an evidentiary exception applied), *Teleglobe* held that under Delaware law, "it is not enough [for a corporation] to be able to meet current obligations; the firm must be able to meet its future obligations as well."  *Id.* (internal quotation marks omitted).  Even where an otherwise insolvent company

---

[11]  *See* Compl. ¶ 5; ANTHONY C. GOOCH & LINDA B. KLEIN, 2 DOCUMENTATION FOR DERIVATIVES 838-39 (4th ed. 2002) ("[T]here can be a special value to having the right to terminate prior to the commencement of insolvency or similar proceedings on the basis of an event of default like the one upheld in the MCorp case in jurisdictions where the contractual close-out rights may be overridden by law once a counterparty has become involved in the proceedings.") (McLoughlin Decl. Ex. D).

ultimately receives outside funding that saves it from actually missing a payment, the company is cash-flow insolvent *unless* it can show that it was "reasonable" for it to believe that the funding was certain. *Id.* at 603. In that case, the Court found that Teleglobe was not "unable to pay" its debts because it reasonably believed it would receive financial support from its corporate parent. *Id.*

This is exactly the opposite of the facts alleged in this Complaint: AIG continually sought and was refused federal assistance in the days leading up to September 16, 2008. Compl. ¶¶ 38-45. Moreover, even after the initial $85 billion, AIG was again unable to pay its debts in November 2008 and March 2009, when it required nearly $100 billion of additional cash infusions and "restructurings" of the terms of the bail-out. *Id.* ¶¶ 53-59.

The Bankruptcy Code uses the same "unable to pay" phrase as the 1987 ISDA Form in Chapter 9, which governs the bankruptcy of municipalities. That section of the Code permits a municipality to seek Chapter 9 relief where it is "insolvent," which is defined as a "financial condition such that the municipality is—(i) generally not paying its debts as they become due . . . *or* (ii) unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C). Courts have uniformly held that the "unable to pay" clause "requires a prospective analysis," that is, it asks whether the municipality "*will be* unable to pay its debts as they become due." *In re City of Bridgeport*, 129 B.R. 332, 336-37 (Bankr. D. Conn. 1991); *accord In re City of Vallejo, Cal.*, No. 08-26813-A-9, 2008 WL 4180008, at *22 (Bankr. E.D. Cal. Sept. 5, 2008), *aff'd*, 408 B.R. 280 (9th Cir. B.A.P. 2009); *In re McCurtain Municipal Auth.*, No. 07-80363, 2007 WL 4287604, *3 (Bankr. E.D. Okla. Dec. 4, 2007); *In re Hamilton Creek Metro. Dist.*, 143 F.3d 1381, 1384 (10th Cir. 1998); *In re Town of Westlake, Tex.*, 211 B.R. 860, 865 (Bankr. N.D. Tex. 1997). Similar to the ISDA Form, Chapter 9's phrasing includes both "not paying its debts as they

become due" and "unable to pay its debts as they become due."  11 U.S.C. § 101(32)(C).  As one

court observed, to read both clauses to cover an entity's "*current . . . inability to pay*" it debts

"would render the second clause mere surplusage," *Bridgeport*, 129 B.R. at 336.  Accordingly,

whether a municipality in fact has failed to pay any debts is irrelevant to its ability to seek

Chapter 9 relief.  *See id.* at 334 ("It is undisputed that on June 6 Bridgeport was paying its debts

as they became due. The issue here is whether Bridgeport was 'unable to pay debts as they

become due.'").

      The rationale for this interpretation is instructive.  Municipalities may seek Chapter 9

relief from their obligations where they are prospectively "unable to pay" their debts, not merely

where they already have failed to pay their debts, because "a city should not have to wait until it

runs out of money in order to qualify for bankruptcy protection."  *Bridgeport*, 129 B.R. at 339.

Indeed, Chapter 9 is intended to enable a financially distressed city to continue providing

essential services while it works out a plan to adjust its debts, and a construction of "unable to

pay" "under which a city would not be able to seek Chapter 9 protection unless and until it was

actually not paying its bills could defeat that purpose."  *Id.* at 336-37.  This parallels the purpose

of the ISDA Form's Events of Default.  Compl. ¶ 26; *see MCorp.*, 1989 Del. Super. LEXIS 69,

at *12 ("[I]t is clear that the purpose of § 9.1(d)(ii) was to afford one party the opportunity to get

out of this Agreement *before* the other party goes bankrupt." (emphasis added)).[12]

---

[12]  For the same reason, the mere "potential" for an influx of funds does not defeat a
municipality's claim that it is unable to pay its debts.  *See In re Pierce County Hous. Auth.*, 414
B.R. 702, 712 (Bankr. W.D. Wash. 2009) (holding that housing authority was "unable to pay its
debts" and finding that "potential" insurance payments to cover mold-related litigation
judgments should not be "considered in the insolvency analysis"); *see also Vallejo*, 2008 WL
4180008, at *22 (declining to consider possibility of city's accepting Union's offer to modify
collective bargaining agreements, which would put off insolvency, because "[i]nsolvency is
determined based on the City's obligations . . . as those obligations actually exist, not as they
could exist under hypothetical circumstances").

Against all these authorities, AIG relies almost exclusively on a recent decision by Judge Peck, *In re Charter Communications*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009) (notice of appeal docketed Dec. 21, 2009), which AIG claims held that a party is not "unable to . . . pay its debts as they become due" where it has debts that it "*might* be unable to pay in the future." Mem. 27. That description of *Charter* distinguishes it from this case, which pleads imminent debts that AIG acknowledged it could not pay, not future debts it "might" not be able to pay.

