UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BROOKFIELD ASSET MANAGEMENT, INC., f/k/a Hees International Bancorp Inc., and BRYSONS INTERNATIONAL, LTD., f/k/a Brysons International Bank, Ltd.,

Plaintiffs,

-against-

AIG FINANCIAL PRODUCTS CORP. and AMERICAN INTERNATIONAL GROUP, INC.,

Defendants.

---

09 Civ. 8285 (PGG)

**DEFENDANTS' REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...........................................................................................ii

INTRODUCTION .......................................................................................................1

ARGUMENT .............................................................................................................3

I.    PLAINTIFFS ARE UNABLE TO EXPLAIN HOW THE COMPLAINT PLAUSIBLY ALLEGES THAT ANY BANKRUPTCY EVENT OF DEFAULT HAS OCCURRED.........................................................................................3

    A.    Plaintiffs Are Unable To Identify Factual Allegations That Would Constitute A Bankruptcy Filing Event Of Default Under Section 5(a)(vii)(4, 8) Of The Swap Agreement .................................................4

    B.    Plaintiffs Are Unable To Identify Factual Allegations That Would Constitute A Dissolution, Winding-Up, Or Liquidation Event Of Default Under Section 5(a)(vii)(1, 5, 7, or 8) Of The Swap Agreement ...........................7

    C.    Plaintiffs Are Unable To Identify Factual Allegations That Would Constitute A Trustee-Related Event Of Default Under Section 5(a)(vii)(6, 7) Of The Swap Agreement .................................................10

    D.    Plaintiffs Are Unable To Identify Factual Allegations That Would Constitute An Insolvency Or Inability To Pay Event Of Default Under Section 5(a)(vii)(2) Of The Swap Agreement ......................................11

        1.    Plaintiffs fail to explain how the Complaint plausibly alleges that either AIG or AIG-FP was unable generally to pay its debts as they became due..........................................................................12

        2.    Plaintiffs fail to explain how the Complaint plausibly alleges that either AIG or AIG-FP was insolvent .........................................17

II.   PLAINTIFFS ARE UNABLE TO REFUTE THAT SECTION 6(e) OF THE SWAP AGREEMENT IS AN UNENFORCEABLE PENALTY CLAUSE ...................20

CONCLUSION........................................................................................................23

# <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

## <u>Cases</u>

*In re Acterna Corp. Sec. Litig.*,
378 F. Supp. 2d 561 (D. Md. 2005) ...................................................................18

*In re AlphaStar Ins. Group Ltd.*,
383 B.R. 231 (Bankr. S.D.N.Y. 2008) ..........................................................17, 18

*Anderson Clayton & Co. v. Alanthus Corp.*,
457 N.Y.S.2d 578 (2d Dep't 1983) ..................................................................23

*In re Baylies' Estate*,
279 N.Y.S. 415 (Sur. Ct. 1935) .........................................................................20

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................17

*In re Charter Comm'cns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ..........................................1, 3, 12, 13, 14

*In re Citadel Indus., Inc.*,
423 A.2d 500 (Del. Ch. 1980) ..............................................................................9

*In re City of Bridgeport*,
129 B.R. 332 (Bankr. D. Conn. 1991) .........................................................15, 16

*In re City of Vallejo, Cal.*,
2008 WL 4146015 (Bankr. E.D. Cal. Aug. 29, 2008) ........................................16

*Clubb v. ANC Heating & Air Conditioning, Inc.*,
675 N.Y.S.2d 176 (3d Dep't 1998) ...............................................................21, 22

*Drexel Burnham Lambert Prods. Corp. v. MCorp*,
1989 Del. Super. LEXIS 69 (Del. Super. Ct. Feb. 23, 1989)...........5, 14, 15, 17, 22

*Drexel Burnham Lambert Products Corp. v. Midland Bank PLC*,
1992 Dist. LEXIS 21223 ....................................................................................22

*In re Foxridge Ltd. P'ship*,
238 B.R. 810 (Bankr. W.D. Mo. 1999) ................................................................6

*Galli v. Metz*,
973 F.2d 145 (2d Cir. 1992) ............................................................................8, 9

*Goodrich & Sherwood Assocs., Inc. v. Johnson*,
1997 WL 23190 (S.D.N.Y. Jan. 22, 1997) .........................................................20

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*,
230 F.3d 549 (2d Cir. 2000)..................................................................................8

*Howard Johnson International Inc. v. HBS Family, Inc.*,
 1998 WL 411334 (S.D.N.Y. July 22, 1998) ............................................22

*Indus. Dev. Found. of Auburn v. U.S. Hoffman Mach. Corp.*,
 171 N.Y.S.2d 562 (Sup. Ct. 1958) ...........................................................20

*Jacob & Youngs v. Kent*,
 230 N.Y. 239 (1921) .................................................................................23

*Kreiss v. McCown De Leeuw & Co.*,
 131 F. Supp. 2d 428 (S.D.N.Y. 2001) ......................................................23

*Le Cordon Bleu, S.A. v. BPC Pub. Ltd.*,
 451 F. Supp. 63 (S.D.N.Y. 1978) ..............................................................23

*Patrickson v. Dole Food Co.*,
 251 F.3d 795 (9th Cir. 2001) ....................................................................11

*Price v. Gurney*,
 324 U.S. 100 (1945) ...................................................................................5

*In re Revere Copper & Brass, Inc.*,
 60 B.R. 887 (Bankr. S.D.N.Y. 1985) ....................................................5, 6, 7

*Rombach v. Chang*,
 355 F.3d 164 (2d Cir. 2004) .....................................................................19

*In re Solutia, Inc.*,
 2007 WL 1302609 (Bankr. S.D.N.Y. May 1, 2007) ..............................5, 6, 7

*Sporre S.A. de C.V. v. Int'l Paper Co.*,
 1999 WL 1277243 (S.D.N.Y. Dec. 30, 1999) ..........................................20

*In re Teleglobe Communications Corp.*,
 392 B.R. 561 (Bankr. D. Del. 2008) .........................................................15

*In re Town of Westlake, Tex.*,
 211 B.R. 860 (Bankr. N.D. Tex. 1997) .....................................................16

*Union Bank of Switzerland v. Deutsche Fin. Servs. Corp.*,
 2000 WL 178278 (S.D.N.Y. Feb 16, 2000) ...............................................5

*Valentine Gardens Coop., Inc. v. Oberman*,
 237 N.Y.S.2d 535 (Sup. Ct. 1963) ...........................................................20

## Statutes

11 U.S.C. § 101(32) ..........................................................................................16

11 U.S.C. § 303(h)(1) ........................................................................................16

8 Del. Code § 278 (2009) ....................................................................................9

## Foreign Statutes

Insolvency Act 1986 (UK) §§ 88, 91(2), 165, 178 ...................................................9, 10

## Other Authorities

2003 ISDA Credit Derivatives Definitions .......................................................................7

Code of Standard Wording, Assumptions and Provisions for Swaps: 1985 Edition ......................5

Jongho Kim, *From Vanilla Swaps to Exotic Credit Derivatives: How to Approach the Interpretation of Credit Events*, 13 Fordham J. Corp. & Fin. L. 705 (2008)........................6, 7

ROGER LOWENSTEIN, WHEN GENIUS FAILED: THE RISE AND FALL OF LONG-TERM CAPITAL MANAGEMENT 180 (Random House 2000)............................................................6, 7

Stephanie J. Seligman, *Just-In-Case: Planning For A Potential Restructuring*, 793 PLI/CORP 703 (1992) ...........................................................................................................6, 7

SIGTARP REPORT, FACTORS AFFECTING EFFORTS TO LIMIT PAYMENTS TO AIG COUNTERPARTIES (Nov. 17, 2009).............................................................................18

JANET M. TAVAKOLI, STRUCTURED FINANCE AND COLLATERALIZED DEBT OBLIGATIONS (2d ed. 2008) ...............................................................................................................6, 7

JEFFREY S. TOLK, UNDERSTANDING THE RISKS IN CREDIT DEFAULT SWAPS (Moody's Inv. Servs. 2001) ...............................................................................................................6, 7

User's Guide to the 1992 ISDA Master Agreements: 1993 Edition................................3

User's Guide to the 2002 ISDA Master Agreements: 2003 Edition................................3

User's Guide to the Standard Form Agreements: 1987 Edition ....................................5

Defendants respectfully submit this reply memorandum in further support of their motion to dismiss the Complaint pursuant to Rule 12(b)(6).

