UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BROOKFIELD ASSET MANAGEMENT, INC.,
f/k/a Hees International Bancorp Inc., and
BRYSONS INTERNATIONAL, LTD.,
f/k/a Brysons International Bank, Ltd.,

                                    Plaintiffs,

              v.

AIG FINANCIAL PRODUCTS CORP. and
AMERICAN INTERNATIONAL GROUP, INC.,

                                    Defendants.

**ECF CASE**

09 Civ. 8285 (PGG)

**MEMORANDUM OPINION &
ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

          Plaintiffs Brysons International, Ltd. and its parent Brookfield Asset

Management, Inc. bring this action against Defendants AIG Financial Products Corp. ("AIG-

FP") and American International Group, Inc. ("AIG") seeking a declaratory judgment that an

interest rate swap agreement entered into by Brysons and AIG-FP in 1990 has, under its terms,

automatically terminated.

          Defendants have moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  For the

reasons stated below, Defendants' motion to dismiss will be GRANTED in part and DENIED in

part.

**BACKGROUND**

          In 1990, Brookfield sought to borrow $200 million from AIG.  (Cmplt. ¶ 13)

AIG offered financing via three transactions:  a sale of debentures and two "fixed for floating"

interest rate swaps.[1]  (Id.)

_____

[1]  The debentures are not at issue in this action.  (Cmplt. ¶ 16)

The first swap transaction was a "Zero-Coupon Swap," under which neither party would make a payment to the other until 2015.  (Cmplt. ¶ 17)  AIG-FP's payment to Brysons would be computed by compounding LIBOR every six months from the inception of the agreement until the termination date on a notional amount of $200 million.  (Id.)  Brysons' payment to AIG-FP would be computed by compounding a fixed rate of 9.61% every six months on the same notional amount.  (Id.)

The second swap transaction was a "Coupon Swap," under which AIG-FP would pay Brysons a fixed amount calculated at an annual rate of 9.61% on $200 million every six months.  (Cmplt. ¶ 18)  Every five years, Brysons would pay AIG-FP an amount calculated at LIBOR on $200 million, compounded every six months.  (Id.)

## I.   THE SWAP AGREEMENT

To document their agreement with respect to the two swap transactions, AIG-FP and Brysons entered into the Swap Agreement, dated October 18, 1990.  (Cmplt. ¶ 15)  The Swap Agreement includes:  a confirmation setting forth the primary economic terms of the swap transactions, the 1987 International Swaps and Derivatives Association ("ISDA") Interest Rate and Currency Exchange Agreement (the "1987 ISDA Form") and the Schedule to the ISDA Agreement, which sets forth amendments to the 1987 ISDA Form reflecting terms specifically negotiated by the parties.  (Id.)  Brysons' and AIG-FP's obligations under the Swap Agreement are guaranteed by their corporate parents, Brookfield and AIG, which are listed as "Specified Entities" in the Schedule to the ISDA Agreement.  (Cmplt. ¶ 24)

The Swap Agreement provides AIG-FP a bi-annual right, beginning in 1995, to cancel the two swaps.  (Cmplt. ¶ 21) Upon AIG-FP's exercise of this cancellation right, the party

who owes money to the other on a net present value basis would have to make a final payment of the amounts incurred from the inception of the swaps through the date of cancellation.  (Id.)

Under the terms of the 1987 ISDA Form, the Swap Agreement between AIG-FP and Brysons terminates automatically upon the occurrence of one of several "Events of Default" listed in § 5(a) of the Agreement.  (Cmplt. ¶¶ 23, 25, 27)  These Events of Default include, inter alia, when either party or Specified Entity:  (1) "is dissolved"; (2) "becomes insolvent or fails or is unable or admits in writing its inability generally to pay its debts as they become due"; (3) "institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights"; (4) "has a resolution passed for its winding up or liquidation"; or (5) "seeks or becomes subject to the appointment of an administrator, receiver, trustee, custodian or other similar official for it or for all or substantially all of its assets. . . ."  (Cmplt., Ex. A § 5(a)(vii))  In addition, an Event of Default occurs under the 1987 ISDA Form when any event occurs that "has an analogous effect" to any of the events listed in Section 5(a)(vii), or when either party or Specified Entity "takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts."  (Cmplt., Ex. A § 5(a)(vii)(7), (8))

According to the Complaint, the Swap Agreement also provides that when an Event of Default occurs, no obligation is imposed on the non-defaulting party.  (Cmplt. ¶ 28) (citing Cmplt., Ex. A § 6(e)(i)(1))  "Thus, a defaulting party may not recover future payments potentially owed by the non-defaulting party, even if the present value of those amounts exceeds the present value of the future payments the defaulting party potentially owes the non-defaulting party."  (Cmplt. ¶ 28)

The Complaint alleges that the Event of Default provisions of the 1987 ISDA Form were intended to allow for "automatic early termination to be triggered well in advance of a bankruptcy proceeding," because "[s]wap dealers want[] to avoid the uncertainties of resolving their obligations in bankruptcy."  (Cmplt. ¶ 26)  "Historically, these broad Event of Default provisions . . . favored swap dealers like AIG-FP over their corporate counterparties and other 'end users' like Brysons, because swap dealers generally had stronger credit ratings than their customers and viewed themselves as less likely to be the defaulting party."  (Cmplt. ¶ 28) Indeed, when the Swap Agreement was executed, "AIG was AAA-rated and considered one of the most secure non-governmental credits in the world," while "Brookfield's senior unsecured debt was rated AA (low) and A+."  (Id.)

In 1992, the ISDA Form was revised to provide that certain Events of Default that had previously triggered automatic termination would "lead to termination only if the other party took action to issue a notice of termination before the default had been cured."  (Cmplt. ¶ 31) "The 1992 ISDA Form also revised the close-out provision in Section 6(e)(i)(1) by changing its terms but giving swap parties the option to choose the 1987 [ISDA] Form's terms instead."  (Id.)

The Complaint alleges that "[o]ver the years, the parties discussed restructuring the swaps," but "AIG never asked Brookfield to substitute the 1992 ISDA Form (or the subsequent 2002 ISDA Form) for the 1987 ISDA Form, even though it was common practice for swap dealers and their existing counterparties to re-document their outstanding swaps under the new forms."  (Cmplt. ¶ 34)

## II.   AIG'S FINANCIAL COLLAPSE AND THE GOVERNMENT BAILOUT

In September 2008, AIG suffered what the Complaint characterizes as "a historic financial collapse."  (Cmplt. ¶ 36)  As a result of the subprime mortgage crisis, "AIG and AIG-

FP suffered billions of dollars of losses."  (Cmplt. ¶ 37)  On September 12, 2008, AIG contacted

the Federal Reserve Bank of New York ("FRBNY") to seek assistance in advance of its potential

failure as a result of liquidity constraints.  (Cmplt. ¶ 38)  In the days that followed, the FRBNY

indicated that AIG would not receive government assistance.  (Cmplt. ¶¶ 39-40, 42)  AIG's

lawyers began preparing for a potential bankruptcy filing, and AIG initiated the drawdown of the

last of its lines of credit.  (Cmplt. ¶¶ 41, 43)

On September 16, 2008, FRBNY changed course and loaned AIG $85 billion "to

prevent AIG's failure from adversely affecting the broader financial system."  (Cmplt. ¶ 45)  In

exchange for its investment, the "FRBNY received a 79.9% equity interest in AIG" and "AIG

was required to use future cash receipts from asset sales, equity issuances, indebtedness, and

other sources to repay amounts outstanding under the government's credit facility."  (Cmplt. ¶

47)  The Government also installed Edward Liddy as CEO of AIG (Cmplt. ¶ 48), and the

FRBNY appointed three trustees to vote its equity interest in AIG.  (Cmplt. ¶ 49)  "In the months

following their appointment, the Trustees arranged to replace more than half of AIG's Board of

Directors."  (Id.)

