UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

BROOKFIELD ASSET MANAGEMENT, INC.,     :
f/k/a Hees International Bancorp Inc., and     :
                                               :
BRYSONS INTERNATIONAL, LTD.,                  :
f/k/a Brysons International Bank, Ltd.,         :
                                               :
                          Plaintiffs,          :
                                               :          Case No. 09-CV-8285 (PGG)
          - v -                                :
                                               :
AIG FINANCIAL PRODUCTS CORP. and              :
                                               :
AMERICAN INTERNATIONAL GROUP, INC.,           :
                                               :
                          Defendants.          :
-------------------------------------------------------------x


## PLAINTIFFS' MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS THE AMENDED COMPLAINT

RICHARD F. ZIEGLER
STEPHEN L. ASCHER
LUKE P. MCLOUGHLIN
DANIELLE F. TARANTOLO
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, NY 10022-3908
*Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...............................................................................................................4

    The September 29, 2010 Opinion ...............................................................................4

    The Amended Complaint .............................................................................................6

ARGUMENT ....................................................................................................................9

I.    THE AMENDED COMPLAINT PLAUSIBLY ALLEGES THAT AIG AND
    AIG-FP WERE PRESENTLY UNABLE TO PAY THEIR DEBTS WHEN
    DUE ..........................................................................................................................9

        A.    The Refusal of AIG's Banker to Extend It Intra-Day Credit, and
            AIG's Missed FX Payments, Plausibly Demonstrate That AIG
            Was Unable to Pay Its Debts .................................................................11

        B.    AIG-FP's Decision to Dispute All Collateral Calls Plausibly
            Demonstrates that AIG-FP Itself Recognized It Was Presently
            Unable to Pay Its Debts.........................................................................144

        C.    The Decision by the Regulators of AIG's Insurance Subsidiaries to
            Bar Them from Lending to AIG Plausibly Demonstrates that AIG
            Was Presently Unable to Pay Its Debts.................................................19

    CONCLUSION.........................................................................................................21

# TABLE OF AUTHORITIES

Page(s)

CASES

*Ascension Health v. Am. Int'l Group, Inc.*,
No. 08-7765, 2009 WL 2195916 (S.D.N.Y. July 23, 2009) ...................................................10

*Ashcroft v. Iqbal*,
129 S. Ct. 1937 (2009)...........................................................................................................9

*Drexel Burnham Lambert Prods. Corp. v. MCorp.*,
Civ. A. No. 88C-NO-80 (SCDP), 1989 WL 16981 (Del. Super. Ct. Feb 23, 1989) ...........5, 14

*Drexel Burnham Lambert Prods. Corp. v. MCorp.*,
Civ. A. No. 88C-NO-80 (SCDP), 1991 WL 165941 (Del. Super. Ct. Aug. 13, 1991)............17

*Estate of Morris v. Dapolito*,
297 F. Supp. 2d 680 (S.D.N.Y. 2004)........................................................................................9

*Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*,
375 F.3d 168 (2d Cir. 2004).....................................................................................................10

*Price v. N.Y. State Bd. of Elections*,
540 F.3d 101 (2d Cir. 2008)........................................................................................................9

*Rescuecom Corp. v. Google Inc.*,
562 F.3d 123 (2d Cir. 2009).......................................................................................................9

*Rexnord Holdings, Inc. v. Bidermann*,
21 F.3d 522 (2d Cir. 1994)........................................................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...................................................................................................................10

*Ursa Minor Ltd. v. Aon Fin. Prods.*,
No. 00CIV-2474(AGS), 2000 WL 1010278 (S.D.N.Y. July 21, 2000) ..................................14

*VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*,
594 F. Supp. 2d 334 (S.D.N.Y. 2008).......................................................................................15

STATUTES

N.Y. Debt. & Cred. Law § 270 (McKinney 2010) ........................................................................19

Plaintiffs Brookfield Asset Management, Inc. and Brysons International, Ltd. (collectively, "Plaintiffs" or "Brookfield") respectfully submit this Memorandum of Law in opposition to the motion by Defendants American International Group, Inc. and AIG Financial Products Corp. ("AIG-FP") (collectively, "AIG" or "Defendants") to Dismiss Brookfield's Amended Complaint ("Am. Compl.") ("AIG Mem.").

## PRELIMINARY STATEMENT

AIG's brief in support of its motion to dismiss is misdirected:  AIG moves to dismiss a claim that Brookfield has not pleaded – a "fails to pay debts" claim – and barely addresses the claim that Brookfield has made – an "unable to pay debts" claim.

The only claim revised in the Amended Complaint is the claim that AIG and AIG-FP were "unable . . . to pay [their] debts as they bec[a]me due" under the Swap Agreement.  The Amended Complaint adds new factual allegations to satisfy the legal standard enunciated by the Court in its September 29, 2010 Opinion ("Opinion"), which dismissed the "unable to pay" Event of Default alleged in the initial Complaint.  The initial Complaint alleged only a prospective inability to pay – that as of September 16, 2008 AIG and AIG-FP were unable to pay obligations coming due the following day.  The Court interpreted the Swap Agreement's "unable to pay" Event of Default provision to require more:  that AIG or AIG-FP was "presently" unable to pay its debts when due.  Op. at 13-18.  The Court required proof of a "present" inability to pay in part because it determined that the existence of an Event of Default should not turn on a "speculative and unworkable exercise" of predicting the party's future accounts payable and receivable.  *Id*. at 17-18 (citation and quotation omitted).