In *Charter*, JPMorgan contended that Charter was insolvent in November 2008 under the terms of its lending agreement that provided that it shall be an event of default if Charter "'shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due,'" 419 B.R. at 245 (quoting loan agreement). JP Morgan contended that in the six months following November 2008, Charter had hundreds of millions of dollars of interest payments coming due with "no available source of cash to make those payments." *Id.* JPMorgan's argument was predicated in part on its view that the intercompany dividend Charter in fact used to make its November payment was unlawful, and so it argued that Charter had suffered an inability to pay notwithstanding that it had actually made the required payment on time. *Id.* The Court understandably rejected JPMorgan's attempt to second-guess the business judgment of Charter's board in approving the dividend. *Id.* at 247.

As to the future obligations, JPMorgan's witnesses could not describe precisely when it alleged Charter would be unable to pay, nor how near in the future such a date would have to be to trigger an event of default under the loan agreement. *Id.* at 245-46. After trial, the Court found JPMorgan's assertions of inability to pay "speculative," and refused to declare an event of default based on "what *may* occur at an unspecified time in the future." *Id.* at 245-46. It concluded that Charter had "multiple strategies for moving cash within the corporate family,"

including intercompany notes and transfers, in order to fund the interest payments. *Id.* at 236, 246. Because the obligations coming due were distant, and Charter had "various . . . methods" of obtaining cash to meet them, the Court concluded that applying a prospective test for inability to pay would, in these circumstances, be "speculative" and "impractical." *Id.* at 246.

While the *Charter* Court declined to interpret the "unable to pay" language in the loan agreement as prospective, the Court did not, as AIG suggests, reason in a vacuum that "inability to pay" invariably must mean the same thing as "failure to pay," a notion that would contradict *MCorp.*, *Teleglobe*, the municipal bankruptcy cases, and common sense.[13] Indeed, the Court found that even were it to apply a prospective analysis, the debts becoming due were insufficiently imminent and too speculative to deem Charter "unable to pay" its debts—rendering its legal interpretation of "inability to pay," at best, an alternative holding. *Id.* at 246-47.

In contrast to *Charter*, there is nothing speculative or remote about the Event of Default alleged by Brookfield. AIG in mid-September 2008 did *not* have any means of meeting obligations that were coming due within days and hours. Up until the moment the bail-out materialized, AIG had repeatedly been told that it would not receive financial assistance from the government. Moreover, it is unclear that an emergency governmental bail-out could ever be considered a permissible source of cash for purposes of § 5(a)(vii)(2).[14]

Apart from the recent *Charter* decision, AIG relies on a host of cases that stand for the truism that a "temporary cash shortage does not constitute insolvency." Mem. 28-29 & nn.21-

---

[13] Presented with a sampling of such authorities, Judge Peck conceded that as a grammatical matter, the clause has a prospective element. Although he dismissed the municipal bankruptcy caselaw as "inapposite" without explanation, he acknowledged that these cases "demonstrate that the words are capable of being read in the manner urged by JPMorgan." 419 B.R. at 236 n.12.

[14] AIG's declaration that it "continue[s] as [a] going concern[]," Mem. 1, is belied by its own admissions in its 10-K: "Without additional support from the U.S. government, in the future there could exist substantial doubt about AIG's ability to continue as a going concern." AIG Mar. 2, 2009 10-K, at 21.

22.  But none of those cases construes a contractual definition of insolvency, much less one similar to the event of default provisions here.  Nor do such cases define the purported line between a "temporary cash shortage" and "insolvency," or suggest that AIG was not insolvent on the extraordinary facts here.[15]  In light of the plain text of the Swap Agreement, the caselaw discussed above, and the analysis and policy underlying both the text and the cases, Brookfield has plausibly alleged the occurrence of an "unable to pay" Default.

**B.      The Complaint Plausibly Alleges a Balance-Sheet Insolvency Event of Default**

Brookfield also plausibly alleges that AIG and AIG-FP were balance-sheet insolvent on the eve of the initial unprecedented $85 billion federal bail-out and again in the following months, during which AIG required another unprecedented $97 billion in federal money and the restructuring of the initial bail-out to stay afloat.  Put simply, Brookfield's Complaint alleges that the values of AIG's assets were exceeded by their liabilities.  Compl. ¶ 64 ("Stated otherwise, it is highly likely that the fair value of AIG's assets was less than their liabilities."); *id.* ¶ 2

---

[15]  *See, e.g.*, *Huntington Towers, Ltd. v. Franklin Nat'l Bank*, 559 F.2d 863, 866, 868-69 (2d Cir. 1977) (finding unreviewable Federal Reserve Bank's determination that bank was solvent during period in which it had liquidity crisis); *Lowrance v. Hacker*, 866 F.2d 950, 955 (7th Cir. 1989) (finding that, for purposes of evaluating accord and satisfaction defense, defendant was not insolvent in period where, despite "cash flow problem," he had "abundant assets"); *In re Plastech Eng'red Prods., Inc.*, 382 B.R. 90, 101 (Bankr. E.D. Mich. 2008) (stating in dicta that it was disputed whether debtor was "insolvent" when it has net outstanding checks in excess of its credit line but sufficient cash available to pay checks actually scheduled to clear on each day); *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 476 F. Supp. 2d 913, 923 (N.D. Ill. 2007) (finding that statement that party was "insolvent" was not supported by deposition testimony that the party "was experiencing cash flow difficulties" even as it "derived revenues from its subsidiaries"), *vacated in part on other grounds*, 529 F.3d 371 (7th Cir. 2008); *In re Adelphia Commc'ns Corp.*, Bankr. No. 02-41729, 2006 WL 687153, at *12 (Bankr. S.D.N.Y. March 6, 2006) (finding, in evaluating whether transfers left plaintiff "undercapitalized"— "technically solvent but doomed to fail"—that it was a factual question whether party could have sold some valuable assets to raise operating capital); *Cary Oil Co., Inc. v. MG Ref. & Mkt., Inc.*, 230 F. Supp. 2d 439, 444 (S.D.N.Y. 2002) (stating, in facts section of case unrelated to insolvency, that company's liquidity crisis pushed it "to the brink of insolvency"). To the extent these cases suggest anything pertinent, it is that insolvency is a fact-dependent question inappropriate for resolution on a motion to dismiss.