## INTRODUCTION

In opposing Defendants' motion to dismiss, Plaintiffs do not dispute that both Defendants have performed all their obligations under the parties' Swap Agreement, have never filed for bankruptcy, and continue as going concerns. Nevertheless, desperate to avoid their $1.2 billion obligation to AIG-FP, which resulted from arms-length negotiations between sophisticated counterparties nearly 20 years ago, Plaintiffs attempt to rewrite the parties' agreement to invent a Bankruptcy Event of Default where none exists, often offering "tests" for these defaults that have no precedent, are entirely unfeasible and lack any semblance of a bright line. "[V]agueness," of course, "is hardly a desirable characteristic for identifying a potential default under a multi-billion dollar" agreement. *In re Charter Comm'cns*, 419 B.R. 221, 246 (Bankr. S.D.N.Y. 2009).

Plaintiffs also seriously understate the substantial negative effects that their requested declaration would have on parties to other ISDA Master Agreements. Plaintiffs' contention that subsequent ISDA Forms "are notably different from the 1987 ISDA Form in pertinent respects" (Opp. 6) is both incorrect and misleading. The Bankruptcy Events of Default in the 1992 and 2002 ISDA Master Agreements contain default triggers that are materially identical to the relevant default triggers in Section 5(a)(vii) of the 1987 ISDA Master Agreement,[1] and allow parties to specify automatic early termination in the event of a Bankruptcy Event of Default.[2] Furthermore, the *same* standard-form Master Agreement governs many different types of

---

[1]    *Compare* 1992 ISDA Master Agreement, § 5(a)(vii) (Declaration of Jonathan E. Pickhardt, dated Feb. 23, 2010 (hereafter "Pickhardt Reply Decl.") Ex. A) and 2002 ISDA Master Agreement, § 5(a)(vii) (*Id*. Ex. B) *with* 1987 ISDA Master Agreement, § 5(a)(vii)(1, 2, 4-8) (Compl. Ex. A).

[2]    *See* 1992 ISDA Master Agreement, § 6(a) (Pickhardt Reply Decl. Ex. A); 2002 ISDA Master Agreement, § 6(a) (*Id*. Ex. B).

derivatives transactions, including both credit default swaps and interest rate swaps. [3] Consequently, as Defendants have previously warned (Mem. 1-2), the ramifications of Plaintiffs' opportunistic attempt to walk away from their sizeable obligation to AIG-FP are not limited to the universe of transactions still governed by the 1987 ISDA Master Agreement, or to interest rate swaps. Rather, the interpretation of the provisions at issue here will have a direct bearing on $531.2 trillion of outstanding derivative contracts. (*See* Mem. 2 n.1).

Plaintiffs' Opposition, moreover, does nothing to undermine the force of Defendants' motion. *First*, Plaintiffs propose an unworkable and impractical interpretation of the "in furtherance" trigger that would result in an Event of Default under Section 5(a)(vii)(4, 8) far in advance of any corporate action directing or approving a bankruptcy filing. No court has ever adopted an interpretation as broad as the one Plaintiffs offer, nor one so in conflict with the purpose of the Bankruptcy Events of Default: to insulate non-defaulting counterparties from formal bankruptcy proceedings. As numerous courts have held, a formal Board resolution constitutes the bright line designating corporate action "in furtherance" of a bankruptcy filing.

*Second*, Plaintiffs ignore the critical language in Section 5(a)(vii)(1, 5, 7, 8) and conflate the independent triggers in those sections when they contend that "AIG is winding up, liquidating, and/or dissolving AIG-FP, or events are occurring with 'an analogous effect' to those events, or AIG is taking steps in furtherance of these acts." (Opp. 29.) When the contractual language of each trigger is considered separately and in full, it is clear the Complaint fails to allege plausibly that an Event of Default has occurred under any of them.

---

[3]    The User's Guide to the 1992 ISDA Master Agreements explains the "broad product coverage contemplated by the 1992 ISDA documentation." User's Guide to the 1992 ISDA Master Agreements: 1993 Edition i (Pickhardt Reply Decl. Ex. C). Meanwhile, "[t]he 2002 Agreement can cover a broad range of derivative transactions, including … credit default swaps … [and] interest rate swaps… ." User's Guide to the 2002 ISDA Master Agreements: 2003 Edition 2 (*Id.* Ex. D).

*Third*, Plaintiffs largely abandon their allegations that the federal government's role in AIG has triggered a trustee-related Event of Default under Section 5(a)(vii)(6, 7), and the arguments they do make either find no support in the Complaint or merely reflect the government's status as majority shareholder.

*Fourth*, Plaintiffs' suggestion that the inability-to-pay trigger in Section 5(a)(vii)(2) contains a "prospective element" is inconsistent with Judge Peck's carefully reasoned decision in *Charter*, 419 B.R. 221, finds no support elsewhere in the case law, and would deprive parties of the certainty and consistency that is essential to effective operation of the ISDA Master Agreement's boilerplate Bankruptcy Event of Default provision. Similarly, with respect to the insolvency trigger in Section 5(a)(vii)(2), Plaintiffs offer no legitimate reason to disregard AIG's audited financial statements, and, in any event, the Complaint's allegations fail to satisfy both the plausibility standard and the heightened pleading standard under Rule 9(b) that is applicable to their thinly disguised allegations of fraud.

*Fifth*, even if the Complaint plausibly alleges an Event of Default, the Plaintiffs have not demonstrated that they should be permitted to walk away from their financial obligations to AIG-FP. The penalty clause analysis that Defendants explained in their opening Memorandum is fully applicable to the Swap Agreement's closeout provision, and the unenforceability of this provision is apparent on the face of the Complaint. Thus, for the reasons set forth below and in Defendants' opening Memorandum, the Complaint should be dismissed in its entirety.

## ARGUMENT

## I. PLAINTIFFS ARE UNABLE TO EXPLAIN HOW THE COMPLAINT PLAUSIBLY ALLEGES THAT ANY BANKRUPTCY EVENT OF DEFAULT HAS OCCURRED

In their opening Memorandum, Defendants demonstrated that the Complaint should be dismissed in its entirety because it fails to allege plausibly any Bankruptcy Event of Default

under Section 5(a)(vii) of the Swap Agreement.   In response, Plaintiffs overstate their allegations, often skirt the actual language of the Swap Agreement, and fail to offer the bright line test that is essential to effective implementation of the ISDA Master Agreement's boilerplate Bankruptcy Event of Default provision.  The Complaint should therefore be dismissed.