The Complaint alleges that not long after the government bailout of AIG, the firm

began to take steps to wind down, liquidate or dissolve AIG-FP.  (Cmplt. ¶¶ 50-52)

"On November 10, 2008, AIG announced that it had reached agreements with the

Treasury Department and the FRBNY to restructure its debt and to provide AIG with even more

cash on easier terms.  The restructuring included a reduction of the FRBNY's original $85 billion

loan to $60 billion, and a separate infusion by the Treasury Department of $40 billion in

exchange for preferred shares."  (Cmplt. ¶ 54)  "The November 10, 2008 restructuring also

included the creation of two new government-created entities designed to limit AIG-FP's

losses." These entities were capitalized, in part, with a $52.5 billion loan from the FRBNY, were created to relieve AIG-FP of its "potential payment obligations on [credit default] swaps," and represented "significant additional steps toward winding up AIG-FP." (Cmplt. ¶ 55)

On March 2, 2009, AIG announced fourth quarter losses of $61.7 billion and net losses of $99 billion for 2008. (Cmplt. ¶ 56) "AIG again instructed its attorneys to prepare for an imminent bankruptcy." (Cmplt. ¶ 57) In response, the Treasury Department implemented a new facility, allowing "AIG to draw up to $30 billion over five years . . . in exchange for non-cumulative preferred stock. The Treasury Department also exchanged $40 billion of its existing, perpetual preferred shares in AIG for shares more akin to common equity. Finally the Federal Reserve agreed to reduce and restructure AIG's outstanding debt on terms more favorable to AIG." (Cmplt. ¶ 58)

"By March 2, 2009, the government had provided a total of approximately $182.5 billion to keep AIG afloat." (Cmplt. ¶ 59)

Brookfield and Brysons allege that AIG's financial collapse and the government bailout resulted in the occurrence of several Events of Default. (Cmplt. ¶¶ 60-74)

## III.   POST-BAILOUT EVENTS

After the government's bailout of AIG, Brookfield and Brysons notified AIG-FP that they believed at least one Event of Default had occurred, terminating their obligations to AIG-FP under the Swap Agreement. (Cmplt. ¶ 75) Denying that any Event of Default had occurred, AIG-FP made payments to Brysons of $9.65 million and $9.61 million on October 20, 2008, and April 20, 2009, respectively. (Cmplt. ¶ 77) Brysons placed those funds in an escrow account. (Id.) On May 19, 2009, the parties entered into a "standstill" agreement in which they agreed to attempt to resolve their dispute before September 30, 2009. (Cmplt. ¶ 78)

On September 30, 2009 – the day the standstill agreement expired – Brookfield and Brysons brought this action seeking a declaratory judgment that an Event of Default has occurred, that the Swap Agreement terminated upon the occurrence of an Event of Default, and that they have no further obligations to AIG-FP or AIG under the Swap Agreement.  (Cmplt. ¶¶ 80-83)  Plaintiffs also seek a judgment awarding them their costs in this action, including reasonable attorneys' fees, pursuant to § 11 of the 1987 ISDA Form.  (Cmplt. ¶ 84)

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "In considering a motion to dismiss . . .  the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests."  Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. 544.

"When determining the sufficiency of plaintiffs' claim for Rule 12(b)(6) purposes, consideration is limited to the factual allegations in plaintiffs' . . . complaint, . . . to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of

which judicial notice may be taken, or to documents either in plaintiffs' possession or of which

plaintiffs had knowledge and relied on in bringing suit."  Brass v. Am. Film Techs., Inc., 987

F.2d 142, 150 (2d Cir. 1993).

        "Under New York law, the initial interpretation of a contract 'is a matter of law

for the court to decide.'" [2]  K. Bell & Assocs. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir.

1996) (quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d Cir. 1996)). "Where

there are alternative, reasonable constructions of a contract, i.e., the contract is ambiguous, the

issue 'should be submitted to the trier of fact.'"  K. Bell & Assocs., 97 F.3d at 637 (quoting

Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993)).

**I.**      **THE COMPLAINT STATES A CLAIM FOR RELIEF ON THE BASIS
THAT ONE OR MORE EVENTS OF DEFAULT HAVE OCCURRED**

        Defendants contend that the Complaint fails to plausibly allege that any of the

Events of Default outlined in the Swap Agreement have occurred.  In considering Defendants'

arguments, it is important to reiterate that – in addition to listing several insolvency and

bankruptcy-related Events of Default – the Swap Agreement provides that an Event of Default

occurs when a party or Specified Entity "takes any action in furtherance of, or indicating its

consent to, approval of, or acquiescence in" any of the listed Events of Default, or when "any

event occurs with respect to the party or any such Specified Entity which, under the applicable

laws of any jurisdiction, has an analogous effect to any [of the specified Events of Default]."

(Cmplt., Ex. A § 5(a)(vii)(7), (8)) (emphasis added)

---

[2]  The Schedule to the Swap Agreement provides that the Agreement "will be governed by, and
construed and enforced in accordance with, the laws of the State of New York."  (Cmplt., Ex. A,
Schedule at 13)

**A.      AIG and AIG-FP's Alleged Insolvency and Inability to Pay Their Debts**

Section 5(a)(vii)(2) of the Swap Agreement provides that an Event of Default has occurred when a party or Specified Entity "becomes insolvent or fails or is unable or admits in writing its inability generally to pay its debts as they become due."  (Cmplt., Ex. A § 5(a)(vii)(2))

**1.      The Complaint Pleads Facts Demonstrating
that AIG and AIG-FP Were Insolvent**

The Complaint alleges that "AIG's need for the government's ultimate infusion of $182.5 billion strongly suggests that AIG was balance-sheet insolvent.  Stated otherwise, it is highly unlikely that the fair value of AIG's assets was less than their liabilities."  (Cmplt. ¶ 64) In support of this claim, the Complaint points to AIG's publicly filed financial statements, which show that AIG reduced the value of its assets by $83 billion in the 90 days after September 30, 2008.  (Id.)  The Complaint further alleges that "AIG's pattern of severe accounting misconduct supports the inference that AIG inflated the value of these assets," and sets forth a number of incidents that call into question AIG's accounting practices, including AIG's 2005 restatement of its five previous annual financial statements, reducing income by $3.9 billion.   (Cmplt. ¶ 65) The Complaint also emphasizes the role that AIG-FP's losses played in AIG's need for a government bailout.  (Cmplt. ¶¶ 37, 55)

Defendants make four arguments in contending that Plaintiffs have failed to state a claim that AIG and AIG-FP's financial condition triggered insolvency-related Events of Default.

At the outset, Defendants argue that the Complaint's allegations as to insolvency are insufficient because they "meticulously avoid[] actually alleging that either AIG or AIG-FP has ever been insolvent. . . ."  (Def. Br. 31-32)  Defendants contend that phrases such as "strongly suggests" and "highly likely" with regard to AIG and AIG-FP's insolvency are

insufficient to plausibly allege an Event of Default.  (Id.)  To the contrary, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556).  Here, the use of phrases such as "strongly suggests" and "highly likely" is fully consistent with the "reasonable inference" standard, and does not make the Complaint susceptible to a motion to dismiss.  See id.