Brookfield's Amended Complaint adds new factual allegations to support a claim that on September 16, 2008, AIG and AIG-FP were presently unable to pay debts due that day.  The Amended Complaint alleges that on September 16, AIG's main banker, J. P. Morgan Chase &

Co. ("J.P. Morgan"), took the extraordinary step of refusing to extend even routine intra-day credit to AIG.  This loss of credit caused AIG – according to AIG's own internal memorandum – "to fail on many other clients and transactions," including certain foreign exchange ("FX") payments.  The Amended Complaint also pleads that on September 16, a senior officer of AIG-FP declared a blanket moratorium on the payment of billions of dollars of collateral calls, the primary debts driving AIG toward bankruptcy.  The Amended Complaint further pleads that the regulators of AIG's insurance subsidiaries barred the subsidiaries from lending to AIG.

Thus, several parties that had an intimate and sophisticated understanding of AIG's financial condition in real time – including, importantly, AIG-FP itself – understood that AIG and AIG-FP were unable to pay debts due that day.  This evidence also shows that AIG and AIG-FP actually failed to make payments due that day.  The Court can plausibly conclude from these allegations that on September 16, AIG and AIG-FP had in fact run out of money, and were presently unable to pay their debts.

To prevail on its motion to dismiss, AIG would have to persuade the Court that these allegations, construed with all inferences in Brookfield's favor and considered against the backdrop of AIG's need for an $85 billion bail-out to avoid bankruptcy the next day, do not "plausibly" allege that AIG was "unable to pay" its debts on September 16.  AIG's argument is itself implausible.  AIG would have this Court believe that AIG's liquidity crisis left it hours away from bankruptcy, but, as a matter of law, it was not yet unable to pay its debts.  To allow AIG to slice the timeline of its collapse this finely – on a motion to dismiss, no less – would effectively immunize an essentially bankrupt party from triggering an Event of Default unless it had already filed for bankruptcy.  This result would contradict a fundamental purpose of the 1987 ISDA Form incorporated into the Swap Agreement – to provide an early warning system

- 2 -

that permits a non-defaulting party to terminate the swap well in advance of its counterparty's formal bankruptcy proceeding.  *See* Op. at 4, 30.

In constructing its argument, AIG's motion barely mentions this Court's prior ruling on the meaning of the "unable to pay" Event of Default.  Instead, AIG tries to atomize Brookfield's considerable allegations of AIG's present inability to pay, argues the insufficiency of each individual allegation under the legal standard applicable to a default that Brookfield has not alleged, and, most blatantly, repeatedly tries to re-write the Swap Agreement.

For example, AIG tries to insert a three-day cure period into the "unable to pay" Event of Default, and thereby require that any Event of Default under Brookfield's Swap Agreement be preceded by defaults declared by AIG's other counterparties.  But the Swap Agreement's "unable to pay" Event of Default has no cure period; it turns solely on when the party's debts are "due."  Whether AIG's underlying FX counterparties could remedy AIG's missed payments under their contracts with AIG is irrelevant to the existence of an Event of Default arising from AIG's systemic collapse under Brookfield's contract with AIG.

Similarly, AIG contrives a "corporate action" requirement out of whole cloth.  However, there is no textual or practical reason to determine a party's ability to pay solely with reference to its Board of Directors.  As here, the actions of a party's managing director, its principal banker, and its major regulators are all sufficient to cause, and to evidence, the party's inability to pay.

AIG also tries to ignore clear provisions of its underlying swap agreements, contending, for example, that it had a legal right to dispute all collateral calls on an entire category of transactions, notwithstanding the express contractual requirement in those agreements that any such disputes be asserted only in good faith.

For these reasons, the allegations of the Amended Complaint, taken individually or together, amply satisfy the "unable to pay" standard enunciated by this Court. AIG's motion to dismiss should be denied.

## BACKGROUND

On September 30, 2009, Brookfield filed an initial Complaint alleging that AIG and AIG-FP suffered multiple Events of Default on their Swap Agreement with Brookfield, and as a result of those Events of Default, the Swap Agreement automatically terminated early. Because AIG has already moved to dismiss the original Complaint, and the Court has already ruled on that prior motion, we do not summarize the initial Complaint in its entirety here.

One of the alleged Events of Default was that AIG and/or AIG-FP were "unable to pay" their debts as they came due. Compl. ¶¶ 38-42, 53-64, 81. The initial Complaint alleged a prospective inability to pay, in that on September 16, 2008, AIG had no ability to pay billions of dollars of debts falling due the very next day. Compl. ¶¶ 38-42. Because AIG would have had to declare bankruptcy on September 17, 2008, the government stepped in with an $85 billion emergency bail-out on the evening of September 16.