("Brookfield believes that discovery will confirm that AIG was balance-sheet insolvent at various points since 2008.").

In response, AIG makes four tenuous arguments.  First, AIG contends that because the Complaint alleges that "discovery will establish" or ("confirm") insolvency, the pleading "meticulously avoids" alleging, and thus fails to allege, that AIG was balance-sheet insolvent. Mem. 31; Compl. ¶¶ 2, 64-65.[16]  Contrary to AIG's argument, these allegations squarely meet Brookfield's *Twombly* obligations.  *Twombly* expressly defines the plausibility standard as "simply call[ing] for enough fact to raise a reasonable expectation that *discovery will reveal evidence.*" *Twombly*, 550 U.S. at 556 (emphasis added).

Second, AIG argues that its financial statements are by themselves a complete Rule 12(b)(6) defense to insolvency allegations, notwithstanding Brookfield's allegations of specific reasons why those statements are highly likely to be unreliable.  Mem. 33.  If AIG's published statements are deemed sufficient to trump Brookfield's fact-specific pleading, a party never could plead claims based on balance-sheet insolvency, including, for example, fraudulent conveyance actions, except where companies have actually declared themselves insolvent.[17]  In

---

[16]  Contrary to AIG's argument, Mem. 25, 31, the Complaint also alleges that *AIG-FP* was balance-sheet insolvent and unable to pay its debts as they became due as its liabilities caused its parent AIG's insolvency.  Compl. ¶ 62-63; *id*. ¶ 37 (contending that "AIG-FP's reckless exposure to the subprime mortgage market brought financial ruin to AIG and AIG-FP," and itemizing losses attributed to AIG-FP); *id*. ¶ 55 (alleging that November 2008 bailout was designed, in part, to "limit AIG-FP's losses" and "reliev[e] AIG-FP of its potential payment obligations on [its] swaps"); *see* AIG Nov. 10, 2008 10-Q, at 50 ("As a consequence of the ratings actions, AIGFP estimated that it would need in excess of $20 billion in order to fund additional collateral demands and transaction termination payments in a short period of time."). The AIG financial statements referenced in the Complaint also make plain that AIG-FP suffered grievous losses that were responsible for AIG's solvency issues and inevitably AIG-FP's. Compl. ¶¶ 64- 65.

[17]  AIG also states that "the drafters of the Master Agreement clearly could not have intended a 'fair value' analysis based on reported balance sheets to be the test for an insolvency-based default." Mem. 34.  This is gainsaid by the 1987 ISDA User's Guide, which states that the ISDA

fact, under New York law, an allegation that a company is balance-sheet insolvent survives a motion to dismiss where the facts alleged raise a plausible inference of insolvency, regardless of what public statements or reports the company has issued. *See In re AlphaStar Ins. Group, Ltd.,* 383 B.R. 231, 280 (Bankr. S.D.N.Y. 2008) ("The Amended Complaint sufficiently pleads that AlphaStar was insolvent at all relevant times. The entire thrust of the Amended Complaint is that the 'fair valuation' of Receivables was substantially less than the book value of $800 million, and AlphaStar's liabilities actually exceeded its assets (at fair valuation). This meets the Bankruptcy Code definition of 'insolvent.'").

Third, AIG argues that Brookfield's balance-sheet insolvency claim should be dismissed under Federal Rule of Civil Procedure 9(b) as an insufficient allegation of "fraud." But Brookfield has not alleged a fraud claim; so long as AIG's balance sheet did not accurately reflect that the value of its liabilities exceeded its assets, Brookfield has alleged an Event of Default, regardless of whether any knowing or purposeful wrongdoing took place. AIG cites no authority for the proposition that Rule 9(b) applies to an allegation of balance-sheet insolvency.

Finally, AIG argues that Brookfield is relying on a "hodge-podge of dated or unsubstantiated accusations bearing no plausible connection to AIG's recent financial statements." Mem. 35. In fact, Brookfield's allegation of balance-sheet insolvency relies primarily on the facts that AIG needed $182.5 billion in emergency federal funding; that AIG acknowledged in its March 2, 2009 Form 10-K that in the 90 days after September 30, 2008—the

---

Form pertains to whatever insolvency laws are applicable. *See* User's Guide to the Standard Form Agreements: 1987 Edition at 7. Insolvency determinations under U.S. and New York law are made on a fair value basis. *See* 11 U.S.C. 101(32)(A) (defining "insolvent" with respect to the entity's property "at a fair valuation"); N.Y. DEBT. & CRED. LAW § 271(1) ("A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.").