> **A.    Plaintiffs Are Unable To Identify Factual Allegations That Would Constitute A Bankruptcy Filing Event Of Default Under Section 5(a)(vii)(4, 8) Of The Swap Agreement**

Defendants explained that the Complaint fails to allege plausibly that AIG has taken "any action in furtherance" of "institut[ing] … a proceeding seeking a judgment of insolvency or bankruptcy" because it does not (and cannot) allege that AIG's Board ever passed a resolution directing or approving a bankruptcy filing.  (Mem. 15-18).  In response, Plaintiffs suggest that the "in furtherance" Event of Default is triggered "as a result of merely considering or planning for a bankruptcy filing."  (Opp. 26.)  This argument suffers from three fundamental flaws.

*First*, it produces an unworkable test that goes beyond the purpose of the Bankruptcy Events of Default and conflicts with a Board's authority to manage the affairs of a corporation. Plaintiffs notably avoid providing any standard or definition for when a corporation would be deemed to be "considering" or "planning" a bankruptcy filing, with the result that their interpretation provides no bright line to assist parties and courts in determining whether an Event of Default—which, applying Plaintiffs' test, could potentially be triggered by anything from water-cooler conversation to serious contingency planning—has occurred.  Triggering a default far in advance of a bankruptcy filing that may or may not occur also goes beyond the conceded purpose of the Bankruptcy Events of Default: to insulate non-defaulting counterparties from bankruptcy proceedings themselves.  *See* Compl. ¶ 26 ("Swap dealers wanted to avoid the uncertainties of resolving their obligations in bankruptcy.").  A default based on a Board's formal resolution directing or approving a filing would just as effectively "'afford [the non-

4

defaulting] party the opportunity to get out of [the] Agreement before the other party goes bankrupt.'" Opp. 17 (quoting *Drexel Burnham Lambert Prods. Corp. v. MCorp*, 1989 Del. Super. LEXIS 69, at *13 (Del. Super. Ct. Feb. 23, 1989)). Additionally, Plaintiffs' interpretation would usurp a Board's authority to manage the affairs of the corporation and to be fully informed before making the monumental decision of whether the corporation should seek bankruptcy protection. *See Price v. Gurney*, 324 U.S. 100, 104 (1945) ("the initiation of the proceedings ... is left to the corporation itself, i.e. to those who have the power of management").

*Second*, Plaintiffs fail to address the overwhelming legal authority cited in the opening Memorandum indicating that a corporation cannot take action "in furtherance" of a bankruptcy filing absent Board approval, *see* Mem. 15-16 (citing *In re Solutia, Inc.*, 2007 WL 1302609, *14 (Bankr. S.D.N.Y. May 1, 2007); *Union Bank of Switzerland v. Deutsche Fin. Servs. Corp.*, 2000 WL 178278, *12 (S.D.N.Y. Feb 16, 2000); *In re Revere Copper & Brass, Inc.*, 60 B.R. 887, 891 n.1 (Bankr. S.D.N.Y. 1985)), dismissing these cases as inapposite because they deal with "corporate action," rather than "any action," in furtherance of a bankruptcy filing. (Opp. 28.) Plaintiffs, however, do not contest the fact that the 1987 Master Agreement was drafted to apply to counterparties other than corporate entities.[4] Consequently, it is difficult to see what Plaintiffs find so "novel" about the fact that the term "any action" was designed *not* to fundamentally change the acts that trigger default by a corporation, but rather to broaden the applicability of the "action in furtherance" default to non-corporate entities, which are plainly incapable of taking "corporate action" in furtherance of a bankruptcy filing. *Cf. In re Foxridge Ltd. P'ship*, 238 B.R.

---

[4]  For example, in 1987 Goldman Sachs & Co., which was a member of the committee that drafted the precursor to the 1987 Master Agreement, was a limited liability partnership. *See* Code of Standard Wording, Assumptions and Provisions for Swaps: 1985 Edition iv-v (Pickhardt Reply Decl. Ex. E). Additionally, the 1987 User's Guide states that "comments [regarding the draft 1987 ISDA Master Agreement] were solicited from several companies and *governmental agencies* worldwide which participate in the interest rate and currency swap markets." User's Guide to the Standard Form Agreements: 1987 Edition 1 (emphasis added) (*Id*. Ex. F).

810, 816 (Bankr. W.D. Mo. 1999) (general partner determines whether limited partnership should pursue bankruptcy).

Moreover, there is nothing "novel" about the claim that, *in the context of a corporation*, the phrase "any action" is synonymous with the phrase "corporate action." It is axiomatic that "[a] corporation acts through its board of directors … [which] act[s] by passing resolutions." *Solutia*, 2007 WL 1302609 at *14. Thus, for corporations like AIG and AIG-FP, the term "any action" necessarily means "corporate action." In any event, the analysis in *UBS*, *Solutia* and *Revere* applies equally well to "any action" as it does to "corporate action." Either way, a legal entity can take no action in furtherance of a bankruptcy filing until the person(s) with the power to authorize such a filing do(es) so. *See Revere*, 60 B.R. at 891 n.1. In the case of a corporation, this requires a Board resolution. The Complaint does not allege that the filing of a bankruptcy petition was ever approved by anyone at AIG—much less by persons with the authority to do so.

*Third*, unable to cite a single case in support of their interpretation of the "in furtherance" trigger, Plaintiffs rely (Opp. 26-27) on secondary sources that, when read in full, actually undercut their position. For example, Jeffrey S. Tolk points out that while "the act of planning for, or even considering, a bankruptcy filing … might be in furtherance of bankruptcy, [such conduct] ***would not generally be considered a bankruptcy event***." UNDERSTANDING THE RISKS IN CREDIT DEFAULT SWAPS 6 (Moody's Inv. Servs. 2001) (emphasis added). Similarly, at best, the remainder of the secondary sources upon which Plaintiffs rely critically observe that there is some risk that an unscrupulous counterparty "could" attempt to read Section 5(a)(vii)(4, 8) "very broadly" to include contingency planning for a bankruptcy filing. *Id.*[5] These articles neither cite

---

[5]    *See also* Stephanie J. Seligman, *Just-In-Case: Planning For A Potential Restructuring*, 793 PLI/CORP 703, 731 (1992) (noting the provision "could" be read this way); JANET M. TAVAKOLI, STRUCTURED FINANCE AND COLLATERALIZED DEBT OBLIGATIONS 68 (2d ed. 2008) (might "potentially" be read this way); Jongho Kim, *From Vanilla Swaps to Exotic Credit*

any cases where this very broad interpretation has been adopted, nor remotely suggest that such an interpretation would be appropriate, but instead warn that such a broad reading would be problematic because it "could lead to a 'credit event' being called … *when no 'default' has actually occurred*." *Id.* (emphasis added).

In sum, Brookfield's broad and impractical reading of the "in furtherance" trigger should be rejected in favor of the more reasonable interpretation adopted in *Solutia*, *UBS*, and *Revere Copper*, and, consequently, this portion of the Complaint should be dismissed.[6]

**B.    Plaintiffs Are Unable To Identify Factual Allegations That Would Constitute A Dissolution, Winding-Up, Or Liquidation Event Of Default Under Section 5(a)(vii)(1, 5, 7, or 8) Of The Swap Agreement**

Defendants also explained that the Complaint fails to allege plausibly that AIG-FP (1) "is dissolved" (Master Agreement § 5(a)(vii)(1)); (2) "has [had] a resolution passed for its winding-up or liquidation" (*id.* § 5(a)(vii)(5)); (3) has had an event occur that, "under the applicable laws of any jurisdiction, has an analogous effect to" (1) or (2) (*id.* § 5(a)(vii)(7)); or (4) has taken "action in furtherance" of (1), (2), or (3) (*id.* § 5(a)(vii)(8)).  (Mem. 18-22).  Unable to contend that *any* dissolution or winding-up Event of Default has been triggered, Plaintiffs instead conflate

---

*Derivatives: How to Approach the Interpretation of Credit Events*, 13 FORDHAM J. CORP. & FIN. L. 705, 761-62 (2008) ("might" be read this way).  And while Long-Term Capital's lawyers apparently were concerned that this language could be misinterpreted in this manner, there is no indication that any of that company's swaps were terminated on this ground or that the lawyers were aware of any cases upholding such a termination.  *See* ROGER LOWENSTEIN, WHEN GENIUS FAILED: THE RISE AND FALL OF LONG-TERM CAPITAL MANAGEMENT 180 (Random House 2000).