Second, Defendants challenge the allegation that AIG and AIG-FP were "balance sheet insolvent," contending that the facts alleged demonstrate "nothing more than that AIG suffered a short term liquidity crisis."  (Def. Br. 32-34)  In support of this contention, Defendants rely on AIG's published financial statements, which "demonstrat[e] that AIG's total assets exceeded its liabilities at the date of those balance sheets."  (Def. Br. 33)  Accepting the validity of AIG's financial statements, however, would be to ignore the Complaint's plausible allegations that those statements overstated the value of AIG and AIG-FP's assets.  The Complaint pleads, for example, that AIG reduced the value of its assets by $83 billion in the 90 days after September 30, 2008, suggesting that those assets were not properly valued prior to September 30, 2008.  (Cmplt. ¶¶ 64-65)

Although Defendants claim that AIG and AIG-FP's problems were limited to a "short term liquidity crisis," the Complaint plausibly avers that the tremendous losses suffered by AIG and AIG-FP, and the resulting need for the government's infusion of $182.5 billion, is evidence that the fair value[3] of those entities' assets was less than their liabilities.  (Cmplt. ¶ 64)

---

[3]  Defendants take issue with Plaintiffs' use of "fair value" in assessing AIG and AIG-FP's assets for purposes of determining balance sheet insolvency.  Defendants argue that "accounting standard-setters" did not adopt "a fair value measurement framework" until 2006, well after the parties entered into the Swap Agreement; thus, they contend, Plaintiffs cannot claim that an insolvency related Event of Default has occurred based on the fair value of AIG and AIG-FP's

Coupled with the allegations calling AIG's financial statements into question, these averments are sufficient to state a claim that Events of Default occurred as a result of AIG and AIG-FP's insolvency.

Third, Defendants argue that the Complaint's allegation that AIG overstated the value of its assets is "nothing more than a thinly disguised accusation of accounting fraud," and that – in alleging fraud – Plaintiffs must meet the heightened pleading standard set forth in Fed. R. Civ. P. 9(b). (Def. Br. 34-35)

Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. Rule Civ. P. 9(b). "This wording is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action." Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004).

Here, however, Plaintiffs need not allege fraud in order to adequately plead that an insolvency-related Event of Default occurred. Plaintiffs need only plausibly allege that the valuations were inflated. In citing a "pattern of severe accounting misconduct" in support of their argument that AIG's financial statements are of questionable reliability, Plaintiffs make reference to, inter alia, AIG's restatement of five years of financial reporting, the finding by AIG's auditors that AIG had failed to maintain an effective system of internal controls over

---

assets. (Def. Br. 33) However, the 1987 Edition of ISDA's User's Guide to the Standard Form Agreements provides that "the Bankruptcy Event of Default has been drafted with the intention that it be broad enough to be triggered by applicable proceedings or events (described in the forms in a general way) under whatever bankruptcy or insolvency law pertains to a particular party." (Pickhardt Decl., Ex. B at 7) Federal bankruptcy law and New York state law define insolvency by reference to the fair value of a person or entity's property. See 11 U.S.C. § 101(32)(A) (2010) (defining insolvency as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation"); NY Debt. & Cred. Law § 271 (2010) (defining insolvency with respect to the "present fair salable value" of a party's assets). Accordingly, fair value is an appropriate measure of AIG and AIG-FP's assets.

financial reporting concerning swap transactions, and large fines imposed and settlement payments AIG made in connection with regulatory actions relating to accounting issues.  (Cmplt. ¶ 65)  None of these prior events necessarily connote fraud.  In any event, because Plaintiffs need not and have not alleged fraud, the pleading requirements of Rule 9(b) do not apply.[4]

Finally, Defendants claim that the Complaint presents a "hodge-podge of dated or unsubstantiated accusations bearing no plausible connection to AIG's recent financial statements."  (Def. Br. 35)  In particular, Defendants challenge the Complaint's assertion that AIG engaged in a "pattern of severe accounting misconduct [that] supports the inference that AIG inflated the value of [its] assets."  (Def. Br. 35-36) (citing Cmplt. ¶ 65)

As discussed above, however, the Complaint contains factual allegations suggesting that AIG was balance sheet insolvent at times when its public financial reporting indicated otherwise, because AIG had inflated the value of its assets.  On a motion to dismiss, this Court must "draw all reasonable inferences in favor of the plaintiff."  Kassner, 496 F.3d at 237.  Here, AIG's recent pattern of prior accounting misconduct – when considered together with the fact that the Government was required to pour $182.5 billion into AIG to stabilize the company – "supports an inference" that AIG may have inflated the value of its assets during the time period preceding its September 2008 collapse.

_____

[4]  Defendants also argue that Plaintiffs have failed to state a claim because the allegedly inflated asset valuations were "fair value estimates [which] by their very nature are subject to future revisions even in normal times."  (Def. Br. 34)  Defendants further note that AIG's 2008 financial statements were audited by PricewaterhouseCoopers.  (Def. Br. 34-35)  While Defendants are free to make their fair value and audit arguments as this action proceeds, they do not establish at this juncture, as a matter of law, that the value of AIG's assets was not inflated or that AIG was not insolvent.  Because questions of fact remain as to these issues, they cannot be resolved on a motion to dismiss.  See Kassner, 496 F.3d at 237.

### 2. The Complaint Does Not Plead Facts Demonstrating that AIG and AIG-FP Failed to, or Were Unable to, Pay Their Debts As They Became Due

The Complaint alleges that "[a]t various times since September 2008, AIG and AIG-FP have been unable to pay debts that are coming due."  (Cmplt. ¶ 62)  In support of this claim, the Complaint points to AIG's mid-September 2008 statements about its financial condition and to the fact that AIG needed additional infusions of government funds – after the initial bailout – as evidence that AIG was unable to pay its debts as they became due.  (Cmplt. ¶¶ 62-63)  The Complaint does not claim, however, that AIG or AIG-FP ever failed to pay a debt when it was due or that AIG or AIG-FP was ever unable to pay any particular debt when it became due.

Defendants argue that under the terms of the Swap Agreement, an "inability to pay" Event of Default does not occur where there is only a prospective inability to pay debts. (Def. Br. 26-31)  Instead, they contend, Plaintiffs must plead and prove that Defendants failed to pay, or were unable to pay, a debt at the time payment was due.  (Id.)  Plaintiffs contend, however, that "the test for inability to pay debts necessarily has a prospective element that differentiates it from the separate test for failure to pay debts."  (Pltf. Br. 15)

Defendants' interpretation of the Swap Agreement is supported by its plain language, which provides that an Event of Default occurs when a party or Specified Entity "fails or is unable or admits in writing its inability generally to pay its debts as they become due." (Cmplt., Ex. A § 5(a)(vii)(2))  The use of the present tense – a party "fails or is unable" to "pay its debts as they become due" – speaks to a moment in time, and implies that the failure or inability must actually happen in order to trigger an Event of Default.