**The September 29, 2010 Opinion**

On September 29, 2010, this Court issued an Opinion that sustained four of the Events of Default alleged in the initial Complaint, rejected AIG's argument that the remedy provision of the Swap Agreement was unenforceable as a matter of law, but dismissed a fifth alleged Event of Default – the "unable to pay" Event of Default summarized above.[1] The Court held that under

---

[1] *See* Op. at 9 (Brookfield pleaded facts demonstrating AIG and AIG-FP were insolvent); *id*. at 13-18 (Brookfield did not plead facts demonstrating AIG and AIG-FP were presently unable to pay debts); *id.* at 18 (Brookfield pleaded facts demonstrating AIG took actions in furtherance of bankruptcy); *id.* at 22 (Brookfield pleaded facts demonstrating AIG and AIG-FP took actions in furtherance of, or analogous to, the dissolution, winding-up, or liquidation of AIG-FP); *id.* at 25 (Brookfield pleaded facts demonstrating that events occurred that had an analogous effect to the

the Swap Agreement, the "inability must actually happen in order to trigger an Event of Default." Op. at 13. Otherwise, the inquiry would require "'[l]ooking into a future filled with payables that are coming due,'" "'a speculative and unworkable exercise for an enterprise'" like AIG or AIG-FP. *Id.* at 14 (quoting *In re Charter Commc'ns*, 419 B.R. 221, 236 (Bankr. S.D.N.Y. 2009) ("*Charter*")). The Court's decision was based primarily on its application of *Charter*, a bankruptcy court decision that was decided after Brookfield filed the initial Complaint.

The Court's Opinion noted several ways in which it might be apparent that a party was "presently" unable to pay its debts. For example, a party could be shown to be presently unable to pay its debts if it "failed to pay a debt when it was due or . . . was ever unable to pay any particular debt when it became due." *Id.* at 13. A party could also be shown to be unable to pay its debts if it took any "corporate action rendering it legally impossible for the entity to pay its debts," regardless of whether there were in fact any missed payments; if a party issues such a moratorium, "it [would be] reasonable to conclude that the entity has, at that moment, become unable to pay its debts." *Id.* at 16 (interpreting *Drexel Burnham Lambert Prods. Corp. v. MCorp.*, Civ. A. No. 88C-NO-80 (SCDP), 1989 WL 16981 (Del. Super. Ct. Feb. 23, 1989) ("*Drexel*")).

The Court's ruling also recognized that to avoid rendering any provision of the Swap Agreement superfluous, the "unable to pay" clause and the "fails to pay" clause would each have to embrace circumstances not embraced by the other:

> "Fails to pay" leaves open the possibility that the entity has the
> resources to pay its debt, but is choosing not to, for whatever

---

appointment of an "administrator, receiver, trustee, or other similar official" for AIG or for substantially all of its assets); Op. at 27-32 (rejecting AIG's contention that Swap Agreement's remedy provision was unenforceable as a matter of law).

> reason. "Unable to pay" speaks of a lack of resources, and
> connotes inability and impossibility.

Op. at 15.  Thus, a party can be "unable to pay" its debts, even if it has not yet "failed to pay" its

debts within the meaning of that separate Event of Default, if its present inability to pay can be

demonstrated by other evidence of its inadequate resources.

The Court held that the allegations of the initial Complaint did not meet these standards.

Because Brookfield's initial Complaint alleged only that AIG was unable on September 16 to

pay debts due the next day, and Brookfield had not alleged any actual payment failures, any

decision not to make payments, or any other facts adequate to show that AIG presently lacked

the resources to pay its debts, the Court held the initial Complaint did not adequately allege that

either AIG or AIG-FP lacked the resources to pay its debts due on September 16.  *Id*. at 17-18.

**The Amended Complaint**

Documents produced by AIG in this action to date and the public release of the

Congressional Oversight Panel's report since the original Complaint was filed have provided

Brookfield with meaningful evidence showing AIG's present inability to pay its debts.  To

address the standard enunciated by the Court in its Opinion, Brookfield filed on January 26, 2011

an Amended Complaint directed almost entirely to that issue.

The Amended Complaint's new factual allegations relate largely to September 15 and 16,

2008, when a number of parties inside and outside AIG simultaneously recognized the

magnitude and imminence of its collapse.  For example, on September 16, AIG's primary banker

J. P. Morgan decided that it was unwilling to extend AIG even the short-term intra-day credit

that is routinely provided to permit financial transactions to proceed smoothly.  This highly

unusual circumstance is itself direct evidence that AIG was unable to pay its debts.  J.P Morgan's

refusal also had significant consequences for AIG's ability to pay its debts:  As Brookfield's

- 6 -

Amended Complaint pleads, AIG's "inability to access funding and the loss of confidence by its own bank and by its counterparties who were unwilling to take any AIG credit risk was causing AIG-FP to fail to pay some of its obligations." Am. Compl. ¶ 43. Thus, on September 16, AIG's Chief Financial Officer reported to its Chief Executive Officer that various counterparties' refusals to settle trades with AIG-FP "ha[ve] the potential for us to default on billions of dollars of FX [foreign exchange] transactions today." *Id.*

The Amended Complaint further alleges, based on an internal AIG memorandum prepared on September 19, that this "potential" for defaults came to pass. The memo describes how circumstances beginning on September 16, 2008 "*have caused us to fail on many other clients and transactions*." *Id.* (emphasis added). As AIG admits in its moving brief, this missed payment "backlog" was not "cleared" until September 19. AIG Mem. 14.