initial period of the bail-out—it took $83 billion in writedowns on its swap portfolio; that AIG's accountants declared a material weakness in its swaps accounting 10 months prior to that write-down; and that AIG's valuations of its swap portfolio—a critical component of the assets recorded on its balance sheet—are now the subject of public criticism by a senior AIG-FP executive.  Compl. ¶¶ 64-66; *see* SIGTARP REPORT, FACTORS AFFECTING EFFORTS TO LIMIT PAYMENTS TO AIG COUNTERPARTIES 8 (Nov. 17, 2009) ("[A]n analysis [by a consortium of banks considering an AIG rescue in September 2008] of AIG's financial condition revealed that liquidity needs exceeded the valuation of the company's assets . . . ."); *id.* at 6 ("The consortium . . . believed AIG's liquidity needs exceeded the value of the company's assets . . . .").[18]  These allegations are neither dated nor unsubstantiated.  The Complaint's additional allegations—that AIG has a history of having issued materially false financial statements, necessitating their restatement, and of having knowingly assisted other entities to do the same, resulting in the recent criminal conviction of a senior AIG executive—corroborate Brookfield's pleading of reasons why AIG's financial reports for the periods 2008-2009 are likely materially unreliable.

### C.     The Complaint Plausibly Alleges That AIG Defaulted by Taking Actions in Furtherance of Bankruptcy

The Complaint plausibly alleges that AIG took actions "in furtherance" of bankruptcy. AIG has admitted that it concluded that bankruptcy was one of just two choices it was required to make on September 16, 2008, and that it directed its lawyers to prepare for bankruptcy. Compl. ¶¶ 41, 44.  AIG's actions in furtherance of its imminent bankruptcy were urgent; there was nothing speculative or merely consultative about these acts, because AIG had no other options at that time, or again in early 2009, when the government's continued assistance suddenly came into doubt.  *Id.* ¶ 57.

---

[18]  *Available at* http://www.sigtarp.gov/reports/audit/2009/Factors_Affecting_Efforts_to_ Limit_Payments_to_AIG_Counterparties.pdf.

AIG responds by claiming that the words "any action in furtherance" have been read *as a matter of law* to be triggered *only* by a formal resolution adopted by the board of directors. Mem. 15.[19] This is incorrect, and AIG cites no pertinent authority to support its claim. In contrast to AIG's position, numerous ISDA commentators have noted that the "action[s] in furtherance" provision could cause a swap party to suffer a default as a result of merely considering or planning for a bankruptcy filing. *See, e.g.*, JANET M. TAVAKOLI, STRUCTURED FINANCE AND COLLATERALIZED DEBT OBLIGATIONS 68 (2d ed. 2008) ("Planning for or considering a bankruptcy filing might be in furtherance of bankruptcy, and can trigger an ISDA default . . . .") (McLoughlin Decl. Ex. E); JEFFREY S. TOLK, UNDERSTANDING THE RISKS IN CREDIT DEFAULT SWAPS 6 (Moody's Inv. Servs. March 16, 2001) ("[T]he act of planning for, or even considering, a bankruptcy filing (such as hiring bankruptcy advisors to discuss options) might be in furtherance of bankruptcy . . . . even if the obligor does not ultimately enter bankruptcy.") (McLoughlin Decl. Ex. F); Stephanie J. Seligman, *Just-In-Case: Planning For A Potential Restructuring*, 793 PLI/CORP 703, 731 (1992) ("Such a provision could be read to be triggered by early steps in contingent planning for a bankruptcy, including, for example, contacting lenders on an exploratory basis to determine the availability of debtor-in-possession financing.") (McLoughlin Decl. Ex. C); *see also* Jongho Kim, *From Vanilla Swaps to Exotic Credit Derivatives: How to Approach the Interpretation of Credit Events*, 13 FORDHAM J. CORP. & FIN. L. 705, 761-62 (2008).

---

[19]  AIG also suggests based on the section's header that § 5(a)(vii) requires an actual bankruptcy filing. Mem. 8 (stating that § 5(a)(vii) "is tellingly entitled 'Bankruptcy'"). This suggestion is specifically foreclosed by the Swap Agreement's explicit provision that "[t]he headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement." Swap Agreement § 9(g).

This clear understanding of the import of the 1987 ISDA Form is underscored by one commentator's recommendation that swap parties should modify the ISDA Form to obtain precisely the protection that AIG did not include in its contract with Brookfield, but seeks belatedly through its motion to dismiss. *See* Seligman, *supra*, at 31-32 ("It is in a Borrower's interest to make two adjustments to the 'standard' language. First, the provision should be limited to *corporate action* approved by a resolution of the Borrower's Board of Directors." (emphasis added)) (McLoughlin Decl. Ex. C).

Market participants have been keenly aware of this consequence of the 1987 ISDA Form's language. During its 1998 crisis, Long-Term Capital Management's employees painstakingly avoided taking any action in furtherance of bankruptcy precisely to avoid triggering a default. As a chronicler of that episode reported, "even a *contemplation* of bankruptcy was considered an act of default. Long-Term's lawyers wouldn't even mention the B-word." ROGER LOWENSTEIN, WHEN GENIUS FAILED: THE RISE AND FALL OF LONG-TERM CAPITAL MANAGEMENT 180 (Random House 2000) (McLoughlin Decl. Ex. G).