[6]    Plaintiffs also incorrectly assert that ISDA has "removed the 'in furtherance' aspect of Section 5(a)(vii) for credit default swaps written in 2003 and thereafter…." (Opp. 27).  The Credit Derivatives Definitions cited by Plaintiffs "are intended for use in confirmations of individual credit derivatives transactions…."  2003 ISDA Credit Derivatives Definitions v (Declaration of Luke P. McLoughlin, dated Feb. 3, 2010 Ex. A).  They have no bearing upon the interpretation of the Bankruptcy Events of Default in the 1987, 1992, or 2002 ISDA Master Agreements (including Master Agreements covering credit default swaps), and these Agreements each contain an "action in furtherance" Bankruptcy Event of Default trigger.  *See* 1987 ISDA Master Agreement, § 5(a)(vii)(8) (Compl. Ex. A); 1992 ISDA Master Agreement, § 5(a)(vii)(9) (Pickhardt Reply Decl. Ex. A); 2002 ISDA Master Agreement, § 5(a)(vii)(9) (*Id.* Ex. B).

these triggers, as well as the catch-all "analogous effect" and "in furtherance" triggers, into an amorphous "going out of business" Event of Default of their own design (Opp. 4). In doing so, Plaintiffs obfuscate the key contractual language that is fatal to their claim. Once the actual language of this Event of Default is restored, Plaintiffs fail to state a plausible claim.

*First*, as discussed, under Section 5(a)(vii)(1), an Event of Default occurs when a counterparty or applicable Specified Entity "***is dissolved***." (emphasis added). When Section 5(a)(vii)(1) is read in conjunction with Section 5(a)(vii)(7)—which refers to an event having an analogous effect under the laws of another jurisdiction—it is clear that Section 5(a)(vii)(1) is directed towards *actual legal dissolution*, which, for AIG-FP, would be dissolution pursuant to Delaware law. *See, e.g., Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (a contractual provision must be interpreted in a way that "best accords with the sense of the remainder of the contract") (internal quotations omitted). Plaintiffs make no attempt to explain how the Complaint alleges any of the events required to effect a dissolution under Delaware law (*compare* Opp. 31 *with* Mem. 19), and thus this portion of the Complaint should be dismissed.

*Second*, as mentioned, under Section 5(a)(vii)(5) an Event of Default occurs when a counterparty or applicable Specified Entity "***has a resolution passed for its winding-up or liquidation***." (emphasis added). In arguing that the Complaint plausibly alleges a default under this trigger (Opp. 29-30), Plaintiffs simply disregard the first six words of the provision, violating basic principles of contract interpretation. *See, e.g., Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 558 (2d Cir. 2000) ("[A]n interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable."). Moreover, Plaintiffs' interpretation ignores the fact that, when Section 5(a)(vii)(5) is read in conjunction with Section 5(a)(vii)(7), it is clear the former provision is directed at resolutions for winding-up or liquidation *that have*

*legal effect* under the insolvency law of the relevant jurisdiction. *See, e.g.*, *Galli*, 973 F.2d at 149; Opp. 30.[7] While, as Defendants previously acknowledged (Mem. 20 n.11), the Delaware Code uses the term "winding-up," it does not ascribe any legal effect to the passage of a resolution by the Board of Directors to wind-up a corporation. Consequently, Plaintiffs have failed to allege plausibly that an Event of Default under Section 5(a)(vii)(5) has occurred.[8]

*Third*, an Event of Default is triggered under Section 5(a)(vii)(7) when "any event occurs with respect to [a] party or … Specified Entity which, ***under the applicable laws of any jurisdiction***, has an ***analogous effect*** to any of the events specified in clauses [(1) or (5)]." (emphasis added). Thus, as Defendants have explained, to state a plausible claim under Section 5(a)(vii)(7), the Complaint must allege that events have occurred with respect to AIG-FP that, ***under the applicable laws of some jurisdiction***, have a legal effect analogous to AIG-FP's dissolution or the passage of a resolution for AIG-FP's winding-up or liquidation. AIG-FP's wind-down, however, is not analogous to dissolution under Delaware law[9] or to a voluntary winding-up under the United Kingdom Insolvency Act 1986.[10] (*Contra* Opp. 30-31.) Plaintiffs'

---

[7] Contrary to Plaintiffs' suggestion (Opp. 29), Defendants have never contended that Section 5(a)(vii)(5) applies only to winding-up proceedings governed by the United Kingdom Insolvency Act 1986. Rather, Defendants' position is that Section 5(a)(vii)(5) is directed at insolvency regimes based on United Kingdom insolvency law because those regimes make express provision for the winding-up of a legal entity by resolution. (*See* Mem. 20.)

[8] Nor have Plaintiffs explained why AIG executives' use of the phrase "wind down" with respect to AIG-FP could possibly be sufficient to allege a claim under Section 5(a)(vii)(5 or 7).

[9] "At common law, the dissolution of a corporation abruptly end[s] its existence, [so that] statutory authority is necessary to prolong the life of a corporation past its date of dissolution." *In re Citadel Indus., Inc.*, 423 A.2d 500, 503 (Del. Ch. 1980). In Delaware, a dissolved corporation is kept alive by statute for a period of three years for the purpose of closing out its corporate and business affairs, 8 Del. Code § 278 (2009), but is statutorily prohibited from carrying on business. *Id.* at 501. In contrast, AIG-FP is neither on statutory life support, nor subject to any legal prohibition from carrying on business.

[10] The distinguishing legal characteristics of a voluntary winding-up under United Kingdom insolvency law include: (a) all share transfers made after the passage of the winding-up resolution are void unless authorized by the liquidator (United Kingdom Insolvency Act 1986 §

*ipse dixit* that AIG-FP's wind-down has a "legal effect" (Opp. 31) is without legal significance.

*Finally*, under Section 5(a)(vii)(8), an Event of Default occurs when a counterparty or Specified Entity "**takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in**" the acts specified in Section 5(a)(vii)(1-7). (emphasis added). Section 5(a)(vii)(8) is not a stand-alone Event of Default, and hence cannot be divorced from the Events of Default it references, even when combined with Section 5(a)(vii)(7) to create an "action in furtherance of an event with an analogous legal effect" Event of Default. Consequently, it is not sufficient for Plaintiffs to cite Section 5(a)(vii)(8) as a kind of *deus ex machina* in response to Defendants' argument that the Complaint fails to allege plausibly an Event of Default under Section 5(a)(vii)(1, 5, or 7). (Opp. 29, 31). Rather, Plaintiffs must actually identify allegations in the Complaint that AIG-FP has taken actions in furtherance of (1) its formal dissolution under Delaware corporation law, (2) the passage by its Board of a resolution for its winding-up or liquidation, or (3) some other event with a legal effect analogous to (1) or (2). Allegations that AIG-FP is taking actions in furtherance of events which have no legal effect under the laws of Delaware *or any other jurisdiction* are insufficient to meet this requirement.