In re Charter Communications, 419 B.R. 221 (Bankr. S.D.N.Y. 2009), likewise supports Defendants' interpretation of the "inability to pay" provision.  There, the court

interpreted a credit agreement providing that an event of default occurred when a party "shall

generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they

become due."  In re Charter Commc'ns, 419 B.R. at 245.  While acknowledging that this

language "is not a model of clarity," the court held that it

> is not prospective and that, fairly read, the covenant deals with a
> present inability to pay debts as they come due, not one that may
> occur at some point in the future.  A covenant tied to events that
> might or might not come to pass lacks specificity  and is virtually
> impossible to apply in practice. . . . Looking into a future filled
> with payables that are coming due is a speculative and unworkable
> exercise for an enterprise such as this.  Given the inherent
> unpredictability of future events and [the allegedly defaulting
> party's] multiple strategies for moving cash within the corporate
> family, it is not practical for a lender to declare a default based on
> what may seem to be well-founded presumptions as to the ability
> of a holding company to pay debts in the future.  Those
> presumptions could well be wrong.

Id. at 236.[5]

The Charter court's reasoning is persuasive here.[6]  If anything, the Swap

Agreement's language is clearer than the language at issue in Charter.  Under the Swap

Agreement, an Event of Default occurs when a party "fails or is unable . . . to pay its debts as

they become due."  (Cmplt., Ex. A § 5(a)(vii)(2))  By contrast, the credit agreement in Charter

---

[5]  Plaintiffs suggest that the Charter court's ruling on this issue is "at best, an alternative
holding."  (Pltf. Br. 21)  To the contrary, the Charter court laid out the holding quoted above and
then, in dicta, suggested that "[e]ven if the Court were to agree with JPMorgan and interpret
section 8(g)(v) prospectively, the evidence is inconclusive in demonstrating that CCH and CIH
would be unable to pay their debts as of any future date."  In re Charter Commc'ns, 419 B.R. at
245-46.

[6]  Plaintiffs attempt to distinguish Charter by arguing that the debts coming due in that case were
not imminent and thus the "inability to pay" was more speculative than is the case here.  (Pltf.
Br. 21)  In Charter, the debts coming due were interest payments to be made over a six month
period following the alleged default.  419 B.R. at 245.  The court found that the allegedly
defaulting party had "various other methods . . . available to enable [it] to pay scheduled future
debts."  Id. at 246.  The Charter court's ruling that a prospective inability to pay debts was not an
event of default under the credit agreement was independent of these factual findings, however.
See id. at 245-46.

14

uses language that is more prospective in nature, providing that default occurs when a party

"shall be unable to . . . pay its debts as they become due."  In re Charter Commc'ns, 419 B.R. at

245.

    Plaintiffs suggest, however, that their interpretation of the "inability to pay" Event

of Default provision is necessary in order to give effect to all of its terms.  In particular, Plaintiffs

argue that Defendants' interpretation renders superfluous the "fails to pay" component of the

"inability to pay" Event of Default.  See Cmplt., Ex. A § 5(a)(vii)(2) (Event of Default occurs

when a party "fails or is unable . . . to pay its debts as they become due").  Plaintiffs argue that if

being "unable" to pay does not include a prospective inability to pay, then there is no distinction

between "fail[ing]" to pay and being "unable" to pay.  (Pltf. Br. 15)

    "In interpreting a contract under New York law . . . the contract 'should be

construed so as to give full meaning and effect to all of its provisions.'"  LaSalle Bank Nat.

Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (quoting Shaw Group,

Inc. v. Triplefine Int'l Corp., 322 F.3d 115, 121 (2d Cir.2003))  "'[A]n interpretation of a

contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not

preferred and will be avoided if possible.''"  LaSalle Bank Nat. Ass'n, 424 F.3d at 206 (quoting

Shaw Group, Inc., 322 F.3d at 124 (quoting Galli v. Metz, 973 F.2d 145, 149 (2d Cir.1992))).

    Here, however, Defendants' reading of the "inability to pay" clause does not

render the "fails to pay" clause superfluous.  "Fails to pay its debts as they become due" and "is

unable to pay its debts as they become due" are not necessarily congruent.  "Fails to pay" leaves

open the possibility that the entity has the resources to pay its debt, but is choosing not to, for

whatever reason.  "Unable to pay" speaks of a lack of resources, and connotes inability and

impossibility.

Drexel Burnham Lambert Products Corp. v. MCorp., Civ. A. No. 88C-NO-80 (SCDP), 1989 WL 16981 (Del. Super. Feb. 23, 1989), cited by Plaintiffs, is not to the contrary. There, the court found an event of default based on MCorp.'s inability to pay a debt.  MCorp.'s board had declared a moratorium on "the payment of interest and principal on approximately $470 million of parent company indebtedness. . . ."  Id. at *4.  In denying MCorp's motion for reargument, the court reiterated its finding that an inability to pay event of default had occurred. The court noted that "[t]he retroactive application of the announcement [of the moratorium] coupled with actual failure to pay debts due [prior to issuance of the moratorium] is a sufficient basis on which to find an event of default. . . ."  Drexel Burnham Lambert Products Corp. v. MCorp., Civ. A. No. 88C-NO-80 (SCDP), 1991 WL 165941, at *1-2 (Del. Super. Aug. 13, 1991) (unpublished opinion).  Even if Drexel could be read to suggest that the moratorium alone would have triggered an inability to pay event of default, such a finding would not assist Plaintiffs' argument here that a prospective inability to pay is sufficient.  Where an entity takes corporate action rendering it legally impossible for the entity to pay its debts, it is reasonable to conclude that the entity has, at that moment, become unable to pay its debts.[7]

Plaintiffs' attempt to draw an analogy between the language of the Swap Agreement and Chapter 9 of the Bankruptcy Code – which governs municipal bankruptcies – is likewise misguided.  See Pltf. Br. 18-19.  A municipality may be a debtor under Chapter 9 only if it is insolvent, which means that it is either "generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute" or is "unable to pay its debts as they

---

[7]  Plaintiffs' reliance on In re Teleglobe Communications Corporation, 392 B.R. 561 (Bankr. D. Del. 2008) is misplaced.  There, the insolvency question arose in connection with a discovery dispute, and involved application of Delaware law.  Id. at 598-99, 602.  This case sheds no light on whether, under the Swap Agreement and as a matter of New York law, Plaintiffs have sufficiently alleged an inability to pay Event of Default.

become due." 11 U.S.C. §§ 109(c)(3), 101(32)(C).  Courts have held that a municipality is

"unable to pay its debts as they become due" if it has a prospective inability to pay its debts.

See, e.g., In re City of Bridgeport, 129 B.R. 332, 336-37 (Bankr. D. Conn. 1991).

   Although the "inability to pay" language used in Chapter 9 mirrors that used in

the 1987 ISDA Form, the context is very different.  The purpose of Chapter 9 is to "enable a

financially distressed city to 'continue to provides its residents with essential services.'"  Id.

(quoting H.R.Rep. No. 1011, 100th Cong., 2d Sess. 2 (1988)).  "A construction of § 101(32)(C)

under which a city would not be able to seek Chapter 9 protection unless and until it was actually

not paying its bills could defeat that purpose, as actually not paying bills could lead to the non-

delivery of services."  In re City of Bridgeport, 129 B.R. at 337.  Construing the "inability to

pay" language in Chapter 9 broadly is thus consistent with the legislative purpose of the

provision.

   No such purpose animates the Swap Agreement or the 1987 ISDA Form.  For this

reason, case law interpreting the "inability to pay" language of Chapter 9 is not determinative of

the issue here.  See In re Charter Commc'ns, 419 B.R. at 236 n. 12 ("[C]ases prospectively

construing similar language in the context of chapter 9 of the Bankruptcy Code . . . are inapposite

to the present situation.").