The Amended Complaint also addresses actions taken by AIG as a result of its September 15, 2008 credit ratings downgrade, which caused AIG-FP to need at least $20 billion of additional funds to meet new collateral calls and related demands. AIG Mar. 2, 2009 10-K, at 4. The Amended Complaint alleges that on September 16, the day after the downgrade and a raft of associated collateral calls, "AIG-FP personnel were instructed to immediately 'contact all counterparties who have outstanding calls on these types of transactions [credit default swaps on tranches of collateralized debt obligations] and tell them we formally dispute [the calls].'" Am. Compl. ¶ 44. As AIG acknowledged in its brief, this instruction was issued by Tom Athan, a managing director of AIG-FP's Credit Trading group. AIG Mem. 10.

Because this instruction covered an entire category of outstanding collateral calls without any individualized determination as to whether each collateral call was justified or its amount was correct, Brookfield has alleged that the instruction was not issued in good faith, Am. Compl.

¶ 44, as required by the common law duty of good faith and fair dealing, and by the express terms of AIG's contracts with the counterparties who made the collateral calls. *See* ISDA Credit Support Annex ¶ 11(d), AIG Ex. D ("Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations by either party, will be made in good faith and in a commercially reasonable manner.").  This directive effectively constituted a moratorium on making the payments most responsible for AIG-FP's liquidity crisis.  Am. Compl. ¶ 44.

Brookfield has alleged that this directive showed AIG's inability to pay its debts, and the Congressional Oversight Panel ("COP") charged with investigating the AIG bail-out agreed: The COP report found that in September 2008 "AIG *was unable to meet* the cash calls from jittery trading partners worried about the company's CDO exposure."  June 10, 2010 COP Report, at 38 (emphasis added) (quoted in Am. Compl. ¶ 45).

The Amended Complaint further alleges that on September 16, 2008, AIG's insurance regulators notified AIG that it would "no longer be permitted to borrow funds from its insurance company subsidiaries under a revolving credit facility that AIG maintains with certain of its insurance subsidiaries acting as lenders."  Am. Compl. ¶ 42 (quoting June 10, 2010 COP Report, at 246).  This regulatory action further restricted AIG's ability to pay its debts.

In addition, the Amended Complaint alleges that two weeks after the initial bail-out, "AIG continued to demonstrate an ongoing inability to pay debts as they came due when it notified a company . . . that it planned to default on a $75.7 million capital commitment."  *Id.* ¶ 55.  Based on these allegations, the Amended Complaint repeatedly alleges that AIG and/or AIG-FP were "presently" "unable to pay" their debts.  *E.g.*, *id.* ¶¶ 44-45, 68-70.

AIG's brief disregards this clear pleading and devises arguments concerning the "fails to pay" Event of Default instead.  Yet the Amended Complaint mentions the concept of "failing to pay debts" only in quotations from the parties' Swap Agreement, *e.g.*, Am. Compl. ¶¶ 2, 90, and in paragraphs that are plainly referring to AIG's "unable to pay" Event of Default, not a "failure to pay" Event of Default.  *E.g.*, Am. Compl. ¶¶ 43, 69.  In light of these unmistakable "inability to pay" allegations, AIG's choice to test the Amended Complaint under the "fails to pay" standard appears to be a deliberate attempt to side-step this Court's "unable to pay" standard.[2]

## ARGUMENT

## I.   THE AMENDED COMPLAINT PLAUSIBLY ALLEGES THAT AIG AND AIG-FP WERE PRESENTLY UNABLE TO PAY THEIR DEBTS WHEN DUE

"[T]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In making this plausibility determination, "a court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally."  *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009) (citation and quotation omitted); *accord Ascension Health v. Am. Int'l Group, Inc.*, No. 08-civ-7765, 2009 WL 2195916, at *1 (S.D.N.Y. July 23, 2009) (Gardephe, J.).

_____

[2] AIG's insistence on misconstruing the Amended Complaint is particularly surprising given that Brookfield explained the amended pleading both in correspondence, *see* Brookfield Dec. 22, 2010 Pre-Motion Letter, at 1 ("The primary purpose of the proposed Amended Complaint is to allege an "unable to pay" Event of Default under § 5(a)(vii)(2) of the Swap Agreement, in accordance with the legal standard enunciated by the Court in its Opinion and Order of September 29, 2010."), and in a telephonic conference with the Court, *see* Jan. 19, 2011 Tr. at 14 (counsel for Brookfield describing how allegations are "exactly encompassed by the ISDA event of default of being unable to pay debts.").  If AIG uses its reply brief to make new arguments under the legal standard that it ought to have addressed more fully in its moving brief, those arguments should not be considered.  *Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680, 689 n.7 (S.D.N.Y. 2004) ("[I]t is well settled that arguments may not be raised for the first time in a reply brief as that tactic denies the plaintiff the opportunity to respond.").

Moreover, the Amended Complaint's allegations should be considered in their totality.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety . . . .").  Accordingly, "[d]ismissal is only warranted if the facts as alleged are insufficient to 'raise a right to relief above the speculative level.'"  *Price v. N.Y. State Bd. of Elections*, 540 F.3d 101, 107 (2d Cir. 2008) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)).

In a contractual case like this one, the movant's burden is even higher, because it must demonstrate that relevant contractual provisions are unambiguous as a matter of law.  *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177-78 (2d Cir. 2004).