For the same reason, ISDA removed the "in furtherance" aspect of Section 5(a)(vii) for credit default swaps written in 2003 and thereafter based on the recognition that numerous events could trigger an "in furtherance" default. *See* ISDA G6 Committee, *Commentary on Supplement Relating to Successor and Credit Events to the 1999 ISDA Credit Derivatives Definitions*, at 3 (I.S.D.A. Inc. 2001) ("[W]hile a Reference Entity may explore the possibility of filing for bankruptcy through discussions with counsel, it may make no filings in that regard and may therefore continue to exist without the occurrence of a default after such discussions. However,

such discussions could be seen to be 'in furtherance' of making a voluntary filing and therefore constitute a Credit Event in and of themselves . . . .").[20]

AIG addresses none of this overwhelming authority. Instead, it relies on a trio of non-ISDA cases involving the phrase "corporate action," rather than the phrase in the 1987 ISDA Form, "any action." Mem. 15 (citing *Union Bank of Switzerland v. Deutsch Fin. Servs. Corp.*, No. 98-3251, 2000 WL 178278 at *4 (S.D.N.Y. Feb. 16, 2008) (non-ISDA language requiring "corporate action"); *In re Revere Copper & Brass, Inc.*, 60 B.R. 887, 891 n.l (Bankr. S.D.N.Y. 1985) (same); *In re Solutia, Inc.*, No. 03-17949, 2007 WL 1302609, at *14 (Bankr. S.D.N.Y. May 1, 2007) (non-ISDA language requiring "corporate acts")). AIG argues that "corporate action" is the same as "any action," because, according to AIG, the words "any" and "corporate" mean essentially the same thing, and because the word "any" is designed to pertain to among others, "the World Bank and the European Investment Bank." Mem. 15-16 n.10. AIG presents no authority for these novel suggestions, all of which fail to address the language of the ISDA Form in *this* contract and which are refuted by the authorities described above.

Finally, as a factual matter, AIG was not "*merely consider[ing]* the possibility of a bankruptcy filing," as AIG contends. Mem. 17. AIG took every step toward a bankruptcy filing short of actually passing a Board resolution and filing papers. Thus, AIG's situation cannot be compared to that of other financial institutions that suffered losses during the past two years. In view of the post-1987 changes to the ISDA Form as well as AIG's unique circumstances, AIG's deemed bankruptcy-related default will not cause the calamities AIG suggests.

---

[20] *Available at* http://www.isda.org/press/pdf/Summary_of_Short_term_commentary_nov26.pdf.

**D. The Complaint Plausibly Alleges an Event of Default Arising Out of the Dissolution, Winding-Up, and/or Liquidation of AIG-FP**

The Complaint plausibly alleges that AIG is winding-up, liquidating, and/or dissolving AIG-FP, or events are occurring with "an analogous effect" to these events, or AIG is taking steps in furtherance of these acts. Compl. ¶¶ 50-52, 55, 70-71, 81. AIG has declared that it is "shutting . . . down" AIG-FP, that AIG-FP is no longer "'in business as you would normally think about it,'" that AIG has started "running off AIG-FP's obligations," that AIG has "prohibited AIG-FP from conducting any new business," and that AIG has instructed AIG-FP's new CEO to "identify Financial Products' outstanding obligations, resolve those transactions as profitably and quickly as possible, and then *close the doors and turn out the lights*." Compl. ¶¶ 50-52 (quotations omitted, emphasis added). Given the undisputed fact that AIG is deliberately putting AIG-FP out of business, AIG cannot reasonably contend that Brookfield has failed to allege that AIG-FP has taken action "in furtherance" of its dissolution, winding-up, or liquidation.

To overcome these allegations, AIG contrives several legal obstacles to a finding that it has defaulted under the Swap Agreement. For one thing, AIG claims that "winding-up" is a term of art referring exclusively to proceedings under the United Kingdom Insolvency Act of 1986. Mem. 20-21. This argument finds no support in the ISDA Form's text or under United States law. Corporate winding-up is a long-established feature of U.S. corporate law. *See, e.g.,* 8 DEL. CODE §§ 271-85 (2009).[21] Although the 1987 ISDA User's Guide cited by AIG references U.K.

---

[21] *See also* BLACK'S LAW DICTIONARY 1738 (9th ed. 2009) (defining "winding up" as "[t]he process of settling accounts and liquidating assets in anticipation of a partnership's or a corporation's dissolution"); WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 7968 (2003) (defining liquidation of corporations as "winding up of its business and affairs, including the collection of assets, the settlement of liabilities, the disposition of its properties, and the distribution of its remaining property among the shareholders according to their interests").

law, Mem. 20 n.12, it does not limit the clause to U.K. law.  To the contrary, the Guide says, "the Bankruptcy Event of Default has been drafted with the intention that it be broad enough to be triggered by applicable proceedings or events (described in the forms in a general way) under *whatever bankruptcy or insolvency law pertains to a particular party*."  User's Guide to the Standard Form Agreements: 1987 Edition at 7 (emphasis added).

AIG's related suggestion—that a winding-up must be speedy, Mem. 22 nn.15-16—is explicitly rejected by the Delaware law on winding-up.  *See* 8 DEL. CODE. § 278 ("Continuation of corporation after dissolution for purposes of suit and winding up affairs"); *id*. ("All corporations*,* whether they expire by their own limitation or are otherwise dissolved, shall nevertheless be continued, *for the term of 3 years from such expiration or dissolution* . . . for the purpose of . . . enabling them *gradually* to settle and close their business . . . ." (emphasis added)).  Even in the United Kingdom voluntary wind-ups are often lengthy procedures.[22]

The absence of court supervision of AIG-FP's winding-up, Mem. 3, is of no moment. Voluntary wind-ups in the U.K. are conducted outside court supervision, absent a specific request.  *See* U.K. Insolvency Act § 112 (express application by the liquidator or a contributory or creditor); *id.* § 108 (court may appoint or remove a liquidator on cause shown).  After passage of the resolution, the company may appoint a liquidator to take control of the company, whose role is "winding up the company's affairs and distributing its assets."  *Id.* §§ 91(1), 100(1).  This process is analogous to the events occurring with respect to AIG-FP.