### C.     Plaintiffs Are Unable To Identify Factual Allegations That Would Constitute A Trustee-Related Event Of Default Under Section 5(a)(vii)(6, 7) Of The Swap Agreement

Defendants demonstrated that the Complaint does not plausibly allege that the federal government's role as AIG's majority shareholder triggered a trustee-related Event of Default. (Mem. 22-25). In response, Plaintiffs do not deny that, as Defendants argued, the appropriate test is whether a government-appointed official is empowered by statute to manage a party's day-to-day operations. Rather, they contend that Defendants "overlook[ed]" or "understate[d]"

---

88); (b) the powers of all directors cease upon the appointment of a liquidator (*id.* § 91(2)); (c) a liquidator has the ability to exercise certain powers of the court (*id.* § 165); and (d) a liquidator has the power to disclaim onerous property, including unprofitable contracts (*id.* § 178).

allegations in the Complaint but then make no effort to connect these allegations to that test. (Opp. 32). Specifically, Plaintiffs contend that the Complaint alleges that (1) the AIG Trustees have worked to wind-down AIG-FP; (2) the AIG Trustees have appointed a number of new AIG Board members; and (3) the federal government chose a new CEO for AIG. (*Id.*)

As to the first contention, nowhere does the Complaint attribute AIG-FP's wind-down to the AIG Trustees. In fact, the statements concerning AIG-FP's wind-down cited in the Complaint (*see* Compl. ¶¶ 50-52) show that actions related to the wind-down commenced *prior* to the AIG Trustees' appointments in January 2009 (*see id.* ¶ 49). Moreover, the second and third contentions are consistent with Defendants' argument that the government and the AIG Trustees have merely acted in their capacity as AIG's majority shareholder, exercising the influence that flows from this status to—as Plaintiffs concede (Opp. 32)—"indirectly" bring about the appointment of a new CEO and Board members. *See, e.g.*, *Patrickson v. Dole Food Co.*, 251 F.3d 795, 808 (9th Cir. 2001) (noting that the right "to approve the appointment of directors and officers" of a foreign corporation "is not considerably different from the control a majority shareholder would enjoy under American corporate law."). Since a change in majority shareholder control does not constitute an Event of Default under Section 5(a)(vii)(6, 7), this portion of the Complaint should be dismissed as well.

### D. Plaintiffs Are Unable To Identify Factual Allegations That Would Constitute An Insolvency Or Inability To Pay Event Of Default Under Section 5(a)(vii)(2) Of The Swap Agreement

Defendants also explained (Mem. 25-36) that the Complaint does not plausibly allege an Event of Default under Section 5(a)(vii)(2), which occurs when "[t]he party or any applicable Specified Entity … ***becomes insolvent*** or fails or ***is unable*** or admits in writing its inability ***generally to pay its debts as they become due*.**" Master Agreement § 5(a)(vii)(2) (emphasis added). In response, Plaintiffs offer an unworkable and impractical prospective test to determine

11

whether a party **will be** unable to pay its debts as they become due (Opp. 14-22) and continue to disregard AIG's audited financials without even the slightest factual allegations of fraud. (Opp. 22-25). Plaintiffs' arguments thus do not support the existence of an Event of Default under either the inability-to-pay trigger or the insolvency trigger.[11]

> **1.      Plaintiffs fail to explain how the Complaint plausibly alleges that either AIG or AIG-FP was unable generally to pay its debts as they became due**

Defendants demonstrated that the Complaint nowhere alleges that either AIG or AIG-FP was unable to pay any debt at the time payment was actually due, and therefore, consistent with Judge Peck's recent decision in *Charter*, 419 B.R. 221, that the Complaint does not plausibly allege that either AIG or AIG-FP has triggered the inability-to-pay Event of Default. (Mem. 26-31.) In response, Plaintiffs principally contend that "the test for inability to pay debts necessarily has a prospective element…." (Opp. 15.) Plaintiffs, however, fail to offer even the slightest definition or standard for this "prospective element." Instead, their "test" for determining when a party "*is unable* … generally to pay its debts *as they become due*" apparently looks to some indeterminate point in the future in an effort to gauge whether a party might be unable to pay its debts at that time. It is simply impossible to understand how this amorphous and speculative "test" would operate in practice or how it could provide the certainty that is needed in the vast global market for both simple and complex financial transactions. Indeed, Plaintiffs' "test"

---

[11]    As a threshold matter, Defendants demonstrated that this portion of the Complaint should be dismissed because, despite seeking a declaration that ***AIG-FP*** has triggered a default in Section 5(a)(vii)(2) (*see* Compl. ¶ 81), it only makes factual allegations with respect to ***AIG's*** purported insolvency and inability to pay. (Mem. 25). In response, Plaintiffs are only able to cite (Opp. 23 n.16) allegations that contain conclusory assertions with respect to AIG-FP (*see* Compl. ¶¶ 62-63), discuss AIG-FP's losses without regard to whether they rendered AIG-FP insolvent or unable to pay its debts as they became due (*see id.* ¶¶ 37, 55), or do not address AIG-FP at all (*see id.* ¶ 64). Plaintiffs' reliance on AIG's 2008 third quarter Form 10-Q report is also misplaced, as it merely states that AIG-FP needed $20 billion "in a short period of time," not that it was ever insolvent or unable to pay its debts when due. AIG 2008 3Q Report, at 50 (Declaration of Jonathan E. Pickhardt, dated December 17, 2009 ("Pickhardt Decl.") Ex. A).

would inevitably spawn extensive litigation regarding the existence of an Event of Default and would encourage parties to seize on uncertainties regarding a counter-party's future liquidity in a contrived effort to avoid future obligations under a swap agreement.

Plaintiffs' unmanageable "test," moreover, has no support in the case law.  For example, in *Charter*, Judge Peck noted the "inherent unpredictability of future events," and rejected a "forward-looking" interpretation of the inability-to-pay trigger in part because "[a] covenant tied to events that might or might not come to pass lacks specificity and is virtually impossible to apply in practice."  *Id.* at 236.  Judge Peck further explained that it was simply  "not practical … to declare a default based on what may seem to be well-founded presumptions as to the ability of a holding company to pay debts in the future" because, as here, "***[t]hose presumptions could well be wrong.***"  *Id.* (emphasis added); *see also id.* at 246.

While Judge Peck noted in *Charter* that the prospective gloss urged by JPMorgan was left open as a "possible interpretation[]" because "[t]he language used in the loan agreement [was] not a model of clarity," *id*. at 236, that is not the case with respect to Section 5(a)(vii)(2) of the Master Agreement.  In *Charter*, an inability-to-pay default occurred when a designated party "*shall be* unable to … pay its debts as they become due."  *Id.* at 245 (emphasis added).  To the extent that Judge Peck gave any consideration to a prospective interpretation, he focused on the "shall be unable" language.  *Id.* at 246.  Section 5(a)(vii)(2), however, does not use this language, but instead provides that an inability-to-pay default occurs when a designated party "*is* unable … generally to pay its debts as they become due."  Master Agreement § 5(a)(vii)(2) (emphasis added).  Thus, the case against a prospective interpretation is even stronger here than in *Charter*.