   Given the plain language of the "inability to pay" clause and, in particular, its use

of the present tense, the reading urged by Plaintiffs is not plausible.  Moreover, as the Charter

court pointed out, "[l]ooking into a future filled with payables that are coming due is a

speculative and unworkable exercise for an enterprise" like AIG or AIG-FP, or any corporate

party to an agreement like the Swap Agreement at issue here.  See id. at 236.  Accordingly, the

"inability to pay" provision of the Swap Agreement is not prospective but "deals with a present

inability to pay debts as they come due." <u>See</u> <u>id.</u>  Because Plaintiffs have failed to plead facts demonstrating that AIG or AIG-FP ever failed to pay a debt when it was due, or were ever unable to pay a debt when it became due, they have failed to state a claim for relief based on an "inability to pay" Event of Default.

### B.      AIG's Alleged Actions in Furtherance of Bankruptcy

Section 5(a)(vii)(4) of the Swap Agreement provides that an Event of Default has occurred when a party or Specified Entity "institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights. . . ."  (Cmplt., Ex. A § 5(a)(vii)(4))  As noted earlier, under the parties' agreement, an Event of Default also takes place when any event occurs that "has an analogous effect" to any of the events listed in Section 5(a)(vii), or when either party or Specified Entity "takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts."  (Cmplt., Ex. A § 5(a)(vii)(7), (8))

The Complaint alleges that AIG took actions "in furtherance of" bankruptcy, triggering an Event of Default under Sections 5(a)(vii)(4) and 5(a)(vii)(8) of the Swap Agreement.  "On at least two occasions, AIG's management directed that its bankruptcy lawyers prepare papers for an imminent bankruptcy filing, and its Board of Directors reviewed management's plans to file a bankruptcy petition."  (Cmplt. ¶ 68)  The Complaint further pleads that on September 16, 2008, after the FRBNY made its first bailout proposal, AIG's CEO told the AIG Board that the firm's options were to "'[f]ile for bankruptcy tomorrow morning or take the Fed's deal tonight.'"  The Complaint also alleges that AIG "initiated the drawdown of its existing credit lines to support its future operations, because those credit lines would become unavailable in a bankruptcy."  (Cmplt. ¶ 69)

Defendants contend that New York law requires "an actual board of directors' resolution directing or approving a bankruptcy filing" in order "to trigger a default based on action taken 'in furtherance' of such a filing."  (Def. Br. 15)  None of the cases cited by Defendants involve the 1987 ISDA Form or a swap agreement, however.  Instead, these cases involve contracts specifically providing that a "corporate act" or "corporate action" in furtherance of bankruptcy is necessary to trigger an event of default.  See In re Solutia, Inc., No. 03-17949 (PCB), 2007 WL 1302609, at *14 (Bankr. S.D.N.Y. May 1, 2007) ("corporate acts in furtherance of the commencement of a bankruptcy"); Union Bank of Switzerland v. Deutsch Fin. Servs. Corp., No. 98 Civ. 3251 (HB), 2000 WL 178278, at *11-12 (S.D.N.Y. Feb. 16, 2000) ("corporate action to authorize, or in furtherance of [a bankruptcy filing]"); In re Revere Copper & Brass, Inc., 60 B.R. 887, 891 n. 1 (Bankr. S.D.N.Y. 1985) ("the taking of corporate action by the Company in furtherance [of bankruptcy or similar proceedings]").  These cases stand for the proposition that where a contract provides that "corporate action" in furtherance of a bankruptcy filing will trigger an event of default, "an actual board of directors resolution to file [for bankruptcy] [i]s required" to trigger the event of default and "'contingency planning and discussions prior thereto do not rise to the level of corporate action.'"  In re Solutia, Inc., 2007 WL 1302609, at *14 (quoting In re Revere Copper & Brass, Inc., 60 B.R. at 891 n. 1).

Here, however, the Swap Agreement does not require "corporate action" to trigger an event of default.  Instead, the Swap Agreement states that "any action in furtherance of" bankruptcy will trigger an Event of Default.  (Cmplt., Ex. A § 5(a)(vii)(4), (8)) (emphasis added)  Defendants argue that this is a distinction without a difference, because a corporation acts through its board of directors, so "for corporations like AIG and AIG-FP the term 'any action' necessarily means 'corporate action.'"  (Def. Reply. Br. 6)

Defendants' attempt to read the phrase "corporate action" into the Swap Agreement ignores the Agreement's plain language and is not persuasive.  As the court observed in In re Solutia – one of the cases Defendants rely on  – "[w]hile the word 'action' can mean several different things, the phrase 'corporate action' has a distinct meaning."  2007 WL 1302609, at *14.  Indeed, the Solutia court distinguished between "[t]he corporate action of authorizing the Chapter 11 filing" and "[a]ll other activities undertaken by the Debtor."  This distinction acknowledges the obvious fact that a corporation such as AIG or AIG-FP engages in activities or actions every day that are not "corporate actions."  While AIG's board may not have passed a resolution endorsing a bankruptcy filing, the allegations in the Complaint plausibly claim that AIG took "action in furtherance of" a bankruptcy filing.

Defendants also argue that if the actions pled in the Complaint are held to constitute actions in furtherance of bankruptcy that could trigger an Event of Default, "market turmoil" will result, and corporate boards will have a "disincentive . . . to engage in responsible contingency planning when confronted with liquidity constraints."  (Def. Br. 17-18)  Such arguments have no bearing whatsoever as to whether – under the plain language of the agreement at issue – Defendants are entitled to judgment as a matter of law.  That question turns on whether "any action in furtherance [of bankruptcy]" must be read to state "any corporate action in furtherance [of bankruptcy]."  Defendants have made no such showing.[8]

---

[8]  In warning of apocalyptic consequences flowing from the denial of their motion to dismiss, Defendants trivialize the allegations in the Complaint.  Plaintiffs have not alleged that AIG "merely considered the possibility of a bankruptcy filing or merely instructed its bankruptcy counsel to prepare for a filing."  See Def. Br. 17.  Instead, the Complaint claims that a bankruptcy filing was imminent on two occasions during the relevant period (Cmplt. ¶¶ 44, 57), and alleges that AIG's CEO told the Board of Directors that the firm's only "'two bad choices'" were to accept a deal with the FRBNY on the evening of September 16, 2008, or to file for bankruptcy protection the next morning.  (Cmplt. ¶ 44) (quoting Bad Bets and Cash Crunch Pushed Ailing AIG to the Brink, WALL ST. J., Sept. 18, 2008, at A1)

Indeed, the parties have cited commentators who have suggested that "any action in furtherance [of bankruptcy]" provisions are ambiguous.  See JEFFREY S. TOLK, UNDERSTANDING THE RISKS OF CREDIT DEFAULT SWAPS 6 (Moody's Inv. Servs. March 16, 2001) (McLoughlin Decl., Ex. F) (noting that such clauses can be read to "include[] events that are vague, difficult to identify, and do not clearly indicate default"); JANET M. TAVAKOLI, STRUCTURED FINANCE AND COLLATERALIZED DEBT OBLIGATIONS 68 (2d ed. 2008) (McLoughlin Decl., Ex. E) ("Planning for or considering a bankruptcy filing might be in furtherance of bankruptcy, and can trigger an ISDA default, but would not generally be considered a bankruptcy event by Moody's.").