Here, the Amended Complaint plausibly alleges that on September 16, 2008, AIG and AIG-FP were unable to pay debts due that day.  For a period of time immediately prior to receipt of the bail-out funding, AIG could not access intra-day credit from its bankers, could not access capital from its insurance subsidiaries, and had no liquidity in its remaining unregulated businesses.  As a result of all these circumstances, AIG and AIG-FP were unable to make payments then due on credit default swaps ("CDSs"), on FX transactions, and likely on other transactions.  Now that Brookfield has the benefit of this Court's Opinion and is entering into the second phase of discovery, Brookfield believes it will likely discover additional evidence showing this Event of Default.[3]

---

[3] Brookfield's discovery to date has largely been limited to reviewing the responsive email files of 19 executives whom it identified at the outset of the case, as well as documents that AIG produced to Congress and certain other governmental entities.  Thus, Brookfield has not yet taken discovery, for example, of AIG's and AIG-FP's cash management or accounts payable records; of the individuals primarily responsible for handling requests that AIG-FP post collateral in September 2008; or of J.P. Morgan's decision to eliminate AIG's intra-day credit.  Moreover, Brookfield has removed certain allegations from the Amended Complaint that AIG

Although these allegations must be considered in their totality, Brookfield addresses AIG's arguments on an allegation-by-allegation basis, as AIG has done, below.

### A. The Refusal of AIG's Banker to Extend It Intra-Day Credit, and AIG's Missed FX Payments, Plausibly Demonstrate That AIG Was Presently Unable to Pay Its Debts

As noted above, the Amended Complaint alleges that on September 16, 2008, AIG's banker, J. P. Morgan, and various AIG counterparties refused to extend AIG intra-day credit, and, as a result, AIG failed to pay certain FX debts from September 16 through 19. Clearly, the facts that AIG's banker refused to extend it credit even for a matter of hours, and that AIG failed to make payments for three days "on numerous clients and transactions," give rise to a plausible inference that AIG was presently unable to pay its debts.[4]

In response to these allegations, AIG blames "actions by J.P. Morgan" that "delayed settlement of some of AIG-FP's FX transactions" and argues that "[s]hort-term delays in the payment" of FX dollar amounts cannot "trigger the ISDA general failure-to-pay Event of Default." AIG Mem. 12-13. AIG's argument rests on its contention that AIG had a "cure period" in which to make these payments. AIG appears to derive this cure period from the International Foreign Exchange Master Agreement, which is "often used to govern FX transactions," AIG Mem. 13, and provides for a two-day cure period. AIG also cites to Section 5(a)(i) of the 1987 ISDA Form (a default provision separate from that in § 5(a)(vii) that is at

was able to rebut, after reviewing a draft amended complaint, by producing additional evidence. AIG reviewed a draft amended complaint because Brookfield sought AIG's consent to include certain information marked "confidential" in the Amended Complaint, without having to file it under seal pursuant to the parties' Stipulated Confidentiality Agreement and Protective Order, April 26, 2010, Dkt. 31 ("Confidentiality Order").

[4] AIG misapprehends Brookfield's reference to AIG's plan to withhold a $75.7 million capital commitment. Rather than contending that the planned default on a capital commitment itself constitutes an Event of Default, the Amended Complaint merely notes that two weeks after the initial bail-out "AIG continued to demonstrate an ongoing inability to pay debts as they came due when it notified a company . . . that it planned to default." Am. Compl. ¶ 55.

issue here), which governs a swap party's failure to pay its counterparty, and has a three-day cure period.

AIG's argument suffers from an avalanche of flaws. Most importantly, there simply is no cure period in the text the "unable to pay" Event of Default provision at issue here. Since virtually every provision on the prior page of the parties' Swap Agreement includes a "cure period,"[5] this omission was no accident. The drafters of the 1987 ISDA Form wanted to give counterparties the opportunity to avoid being entangled in a counterparty's bankruptcy proceedings by defining Events of Default that would be triggered by major financial reversals before they culminated in bankruptcy. Op. at 30.

Accordingly, far from including a cure period, the 1987 ISDA Form makes it clear that Early Termination occurs *immediately* with respect to Events of Default triggered under Section 5(a)(vii), including the "unable to pay" default under § 5(a)(vii) at issue here. *See* Swap Agreement § 6(a) ("[A]n Early Termination Date will be deemed to have occurred in respect of all Swap Transactions immediately upon the occurrence of any Event of Default specified in Section 5(a)(vii)(1), (2), (3), (4), (5), (6), (7), or (8) . . . .").

---

[5] *See, e.g.*, Swap Agreement § 5(a)(i) ("Failure by the party to pay, when due, any amount required to be paid by it under this Agreement *if such failure is not remedied on or before the third Business Day* after notice of such failure to pay is given to the party.") (emphasis added); § 5(a)(ii) ("Failure by the party to comply with or perform any agreement or obligation . . . in accordance with this Agreement *if such failure is not remedied on or before the thirtieth day* after notice of such failure is given to the party.") (emphasis added); § 5(a)(iii)(1) ("Failure by the party . . . to comply with or perform any agreement or obligation . . . in accordance with any Credit Support Document *if such failure is continuing after any applicable grace period has elapsed*.") (emphasis added); § 5(a)(v) ("The occurrence of an event of default in respect of the party or any applicable Specified Entity under a Specified Swap which, following the giving of any applicable notice *or the lapse of any applicable grace period*, has resulted in the designation or occurrence of an early termination date in respect of such Specified Swap.") (emphasis added).