---

[22]  *See also* U.K. Insolvency Act § 93 (mandating a meeting "at the end of the first year from the commencement of the winding up, and of each succeeding year").  The cases AIG cites to the effect that U.K. wind-up is rapid discuss judicial, not voluntary wind-up.  *See Re Lafayette Elecs. Europe Ltd*, [2007] B.C.C. 890, 892, 2006 WL 4852113 (U.K. Ch.D. 2006); *Re a Company (No. 000314 of 1989)*, [1990] B.C.C. 221, 223, 1990 WL 753980 (U.K. Ch.D. 1989).

AIG also contends that even if AIG-FP is presently being dissolved, it has not yet been dissolved. Mem. 19. But the phrase "is dissolved" in § 5(a)(vii)(2) of the Swap Agreement cannot be reinterpreted to mean "has been dissolved" in the past tense, as AIG would have it. *See* Mem. 19 ("[T]he Complaint does not . . . allege that AIG-FP has been dissolved . . . ."). AIG's related notion that the Default cannot be triggered until the certificate of AIG-FP's dissolution has been processed by the Delaware Secretary of State, *id.*, is at odds with the ISDA Form's text, the "in furtherance" and "analogous effect" clauses, and the purposes of § 5(a)(vii)'s deemed automatic early termination mechanism. *See* Compl. ¶ 26 (market participants who wrote the 1987 ISDA Form intended automatic early termination to be triggered "well in advance" of applicable proceeding). A party cannot avoid a default by eschewing or delaying necessary formalities.

Finally, AIG contends that shutting down AIG-FP is not "analogous" to dissolution, winding-up, or liquidation, because AIG's closure of AIG-FP is not occurring "under *any* applicable laws of *any* jurisdiction." Mem. 3 (emphasis in original). As a practical matter, however, AIG-FP has ceased doing "business as you would normally think about it," and is poised to "turn out the lights." Compl. ¶¶ 50, 52. The "legal effect" of AIG-FP's actions is indistinguishable from a formal winding-up or dissolution. By the same token, AIG cannot contend that the ISDA Form's use of the phrase "winding down" allows AIG to avoid admitting that it is "winding-up" AIG-FP; these terms are used interchangeably.[23] In sum, even if putting AIG-FP's out of business is not technically an unwinding under Delaware law, it is analogous to

---

[23] *See, e.g.*, *S.E.C. v. Am. Bd. of Trade*, 719 F. Supp. 186, 188-89 (S.D.N.Y. 1989) ("[T]he Court . . . ordered the parties to begin formulating a plan to *wind-down* the program. . . . [T]he Court appointed Edward Brodsky, Esq. as special master to supervise the *winding up* of the commercial paper program . . . . The Court then appointed Gould as special master . . . to assist in implementing a *wind-down* of the commercial paper program." (emphasis added)).

and in furtherance of a dissolution, winding-up, or a liquidation under either Delaware or U.K. law.

### E.    The Complaint Plausibly Alleges a Trustee-Related Event of Default

Brookfield's Complaint plausibly alleges a trustee-related event of default.  In particular, the Complaint alleges that the government, among other things, appointed a CEO, took ownership of 79.9% of AIG's stock, and appointed Trustees to control that stock and maximize AIG's repayment to the Treasury.  Compl. ¶¶ 45-49, 72-73.

To argue that these facts do not have an "analogous effect" to a trustee-related default, AIG argues that the AIG Trustees are not managing "all or substantially all its assets" as required by § 5(a)(vii)(6) of the Swap Agreement because they can act "solely as the controlling shareholder of AIG," but may not "acquire, manage or dispose of AIG's property," or "*manag[e] AIG's day-to-day operations*."  Mem. 23-24 (emphasis in original).  This argument simply overlooks Brookfield's pleading.

First, AIG dramatically understates the Complaint's pleading of the nature and extent of the government's involvement in managing AIG's affairs.  In addition to appointing Trustees under the Trust Agreement, the government also appointed a new CEO for AIG, Edward Liddy; Mr. Liddy was obviously involved in the managing the day-to-day affairs of AIG, for "all or substantially all of its assets."  Compl. ¶ 48.  Moreover, as alleged in the Complaint, the Trustees have worked in the months following their appointment to replace the AIG Board and wind-up AIG-FP.  Compl. ¶¶ 49-52. And the January 16, 2009 Credit Facility Trust Agreement, upon which AIG so heavily relies, nowhere describes the Trust as having powers limited to that of a "controlling shareholder."  As a practical matter, the government's control over the vast majority of AIG's stock gives it the indirect ability to manage AIG's affairs, even if the Trustees do not directly manage the details of AIG's day-to-day business.

## II.    THE COMPLAINT PRECLUDES AIG'S AFFIRMATIVE DEFENSE THAT THE 1987 ISDA FORM IS UNENFORCEABLE

AIG also moves to dismiss the remedy sought in the Complaint on the ground that even if AIG has defaulted, terminating the Swap Agreement without requiring a payment from Brookfield would impose a "penalty" on AIG, rendering the close-out provision unenforceable. Mem. 36-39.  AIG's attempt to interpose an affirmative defense of unenforceability is procedurally improper and substantively unfounded.