Unable to assail Judge Peck's reasoning, Plaintiffs unsuccessfully attempt to distinguish the facts in *Charter*.  *First*, Plaintiffs' contention (Opp. 21) that the decision in *Charter* turned upon the "speculative and remote" nature of the alleged inability to pay is belied by both the

13

facts and Judge Peck's decision.  The obligations at issue in *Charter* were not coming due at some "distant" time, as Plaintiffs assert (Opp. 21), but rather at various times during the next six months.  *See Charter*, 419 B.R. at 245.  Moreover, Judge Peck focused on the fact that, as here, *the Holding Companies had in fact paid their debts as they became due*, and not upon the amount of time the Holding Companies had to pay their debts.  *See id.* at 247 ("[I]t is significant that the Designated Holding Companies in fact paid all of their debts as they became due….").  *Second*, Plaintiffs' attempt to distinguish *Charter* by contending that government funds are not "a permissible source of cash for purposes of [Section] 5(a)(vii)(2)," (Opp. 21), is utterly without textual support, and indeed strains credulity.  It is ridiculous to suggest that an ISDA Master Agreement can be terminated if a party is able to pay its debts using a "source of cash" the other party finds objectionable.  *Third*, Plaintiffs' suggestion that Judge Peck's rejection of a prospective interpretation of the provision at issue was "at best, an alternative holding," (*id.*), is belied by both the structure and plain language of the *Charter* decision.[12]

To support their interpretation of the inability-to-pay trigger, Plaintiffs heavily rely (Opp. 15-17) on two unpublished decisions in the same case from the Superior Court of Delaware, neither of which has been cited in the twenty years since they were issued.  *See Drexel Burnham Lambert Products Corp. v. MCorp*, 1989 Del. Super. LEXIS 69 (Del. Super. Ct. Feb. 23, 1989), *reh'g denied* 1991 Del. Super. LEXIS 298 (Aug. 13, 1991).  Contrary to Plaintiffs' contention, however, the court in *MCorp* never ruled that the inability-to-pay provision at issue would be triggered by a "'prospective inability' to pay debts."[13]  (Opp. 17).  Rather, the court ruled that an inability-to-pay default had occurred because (1) MCorp's Board of Directors had imposed a

---

[12]  Judge Peck addressed the prospective application issue first, before noting that JPMorgan would not succeed *even if* its interpretation was correct.  *Charter*, 419 B.R. at 246 ("Even if the Court were to agree with JPMorgan and interpret section 8(g)(v) prospectively...").

[13]  As here, the *MCorp* agreement provided for an Event of Default when a party "fails or is unable to pay its debts generally as they become due."  1989 Del. Super. LEXIS 69, at *3.

14

retroactive moratorium on the payment of its debts, meaning the company lacked the legal authority to make payments, and (2) MCorp *had actually failed to pay its debts*. *MCorp*, 1991 Del Super. LEXIS 298, at *5 ("The retroactive application of the [moratorium] coupled with actual failure to pay debts due on October 21 is a sufficient basis on which to find an event of default for purposes of this contract."). In fact, the term "prospective" does not appear *at all* in the court's initial decision, and is used only twice in the decision denying MCorp's motion for re-argument, where Plaintiffs quote it out of context. (*See* Opp. 17 (quoting *MCorp*, 1991 Del. Super. LEXIS 298, at *3).) At best, *MCorp* stands for the proposition that the inability-to-pay provision at issue in that case was triggered before a party could be forced into bankruptcy under Section 303(h)(1) of the Bankruptcy Code. *See MCorp*. 1989 Del. Super. LEXIS 69, at *13. But the mere fact that an inability-to-pay default is triggered before a party is legally bankrupt does not mean the event of default applies prospectively.[14]

Nor do Chapter 9 municipal bankruptcy cases lend any weight to Plaintiffs' argument. Contrary to Plaintiffs' contention (Opp. 19), the Chapter 9 municipal bankruptcy mechanism and the Bankruptcy Event of Default triggers have fundamentally different purposes. While Chapter 9 is designed "to enable a financially distressed city to continue to provide its residents with essential services … while it works out a plan to adjust its debts and obligations," *In re City of Bridgeport*, 129 B.R. 332, 336-337 (Bankr. D. Conn. 1991) (internal quotations omitted), as Plaintiffs concede, the Bankruptcy Event of Default triggers are designed to insulate non-defaulting counterparties from bankruptcy proceedings, *see* Compl. ¶ 26 ("Swap dealers wanted

---

[14]   Plaintiffs' reliance (Opp. 17-18) on *In re Teleglobe Communications Corp.*, 392 B.R. 561 (Bankr. D. Del. 2008), is also misplaced. While the court explained that under Delaware law "[t]he cash flow test is 'forward looking,'" it emphasized "that it was not appropriate to exclude from the cash flow test the funding *actually given* [by outside sources] … in determining whether the Debtors were insolvent." *Id.* at 602 (emphasis added). Thus, even if Delaware law applied here, under *Teleglobe*, it would be erroneous to ignore the financing that the federal government provided when assessing AIG's ability to pay its debts.

to avoid the uncertainties of resolving their obligations in bankruptcy"); *MCorp*, 1989 Del. Super. LEXIS 69, at *13 (same). A prospective "inability to pay" test is essential under Chapter 9 because requiring a city to wait "until it was actually not paying its bills" before it could seek bankruptcy protection "could lead to the non-delivery of services." *Bridgeport*, 129 B.R. at 337. In contrast, regardless of whether the "inability to pay" trigger is prospective, a counterparty will never be required to resolve its obligations in bankruptcy, because an Early Termination Date automatically occurs immediately before the initiation of bankruptcy proceedings. *See* Master Agreement, §§ 5(a)(vii)(4), 6(a). Thus, Chapter 9 cases are inapposite for the simple reason that Chapter 9 is concerned with *avoiding a failure to pay* (and corresponding failure to deliver essential services), while the Bankruptcy Event of Default triggers are concerned with *avoiding being involved in a bankruptcy proceeding itself*.

But even if Chapter 9 cases were somehow applicable here, they actually support dismissal. Where a municipality seeks to qualify as insolvent because it is "unable to pay its debts as they become due" (11 U.S.C. § 101(32)(C)(ii)), the inability to meet a debt must be "*certain*," and therefore "*[m]ere possibility or even speculative probability is not enough.*" *In re Town of Westlake, Tex.*, 211 B.R. 860, 865 (Bankr. N.D. Tex. 1997) (internal quotations omitted). *Accord In re City of Vallejo, Cal.*, 2008 WL 4146015, *23 (Bankr. E.D. Cal. Aug. 29, 2008). The Complaint, however, contains no factual allegations that Defendants lacked the resources and access to resources to pay ongoing debts or that it was otherwise certain they could not pay their debts as they came due. Indeed, the fact that the federal government provided AIG assistance (Compl. ¶¶ 44-45) *before* it failed to pay any debt demonstrates the exact opposite.

Finally, Plaintiffs are incorrect in asserting that Defendants' interpretation of Section 5(a)(vii)(2) conflates the phrase "fails … generally to pay" with the phrase "is unable … generally to pay." (Opp. 15-16). A party may be "unable" to pay its debts when they become

due regardless of whether it actually "fails" to do so.  For example, a party may be legally precluded from paying due to a regulatory prohibition (such as an order from an insurance regulator to cease paying claims) or a Board-imposed moratorium (as in *MCorp*).  In both of these situations, the party would be *unable* to pay its debts at the time they become due, whether or not it actually fails to pay.

In sum, only Defendants' interpretation of the inability-to-pay trigger—that a party must be unable to pay its debts at the time payment is actually due—offers a bright-line rule that provides much-needed certainty and is supported by apposite legal authority.  Since Plaintiffs are unable to contend that the Complaint plausibly alleges an inability-to-pay Event of Default under this interpretation, the requested declaratory relief should be dismissed.

### 2.    Plaintiffs fail to explain how the Complaint plausibly alleges that either AIG or AIG-FP was insolvent

Defendants further explained that the request for a declaration that an insolvency Event of Default occurred should be rejected, as the Complaint fails to actually allege that AIG was balance sheet insolvent.  (Mem. 31-36.)  Defendants also demonstrated that the financial statements referenced in the Complaint indicate that AIG's balance sheets maintained a positive stockholders' equity at all times prior to and following September 2008, and that Plaintiffs' attempt to disregard them was a thinly veiled and insufficiently pled allegation of fraud.