One commentator has urged parties to contracts containing "any action in furtherance of" language to clarify the meaning of the phrase:

> Such a provision could be read to be triggered by early steps in contingent planning for a bankruptcy, including, for example, contacting lenders on an exploratory basis to determine the availability of debtor-in-possession financing.  It is in a Borrower's interest to make two adjustments to the "standard" language.  First, the provision should be limited to corporate action approved by a resolution of the Borrower's Board of Directors.  Second, the default should not be automatic but should require action by the lenders to declare the default.

Stephanie J. Seligman, Just-In-Case: Planning for a Potential Restructuring, 793 PLI/CORP 703, 731 (1992) (McCloughlin Decl., Ex. C).

Defendants acknowledge this ambiguity, but assert that only an "unscrupulous counterparty" could read the provision as broadly as Plaintiffs suggest.  (Def. Reply Br. 6) Defendants cite nothing in support of this self-serving assertion, however.

In sum, Plaintiffs have stated a plausible claim that AIG's actions taken in preparation for filing a bankruptcy petition in September 2008 and March 2009 could constitute

"an[] action in furtherance" of bankruptcy and thus an Event of Default under the Swap

Agreement.  Defendants have not demonstrated that the Swap Agreement must be read otherwise

as a matter of law.

      **C.**      **The Dissolution, Winding Up, and/or Liquidation of AIG-FP**

      Section 5(a)(vii)(1) of the Swap Agreement provides that an Event of Default has

occurred when a party or Specified Entity "is dissolved," and Section 5(a)(vii)(5) of the Swap

Agreement provides that an Event of Default has occurred when a party or Specified Entity "has

a resolution passed for its winding-up or liquidation."  (Cmplt., Ex. A § 5(a)(vii)(1), (5))

      The Complaint alleges that "AIG-FP has had 'a resolution passed for its winding-

up or liquidation,' or, at a minimum, has taken 'an[] action in furtherance of, or indicating its

consent to, approval of, or acquiescence in' a winding-up, liquidation or dissolution."  (Cmplt. ¶

70)  The Complaint also alleges that events have taken place that have "an analogous effect to"

winding-up, liquidation or dissolution.  In making these allegations, the Complaint relies on

AIG's statements to the effect that it is shutting down AIG-FP.  (Cmplt. ¶ 71)  For example, the

Complaint quotes AIG CEO Edward Liddy as stating that AIG "intend[s] to wind down [AIG-

FP]" and that AIG-FP is "shutting down." (Cmplt. ¶¶ 50-52)  Relying on these statements and

other public reports, the Complaint further alleges that AIG has "prohibited AIG-FP from

conducting any new business, and AIG is now in the process of running off AIG-FP's

obligations."  (Cmplt. ¶¶ 51-52)

      In arguing that the Complaint is insufficient to state a claim based on a

dissolution, winding-up, or liquidation-related Event of Default, Defendants argue that all three

actions require specific steps to be taken under the law.  (Def. Br. 19-21)  A Delaware

corporation such as AIG-FP can be dissolved by (1) a resolution of the board of directors

subsequently approved by a majority of the stockholders entitled to vote, or (2) the unanimous

written consent of all of the stockholders entitled to vote.  8 Del. Code § 275(a)-(c) (2010).

Dissolution does not become effective until a certificate of dissolution is filed with the Delaware

Secretary of State.  8 Del. Code § 275(f) (2010).  Similarly, Defendants argue that liquidation is

a "formal statutory process governed by federal bankruptcy law."  (Def. Br. 21)  Defendants

further claim that the Swap Agreement's references to "winding-up" refer solely to procedures

under the United Kingdom's Insolvency Act of 1986 (Def. Br. 20), although they provide no

support for this assertion.[9]

  Defendants point out that the Complaint does not plead that any of these formal

legal processes have been initiated, nor that AIG-FP has taken any action in furtherance of the

steps required to begin these legal processes.  (Def. Br. 19)  Defendants also claim that none of

the events pleaded in the Complaint have an analogous legal effect to dissolution, winding-up, or

liquidation.  (Def. Br. 21)

  The dissolution of a corporation "puts an end to its existence, the result of which

may be likened to the death of a natural person."  Chicago Title & Trust Co. v. Forty-One Thirty-

Six Wilcox Bldg. Corp., 302 U.S. 120, 125 (1937).  Similarly, "winding up" is "the process of

settling accounts and liquidating assets in anticipation of a partnership's or a corporation's

dissolution."  BLACK'S LAW DICTIONARY 1738 (9th ed. 2009).  Under Chapter 7 of the

---

[9]  Defendants assert that the "customs, practices, usages and terminology of the swaps industry make clear" that "the wind-up trigger was intended to apply to corporations chartered in countries governed by United Kingdom-based insolvency regimes, which include a mechanism for the voluntary winding-up of a corporation by resolution."  (Def. Br. 20)  In support of this argument, Defendants cite the User's Guide to the 1987 ISDA Form, which provides only that "the Bankruptcy Event of Default has been drafted with the intention that it be broad enough to be triggered by applicable proceedings or events (described in the forms in a general way) under whatever bankruptcy or insolvency law pertains to a particular party.  However, where such a party is organized in a jurisdiction other than the United States or the United Kingdom, users may, in certain cases, wish to modify this provision to refer to specific provisions of applicable laws."  (Pickhardt Decl., Ex. B at 7)  This is hardly evidence that the "winding-up" Event of Default is limited to corporations operating under the United Kingdom Insolvency Act.

Bankruptcy Code, "'liquidation is the prompt closure and distribution of the debtor's estate.'"  In re Medaglia, 52 F.3d 451, 457 (2d Cir. 1995) (quoting Pioneer Inv. Servs. v. Brunswick Assocs., 507 U.S. 380, 389 (1993))  Black's Law Dictionary defines liquidation more broadly as "determin[ing] the liabilities and distribut[ing] the assets of (an entity), esp. in bankruptcy or dissolution" or "wind[ing] up the affairs of (a corporation, business, etc.)."  BLACK'S LAW DICTIONARY 1014 (9th ed. 2009).

Defendants' argument that the Complaint fails to allege actions taken in furtherance of, or analogous to, a dissolution, liquidation, or winding up of AIG-FP are not persuasive.  While the Complaint does not plead the formal legal processes Defendants suggest are required, the implications of the "in furtherance of" provision in Section 5(a)(vii)(8) and the "analogous effect" provision in Section 5(a)(vii)(7) are that an Event of Default occurs before a counter-party becomes enmeshed in the affairs of an entity that is formally dissolving, liquidating or winding up.  For example, Defendants emphasize that the Swap Agreement's language predicates a winding-up or liquidation-related Event of Default on the allegedly defaulting party having "a resolution passed for its winding up or liquidation."  (Def. Reply Br. 8)  But actions in furtherance of having such a resolution passed – or actions in furtherance of taking formal steps toward dissolution – could plausibly include efforts to conclude the business of the corporate entity.  The alleged running off of AIG-FP's obligations and the prohibition on AIG-FP conducting new business (see Cmplt. ¶¶ 51-52) – steps taken to bring about an "end to [AIG-FP's] existence" – are plausibly in furtherance of formal dissolution, winding-up or liquidation efforts, all of which involve effectively concluding the affairs of the corporation.

Even if the actions pled in the Complaint are not in furtherance of dissolution, winding-up, or liquidation, they have an "analogous effect" to those events.  The Complaint

points not only to actual steps taken to put an end to AIG-FP's business functions, but cites repeated corporate statements to the effect that AIG-FP is "shutting down."  Defendants emphasize that the Swap Agreement requires an "analogous effect" "under the applicable laws of any jurisdiction," contending that the steps alleged in the Complaint do not have any legal effect in any jurisdiction.  (Def. Br. 21-22)  But the steps AIG has taken in "shutting down" AIG-FP appear, as alleged in the Complaint, to have the effect of bringing about an end to AIG-FP's business.  In any jurisdiction, that is analogous to the effects of dissolution or of having a resolution passed for a corporation's winding-up or liquidation.  In short, Plaintiffs have stated a plausible claim for relief based on a dissolution, winding-up, or liquidation-related Event of Default.