For the same reasons, AIG is mistaken when it attempts to import a cure period from wholly separate contracts, such as those that governed AIG-FP's FX transactions with other counterparties.[6]  The fact that AIG and certain of its FX counterparties bargained for cure periods to govern their own affairs is of no moment here.  The cure periods in those underlying agreements are designed to give each party notice and the opportunity to make a payment that may have been missed before the other party can exercise its rights.  Under the provision at issue here, however, Brookfield is entitled to automatic early termination when an "unable to pay" Event of Default occurs, not as the result of an inadvertent missed payment, but because of AIG's systematic collapse.  The Swap Agreement's express provision for "immediate[]" early termination makes it clear that AIG is not entitled to the opportunity to cure that condition.

The question under the Swap Agreement is whether this evidence plausibly supports the allegation that AIG was "unable . . . to pay its debts *as they become due.*"  Swap Agreement § 5(a)(vii)(2) (emphasis added).  A debt is "due" when it is "owing or payable," BLACK'S LAW DICTIONARY 574 (9th ed. 2009), not after expiration of an applicable cure period (*i.e.*, when an Event of Default can be declared for missing the payment).  Under the ISDA Form, a party is obligated to make payments not later than the "due date" specified.  *See* Swap Agreement, § 2(a)(ii) ("Payments under this Agreement will be made not later than the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement . . . .") (emphasis added).  There is a clear distinction between when a payment

---

[6] Even if AIG could overcome the absence of any cure period in Section 5(a)(vii)(2) by importing cure periods in the separate contracts that AIG failed to pay on time, the record does not establish that the FX transactions actually at issue here were subject to a Master Agreement that included such a cure period.  AIG's vague contention that FX transactions are "often" subject to such cure periods, AIG Mem. 12, is of no assistance to a Rule 12(b)(6) motion, and suggests that the contrary may well be the case, at least as to some of the missed payments at issue.

- 13 -

is "due" and when a contractual remedy for the missed payment arises. *See Ursa Minor Ltd. v. Aon Fin. Prods.*, No. 00CIV-2474(AGS), 2000 WL 1010278, at *7 (S.D.N.Y. July 21, 2000) ("The Court finds that the words 'when due' merely reference the point in time when AFP's payment obligation under the Credit Default Swap attaches, that is, not until the due date for payment under the Surety Bond has come and gone with no payment from GSIS.").  The cure period separates the date the payment is "due" from the date a contractual default may be declared. *See, e.g., Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 524 (2d Cir. 1994) ("The terms of the Agreements allowed Bidermann a grace period until the following payment date before his failure to pay an installment would be an event of default under the Agreements").

As a practical matter, reading an extra-contractual three-day cure period (or for that matter, any cure period) into the "unable to pay" Event of Default would defeat the purpose of the provision, which is to terminate the Swap Agreement automatically and immediately at the first sign of trouble, without regard to how that trouble may be worked out by third parties or whether a bankruptcy ensues.  Am. Compl. ¶ 26; Op. at 4.[7]

### B.  AIG-FP's Decision to Dispute All Collateral Calls Plausibly Demonstrates that AIG-FP Itself Recognized It Was Presently Unable to Pay its Debts

AIG makes a strained attempt to escape the consequences of the across-the-board moratorium that AIG-FP imposed on the payment of collateral calls arising in the massive portfolio of CDSs AIG-FP had issued on various collateralized debt obligations.

AIG first argues that AIG-FP did not in fact impose any moratorium on the payment of collateral calls, and that it was merely exercising its "legal right to agree or dispute" the

---

[7] AIG's brief also makes much of the adverb "generally" that appears in § 5(a)(vii)(2).  AIG Mem. 4-14.  Regardless of whether "unable" is modified by "generally,"  the Amended Complaint adequately alleges this Event of Default, because AIG and AIG-FP are alleged to have suffered a massive inability to pay.   In any event, this Court has already ruled on the meaning of the "unable to pay" Event of Default, and AIG cannot now argue for a different interpretation.

collateral calls.  AIG Mem. 11.  Here AIG overlooks Brookfield's allegation that AIG-FP did not

have a good-faith basis for disputing all of its collateral calls on these transactions.  Not

surprisingly, the form agreement that governed the CDS transactions that gave rise to the unpaid

collateral calls explicitly requires that "[p]erformance of all obligations under this Annex,

including, but not limited to, all calculations, valuations and determinations made by either party,

will be made in good faith and in a commercially reasonable manner."  ISDA Credit Support

Annex ¶ 11(d), AIG Ex. D.

  Brookfield has amply alleged that AIG-FP's blanket refusal to pay collateral calls did not

have a good faith basis.  Moreover, even if AIG-FP had a good-faith basis to dispute the amount

of the collateral calls, AIG-FP was required to pay the undisputed portions of the calls.  *See*

ISDA Credit Support Annex ¶ 5, AIG Ex. D.[8]

  Because AIG-FP did not have a good-faith basis to dispute the collateral calls, let alone to

refuse to pay at least the undisputed portions of those calls, AIG-FP's blanket decision not to

make these payments on September 16 signifies that it was unable to pay its debts when due.