Procedurally, AIG may prevail on an affirmative defense raised in a motion to dismiss only where the defense "appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).  Far from appearing on the face of Brookfield's Complaint, AIG's defense is flatly contradicted by it.  Brookfield's allegations make clear that the defense is unavailable as a matter of law, as discussed below.  And even if that were not the case, AIG's entitlement to equitable relief would depend on multiple factors, such as whether AIG itself has enforced this very provision in the past against other counterparties.[24]  Even if legally available, therefore, AIG's fact-dependent equitable defense is, at best, premature.

Substantively, AIG's assertion that the unambiguous close-out provision is unenforceable fails as a matter of law.  Contrary to AIG's suggestion, under New York law, sophisticated commercial parties are almost always held to the terms of agreements they have negotiated. "Freedom of contract prevails in an arm's length transaction between sophisticated parties . . . . If they are dissatisfied with the consequences of their agreement, the time to say so was at the

---

[24]  *See In re Baylies' Estate*, 279 N.Y.S. 415, 419 (N.Y. Sur. 1935) ("In any appeal to the equity powers of the court, all the equities must be taken into account."); *Valentine Gardens Co-op., Inc. v. Oberman*, 237 N.Y.S.2d 535, 537 (N.Y. Sup. 1963) ("[T]he granting of an equitable remedy is ordinarily a matter of discretion, not an arbitrary, capricious discretion, but a sound judicial discretion, controlled by established principles of equity, and exercised upon a consideration of all of the circumstances of each particular case."); *see also Indus. Dev. Found. of Auburn v. U.S. Hoffman Mach. Corp.*, 171 N.Y.S.2d 562, 574 (Sup. Ct. 1958) (declining to relieve party from forfeiture because of party's own conduct).

bargaining table." *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 695 (1995).[25]

Courts are even more reluctant to relieve sophisticated parties from their bargains where the contract in question reflects complex, heavily negotiated transactions shaped by standard market practice, including those utilizing the ISDA Form. *See, e.g., Fin. One Public Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, No. 00-6739, 2003 WL 21638214, at *2 (S.D.N.Y. July 11, 2003) (enforcing provision for early termination interest rates in ISDA Form).

Nor does AIG cite any cases striking down a symmetrical provision that could have applied to either party at the time of contracting. Instead, it labels as "nearly identical," Mem. 39, the damages provision invalidated in *Howard Johnson International Inc. v. HBS Family Inc.*, No. 96-7687, 1998 WL 411334 (S.D.N.Y. July 22, 1998), but that was a classic, fixed-sum, one-sided liquidated damages provision—that happened to apply exclusively against the unsophisticated party to the transaction. *Id.* at *4, 6, 8. The symmetrical nature of the close-out provision here, by contrast, undermines any contention that it is so unfair as to justify a finding of unenforceability. *Cf. Fifty States Mgmt. Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 577 (1979) ("Absent some element of fraud, exploitive overreaching or unconscionable conduct . . . there is no warrant, either in law or equity, for a court to refuse enforcement of the agreement of the parties.").[26]

---

[25] *See also Wilmington Trust Co. v. Aerovias de Mexico*, 893 F. Supp. 215, 218 (S.D.N.Y. 1995) (directing courts to consider the "sophistication of the parties and whether both sides were represented by able counsel who negotiated the contract at arms length without the ability to overreach the other side."); *Pacificorp Capital, Inc. v. Tano, Inc.*, 877 F. Supp. 180, 184 (S.D.N.Y. 1995) ("[P]arties['] bargaining power is a factor when determining if one side is exacting an unconscionable penalty . . . ."); *Bigda v. Fischbach Corp.*, 849 F. Supp. 895, 902 (S.D.N.Y. 1994) (same).

[26] AIG does not deny that the close-out provision is symmetrical but attempts to argue unenforceability on the ground that the Swap Agreement is itself asymmetrical—in AIG's favor,

These presumptions apply in force here.  In 1990, AIG was perhaps the most sophisticated swap dealer in the world; the ISDA Form is an industry-wide attempt to standardize the terms of the most complex financial transactions imaginable; and the close-out provision was, if anything, more likely to favor AIG than Brookfield at the time of contracting.

Moreover, the application of the close-out provision to Brookfield's contingent future obligation simply does not impose a penalty on AIG.  Terminating the swaps will not cause AIG to pay *any* damages to Brookfield, let alone liquidated damages of a "penalty" amount; it merely eliminates a contingent receivable that AIG might have received in 2015.  And even if a "penalty" analysis were appropriate, the only reported decision to consider the ISDA Form's close-out provision upheld its enforceability against the very arguments AIG presses in its motion.  *See Drexel Burnham Lambert Prods. Corp. v. Midland Bank PLC*, No. 92-3098, 1992 Dist. LEXIS 21223 (S.D.N.Y. Nov. 9, 1992) ("*Drexel*").