Plaintiffs first contend that their failure to allege that either AIG or AIG-FP was actually balance-sheet insolvent is permissible because the Complaint need only plead "enough *facts* to raise a reasonable expectation that discovery will reveal evidence of" balance-sheet insolvency.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (emphasis added).  But even if Plaintiffs can avoid alleging actual insolvency, the "facts" alleged in the Complaint are woefully inadequate to overcome AIG's audited balance sheets, and they pale in comparison to the allegations in *In re AlphaStar Ins. Group Ltd.*, 383 B.R. 231 (Bankr. S.D.N.Y. 2008)—the sole

case Plaintiffs cite to support their balance-sheet insolvency claim.  In *AlphaStar*, the plaintiff was able to plead a claim based on balance-sheet insolvency in the face of conflicting financial statements because its complaint included detailed allegations (running approximately 190 paragraphs) that AlphaStar fraudulently failed to account properly for potential losses flowing from ongoing litigation—which resulted in its financial statements materially overstating its balances receivable by some $800 million—as well as extensive allegations that AlphaStar's original auditor had breached its professional and contractual duties.  *See id*. at 253-254.

Here, in stark contrast, Plaintiffs identify only a grab-bag of miscellaneous allegations (Opp. 24-25 (citing Compl. ¶¶ 64-66)), none of which is sufficient, either alone or collectively, to state a plausible claim that AIG's financial statements are incorrect.  *First*, the fact that AIG suffered a *liquidity* crisis—*i.e.*, it was short of cash—and obtained government financing says nothing about AIG's *balance-sheet* solvency, which, despite the intense public scrutiny to which AIG has been subjected, has never been credibly challenged.[15]  *Second*, PricewaterhouseCoopers ("PwC"), AIG's independent auditor, provided an unqualified audit opinion for AIG's 2008 year-end report, AIG has not restated any financial statements for 2007-2008, and the mere fact that AIG took write-downs on its swap portfolio *after* September 30, 2008, says nothing about the accuracy of its prior quarterly financial statements.  *See, e.g.*, *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 582 (D. Md. 2005) ("Acterna's October 30, 2002 press release [announcing a $388 million charge for goodwill and other asset impairment] and subsequent 10-Q filing evidence little, if anything, about its financial statements [between Aug. 2001 and Oct. 2002].").

---

[15]    Plaintiffs' selective quotation from the November 2009 SIGTARP Report (Opp. 25), which was not incorporated into the Complaint, is misleading, as it ignores that "FRBNY officials told SIGTARP that, in their view, the private participants declined to provide funding not because AIG's assets were insufficient to meet its needs, but because AIG's liquidity needs quickly mounted in the wake of the Lehman bankruptcy and the other major banks decided they needed to conserve capital to deal with adverse market conditions."   SIGTARP REPORT, FACTORS AFFECTING EFFORTS TO LIMIT PAYMENTS TO AIG COUNTERPARTIES 8 (Nov. 17, 2009).

*Third*, the fact PwC brought issues regarding AIG's internal controls to the company's attention in 2007 in no way diminishes the accuracy of AIG's 2007 Form 10-K,[16] let alone the accuracy of AIG's financial statements in 2008, during which time "AIG maintained, in all material respects, effective internal control over financial reporting…."  AIG 2008 Form 10-K at 191 (Pickhardt Decl. Ex. G).  *Fourth*, Plaintiffs are unable to explain why a former AIG-FP employee's concern about AIG's valuations of certain swaps has any weight when that employee acknowledges in the very same letter that he is "not an expert in the valuation of derivatives." Thus, none of these "facts" creates any expectation, let alone a reasonable one, that Plaintiffs' fishing expedition into AIG's finances will demonstrate that it was ever balance-sheet insolvent.

In any event, as Defendants explained, the Complaint's insolvency allegations are subject to Rule 9(b)'s heightened pleading standard because they are premised on fraud.  While Plaintiffs disavow that they are asserting a fraud *claim* and thus contend that Rule 9(b) is inapplicable (Opp. 24), it is well settled that Rule 9(b) applies "insofar as the claims are premised on allegations of fraud," regardless of whether the allegations are "styled or denominated as fraud or expressed in terms of the consistent elements of a fraud cause of action."  *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004).  Here, Plaintiffs' concede in their Opposition that the Complaint "refer[s] to AIG's checkered history of *accounting fraud*," and they characterize the allegations that AIG's financial statements were allegedly materially misstated as the "most important and specific balance-sheet insolvency allegations in the Complaint"  (Opp. 13 (emphasis added).)  Indeed, by alleging that AIG's valuation of its assets was "materially inflated" (Compl. ¶ 64) and that AIG has a "pattern of severe accounting misconduct" (*id.* ¶ 65),

---

[16]  PwC expressly "considered this material weakness in determining the nature, timing, and extent of audit tests applied in [its] audit of the 2007 consolidated financial statements, and [its] opinion regarding the effectiveness of AIG's internal control over financial reporting [did] not affect [its] opinion on those consolidated financial statements."  AIG 2007 Annual Report, at 129 (Pickhardt Reply Decl. Ex. G).

Plaintiffs have plainly insinuated that AIG's financial statements should be set aside because they fraudulently overstate AIG stockholders' equity.  Plaintiffs, however, never argue that the Complaint's cursory allegations satisfy Rule 9(b)'s stringent pleading requirements, and thus they offer no basis to disregard AIG's audited financial statements.  Plaintiffs' request for a declaration that an insolvency Event of Default occurred should therefore be dismissed.

## II.    PLAINTIFFS ARE UNABLE TO REFUTE THAT SECTION 6(e) OF THE SWAP AGREEMENT IS AN UNENFORCEABLE PENALTY CLAUSE

Defendants also demonstrated that even if the Complaint adequately alleges a Bankruptcy Event of Default, its request for a declaration that Plaintiffs are permitted to walk away from the Swap Agreement with "no further obligations to AIG-FP or AIG under Section 6(e)(i)(1)" (Compl. ¶ 83) should be dismissed because that provision constitutes a void and unenforceable penalty clause.    (Mem. 36-40).    As a threshold matter, whether a contractual provision constitutes an unenforceable penalty is appropriate for determination on a motion to dismiss because it is a pure question of law.  *See, e.g.*, *Sporre S.A. de C.V. v. Int'l Paper Co*., 1999 WL 1277243, *5 (S.D.N.Y. Dec. 30, 1999) (granting motion to dismiss breach of contract claim that relied on unenforceable penalty clause, observing that "[w]hether such a provision is enforceable presents a question of law"); *Goodrich & Sherwood Assocs., Inc. v. Johnson*, 1997 WL 23190, *1 (S.D.N.Y. Jan. 22, 1997) (granting motion to dismiss because plaintiff sought to enforce an unenforceable penalty provision).    It does not, contrary to Plaintiffs' suggestion (Opp. 33), depend in any way on the "equities" of the situation.[17]  Of course, if the equities are relevant, as

---

[17]    The cases upon which Plaintiffs rely are patently irrelevant.  *See In re Baylies' Estate*, 279 N.Y.S. 415, 419 (Sur. Ct. 1935) (bankruptcy trustee not entitled to extension of time to clear property title where values had declined and property no longer in development); *Valentine Gardens Coop., Inc. v. Oberman*, 237 N.Y.S.2d 535, 537-38 (Sup. Ct. 1963) (refusing to enjoin tenants from having dog in apartment where owner knew of dog and permitted other animals to stay in complex); *Indus. Dev. Found. of Auburn v. U.S. Hoffman Mach. Corp.*, 171 N.Y.S.2d 562, 575 (Sup. Ct. 1958) (ordering performance of contract requiring reconveyance of property).