> ### D.    Events Analogous to AIG's Becoming
> ### Subject to the Appointment of a Trustee

Section 5(a)(vii)(6) of the Swap Agreement provides that an Event of Default has occurred when a party or Specified Entity "seeks or becomes subject to the appointment of an administrator, receiver, trustee, custodian or other similar official for it or for all or substantially all of its assets."  (Cmplt., Ex. A § 5(a)(vii)(6))

The Complaint alleges that events have occurred that have "an analogous effect to" the appointment of a trustee to oversee AIG, causing an Event of Default under Sections 5(a)(vii)(6) and 5(a)(vii)(7) of the Swap Agreement.  (Cmplt. ¶¶ 72-74)  In support of this claim, the Complaint alleges that the FRBNY appointed Trustees to vote its controlling equity interest and that those Trustees have since replaced more than half of AIG's Board of Directors.  (Cmplt. ¶¶ 49, 72)  Moreover, the Complaint alleges that as part of the government bailout of AIG, the government appointed AIG's current CEO, Edward Liddy, and engages in "day-to-day review of AIG's business."  (Cmplt. ¶¶ 48, 72)  The Complaint further pleads that in mid-September 2008,

the Secretary of the Treasury informed congressional leaders that the Federal Reserve had

"'essentially seize[d] control of the company under the Fed's emergency powers.'"  (Cmplt. ¶

73) (quoting James B. Stewart, <u>Eight Days</u>, THE NEW YORKER, Sept. 21, 2009, at 73)

        Defendants insist that Section 5(a)(vii)(6) triggers a default only if the appointed

official "is empowered by statute to manage the day-to-day operations of a debtor corporation in

the context of an insolvency, including the power to dispose of the debtor's assets."  (Def. Br.

22)  In support of this contention, Defendants point to provisions of U.K. and U.S. law governing

the appointment of the officials listed in Section 5(a)(vii)(6).  (Def. Br. 22-23)  Under Chapter 7

of the U.S. Bankruptcy Code, for example, a trustee shall, <u>inter alia</u>, "collect and reduce to

money the property of the estate for which such trustee serves, and close such estate as

expeditiously as is compatible with the best interests of parties in interest"; "be accountable for

all property received"; and "investigate the financial affairs of the debtor."  11 U.S.C. § 704(a).

Under Chapter 11 of the U.S. Bankruptcy Code, a trustee performs a number of the duties listed

under Chapter 7, including being "accountable for all property received," and has the power to

"operate the debtor's business."  11 U.S.C. §§ 1106(a)(1), 1108.

        Defendants contend that the terms of the AIG Credit Facility Trust Agreement

preclude the Trustees from engaging in any of the management duties assigned to a trustee under

the Bankruptcy Code or to similar officials under other statutes.  (Def. Br. 22-25)  The Trust

Agreement provides that "[i]n no event shall the Trustees become directors of the Company or

otherwise become responsible for directing or managing the day-to-day operations of the

Company or any of its subsidiaries." [10]  (Pickhardt Decl., Ex. D § 2.04(f))  As a result,

---

[10]  This Court may consider the Trust Agreement in evaluating Defendants' motion to dismiss, because it is a public document "of which plaintiffs had knowledge and relied on in bringing suit."  <u>See</u> <u>Brass</u>, 987 F.2d at 150.

Defendants argue that the Trustees are merely the equivalent of a majority shareholder.  (Def. Reply Br. 11)

Plaintiffs do not rely solely on Section 5(a)(vii)(6) of the Swap Agreement, however, contending instead that a trustee-related Event of Default has occurred because the government's appointment of the Trustees and of AIG's CEO have had "an analogous effect to" the appointment of a trustee or similar official to oversee AIG.  See Cmplt. ¶¶ 72-74; Pltf. Br. 32. Nothing in the Trust Agreement limits the role that the Trustees may play to that of a majority shareholder.  Nor is it clear that the Trust Agreement precludes the government-appointed CEO of AIG from exercising control analogous to that of a trustee.  In short, the role of the Trustees and the CEO at AIG presents factual issues that cannot be resolved on a motion to dismiss.  See Kassner, 496 F.3d at 237.

## II.     DEFENDANTS HAVE NOT DEMONSTRATED THAT SECTION 6(E) OF THE SWAP AGREEMENT CONSTITUTES AN UNENFORCEABLE PENALTY

Defendants also move to dismiss the Complaint on the grounds that even if an Event of Default has occurred, the requested relief constitutes an unenforceable penalty.

Relying on Section 6(e) of the Swap Agreement, Plaintiffs seek a declaration that an Event of Default has occurred, relieving them of their obligation to make the termination payment that would normally be due under the Agreement.  (Cmplt. ¶ 28)  Defendants point out that the bulk of Plaintiffs' payment obligations under the Swap Agreement remain unfulfilled, because these obligations "do not arise until maturity."

"Parties to a contract have the right, under New York law, to specify within a contract the damages to be paid in the event of a breach, so long as such a clause is neither unconscionable nor contrary to public policy."  Rattigan v. Commodore Int'l Ltd., 739 F. Supp. 167, 169 (S.D.N.Y. 1990).  "Whether [a] . . . fee represents an enforceable liquidation of

damages or an unenforceable penalty is a question of law, giving due consideration to the nature

of the contract and the circumstances." <u>JMD Holding Corp. v. Cong. Fin. Corp.</u>, 4 N.Y.3d 373,

379-80 (2005). "The burden is on the party seeking to avoid liquidated damages . . . to show that

the stated liquidated damages are, in fact, a penalty." <u>Id.</u>

   "Under New York law, '[a] contractual provision fixing damages in the event of

breach will be sustained if the amount liquidated bears a reasonable proportion to the probable

loss and the amount of actual loss is incapable or difficult of precise estimation. . . . If, however,

the amount fixed is plainly or grossly disproportionate to the probable loss, the provision calls

for a penalty and will not be enforced.'" <u>Kingsbridge Med. Ctr., P.C. v. Hill</u>, 357 F. Supp. 2d

754, 758 (S.D.N.Y. 2005) (citing <u>Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.</u>, 41

N.Y.2d 420 (1977); <u>Leasing Serv. Corp. v. Justice</u>, 673 F.2d 70, 73-74 (2d Cir. 1982)).

   "The reasonableness of liquidated damages and the certainty of actual damages

both must be measured as of the time the parties enter the contract, not as of the time of the

breach." <u>Rattigan</u>, 739 F. Supp. at 169 (citing <u>Vernitron Corp. v. CF 48 Associates</u>, 104 A.D.2d

409, 409 (2d Dep't 1984)). "[C]ourts should resolve any reasonable doubt as to whether a

provision constitutes an unenforceable penalty or a proper liquidated damages clause in favor of

a construction which holds the provision to be a penalty." <u>Howard Johnson Int'l Inc. v. HBS</u>

<u>Family, Inc.</u>, No. 96 Civ. 7687 (SS), 1998 WL 411334, at *5 (S.D.N.Y. July 22, 1998).