The plain inference from these facts is that AIG-FP was motivated by its recognition that it

simply did not have the means to pay the collateral calls triggered by the September 15, 2008

credit ratings downgrade.  AIG Mar. 2, 2009 10-K, at 4.  Whether this blanket refusal is

characterized as a "moratorium" is beside the point.

  AIG also tries to negate the "dispute all CDS collateral calls" email by claiming that

AIG-FP "satisfied calls that same day even after the [moratorium] email at issue was sent."  AIG

---

[8] The lone case cited by AIG in support of its contention that the "unable to pay" Event of
Default is not triggered by a corporation's blanket moratorium on collateral calls (under the guise
of "disputing" the calls) does not stand for that proposition; it states merely that parties should
use dispute resolution procedures.  *See VCG Special Opportunities Master Fund Ltd. v. Citibank,
N.A.*, 594 F. Supp. 2d 334, 343 (S.D.N.Y. 2008).

Mem. 11.  But AIG's ability to pay collateral calls on the evening of September 16 – after the government decided to provide AIG a bail-out package during the intervening hours – simply confirms AIG's prior inability to pay its debts.[9]

AIG next argues that even if AIG-FP did impose a moratorium on the payment of collateral calls, the moratorium does not give rise to an "inability to pay" Event of Default because the moratorium did not amount to "corporate action," *i.e.*, it was not the result of a Board resolution.  In doing so, AIG misapprehends this Court's prior Opinion, which held that "[w]here an entity takes corporate action rendering it legally impossible for the entity to pay its debts, it is reasonable to conclude that the entity has, at that moment, become unable to pay its debts."  Op. at 16.  Neither the Court's Opinion nor *Drexel* stated that *only* "corporate action" could trigger the "unable to pay" Event of Default.  Nothing about the text or purpose of the "unable to pay" Event of Default suggests a requirement of formal Board action.  A moratorium directed by a high-level executive with knowledge of AIG's financial condition and the authority to issue the directive amply indicates a present inability to pay.

In this vein, AIG reprises the tactic that it used unsuccessfully in its briefing on its first dismissal motion concerning the "actions in furtherance of bankruptcy" Event of Default.  There AIG contended that "any action" in furtherance of bankruptcy had to be read to mean solely "corporate action," *see* Op. at 19-20, and the Court firmly rejected AIG's misreading.  *Id.*  Here, AIG's misreading of the Swap Agreement is even more brazen, because the "unable to pay" provision does not have the word "action," let alone the phrase "corporate action."

---

[9] AIG's contention that the payment of three collateral calls (described in AIG Exs. F, G, and H) on September 16 disproves Brookfield's "unable to pay" claim is factually erroneous.  As should be clear to AIG from its possession of the documents and their timestamps, the approval to pay one of the three calls occurred before the issuance of the moratorium.  *Compare* AIG Ex. G *with* AIG Ex. E.  Similarly, as noted above, it does not help AIG that the collateral calls described in AIG's Exhibits F and H were paid *after* AIG had received assistance from the government.

Moreover, requiring formal Board action would undermine the purpose of the 1987 ISDA Form to terminate a contract automatically well in advance of a bankruptcy filing. *See* Op. at 30 ("[T]he overriding purpose of the 1987 ISDA Form's Event of Default provisions is to permit the parties to avoid sorting out their obligations in bankruptcy court.").

AIG's attempt to distinguish *Drexel*, AIG Mem. 15-16, should similarly be rejected, because the facts in this case are far more indicative of a present inability to pay than the facts of *Drexel*. In *Drexel*, the Court held that MCorp suffered an "unable to pay" Event of Default because its Board issued a moratorium on the payment of certain debts; MCorp failed to pay a portion of those debts; and "[i]mmediately after the moratorium was declared, MCorp's chairman publicly admitted that there was a high probability that MCorp would be bankrupt within 30 days." *Drexel Burnham Lambert Prods. Corp. v. MCorp.*, No. 88C-NO-80 (SCDP), 1991 WL 165941, at \*15-16 (Del. Super. Ct. Aug. 13, 1991) (denying rehearing of 1989 *Drexel* decision). By contrast, AIG-FP issued the moratorium on paying collateral calls on September 16 and was bailed out to avoid a bankruptcy filing the next day. Since AIG was several hours rather than 30 days away from bankruptcy, AIG's inability to pay its debts was, if anything, far more "present" than that of MCorp.

Last, AIG argues that "a 'collateral call' is not a debt," AIG Mem. 10, and thus the refusal to pay collateral calls cannot show an inability to pay "debts." This argument is a red herring. Regardless of whether a collateral call is a "debt," the decision by a senior AIG-FP executive to contest all collateral calls on September 16, without any individualized determination as to the merit or amount of each call, shows that AIG-FP had simply run out of money and was unable to pay its debts on that day.

- 17 -

Like its efforts to import a grace period into the 1987 ISDA Form, AIG's efforts to read the word "debt" to exclude cash collateral calls from the scope of the "unable to pay" default provision are at odds with the purpose of the 1987 ISDA Form's Event of Default provisions.  As the Court has recognized, the 1987 ISDA Form was designed to give swap counterparties the ability to terminate a swap contract at the earliest warning stage, well in advance of potential bankruptcy proceedings.  Am. Compl. ¶ 26; Op. at 4.  That was precisely the situation here.