In *Drexel*, Judge Pollack considered the application of the provision to a defaulting swap party's contingent right to receive a future payment under the swap.  Judge Pollack held that because the "amount of actual loss" that a party would experience upon its counterparty's default "[wa]s incapable or difficult of precise estimation at the time the contract [wa]s entered into," this provision should be upheld as a valid liquidated damages clause.  *Id*. at *3-4.[27]  Judge

---

Mem. 39.  AIG apparently relies on its unilateral Cancellation Right, which could have enabled AIG to cancel the swap if interest rates had gone against it and thereby avoided owing Brookfield a large amount in 2015.  Compl. ¶¶ 21-22.  But the Cancellation Right was exercisable only at specific times—every two years—and there was no guarantee, if Brookfield went bankrupt at a time that AIG owed it a significant sum, that AIG would have been able to first exercise its right to cancel.  As a result, at the time of contracting, it was clear that circumstances could occur in which AIG would owe Brookfield a substantial sum and the close-out provision would have been to AIG's advantage, not Brookfield's.

[27] *See* Swap Agreement § 6(e)(v) (stating that termination payment provisions are a "reasonable pre-estimate of loss," including loss of bargain and loss of future protection); *Truck Rent-A-*

Pollack further held that requiring Drexel "*to forego an unrealized investment gain* is neither a penalty, a forfeiture nor an unjust enrichment." *Id*. at *4 (emphasis added).

AIG tries to distinguish *Drexel* on the grounds that it involved a smaller dollar amount than the contingent receivable here. Mem. 39. But the amount at issue is analytically besides the point because the provision must be evaluated at the time of contracting, when neither party could have predicted the amount of any future obligation or which party would have that obligation. *See In re O.P.M. Leasing Servs*, 23 B.R. 104, 111 n.3 (Bankr. S.D.N.Y. 1982) ("The court must determine the validity of a liquidated damages clause as of the time the parties entered into the agreement at issue. Hindsight may not be used in accomplishing this analysis."); *see also In re United Merchants & Mfrs., Inc.*, 674 F.2d 134, 142 (2d Cir. 1982).

The close-out provision also is not an unenforceable forfeiture. Unlike a penalty, which imposes monetary liability to punish a party for breach, a forfeiture involves the loss of rights under a contract. *See* 14 RICHARD A. LORD, WILLISTON ON CONTRACTS § 42.1 (4th ed. 2000). New York law does not disfavor forfeitures so long as it is clear and unambiguous that the parties agreed to them. *See Trustco Bank New York v. 37 Clark St., Inc.*, 599 N.Y.S.2d 404, 405 (Sup. Ct. 1993); *Winston Personnel Agency, Inc. v. Abcon Indus. Inc.*, 438 N.Y.S.2d 669, 670 (1980) ("[W]hen it is clear from the terms of the contract that the parties have so agreed, the forfeiture will be enforced."). Thus, the rule against forfeitures is merely a rule of construction disfavoring an interpretation of an ambiguous provision that would work a forfeiture. As Judge Lynch has explained:

> New York's anti-forfeiture principle [is] an interpretive device, not . . . a rule that voids clear agreements intended by the parties. . . . While New York courts will not interpret provisions that are ambiguous on their face to effect a forfeiture, a

---

*Center, Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (2d Cir. 1977) (liquidated damages provision will be upheld unless it is "plainly or grossly disproportionate to the probable loss").

> contract is only ambiguous if it is susceptible to two equally plausible interpretations. [Where] there is no ambiguity to resolve. . . . New York law does not require dishonoring the parties' clear agreement.

*Kreiss v. McCown de Leeuw & Co.*, 131 F. Supp. 2d 428, 436 (S.D.N.Y. 2001).

Instead of citing forfeiture law that it cannot overcome, AIG purports to "reserve" the right to challenge the meaning of the close-out provision. Mem. 36, n.28. But the provision is not ambiguous; it requires only defaulting parties to make payments on early termination, but imposes no obligation at all on non-defaulting parties. *See* 1987 ISDA Form § 6(e)(i)(1) ("[I]f there is a Defaulting Party, the Defaulting Party will pay to the other party . . . ."). There is no dispute about the meaning of this provision. *See, e.g.*, *Drexel*, 1992 U.S. Dist. LEXIS 21223, at *2-3 ("The Swap Agreement . . . provides that, in the event of a party's default . . . a defaulting party is not entitled to any compensation on a termination resulting from its default."); User's Guide to the ISDA 2002 Master Agreement: 2003 Edition, at 24 (under this provision, "if a single net amount ran in favour of the Defaulting Party, it would not receive that amount from the Non-defaulting Party") (McLoughlin Decl. Ex. H).

Even if forfeiture law applied to this unambiguous provision, the loss of a contingent unrealized gain is not a forfeiture. *Drexel*, 1992 Dist. LEXIS at *4. In *Kreiss*, the plaintiffs asked the Court not to enforce a contractual provision allowing their former employer to repurchase their stock options, after they had been terminated, for their then-current value, which was nothing. The Court found that the plaintiffs took the risk that the repurchase price could be disadvantageous by failing to exercise the options before being terminated, thus taking the risk of a price drop. *Kreiss*, 131 F. Supp. 2d at 436-37. Similarly, AIG could have exercised its Cancellation Right to collect the accrued amounts on the swaps, but took the risk of continuing them.

Accordingly, the Court should reject AIG's challenge to Brookfield's requested relief.

## CONCLUSION

AIG's motion to dismiss should be denied in its entirety.


Dated: February 3, 2010
     New York, New York

                    BROOKFIELD ASSET MANAGEMENT, INC.
                    BRYSONS INTERNATIONAL LTD.

                    By: _____

                    Richard F. Ziegler
                    Stephen L. Ascher
                    Luke P. McLoughlin
                    Danielle F. Tarantolo
                    JENNER & BLOCK LLP
                    919 Third Avenue, 37th Floor
                    New York, New York 10022-3908
                    *Counsel for Plaintiffs*