explained in the opening Memorandum, they tip decisively in Defendants' favor.  (Mem. 37-39).  Moreover, contrary to Plaintiffs' bald assertion (Opp. 33), Defendants rely exclusively on uncontroverted facts that are readily apparent from the  Complaint.[18]

On the merits, Plaintiffs first seek to hide behind the fact that all parties to the Swap Agreement are sophisticated.  (Opp. 33-34.)  As previously discussed, however, courts applying New York law do not hesitate to invalidate penalty clauses in agreements between sophisticated parties.  (*See* Mem. 38 n.29.)  Plaintiffs' next contention—that Section 6(e)(i)(1) "does not impose a penalty on AIG"  (Opp. 35)—fares no better.  As an initial matter, over $792 million has already accrued in AIG's favor under the Swap over the last 19 years.  Moreover, walk-away provisions that cut off the non-breaching parties' future contractual obligations *do* trigger penalty-clause analysis under New York law on the basis that the future financial benefits lost under the agreement constitute liquidated damages.  For example, in *Clubb v. ANC Heating & Air Conditioning, Inc.*, 675 N.Y.S.2d 176 (3d Dep't 1998), the Appellate Division applied a penalty clause analysis to a contractual provision that allowed the non-breaching party to walk away with "no further obligation to pay the consideration provided herein," *id.* at 177, and ultimately held that that clause constituted an unenforceable penalty  *Id.* at 178.  The appellate court affirmed the trial court's denial of the requested relief, noting that the walk-away provision amounted to "a penalty of $72,800 for a breach which caused actual damages of not more than

---

[18]    Defendants rely on the following facts: (1) Brookfield is seeking to walk away from the Swap without paying AIG-FP a single cent; (2) AIG-FP never missed a payment to Brookfield under the Swap; (3) Defendants never filed for bankruptcy; and (4) the Swap itself establishes a straightforward method of calculating damages.  No other facts are relevant to the penalty clause analysis, which is well-established under New York law. (*See* Mem. 36-37).

$1,500," and holding that "such damages [were] grossly disproportionate to plaintiff's probable loss" and "constitute[d] an unconscionable penalty." *Id.* (internal quotations omitted).[19]

Here, as in *Clubb*, Plaintiffs seek to cut off their financial obligations in a manner grossly disproportionate to any losses they could have incurred due to the alleged Events of Default. Plaintiffs have not alleged that AIG-FP failed to fulfill any obligations under the Swap Agreement or that it filed for bankruptcy.  Nor is there any reason to believe they could have anticipated suffering *any* damages due to any event short of a payment default or bankruptcy filing, let alone damages significant enough to justify cancelling all their outstanding obligations.

The more severe and palpable potential for injury attendant to an actual bankruptcy filing helps to explain the different result in *Drexel*, 1992 U.S. Dist. LEXIS 21223, *cited in* Opp. 35-36.  Although that decision did not contain any analysis, the close-out provision there more reasonably anticipated probable loss because the defaulting party actually filed for bankruptcy, *id.* at *2, and, as Plaintiffs correctly note (Compl. ¶ 26), parties to the 1987 ISDA Master understandably sought to avoid the uncertainties of resolving their obligations in bankruptcy. Here, by contrast, automatically terminating all outstanding obligations due to events that do not involve a bankruptcy proceeding seeks to avoid a harm that did not occur.  Contrary to Plaintiffs' assertion, therefore, *Drexel* is not controlling, and the Court should follow instead the reasoning of generally applicable penalty clause cases such as *Clubb* and *Howard Johnson International Inc. v. HBS Family, Inc.*, 1998 WL 411334 (S.D.N.Y. July 22, 1998).

For these reasons, Plaintiffs are also incorrect in asserting that forfeiture (and not penalty clause) analysis governs this case.  (Opp. 36-37.)  But even if forfeiture law applies, Plaintiffs would still not be entitled to their requested declaration as the Complaint does not—because it

---

[19]    In *Drexel Burnham Lambert Products Corp. v. Midland Bank PLC*, 1992 Dist. LEXIS 21223 (S.D.N.Y. Nov. 10, 1992), the court also described the close-out provision as a "liquidated damages clause," and considered (albeit without analysis) whether it was a penalty.  *Id.* at *3-*4.

cannot—contend that AIG-FP failed to meet its payment obligations.  As Judge Lynch has explained, "[t]he forfeiture cases essentially disfavor complete loss of the benefit of the bargain by a party who has substantially performed its obligations, merely because of technical non-compliance with particular contractual provisions." *Kreiss v. McCown De Leeuw & Co.*, 131 F. Supp. 2d 428, 436 (S.D.N.Y. 2001).  Despite Plaintiffs' attempt to inflate the magnitude of the alleged Events of Default, they cannot dispute that the events of which they complain did not adversely effect their transaction with AIG-FP.  AIG-FP has not missed a single payment, and both parties continue to receive the fruits of their bargain.  It is in precisely these circumstances that courts invoke the substantial performance doctrine to excuse technical non-compliance. *See, e.g.*, *Jacob & Youngs v. Kent*, 230 N.Y. 239 (1921) (Cardozo, J.); *Anderson Clayton & Co. v. Alanthus Corp.*, 457 N.Y.S.2d 578, 579 (2d Dep't 1983); *Le Cordon Bleu, S.A. v. BPC Pub. Ltd.*, 451 F. Supp. 63, 70-71 (S.D.N.Y. 1978).[20]

## CONCLUSION

The Complaint should be dismissed in its entirety.

---

[20]    Plaintiffs attempt to avoid this outcome by arguing that the walk-away provision is so clear in absolving them of their obligations in the event of a default as to preclude the Court from even undertaking a forfeiture analysis. (*See* Opp. 36-37 (citing *Kreiss*, 131 F. Supp. 2d at 436)). But even if the walk-away provision itself were clear (which AIG does not concede), Plaintiffs fail to demonstrate that their interpretation of the "Events of Default" provision, which triggers section 6(e), clearly reflects the intention of the drafters, as discussed above, *see supra* Part I.

Moreover, Plaintiffs' reliance on *Kreiss* is misplaced.  There, the court denied the plaintiffs' request not to enforce a contractual provision permitting their former employer, upon their termination, to repurchase their stock options for the options' then-current value of zero. The court found that the plaintiffs had taken the risk that prices would fall by failing to exercise their options sooner.  The court noted, however, that "the price established by the contract—which by its terms *could* have been something other than zero—turned out to be zero, a possibility clearly contemplated by the agreement." 131 F. Supp. 2d at 436-37.  But here, unlike the contract in *Kreiss* that was allowed to play out to its ultimate conclusion, Plaintiffs' interpretation of the closeout provision would prematurely terminate the Swap Agreement so that the closeout "price" for the defaulting party could *never* be something other than zero.

DATED:    New York, New York
          February 23, 2010

QUINN EMANUEL URQUHART OLIVER &
   HEDGES, LLP


By: _____
    Michael B. Carlinsky
    Daniel Cunningham
    Jonathan Pickhardt
    William B. Adams
    Simona Gory

51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000
michaelcarlinsky@quinnemanuel.com
danielcunningham@quinnemanuel.com
jonpickhardt@quinnemanuel.com
williamadams@quinnemanuel.com
simonagory@quinnemanuel.com

*Attorneys for Defendants AIG Financial
Products Corp. and American International
Group, Inc.*