   "[D]ue consideration must also be given to the nature of the contract and the

attendant circumstances. . . . Relevant here is whether the parties were sophisticated and

represented by counsel, [whether] the contract was negotiated at arms-length between parties of

equal bargaining power, and [whether] similar damages provisions were incorporated into other

[] contracts."[11]  Bigda v. Fischbach Corp., 849 F. Supp. 895, 902 (S.D.N.Y. 1994); see also

Edward Andrews Group, Inc. v. Addressing Servs. Co., Inc., No. 04 Civ. 6731 (LTS), 2005 WL

3215190, at *6 n. 3 (S.D.N.Y. Nov. 30, 2005); Pacificorp Capital, Inc. v. Tano, Inc., 877 F.

Supp. 180, 184 (S.D.N.Y. 1995); Rattigan, 739 F. Supp. at 172.

    Defendants contend that releasing the non-defaulting party from its obligations

under the Swap Agreement after an Event of Default "regardless of the severity of the breach,

regardless of the amount owed on the Swap, and regardless of the unexpired time left under the

Swap Agreement" necessarily means that the damages are unreasonable in proportion to the

probable loss.  (Def. Br. 37-38)  Defendants also contend that damages from a future breach

were not difficult to ascertain at the time the parties entered into the Swap Agreement.  (Def. Br.

40)

    With respect to the latter point, at the time the Swap Agreement was entered into,

the parties could not have known which party would default, when a default might occur, and

what losses might flow from such a default.  Losses would not be limited to merely the payments

that should have been made by a defaulting party, but could also include "the loss of protection

against future risks," resulting from no longer being a party to the Swap Agreement.  Such losses

would be difficult to quantify.  See Cmplt., Ex. A § 6(e)(v).

---

[11]  Defendants assert that the sophistication of the parties is not relevant to the liquidated
damages analysis (Def. Br. 38 n. 29; Def. Reply Br. 21), contradicting a long line of cases that
require courts to give "due consideration" to the sophistication of the parties, among other
factors, in assessing whether a damages provision constitutes an unenforceable penalty.  See,
e.g., Bigda, 849 F. Supp. at 902; Edward Andrews Group, Inc., 2005 WL 3215190, at *6 n. 3;
Pacificorp Capital, Inc., 877 F. Supp. at 184; Rattigan, 739 F. Supp. at 172.  The cases cited by
Defendants do not hold that the sophistication of the parties is irrelevant; instead, they invalidate
penalty provisions despite the fact that the parties were sophisticated.  See Bristol Inv. Fund v.
Carnegie Int'l Corp., 310 F. Supp. 2d 556, 566 (S.D.N.Y. 2003); In re MarketXT, 376 B.R. 390,
421 (Bankr. S.D.N.Y. 2007); In re O.P.M. Leasing Servs., Inc., 23 B.R. 104, 113 (Bankr.
S.D.N.Y. 1982).

Moreover, in assessing whether the Swap Agreement's "walk away" provision imposes a cost that is reasonably proportionate to the losses incurred by the non-defaulting party, it must be acknowledged that the overriding purpose of the 1987 ISDA Form's Event of Default provisions is to permit the parties to avoid sorting out their obligations in bankruptcy court, by allowing them to "walk away" from the agreement before a bankruptcy filing occurs.  The "walk away" provision is reasonably calculated to serve this purpose, in light of the potential costs that could be incurred by a non-defaulting party forced to navigate a counter-party's bankruptcy. These potential costs would also have been difficult to quantify at the time the parties entered into the Swap Agreement.

Consideration of "the nature of the contract and the attendant circumstances" suggests that Section 6(e)(i) of the Swap Agreement may be enforceable.  See Bigda, 849 F. Supp. at 902.  The parties to the Swap Agreement are sophisticated financial entities, the Swap Agreement was negotiated at arms-length, and if there was any disparity in bargaining power, it appears that the disparity worked to AIG-FP's advantage.  The Complaint alleges that AIG-FP compelled Brysons' participation in the two swap transactions, and alleges that the Swap Agreement grants AIG-FP a bi-annual right to cancel the two swaps beginning in 1995, which the Complaint claims was "an extremely valuable option."  (Cmplt. ¶¶ 17, 21-22)  Finally, Section 6(e)(i) of the Swap Agreement is not unique to this contract.  Instead, it is part of the 1987 ISDA Form, a standard industry-wide contract.

Based on the record currently before this Court, Defendants have not demonstrated that Section 6(e)(i) is unenforceable.  See Bigda, 849 F. Supp. at 902.  The only case to interpret the enforceability of a similar provision in a swap agreement is Drexel Burnham Lambert Products Corporation v. Midland Bank PLC, No. 92 Civ. 3098, 1992 U.S. Dist. LEXIS

21223 (S.D.N.Y. Nov. 10, 1992).  In that case, the swap agreement provided that "in the event of a party's default, a settlement may be demanded only by the nondefaulting party and [] a defaulting party is not entitled to any compensation on a termination resulting from its default." Id. at *2-3.  The court held that this provision was "not unconscionable or contrary to public policy as the amount liquidated bears a reasonable relationship to the probable loss, and the amount of actual loss is incapable or difficult of precise estimation at the time the contract is entered into."  Id. at *3-4.  The court thus concluded that requiring the defaulting party to "forego an unrealized investment gain is neither a penalty, a forfeiture nor an unjust enrichment." Id. at *4.

Defendants question the precedential value of Drexel, noting that it merely sets forth findings of fact and conclusions of law, without analysis.  (Def. Br. 39)  Defendants have failed, however, to cite case law in which courts have found analogous liquidated damages provisions to constitute unenforceable penalties.  Defendants rely instead on cases such as Howard Johnson International Inc. v. HBS Family, Inc., No. 96 Civ. 7687 (SS), 1998 WL 411334 (S.D.N.Y. July 22, 1998), which they mistakenly claim involves circumstances that are "nearly identical" to the instant case.  (Def. Br. 39)  The circumstances of the Howard Johnson case could hardly be more different.

In that case, the court invalidated a liquidated damages provision in a license agreement concerning a Howard Johnson motel in Florida.  Howard Johnson International Inc., 1998 WL 411334, at *1, 8.  The agreement provided that – in the event of a default by HBS Family – it would be required to pay Howard Johnson International $2,000 per guest room – a sum amounting to $224,000.  Id. at *1, 7.  The court found that the liquidated damages provision constituted an unenforceable penalty, noting that (1) it did not "bear[] any reasonable

relationship to the pecuniary harm plaintiff would have likely suffered in the event of a breach";
(2) "the parties were clearly unequal in bargaining power"; (3) HBS Family "was not
represented by an attorney when [it] entered the License Agreement"; and (4) the provision was
not symmetrical. Id. at *7-8. Here, of course, the provision in question was symmetrical; AIG
was highly sophisticated; AIG likely enjoyed an advantage in bargaining power; and AIG was
presumably represented by counsel when it entered into the Swap Agreement.

On the present record, Defendants have not demonstrated that Section 6(e)(i) of
the Swap Agreement constitutes an unenforceable penalty provision under New York law.
Accordingly, this action will not be dismissed on that basis.

### CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED as to
Plaintiffs' claim that an Event of Default occurred as a result of AIG and AIG-FP's inability to
pay their debts. Defendants' motion to dismiss is otherwise DENIED. The Clerk of the Court is
directed to terminate the following motion: Docket No. 13.

Dated: New York, New York
       September 28, 2010

                                        SO ORDERED.

                                        Paul G. Gardephe
                                        United States District Judge

32