For this reason, AIG's argument that collateral calls are not considered "debts" for the purpose of the 1987 ISDA Form must be, and is, mistaken.  AIG's argument is that a collateral call is "security against a debt," which converts an unsecured claim into a secured claim; according to AIG, the collateral call is not itself a "debt."  AIG Mem. 10.  This technical argument is legally unsupportable.  New York law defines "debt" broadly to include "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."  N.Y. DEBT. & CRED. LAW § 270 (McKinney 2010).  And AIG-FP's obligation to post collateral was plainly a "legal liability on a claim," because AIG's counterparties had a claim to additional collateral under the ISDA Credit Support Annex.  ISDA Credit Support Annex ¶ 3, AIG Ex. D ("[U]pon a demand made by the Secured Party . . . the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount . . . .").  In fact, under the standard Credit Support Annex, AIG-FP's counterparties had the right to demand that collateral be paid in cash.  *Id.* ¶ 13(b)(ii) (allowing parties to assign a valuation percentage to the types of eligible collateral, including "Cash").  In sum, there is no reason why AIG's obligation to post collateral for an underlying debt was not itself a debt.

For all these reasons, AIG-FP's decision on September 16 to dispute all CDS collateral calls plausibly shows that AIG-FP itself recognized that it was then unable to pay its debts.

**C.  The Decision by the Regulators of AIG's Insurance Subsidiaries to Bar Them from Lending to AIG Plausibly Demonstrates that AIG Was Presently Unable to Pay Its Debts**

The Amended Complaint alleges that on September 16, also in the wake of AIG's credit rating downgrade, the regulators of some of AIG's insurance subsidiaries directed the subsidiaries to discontinue lending money to their parent.  Am. Compl. ¶ 42.  These directives deprived AIG of an important source of funds with which to pay its debts, and further establish AIG's inability to pay its debts when due.

AIG argues that "the actions of third-party insurance regulators do not constitute 'corporate action' by AIG, a necessary element of the test articulated in *Drexel* and the Court's Dismissal Order."  AIG Mem. 16.  But nothing in the Swap Agreement, *Drexel*, or the Opinion states that only an official Board resolution can give rise to the conclusion that a swap party is presently unable to pay its debts.  In fact, in its reply papers on its motion to dismiss the initial Complaint, AIG itself argued that an inability to pay Event of Default could arise if a party were "legally precluded from paying due to a regulatory prohibition (such as an order from an insurance regulator to cease paying claims)."  AIG Feb. 23, 2010 Reply Mem. 16-17.  Stripped of its erroneous statements about the Court's holding and that of *Drexel*, AIG has no response to Brookfield's detailed allegation that insurance regulators recognized AIG's collapse and took steps to bar AIG from paying debts with funds lent to it by its subsidiaries.

Instead, AIG contends that the Amended Complaint merely "suggest[s] that insurance regulators proscribed just one manner in which AIG could obtain funding to pay its debts, leaving open any number of other means (including the receipt of funding from a lender such as the Federal Reserve)."  AIG Mem. 17.  AIG's argument ignores that inferences must be drawn in

- 19 -

Brookfield's favor, not AIG's, and seeks to diminish the import of the state insurance regulators' actions.  Funds from AIG's insurance business were a key source of cash flow for AIG in the months preceding the actions of its regulators in mid-September 2008.  Brookfield has ample grounds to allege that AIG, deprived of those cash flows on September 16, 2008, had no ability to pay its debts.  AIG's interpretation, by contrast, would ignore the practical effect of the regulator's prohibition, and instead base an Event of Default on whether the Federal Reserve remained a possible lender to a particular entity.  AIG Mem. 17.  This curious reading is unavailing, as every company is a potential recipient of such assistance.[10]

In sum, the Amended Complaint plausibly alleges an "unable to pay" Event of Default based on the three key circumstances pleaded by Brookfield, whether taken individually or collectively.

---

[10] The repeated representations in AIG's brief that AIG was or is in sound financial condition, *e.g.*, AIG Mem. 1 ("AIG remains a viable and going concern."); AIG Mem. 2 (AIG had "a trillion dollar[s]" of assets "at the end of 2007"), are not only wholly inappropriate in support of its Rule 12 motion but are belied AIG's own public financial statements.  Those statements concede that AIG's going concern status is dependent on continued governmental support, *see* AIG Mar. 2, 2009 10-K, at 21 ("Without additional support from the U.S. government, in the future there could exist substantial doubt about AIG's ability to continue as a going concern."), and make clear that while the company had approximately one trillion dollars in assets at the end of 2007, it also had nearly one trillion dollars in liabilities at the same time.  AIG Feb. 28 2008 10-K at 113 (total liabilities for 2007 listed as $964,604,000).

## CONCLUSION

AIG's motion to dismiss should be denied in its entirety.

Dated: March 2, 2011
        New York, New York

                              BROOKFIELD ASSET MANAGEMENT, INC.
                              BRYSONS INTERNATIONAL LTD.

                              By: _Richard Ziegler_  /LPM

                                   Richard F. Ziegler
                                   Stephen L. Ascher
                                   Luke P. McLoughlin
                                   Danielle F. Tarantolo
                                   JENNER & BLOCK LLP
                                   919 Third Avenue, 37th Floor
                                   New York, New York 10022-3908
                                   *Counsel for Plaintiffs*