14kQbroC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BROOKFIELD ASSET MANAGEMENT,
    INC.,
4
              Plaintiff,
5
              v.                          09 CV 8285 (FM)
6
    AIG FINANCIAL PRODUCTS CORP.,
7
              Defendant.
8
    ------------------------------x
9                                        New York, N.Y.
                                         April 20, 2011
10                                       10:15 a.m.

11  Before:

12                  HON. FRANK MAAS,

13                                       Magistrate Judge

14                       APPEARANCES

15  JENNER & BLOCK, LLP
         Attorneys for Plaintiff
16  BY:  RICHARD F. ZIEGLER
         STEPHEN L. ASCHER
17       LUKE P. McLOUGHLIN
         ERIC P. BROWN
18
    QUINN, EMANUEL URQUHART & SULLIVAN LLP
19       Attorneys for Defendant
    BY:  JONATHAN E. PICKHARDT
20       JAKE M. SHIELDS
         ANNE E. GREEN
21       RICO JEDRYCZYK

22

23

24

25
```

14kQbroC

1                (In open court)

2                THE DEPUTY CLERK:  Conference in the matter of

3    Brookfield Asset Management v. AIG Financial Products.

4    Counsel, state your name for the record, please.

5                MR. ASCHER:  Stephen Ascher from Jenner & Block.  I'm

6    here with my colleagues, Luke McLoughlin and Eric Brown, for

7    the plaintiff Brookfield.

8                THE COURT:  Good morning.

9                MR. ASCHER:  Good morning, your Honor.

10               MR. PICKHARDT:  Good morning, your Honor.  John

11   Pickhardt from Quinn Emanuel on behalf of AIG.  I'm joined at

12   counsel table by Jake Shields.

13               THE COURT:  We have Mr. Ziegler hiding in the back.

14               MR. ZIEGLER:  I'm only going to speak if I can't help

15   myself.

16               THE COURT:  Well, then I'll enjoy hearing from you.

17               I received the April 13 letter from Mr. Ascher and --

18   or his April 18 letter, and I'm mindful of the fact that the

19   document discovery deadline, as I understand it, is August 31,

20   is that correct?

21               MR. ASCHER:  That's right, your Honor.

22               THE COURT:  With respect to the pace of production, I

23   have two observations:  One, it does seem somewhat slow.  Two,

24   I think it's probably not helped by interim requests to

25   prioritize certain documents which it seems to me probably

14kQbroC

1    slows down, if not confuses, the process.

2            MR. ASCHER:  Your Honor, many of the prioritizations,

3    if not all of them, are because we are trying to get a sense of

4    what -- trying to get information about certain topics so we

5    can figure out how much more we need.  So we are not

6    prioritizing simply because we want to conduct some internal

7    analysis for our own purpose.  The prioritization is in order

8    to limit and give some sense to the document production.  So I

9    think it has been productive to do that.

10           Beyond that, your Honor, while I'm standing, we think

11   it's slow too, obviously, and while AIG's letter lists a

12   seemingly impressive array of documents that have been

13   produced, seven of those categories are very discrete items

14   that are routinely produced in litigation by AIG, probably

15   several times a year at least:  Organizational charts and that

16   sort of thing, accounting policies, document retention

17   policies, some universe of documents that they've already

18   produced in other litigations or to regulatory agencies.  Then

19   the remainder of the things that they've produced are, while

20   voluminous in pages, not sets of documents that would require a

21   burdensome page-by-page review either for privilege or

22   responsiveness.  These are reports or other financial

23   information that are collected in a single place.  While we

24   recognize that there is some process that they need to go

25   through to collect those documents, it's just not comparable to

14kQbroC

1   the type of information that really requires the three and a

2   half months that they've taken so far.

3          MR. PICKHARDT:  Good morning, your Honor.  Your Honor,

4   we disagree, as you might expect, with regard to whether the

5   pace of production here has been too slow.  As your Honor may

6   recall at our last conference, we were discussing a letter that

7   Jenner had prepared identifying certain categories of documents

8   that they asked us to focus on, and your Honor identified a

9   number of categories of documents on that list that seemed like

10  ones that could be gotten in relatively short order and asked

11  that we focus on those categories.

12          Notwithstanding that there was a small number of

13  categories, since our last conference we have produced

14  documents in response to all but one of the bullet points that

15  had been identified in Jenner's letter.  In addition, we have

16  produced -- you know, the volume is substantial and

17  notwithstanding, you know, what Mr. Ascher says, it does

18  reflect a significant amount of effort.  We have produced over

19  a half million pages.  We have another three million pages that

20  are all set to go.  We have it all ready to go out the door,

21  and the only thing we are waiting on is our satisfaction of

22  certain notice requirements under confidential agreements in

23  order to allow us to produce the documents.

24          THE COURT:  All of the 3 million pages hinge on that?

25          MR. PICKHARDT:  Yes, your Honor.  These include, as

14kQbroC

1    you recall, Brookfield asked about data rooms, and we have

2    gathered data rooms and the only issue with those is that we do

3    have certain confidentiality agreements with third parties

4    covering the substance of those data rooms.

5            THE COURT:  This is not European privacy issues; this

6    is contractual privacy issues?

7            MR. PICKHARDT:  That's right.  So we have produced

8    notice to the third parties and indicated that we intend to

9    produce these documents by a date certain, you know, unless

10   they come in and raise some issue which they would have to, I

11   think, present to your Honor, we are going to go ahead and

12   produce those documents on the date certain that we identified

13   to the third parties.

14           THE COURT:  What's the date certain?

15           MR. PICKHARDT:  It's within the next ten days.  We had

16   to send out, I think, eight of these different letters.

17   There's different dates depending on the particular letter, but

18   certainly within ten days to two weeks there is going to be

19   another 3 million pages.

20           So, your Honor, we certainly respect that there may be

21   honest disagreements with respect to AIG's efforts and we're

22   happy to address those, but it is difficult for us to fathom

23   that there's an honest disagreement here when Brookfield

24   identifies a list of documents, we have a conference with

25   respect to those documents.  In the wake of that, you know, we

14kQbroC

1   have either produced or will produce over 3 and a half million

2   pages of documents that cover all but one of the categories,

3   you know, that were identified.  We also --

4            THE COURT:  The category that isn't covered is what?

5            MR. PICKHARDT:  It concerns there's one bullet point

6   that concerns third-party bank credit facilities.  We are in

7   the process of gathering documents sufficient to identify

8   third-party bank credit facilities, but we just don't have

9   those documents yet.

10            We also have been working, contrary to what Mr. Ascher

11   said, to assist in providing samples of documents or reports

12   where we have indicated we think those reports would be

13   sufficient to provide them, you know, with discovery that they

14   want and provide them samples so that we can try and front any

15   disagreements as early as possible.  But I think a lot of the

16   categories of documents that they are asking us to prioritize,

17   for example, all of these documents regarding collateral calls

18   has nothing to do with whether that's going to speed up, you

19   know, the pace of discovery.  It's just them saying, this is

20   what we want first.

21            And so we do agree -- (A) we think we have been

22   undertaking this at a diligent and adequate pace, and we think

23   we should be given the leeway, given the short time period we

24   have to complete document discovery, for us to undertake these

25   efforts in the manner in which we think will be most efficient

14kQbroC

1    subject to our continued demonstration that we are making

2    progress, and we think we have made that demonstration and we

3    expect to continue to do so.

4              THE COURT:  Well, the reality is that I can't

5    micromanage the process.  Certain documents were requested on a

6    priority basis.  I guess what I'm saying is I don't want to see

7    continual requests or rolling requests to prioritize certain

8    documents because I think it probably screws up the process

9    except to the extent that it's something like a request for a

10   sample of a certain type of report to determine whether other

11   requests can be narrowed.

12             MR. ASCHER:  We appreciate that, your Honor, and we

13   are trying to keep that to a minimum.  We have one exception

14   that we will get to in a minute for separate reasons, but just

15   to put a final word on that, Mr. Pickhardt is correct that AIG

16   has produced the things that we prioritized in our last

17   conference, but you will recall those are the things that we

18   identified in the course of several meet and confers as what we

19   consider to be the easiest things for AIG to produce.  So the

20   fact that it took AIG three and a half months to get us the

21   things that are the easiest doesn't give us a lot of comfort

22   that they are going to be able to get us the harder things in

23   the remaining four and a half months.

24             THE COURT:  Well, easy or hard, August 31, as far as

25   I'm concerned, is a drop-dead date.  So regardless of how much

14kQbroC

1    effort or how many contract attorneys it may take, I expect all

2    of the requests to be responded to fully except to the extent

3    that I've indicated that they need not be by August 31.

4            With that in mind, why don't we then turn to the

5    specific issues raised in Brookfield's letter, which I guess

6    starts with the moratorium on collateral call payments.  These

7    are at request 45.

8            MR. ASCHER:  Yes, your Honor.  That is I think the one

9    exception where we have prioritized documents for a reason

10   other than because we think it will allow us to determine what

11   other documents we need.  We have prioritized that universe of

12   documents, frankly, because AIG has selectively collected and

13   provided a subset of those documents to us in an effort to

14   persuade us to withdraw a key allegation in the amended

15   complaint, which is that AIGFP instituted a collateral --

16   excuse me -- a moratorium on the payment of collateral calls on

17   a certain class of transactions, CDS on CDOs on September 16,

18   which you will recall is the type of incident that Judge

19   Gardephe stated could be evidence of an inability -- a present

20   inability to pay one's debts when due.

21           THE COURT:  Mr. Pickhardt's letter said, well, we only

22   did it a little, but for your purposes probably a little is

23   enough if it's in the critical time period.

24           MR. ASCHER:  Well, we would certainly favor that

25   reading, your Honor.  And beyond that, we don't agree it was a

1  little.  While it was on a specific category of transactions,

2  this is the category of transactions that more than any other

3  transaction type was responsible for AIG's demise, and --

4          THE COURT:  But on your theory of the case -- I mean,

5  Mr. Pickhardt's letter said, well, based on the documents that

6  we've given them -- and I'm paraphrasing -- they now realize

7  there's a moratorium only as to one transaction type, CDS on

8  CDOs, and as to only part of the day on September 16 until the

9  government committed to the bailout.

10          Assuming all of that is correct, I assume you'd say

11  Brookfield still wins, right?

12          MR. ASCHER:  Yes, your Honor, absolutely, for two

13  reasons:  First of all, as I just mentioned, the fact that it's

14  one category of transactions, the vast majority of the

15  collateral calls were on that category of transactions.  The

16  foreign exchange transactions, the repo transactions, these are

17  yielding collateral calls of a million dollars, two million

18  dollars.  On the CDS of CDOs, you have collateral calls in the

19  hundreds of millions of dollars, and frequently tens of

20  millions of dollars getting called on that day.  So we don't

21  see that as having any substance at all, your Honor.

22          The second point is that the moratorium seems not to

23  have gone beyond the afternoon of September 16, and the only

24  reason for that is, well, if it had, AIG would have gone

25  bankrupt.  The government stepped in.  They stepped in at the

14kQbroC

1    last possible moment, but if they hadn't stepped in then, they

2    would have gone bankrupt.  So it's necessarily true that the

3    moratorium didn't last beyond that day or else we'd have a very

4    different situation.

5              But one of the key points that we've alleged, and

6    which we think we'll be able to prove very easily is that this

7    agreement was designed to permit early termination because of

8    an event of default even before a bankruptcy occurs, otherwise,

9    the only event of default would be bankruptcy.

10             THE COURT:  Say that again.

11             MR. ASCHER:  The swap agreement between the parties

12   includes a provision concerning events of default, and one of

13   the events of default is bankruptcy.

14             THE COURT:  Right.

15             MR. ASCHER:  But there are a lot of other events of

16   default like insolvency and winding up, acts in furtherance of

17   bankruptcy, and so it's obvious that something short of

18   bankruptcy must be able to trigger an event of default or else

19   the only event of default listed in the agreement would be

20   bankruptcy itself.

21             So that's why we think this allegation will prove to

22   be a very powerful one, your Honor, and we think we're entitled

23   to full discovery on it.

24             Somewhat surprisingly to us, AIG took it upon

25   themselves to send us a letter saying you're wrong, there was

14kQbroC

no moratorium.  And what they did was they collected a set of

65 emails that purported to show that AIGFP agreed to certain

collateral calls over the course of September 16, and that the

ordinary collateral call posting process was ongoing on that

day.

         Well, in fact, if you take those 65 emails and put

them in chronological order from the beginning of September 16

to the end of September 16, you see just the opposite.  The

only collateral calls that AIG agreed to pay before the 4:00

bailout from the government are collateral calls on repo

transactions and an interest rate swap and one single CDS of

CDO where the collateral call had actually received the

previous day and a failure to pay it that day would have been

clearly a failure to pay and not just evidence of an inability

to pay.  All of the other collateral calls on CDS of CDOs got

deferred until after -- until the very end of the day, and by

that time we know from public sources, and we think from

documents, the government had said to AIG, OK, we're giving you

$85 billion.

         So that's a very important allegation.  AIG has given

us this misleading, we think, subset of documents, and all we

have asked for, your Honor, is as long as we are, frankly,

under threat of Rule 11 in their letters, explicit invocation

of Rule 11 being put to test our allegations, we want

sufficient information in order to understand what really

14kQbroC

1    happened with respect to the collateral calls on

2    September 15th, 16th and 17th.  And we've asked for complete

3    information concerning what collateral calls were received,

4    what were made, what were disputed, what happened with the key

5    email.  It's an email from someone named Tom Athan at AIGFP who

6    says, let's hold all the collateral calls till the end of the

7    day.  Let's dispute them.  We're just disputing everything.  We

8    haven't made a determination whether we can dispute it, but

9    that's the position we're going to take.  And we want complete

10   information about what happened during that period because we

11   think it's crucial to allow us to evaluate their claim that we

12   are in violation of Rule 11.  So that is the one category of

13   information that we are prioritizing.

14           Now, for the first time in AIG's letter on Monday,

15   they appear to back away from the objection that they made in

16   their response to our document request.  You will recall

17   originally AIG said, well, if it wasn't a board ordered

18   moratorium, it doesn't count because it's not a quote

19   "corporate action."  And that we think is contrary to Judge

20   Gardephe's holdings.  We think they are essentially helping

21   themselves to a stay of discovery.

22           As we read Monday's letter from Quinn Emanuel, we

23   believe that they are essentially abandoning that as an

24   objection to the document request.  We see no defense of that

25   in their letter.  I'd like to clarify that on the record today.

14kQbroC

1          And then beyond that, AIG does say that they will

2     produce some documents from this one email address,

3     AIGFPcollateral@AIGFP.com, something like that, which

4     apparently was used to receive collateral calls and to

5     communicate AIG's decision whether to dispute or pay in part or

6     pay in whole the collateral call.

7          And that's a nice start, your Honor, but there's still

8     a lot of ambiguity about what exactly AIG is going to produce

9     and whether it will be complete information.  The ambiguities

10    are, first of all, what exactly will be produced from that

11    email address.  There is a suggestion in meet and confers that

12    we've had with Quinn Emanuel that they will only produce emails

13    that represent a formal instruction or agreement to pay or

14    dispute the collateral calls.

15          Now, we think there is no -- I'm not quite sure I know

16    what that means, but we think we're entitled to everything out

17    of that email address, and, frankly, we think it will be less

18    burdensome for them just to give us everything from that email

19    address.  It's all extremely likely to be responsive, and it's

20    extremely unlikely to be privileged.

21          THE COURT:  You're seeking this for what period of

22    time for that day?  For --

23          MR. ASCHER:  We've asked for September 15th, 16th and

24    17th in the course of back and forth with Quinn Emanuel,

25    although, frankly, it would be helpful to have the full

14kQbroC

```
 1    eight-day period, September 10 to 17, which was an eight-day
 2    period that we had used previously.
 3              So that's one issue.  AIG is claiming burden, but it
 4    seems to me it's something that's probably very easily
 5    collected given that it's in a single email box.
 6              The next ambiguity, your Honor, we don't have a clear
 7    commitment from AIG to search any other custodians for this
 8    information.  We recognize that we've gotten other information
 9    on this question because some relevant custodians were included
10    in our original list of 19.  That was a list of course that
11    came from us, not from AIG.  We'll get more information from
12    the 18 additional custodians that we've identified, but -- and
13    this will be a recurring theme today, your Honor.  We think AIG
14    has an obligation to tell us if there are any other custodians
15    that they think they have an obligation to search.
16              AIGFP apparently had a group of people who, as part or
17    perhaps all of their job, were dealing with collateral calls
18    and responding to them, calculating what they needed to pay and
19    ordering payments.  And so there may be a group of people whose
20    emails needs to be searched in addition to this collateral call
21    email address itself.
22              AIG also hasn't committed to search for documents
23    specifically concerning that key Athan email that I mentioned.
24              THE COURT:  What's the name of that individual?
25              MR. ASCHER:  Tom -- I'm not sure if it's Athan or
```

14kQbroC

1  Athan.   A-T-H-A-N.

2              THE COURT:  A-T-H-A-N?

3          MR. ASCHER:  A-N.  He was a managing director at AIGFP

4  who was responsible for credit trading and seems to have been

5  not normally involved in the collateral call process, but I

6  think it's evidence of what an extraordinary act it was to

7  decide to dispute all the collateral calls; that that came from

8  him on September 16.

9          Then the final issue, your Honor, which is what we

10  started this conversation about, is whether this will be

11  produced in the ordinary course at some point between now and

12  August 31, or, given the selective production and the Rule 11

13  invocation by AIG, whether this information will be prioritized

14  and produced shortly.

15          MR. PICKHARDT:  Your Honor, Brookfield's position on

16  this has shifted significantly.  When they filed their amended

17  complaint, they included allegations in their complaint that

18  there had been a blanket instruction at AIGFP to dispute all

19  collateral calls.  They also described it as an

20  across-the-board moratorium on the payment of collateral calls.

21  When FP saw that and saw the scanty document that they were

22  relying upon, which was a single email from Mr. Athan, they

23  said that never happened, and we know it never happened because

24  AIG was agreeing to the payment of collateral calls across the

25  day.

1          And the documents that we have provided to Brookfield

2     demonstrate that in advance of this afternoon email from

3     Mr. Athan when there was purportedly this across-the-board

4     moratorium and this blanket instruction in place, AIGFP had

5     already agreed to post over $400 million in collateral to

6     counterparties.  Within one hour of Mr. Athan sending the

7     email, AIG had agreed to post another $300 million.

8          Now, what Brookfield now comes in and says, it says,

9     well, wait a minute, that's because, you know, our allegations

10    relate only to a particular subset of transactions:  CDS on

11    CDOs.  And we're only talking about part of the day; we're not

12    talking about the whole day.

13         And they certainly can say that now.  It's not what

14    their amended complaint says.  It's not what the briefing says

15    on the motion to dismiss.  They talk about blanket instructions

16    and across-the-board moratoriums.  And the documents that they

17    already --

18         THE COURT:  And you've given them documents which

19    suggest that's not the case, and what they're trying to

20    determine is whether they have a selective sample or whether

21    you're correct.

22         MR. PICKHARDT:  Well, your Honor, all we are saying is

23    that if they are going to claim that there was an

24    across-the-board moratorium or a blanket instruction, and we

25    say, look, here are documents that demonstrate there was

14kQbroC

agreement to pay collateral calls both before this email, there

was agreement to post collateral both after this.  There are no

other documents that are going to put in context, you know,

those emails to suggest that in fact this actually had been in

place and there was either an across-the-board moratorium or a

blanket instruction.

             MR. ASCHER:  Your Honor, I hate to interrupt, but

since Mr. Pickhardt is repeatedly misquoting the amended

complaint, it may be helpful to your Honor if I were to hand up

the relevant paragraph of the complaint, which says explicitly

that the moratorium related to credit default swaps on tranches

of collateralized debt obligations.  It says that right in

paragraph 44.

             And then there is a second reference to the moratorium

allegation in paragraph 68 of the amended complaint, and I'll

concede that paragraph 68 doesn't explicitly reiterate that the

moratorium applied only to credit default swaps on tranches of

collateralized debt obligations, but it does explicitly refer

the reader to paragraph 48.  So Mr. Pickhardt is really

misstating facts here in this argument, your Honor.

             MR. PICKHARDT:  Your Honor, both paragraphs 44 and 68

of the complaint refer to an across-the-board moratorium, and

when they talk about disputes, they talk about disputes on

collateral calls.

             THE COURT:  Hand up the amended complaint, please.

14kQbroC

1          (Pause)

2          THE COURT:  It seems to me paragraph 68 is probably

3     broader than what the facts may show, but paragraph 44 it

4     sounds like is consistent with what the documents you gave them

5     show.

6          MR. PICKHARDT:  We don't think so, your Honor.  The

7     last sentence of paragraph 44 is indicating what that email

8     represented which, according to Brookfield, was a blanket

9     instruction to dispute all collateral calls.

10          THE COURT:  OK.

11          MR. PICKHARDT:  If that's the inference that they are

12     contending can reasonably be drawn from that email, we have

13     produced documents to show whether you look both before that

14     email or after that email, in the immediate wake of that email

15     there were very significant collateral calls being agreed to by

16     AIG.

17          THE COURT:  But if they delete the blanket, that

18     eliminates your objection but still is consistent with their

19     theory of that particular default.

20          MR. PICKHARDT:  Well, your Honor, we don't think

21     ultimately it will be consistent.  If AIG was in a position

22     where if they agreed to collateral calls -- or that they were

23     in a position where they could not agree to collateral calls,

24     and that's why they were instituting this moratorium, then why

25     would it conceivably make sense that FP would say, well, we're

14kQbroC

```
1   going to agree to hundreds of millions of dollars of collateral
2   calls with respect to this category, but we're going to, you
3   know, put off collateral calls on this other category because
4   they can't pay.  So --
5        THE COURT:  Because if I'm running, you know, a
6   mom-and-pop store, and I have 30 creditors screaming at me
7   because I'm not paying, it might make sense for me to take my
8   limited resources and pay the 29 smaller creditors and stiff
9   the big one, so I only have one angry person rather than
10  distributing the money allocably or paying the big creditor and
11  having the remainder of the people calling me constantly.
12       I'm not saying that that's what occurred, but that is
13  certainly a plausible interpretation of what the motivation
14  might have been, and it seems to me that as to this particular
15  issue, it should be a fairly narrow universe of documents.
16       So I am inclined to agree with Mr. Ascher that,
17  particularly since AIG seems through its Rule 11 letter to
18  attach great importance to this issue, that it ought to be
19  prioritized so that Brookfield can make a determination as to
20  whether it needs to further amend its complaint.
21       MR. PICKHARDT:  Well, your Honor, two points there.
22  With respect to whether AIG is intending to produce these
23  documents, I don't think there is any disagreement.  We have
24  already told Brookfield we are in the process of gathering the
25  contents of this collateral call email box.  We do believe that
```

14kQbroC

1   that is where any communications with respect to collateral

2   calls would be contained.  We are intending to produce out of

3   that email box any communications that they had with third

4   parties regarding collateral calls so they'll be able to see

5   whether there's disputes with third parties concerning

6   collateral calls --

7          THE COURT:  Are you representing that if honchos like

8   Athan got in the loop, that the collateral call email address

9   necessarily would have those documents?

10          MR. PICKHARDT:  We believe that to be the case.  If

11   there was some sort of a moratorium put on the payment of

12   collaterals, it would have to be communicated to the collateral

13   call team and it would be done through that email box.

14          THE COURT:  That would be the instruction to implement

15   it.  They're also interested in whether there were memos that

16   reflect the decision-making process leading to a decision to

17   implement it.

18          MR. PICKHARDT:  Which in fact, your Honor, is one of

19   the reasons why we believe this is all attempt that is being

20   conjured by Brookfield because we have already produced a very

21   large volume of documents from senior executives at AIG

22   financial products from the critical time period including the

23   senior people.  That's why they have seen the email that they

24   have seen.  If there had been some sort of broad crisis and

25   concern that, you know, agreeing to collateral calls was going

14kQbroC

1   to somehow put the company out of business, they would have

2   gotten those high-level documents already.

3           THE COURT:  So Athan's emails have been searched for

4   relevant documents.  Is he one of the key custodians?

5           MR. PICKHARDT:  He is among the custodians who are

6   going to be in the second group that we are searching, so his

7   emails will be searched.

8           I'll also note that Mr. Athan's email that they are

9   making such a big deal about also was in the collateral call

10  box.  So that also would be -- that specific email would be

11  picked up through a search of that box.

12          And we are intending to produce -- notwithstanding

13  that we think this has zero legal significance because this is

14  not a corporate moratorium if you have two lower level

15  employees who are saying, you know, let's enforce our legal

16  rights to dispute collateral calls for a period of time.  So

17  setting that aside, we are agreeing to produce documents that

18  we come across in that email box that would constitute some

19  sort of an instruction to either not pay or to dispute, and,

20  again, there have been, you know, a bunch of senior executives

21  from AIG Financial Products whose documents have already been

22  searched, and if something had been in those boxes, they would

23  have been produced as responsive.

24          THE COURT:  When are the documents for the second

25  tranche of 18 custodians going to be produced?

14kQbroC

1          MR. SHIELDS:  Your Honor, we started reviewing those

2     document based on the search terms that we had used for the

3     first 19 custodians, which has yielded quite a large number of

4     documents, around half a million or so.  Brookfield has, in our

5     last meet and confer about a week and a half ago, suggested

6     that they will -- let me first suggest that we're going to

7     start with those search terms but we are going to continue to

8     think about narrowing given the very large number of documents

9     that have been yielded from what we think are very large search

10    teams.

11         Brookfield has indicated they will provide us with

12    additional search terms in a joint effort to narrow that.  So

13    until we get that proposal from them and discuss it, it's hard

14    to tell exactly when we will get through these documents

15    because we don't know how many we're going to be reviewing.

16    But, needless to say, half a million documents to start is

17    quite a large number of documents, and I'm sure it will expand

18    as we add custodians and as we review other types of documents

19    that we've agreed to produce.

20         MR. ASCHER:  Your Honor, one approach then would be to

21    prioritize Mr. Athan's emails as well as the collateral call

22    email address and essentially separate those two custodians

23    from the other 17 custodians in the second phase of custodians

24    that Brookfield is suggesting.

25         MR. PICKHARDT:  Your Honor, we are in the process of

14kQbroC

 1    gathering the collateral call email box.  We do not have it in

 2    our possession yet.  We also don't understand the need for a

 3    priority in this instance by Brookfield's own position that

 4    purportedly the documents that we had given them don't support

 5    our case; undercut our case.

 6            THE COURT:  You sent them a Rule 11 letter.  They want

 7    to see whether you're right.

 8            MR. PICKHARDT:  Your Honor, they are not suggesting

 9    that the documents that we have produced don't reflect what

10    they purport to reflect, which is agreements to post

11    collateral.  They have not given any explanation as to another

12    document that they could imagine that would somehow suggest

13    that AIG had not in fact agreed to the collateral calls that

14    are reflected in those emails.  That's the only narrow fact

15    that we are saying is that there was agreements to post

16    collateral across the entire span of the 16th.  We don't think

17    that there is any other contextualizing that would somehow say

18    that that was not the case; and if it is the case, they can't

19    stand on these allegations.  That's the narrow point here.

20            THE COURT:  I am going to reach a somewhat Solomonic

21    solution here which is to direct that the Athan emails to or

22    from or on which he's copied be prioritized.  If he gave that

23    instruction, presumably there was some discussion that led to

24    it, and if it's reflected in email traffic, that will show up

25    when his emails are searched.

14kQbroC

1           MR. PICKHARDT:  Your Honor, we are happy to do that.

2    As Mr. Shields indicated, one of the things that we have been

3    waiting on, frankly, for six, eight months are search terms

4    that are agreed to by Brookfield.  So if they can let us know

5    what search terms they would like for us to use with respect to

6    Mr. Athan's email box, which is the only reason those emails

7    haven't been searched already and they aren't queued up for

8    review, we'll be happy to do that on a priority basis.

9           MR. ASCHER:  Your Honor, I'm not sure they need new

10   search terms on that, but we can certainly very quickly look

11   back at our search terms and give that to them immediately, but

12   just to try to put the baby back together again, your Honor --

13          THE COURT:  Wait.  Hang on.  Within one week either

14   give them narrowed search terms or confirm that you want them

15   to run the search terms you previously gave them.

16          MR. ASCHER:  Right.  Thank you, your Honor.

17          Just to be clear, your Honor, since the original

18   document was found in the collateral call email address and so

19   much of the information that AIG has sent us has come from the

20   collateral call email address, and it is one email address,

21   it's hard for me to believe that it's got either non-responsive

22   information in it or any significant privileged information in

23   it given that it's just being sent out to multiple recipients.

24   We do think that it is very unburdensome and would also be very

25   helpful to also get the contents of that email box.

```
1          THE COURT:  I thought I heard Mr. Pickhardt say that
2     he doesn't yet have the collateral call email box.
3          MR. PICKHARDT:  That's correct, your Honor.  We are in
4     the process of collecting it, you know, for the entire time
5     period.  One of the things we've indicated to Brookfield is
6     that we do expect that box to be extremely voluminous.  We do
7     think it is going to contain both non-responsive and privileged
8     material.  We are thinking that we will be able to produce
9     documents out of that email box efficiently by identifying
10    communications that were shared with third parties over which
11    there would be no claim of privilege, and therefore we can
12    produce documents out of that box most efficiently in that
13    process, as well as, you know, identifying any documents that
14    would, you know, support this theory of a purported, you know
15    moratorium.
16         So that is our intent, you know, to do, you know,
17    subject to us getting a better sense as to what the volume is,
18    and if there are burden concerns, we will raise them, but at
19    this point we are not in a position to do that.
20         THE COURT:  I am going to adhere to my ruling.
21         MR. ASCHER:  OK.  Your Honor, I don't want to belabor
22    it --
23         THE COURT:  But you will.
24         MR. ASCHER:  -- but I will a little bit.  I will try
25    to split the baby of my belaboring.  They must have collected
```

14kQbroC

```
 1   some portion of the collateral call email box because they've

 2   already selectively produced 65 emails from it to us.  So I am

 3   not quite sure how it could be that they don't yet have that

 4   email address.

 5           Second of all, it is still a bit ambiguous, I think,

 6   whether they are going to be producing all responsive emails

 7   out of both Mr. Athan's emails and the collateral call email

 8   box or whether they are somehow limiting it to formal

 9   instructions to dispute or delayed payment or impose a

10   moratorium on payment.  I thought I heard Mr. Pickhardt say he

11   wasn't abiding by that limitation, but I just wanted to make

12   that clear on the record, your Honor.

13           THE COURT:  Let's take the second of those first.

14           MR. PICKHARDT:  Yes, your Honor.  I thought I already

15   had been clear on this point.  We do disagree and reserve our

16   rights as to whether any of this has any legal significance

17   because we do think it has to be corporate action to have any

18   relevance under the standard set forth by Judge Gardephe.

19   However, we are intending to produce documents that would

20   reflect any instruction, directive from an employee at whatever

21   level to institute, you know, a policy or a plan to either

22   dispute or not post collateral.

23           THE COURT:  Well, how about discussion about whether

24   or not that's a good idea?

25           MR. PICKHARDT:  Yes, your Honor, we will -- anything,
```

14kQbroC

1    you know, related to, you know, a --

2              THE COURT:  You're carving something out, and I'm not

3    sure what the piece that you're carving out is.

4              MR. PICKHARDT:  The only thing I'm carving out, your

5    Honor, is that there may be internal discussions that may or

6    may not involve lawyers with respect to particular, you know,

7    collateral call payments.  We are not intending to produce

8    that.  However, you know, to the extent that there are

9    discussions --

10              THE COURT:  Well, just let me stop you there.  If they

11    are not privileged and they're responsive, they have to be

12    produced.  If they are privileged, they have to be logged.

13              MR. PICKHARDT:  Your Honor, we have objected to just

14    internal correspondence at AIG related to the day-to-day

15    routine posting of collateral as not being relevant.

16              THE COURT:  We're talking about the three-day period,

17    right?

18              MR. PICKHARDT:  No, your Honor.  These are requests

19    that cover the entire time period from August of 2008 to March

20    of 2009.  There is an immense --

21              MR. McLOUGHLIN:  We are carving out these three days.

22              THE COURT:  As to that, I think your burdensomeness

23    argument is valid.

24              MR. ASCHER:  We want everything for September 15, 16

25    and 17 your Honor, absolutely.  And for that I don't think it

14kQbroC

1  could be burdensome, and it is absolutely relevant to

2  reconstructing what was occurring at AIGFP.  Mr. Pickhardt has

3  minimized it by saying as if there was some sort of crisis.

4  There was a crisis, your Honor.

5          THE COURT:  Yes, I think for that three-day period

6  production should be inclusive.

7          MR. PICKHARDT:  OK, your Honor.  So if I understand

8  what we are adhering to here is that for that three-day time

9  period out of that email box, we would agree to produce

10  discussions with respect to either disputes on collateral calls

11  or whether to pay collateral calls, we certainly will produce

12  any --

13          THE COURT:  It's not just out of the email box.  If,

14  for example, Athan has emails that aren't in the collateral

15  call email box, those have to be produced, and if there were

16  emails from key decision makers which are not in that box,

17  similarly those have to be produced, not just as to formal

18  instructions or decisions but any discussion of whether or not

19  to honor collateral calls.

20          MR. PICKHARDT:  OK, your Honor, we understand.  We

21  have -- you know, to the extent we have already come across

22  documents of that nature in the senior executives' email boxes

23  that we've already reviewed, those have been produced, we will

24  do so for Mr. Athan as well, as well as for that three-day

25  period from the collateral call box.

14kQbroC

1        THE COURT:  OK.

2        MR. ASCHER:  I think we're comfortable, your Honor.

3        THE COURT:  OK.

4        MR. ASCHER:  I'd be more comfortable if they were

5   going to review all of Mr. Athan's emails for those three days,

6   which can't possibly be burdensome.  We're talking about one

7   custodian who probably gets a few hundred emails a day.

8        THE COURT:  I think I directed that, but precisely how

9   they go about it, as I said, I'm not going to micromanage, but

10   as a practical matter I think that may be what they have to do.

11        MR. ASCHER:  Thank you, your Honor.

12        THE COURT:  Let's move on to request 46.

13        MR. McLOUGHLIN:  Yes, Judge.  Good morning.

14        Request 46 is directed at documents concerning AIG's

15   failure to pay its obligations.  The reason that we have that

16   request is because it goes to one of our core allegations in

17   the case:  That AIG was unable to pay its debts and the

18   evidence of that is that or some of the evidence of that is

19   that on the 16th and at other days immediately prior to the

20   first bailout, AIG did in fact make -- did have missed

21   payments.  It failed to pay certain counterparties.

22   Brookfield's allegations on that score are based in part of

23   AIG's own documents, documents that say things like "these

24   events are causing us to fail on many transactions" or another

25   document that says "a counterparty isn't paying us because

14kQbroC

1    we're failing to pay them on coupon payments." It's those

2    facts that we believe are probative and will help us prove our

3    claim that AIG triggered an event of default for being unable

4    to pay event of default.

5            So we gave a request to that effect, and the results

6    after three and a half months than and four meet and confers is

7    that AIG has informed us that they will seek out a person --

8    they have not interviewed him yet -- and they will talk to him

9    when his business commitments and schedule permits.

10           Judge, this is a type of information that --

11           THE COURT: Hang on just a second. I underlined that

12   last line of Mr. Pickhardt's letter, and I put next to it in

13   the margin an X. I don't care who this individual is, he needs

14   to get together with you folks soon.

15           MR. PICKHARDT: Yes, your Honor. We have committed

16   that we will have a proposal to Brookfield on this topic within

17   a couple weeks. So we are not intending to, you know, try to

18   string this out. As your Honor knows, we have been focused on

19   a lot of categories of documents that we have been asked to

20   prioritize to get to them. This has not been the subject of

21   recent meet and confers. I was a little surprised to see it in

22   the letter because we would have been happy to provide it. To

23   the extent --

24           THE COURT: But the long lead item I gather is

25   interviewing this person, and that needs to be accomplished

14kQbroC

1    quickly.

2            MR. PICKHARDT:  Yes, your Honor.  Again, we do expect

3    to be able to do that.  Our hope is that we're going to be able

4    to do that within a week.  And, again, we've indicated to

5    Brookfield that within a couple weeks we expect to have a

6    proposal to them on this.  This is a complicated request

7    because they are asking for all documents related to any

8    failure to pay and, frankly --

9            THE COURT:  And I've indicated to the extent that the

10   stationery store didn't get paid, I don't view that as

11   something -- I mean, it is responsive, but I don't view that as

12   what this effort should be about.  And things like that need to

13   be carved out in some sort of way so as to reduce the burden.

14           MR. PICKHARDT:  Yes, and we have spoken to -- I

15   apologize, your Honor.

16           THE COURT:  That's OK.  I am going to direct that

17   whatever individual you've referred to in the last sentence of

18   that letter be interviewed in the next ten days.

19           MR. PICKHARDT:  Understood, your Honor.  I also don't

20   mean by singling out one individual that this is the first

21   effort we have undertaken with respect to this particular

22   request.  We have interviewed, you know, a number of people at

23   AIG and have kind of triangulated to this being the person that

24   we need to talk to.  So we have had ongoing efforts, and we

25   expect that those efforts will result in a proposal shortly and

14kQbroC

1   we certainly understand your Honor's order and will meet with

2   him within the next ten days.

3          THE COURT:  OK.  Does that bring us to request 51?

4          MR. McLOUGHLIN:  That does bring us to request 51,

5   your Honor.  Request 51, as you saw, relates to the decision to

6   unwind AIGFP.  That decision was a momentous decision for a

7   company like AIG.  It is a major subsidiary with thousands of

8   employees with numerous portfolios, and it is not an

9   exaggeration to say that that subsidiary was at the heart of

10  AIG's demise and, frankly, at the heart of the broader

11  financial crises that led to the multiple bailouts.

12         Our allegation is that regardless of the label put on

13  it, that that unwinding of FP triggered an event of default.

14  To that end, we propounded a document request, and we've gotten

15  strangely little about the decision, and we've gotten sort of

16  curious proposals from AIG about what they plan to search for

17  the decision because the people they plan to search either

18  don't have documents -- we've already received the board

19  materials.  That's the first universe.  They don't discuss in

20  any depth the winding up of FP or turning off or shutting down

21  of FP.

22         The second universe they've proposed is the steering

23  committee to manage the wind up of FP.  Those people are

24  involved in the progress of winding up AIGFP.  To our

25  knowledge, those people are not involved in the decision to

14kQbroC

1    wind up AIGFP.

2         So we have a kind of a carve-out here that is drawing

3    our attention that is curious in light of our very specific

4    request for information about the decision to turn off or shut

5    down AIGFP.  It may be there are privileged documents.  We

6    haven't been told this, but it may be --

7         THE COURT:  I was going to say, it may be that they

8    take the position that all of the treasure trove you're seeking

9    is privileged.

10        MR. McLOUGHLIN:  They haven't taken that position

11   formally -- in anything written they've put towards us, your

12   Honor.  So we are kind of at a loss to know what is out there,

13   and when they're proposing people and saying, well, we're going

14   to continue to work on it, we are going to ask the steering

15   committee or we are going to search the steering committee --

16        THE COURT:  Mr. Pickhardt's letter says they are not

17   aware of any additional custodians who might have responsive

18   documents, so they don't know what else they ought to do.  If

19   there is no privilege log yet as to this, you may have to await

20   the privilege log, but why don't you tell me what that --

21        MR. McLOUGHLIN:  Sorry.

22        MR. SHIELDS:  Finish your thought.

23        THE COURT:  Somebody.  Anybody.

24        MR. McLOUGHLIN:  Well, Judge, they may say that there

25   are no responsive documents, but it's not clear that there may

14kQbroC

1  be responsive privileged documents that would lead us in the

2  direction where we could speak to, for example, Doug Poling,

3  former general counsel, Bill Shirley, current general counsel.

4  Those individuals, given, again, the enormity of this decision

5  -- again, this is not turning up a small subsidiary.

6       THE COURT:  I understand that.

7       MR. McLOUGHLIN:  So it is the shear absence of

8  documents about the decision to shut it down that has drawn our

9  attention and which we need to know more about.

10       MR. SHIELDS:  Your Honor, to the best of our

11  knowledge, the decision to wind down FP was made by the board

12  of directors of AIG.  We have produced the board minutes, the

13  board packages from the relevant time period, we produced

14  to/from searches from the email addresses of the board members,

15  we've also produced every document we've seen from the 19

16  custodians relating to wind down.

17       THE COURT:  Do I remember correctly that the board

18  members did not have AIG --

19       MR. SHIELDS:  Correct.

20       THE COURT:  -- email addresses unless they happened to

21  be at AIG?

22       MR. SHIELDS:  Correct, your Honor.  But they

23  communicated with -- to the extent they were communicating with

24  AIG regarding board issues, they were doing so copying the

25  corporate secretary.  So what we've done is done a to/from

14kQbroC

1    search from the corporate secretary's files in order to find

2    communications involving the board members of official board

3    business.  So, to produce all of those documents, we intend to

4    for the second set of 18 custodians produce anything we see

5    regarding wind down.  We are going to do so as well from the

6    files of the AIGFP steering committee which was in charge of

7    the wind down as well as any other members of that committee

8    who were not a part of the original set of custodians which

9    we've agreed to.

10          We really are at a loss as to what else they expect us

11   to do.  We have not been told of any other place where we

12   should be looking for that.

13          THE COURT:  What is the status of a privilege log as

14   to that portion of Brookfield's request?

15          MR. SHIELDS:  We've done the privilege log for the

16   board materials already and given it to them with respect to --

17   have we done -- we're still in the process for the 19

18   custodians.  We previously agreed to a date in July to finish

19   that up on a rolling basis, and we will do so.

20          MR. McLOUGHLIN:  Well, Judge, Bill Shirley, who is the

21   current general counsel, is not listed on any list of

22   custodians to date.  It would be helpful to know if we should

23   expect the majority of responsive documents are in his custody

24   and going to be logged as privileged before July.

25          MR. SHIELDS:  Your Honor Bill Shirley is a lawyer at

14kQbroC

1   FP.  Again, our understanding is that the decision to wind down

2   AIGFP, which, again, makes sense, was made by the AIG board,

3   not a lawyer at AIGFP.

4           THE COURT:  Well, but they're seeking any documents

5   that relate to the decision.  So I don't think they are

6   suggesting that some lawyer at a subsidiary implemented the

7   decision.

8           MR. SHIELDS:  Well, your Honor, to the extent --

9           THE COURT:  But if I hear counsel correctly, they're

10  saying they don't have any documents that show a series of

11  discussions leading to the decision, which they find odd and I

12  guess I find odd also.

13          MR. SHIELDS:  Well, your Honor, it's possible, and I

14  wasn't there, that these discussions may have been oral, you

15  know, particularly given the timing of the decision which was

16  in September of 2008 period.  Again, I don't know.  All I know

17  is that we have looked in the exact places where one would

18  expect to have discussions regarding these issues, particularly

19  the board minutes and board packages as well as the emails of

20  the board members as well as the emails of the most senior

21  members of AIG where this decision would have been made, not at

22  FP.  And the documents are what they are.

23          MR. McLOUGHLIN:  Judge, if I could just be heard on

24  that briefly.  Two quick points:  First, respectfully,

25  Mr. Shields should know or Mr. Pickhardt should know by now

14kQbroC

1    what happened, how was the decision made.  If it's not

2    reflected in any of these documents, perhaps, you know, the

3    notion is, Judge, perhaps it was oral, perhaps it was conducted

4    in a hurry.  That should be pinned down by now that we are over

5    a year into this case in that AIGFP is a defendant, wind-up has

6    survived the motion to dismiss, wind-up, whatever name they

7    want to call it, has survived the motion to dismiss, we really

8    should be working on a better submission to the Court on what

9    is going on there, and I would add that, they referred to --

10        THE COURT:  But if at the end of document production

11   there are no documents, I assume that there will be a 30(b)(6)

12   deposition saying who made the decision and how and what was

13   the process leading to it.

14        MR. McLOUGHLIN:  Judge, it may come to pass that a

15   30(b)(6) is the only way to get this; however, we would point

16   out that Brookfield has been the party that has continually

17   proposed custodians so for AIG to say, here, these are the

18   folks that --

19        THE COURT:  I don't hear counsel saying simply they

20   gave us a list of names, we looked at those names, and we came

21   up empty handed.  I thought I heard you say that you've looked

22   in every place you believe would be a logical place and haven't

23   been able to find further documents.

24        MR. SHIELDS:  We haven't been -- in our investigation,

25   we have not been directed to any other place to look for these

14kQbroC

1    documents.  We continue to ask questions.

2           THE COURT:  When you say "directed," I'm not sure

3    we've looked in all the places Brookfield asked us to look or

4    whether you're saying we've looked in all the places that we

5    think are logical.

6           MR. SHIELDS:  It's the latter, your Honor.  Again, we

7    continue to have discussions with our clients regarding any

8    other place we have not thought about where we should be

9    looking for this and any other type of relevant documents.

10          THE COURT:  It may be that AIG gathered in a huddle

11   and said we're not going to exchange any correspondence about

12   this.  It seems odd, but that may in fact be what occurred

13   here, so...

14          MR. McLOUGHLIN:  We would like to know where they --

15   who's been doing the directing there.  Has Doug Poling or Bill

16   Shirley be the ones giving these suggestions where to look?

17          THE COURT:  We are putting the cart before the horse.

18   The horse is document production, and then there will be a

19   period for depositions and other forms of discovery.  The only

20   thing I'm concerned about today is documents, and if there are

21   no documents, that pretty much is the end of the discussion.

22   Or if they're privileged and will be on this log.

23          MR. McLOUGHLIN:  I hear you, your Honor.  I guess to

24   maybe put a sharper point on it, we haven't been given an

25   explanation of why a committee charged with the winding up of

14kQbroC

1   AIGFP financial products would know anything about the decision

2   to wind up the subsidiary itself.  Why were the people tasked

3   with that.  So, again, we are kind of looking through a glass

4   darkly here and trying to discern what are the decisions, what

5   is the thinking behind the people that are being proposed

6   because the people that are being proposed to date simply don't

7   add up.

8          MR. SHIELDS:  But, your Honor, the board, AIG board,

9   is the entity that made this decision.  There are references to

10  the wind down in the board minutes that we've provided them.

11  There is a place where they should be looking.  That is the

12  place we've been looking.  Also, in addition to the --

13         THE COURT:  Who made the presentation to the board

14  suggesting this proposal?

15         MR. SHIELDS:  I don't know, your Honor.  All I know is

16  that the decision itself was made by the board.

17         THE COURT:  Isn't there an agenda that reflects who

18  was going to present this fairly significant proposal?

19         MR. SHIELDS:  We've given them all the agendas that we

20  have for the board for that period of time.

21         MR. McLOUGHLIN:  Judge, the answer is no.

22         THE COURT:  Well, it sounds like it will be a topic

23  that you will want to have in a 30(b)(6) deposition fairly

24  early on when you get to the deposition stage, but at this

25  stage I'm just worried about documents.

14kQbroC

1          MR. McLOUGHLIN:  We understand, your Honor.

2          I guess one aspect that we would like to put on the

3    table taking up your point about the privilege log is to put a

4    clear date on the calendar of when we can expect to get

5    privileged materials regarding this point.  So we are not on

6    the last day of discovery -- that's when we start drafting the

7    30(b)(6) notice.

8          MR. SHIELDS:  Your Honor, they already have the

9    privilege log for the board materials.  And for the remainder

10   of the privilege log of the 19 custodians, it's impossible for

11   us to target just those discussions that may involve a

12   discussion of wind down and prioritize that.  What we've been

13   doing, and which makes the most logical sense, is going date by

14   date and log entry by log entry and producing them in a

15   coherent order.

16         THE COURT:  As I said, I'm not going to micromanage

17   the process and this is one of those aspects that I'm not going

18   to micromanage.

19         MR. McLOUGHLIN:  I understand your position, Judge.

20   Thank you.

21         THE COURT:  Request 43.

22         MR. BROWN:  Yes, your Honor.

23         As you know, request 43 seeks documents concerning

24   governmental assistance to AIG.  This is obviously a big part

25   of the story of this case.  It's relevant not just to the

14kQbroC

1    trusteeship event of default but also to the balance sheet,

2    solvency and inability to pay debts in the event of default.

3              Request 43 is targeted at these latter two issues.  In

4    the course of negotiating the bailout in terms of the bailouts,

5    individuals at AIG and at the federal government had to assess

6    AIG's financial condition, had to make a determination of AIG's

7    cash needs and decide what they were going to do.  In doing

8    this they performed an analysis very similar to the solvency

9    analysis and the liquidity analyses that we are going to

10   performed with regard to AIG.  So request 43 is targeted to get

11   materials that are going to help us perform these analyses.

12             In response to this request, AIG has agreed to produce

13   three categories of documents which are plainly inadequate to

14   satisfy our needs.  First, they've agreed to produce agreements

15   and amendments to those agreements between AIG and the federal

16   government.  These are obviously important documents, but to

17   our understanding these are all public documents.  So AIG

18   hasn't really given us a lot by agreeing to produce those in

19   discovery.

20             Second, they've agreed to produce formal

21   communications under those agreements.  Again, that's a great

22   start, but there are several important limitations to that.

23   First of all, this excludes all documents created and all

24   communications prior to the first bailout.  By definition,

25   there was no agreement between AIG and the federal government

14kQbroC

1      at that point, so there can't be any formal communications

2      under agreement.  And we believe this may be one of the most

3      fertile time periods for the sorts of analyses and

4      communications that we're looking for.

5           Second of all, this limitation excludes all

6      communications or documents exchanged just between AIG

7      personnel.  While it's obviously important that we know

8      whatever AIG ultimately decided to tell the federal government,

9      we think a lot of the stuff that we're looking for is going to

10     happen in the back-and-forth between AIG employees deciding

11     what exactly their needs were and what they were going to tell

12     the government and we think we're entitled to those documents

13     as well.

14          Finally, we think likely a lot of this back-and-forth

15     and a lot of the heavy work done in regard to assessing AIG's

16     financial condition happened in the form of informal

17     communications and not the handful of formal communications

18     that likely were exchanged between AIG and the federal

19     government.  So that's on the formal communications.

20          The third category of documents that AIG has agreed to

21     produce in response to this request are things from the office

22     of the AIG corporate secretary.  Again, we think these are

23     important documents and we're glad to get them, but we think

24     that the office of the corporate secretary is most likely going

25     to be involved in governance issues, likely played some role in

14kQbroC

1   the exchange of formal communications between AIG and the

2   federal government, but we have no reason to believe, and we

3   don't think it's likely, that the office of the AIG corporate

4   secretary was involved in the sort of detailed financial

5   analysis to assess AIG's financial condition, to assess their

6   cash needs, and to figure out what exactly they needed from the

7   federal government.  We think it's most likely that this

8   happened in the AIG treasury department or some similar group

9   that had its hands dirty in figuring out sort of AIG's

10  financial condition.  So, for that reason, we think that what

11  they've agreed to do on this request is wholly inadequate.

12          Finally, I just want to observe that in the course of

13  AIG's productions to date we've received already nothing on the

14  second and third bailouts.  I think this really illustrates the

15  point that Brookfield isn't in a position to identify

16  custodians likely to have documents responsive to this request.

17  It's AIG's responsibility to identify those custodians and thus

18  far have failed to do so.  So we are asking your Honor to order

19  them to undertake a more serious search identifying custodians

20  likely to have documents responsive to this request and to

21  produce those documents.

22          THE COURT:  Mr. Shields.

23          MR. SHIELDS:  Your Honor, as a general matter, we have

24  started with the original 19 custodians which will extend into

25  the second 18 have been producing documents relative to AIG's

14kQbroC

1    financial condition as well as the assessment and the receipt

2    of federal funding from the Fed and from other governmental

3    entities.  So the types of documents that they are seeking are

4    and should continue to be included within this category of

5    documents.

6           In addition, we have agreed to give the exact

7    documents that Mr. Brown has described, including formal

8    communications between AIG and the Fed under the credit

9    facility which will include waiver -- requests for waivers on

10   the terms of the facility from AIG to FP, which is significant

11   because to the extent that AIG was seeking relief from any

12   restrictions that the Fed had put on AIG would have been done

13   through this process.  A lot of these documents have been

14   produced from the files of the 19 custodians and will continue

15   to be produced as discovery continues.

16          THE COURT:  Well, one of the things that

17   Mr. Pickhardt's letter says is that the request is ambiguous

18   and over broad.  My view is, first of all, I don't view it as

19   vague.  I think it's fairly clear, and I suppose at the

20   perimeter it might be over broad, but that's something that

21   ought to be the subject of discussion then.  By saying it might

22   be, I'm not saying it necessarily is.  I think it's asking for

23   a fairly defined core group of documents, and if those don't

24   exist or go beyond formal requests, documents at the office of

25   the corporate secretary and the like, it seems to me that they

14kQbroC

1    are still documents that need to be produced.

2          MR. SHIELDS:  One of the categories of documents that

3    we've agreed to give them is documents from AIG strategic

4    planning group.  One of the types of documents we are told are

5    in there are documents assessing the impact of federal funding

6    from -- the impact on AIG of federal funding which seems to be

7    at the core of what they are looking for.

8          I mean, to the extent, your Honor, that they are

9    looking for every communication between AIG and the Fed, that

10   is clearly an over broad request given the amount of

11   interaction that those two entities had over this extended

12   period of time.

13         We think that the areas where we have targeted our

14   searches including the custodians that they have identi -- that

15   we are reviewing, as well as these additional targeted areas,

16   should give them everything they need to understand the

17   relationship between AIG and FP -- excuse me, AIG and the Fed,

18   as well as given all of the financial data we've agreed to give

19   them, that should give them everything they need to assess

20   AIG's solvency and other financial issues.

21         THE COURT:  I think it's clear if there were

22   communications back and forth that relate to minutiae, that's

23   not responsive to the request.  However, if beyond all the

24   categories that you've just described or are described in the

25   letter, if there's some guy named Murray whose job it was to

14kQbroC

assess, for example, the valuation of the government's

financial assistance, and he doesn't fall within any of the

bailiwicks that you've described, my view is that Murray's

files would have to be produced providing that a good faith

inquiry on your part has disclosed the fact that there is a guy

named Murray.

I don't think you have to look at every employee of

AIG or AIGFP to determine whether there is such an individual,

but an inquiry into the process reveals that he exists, even if

his files don't fall within these three categories, they would

have to be produced.

MR. PICKHARDT:  Your Honor, we actually, you know,

have been endeavoring to identify reports of the nature that

your Honor just suggested.  For example, when we talked to the

treasury department, we asked them about needs under the Fed

facility and what sorts of reports or communications there

might be around that, and they indicated that there are some

cash flow reports that were identifying what needs there would

be under the federal facility.  We have cited those for

production and collection.

So we certainly are seeking to provide to Brookfield

financial reports that will provide them with a view of the

company's financial condition and how that financial condition

relates to, you know, the Fed facility.

As Mr. Shields has indicated, the reason why we're a

14kQbroC

1    little bit lost with providing a full response to this is that

2    they've asked for all documents related to the reasons for, you

3    know, the government bailout.  Obviously, we could turn the

4    buildings upside down and shake out every piece of paper if we

5    were going to technically respond to all of that.  But we

6    certainly have been seeking, to the extent that we can

7    identify, financial reports that will be responsive to this.

8    We are seeking to get those, and we are getting the things from

9    the corporate secretary's office which we think is really the

10   focus for the main communications.

11        THE COURT:  In my remarks, I was, I suppose, focusing

12   more on email traffic, and to the extent that a good faith

13   inquiry discloses that there are other custodians beyond

14   corporate secretary and the like whose files ought to be

15   examined, all I'm saying is I view that as being incumbent upon

16   AIG.

17        MR. PICKHARDT:  Well, your Honor, I mean, we are

18   certainly happy to identify for Brookfield as our investigation

19   continues on this if there is a point person who is dealing

20   with the Fed on any particular issues with respect to the

21   federal bailout.

22        To the extent we are asking for you, you know, any

23   custodian's documents that relate in some way, you know, to the

24   bailout, I just don't even know where we would start on that.

25        THE COURT:  I would imagine as the bailout was

14kQbroC

occurring, there were people at astonishingly low levels of the

company who were emailing back and forth about the financial

consequences of the bailout and the reasons therefor perhaps

for the restructuring that was covered in the newspapers.  I'm

not expecting you to seek out those sorts of materials, but

among the decision makers or people who reported directly to

decision makers with respect to these three issues described in

the request, I am expecting you to make reasonable inquiries

such that if there were people beyond those who you've

indicated you're reviewing whose email traffic in particular

needs to be looked at, you need to do that.

MR. PICKHARDT:  Your Honor, we do believe to the

extent we are talking about decision makers, we have, you know,

40 plus custodians who are the decision makers related to this

is process, we do think that would be captured by those

particular individuals.  We will, in light of your Honor's, you

know, comments go back and consider whether there are

additional custodian who we have, you know, learned about in

this process so far or who we can identify through further

inquiry and can, you know, discuss that with Brookfield and

whether we think that would be or burden would dictate that we

think we should not have to search those.

THE COURT:  And just in general, I think with respect

to each of these requests, that analysis is true.  If they've

identified 40 or so custodians and they've missed a key person

14kQbroC

1    who you're aware of, I think it's incumbent upon you to produce

2    the documents from that additional key person.

3            MR. PICKHARDT:  And we have been undertaking those

4    efforts.  But your Honor will recall that when Brookfield

5    requested a very expedited schedule, which your Honor didn't

6    give them exactly what they asked for but it's not that far off

7    really, and our feet are to the fire to get this done, one of

8    the things they represented is that we are not propounding

9    requests that are going to require you to go find all documents

10   and to turn upside down and do lots of full email box searches,

11   but what we are rather looking for are the key reports.  And

12   that is -- you know, we are trying to satisfy what they are

13   looking for, but we do think, your Honor, it would be, you

14   know, inconsistent with what Brookfield has represented this

15   phase of discovery is supposed to be about and ultimately

16   inconsistent with the extremely tight time frames that we are

17   under for us to do sort of full searches of additional

18   discovery --

19           THE COURT:  I don't disagree with what you just said,

20   but, you know, there are a number of different ways to find

21   responsive documents, one of which is electronic searches,

22   another of which is turning to the key decision makers and

23   saying is there anybody else who was in the loop, which I

24   assume you are doing as part of this process.  If the answer

25   is, yes, there's a guy named Murray who worked on the third

14kQbroC

floor who actually was responsible for compiling all of this

even though nobody had heard of Murray before, I deem Murray's

files as responsive.

         MR. PICKHARDT:  Yes, your Honor, we absolutely have

been doing that.  I can give you an example.  A couple weeks

ago we met with AIG's treasurer, Mr. Gender.  We asked

Mr. Gender to bring with him to that meeting a group of people

who could help us with respect to a number of requests.  He

brought those individuals, and we sat there, we talked to each

of them and said what would you have, you know, that might be

helpful responsive to these requests?

         So we are not limiting ourselves to just asking the

most senior folks.  We are going down a level, and, for

example, growing out of that meeting, we learned about these

reports that treasury prepares that concern liquidity needs

under the Fed facility, and we are in the process of gathering

those.

         So we think we have been undertaking a reasonable

process along the lines of what your Honor is identifying and

will be consistent with the very tight time constraints that we

are under seeking to get Brookfield sufficient documents for

them to have the information that they are looking for.

         MR. BROWN:  I would just like to make two quick

points, your Honor.  First of all, part of what motivates this

request is the fact that Brookfield believes there's a very

14kQbroC

1    good chance that AIG was also balance sheet insolvent prior to

2    the second government bailout.  That's why the second bailout

3    was necessary.

4            We think we're entitled to get the analyses and the

5    work that went in to determining why the second bailout was

6    necessary and how to structure it and how much AIG needed.

7            We don't think that sort of detailed analyses is going

8    to appear in the formal correspondence that is going back and

9    forth between the parties.  That is why this request digs

10   deeper.  I think I've explained why the formal

11   communications --

12           THE COURT:  So where is it going to appear on your

13   hypothesis?

14           MR. BROWN:  We think, as I said, it's likely that

15   there were communications between employees at AIG and

16   individuals at the government about the cash needs and that

17   they were exchanging analyses.  We think it is likely that was

18   done informally; it was done in day-to-day email traffic

19   between these individuals.  For that reason, we think it's very

20   important that AIG search everything that went across from AIG

21   to the federal government.  Also, we think that a significant

22   amount of this work was done between individuals at AIG when

23   they were deciding exactly how much they needed to ask the

24   government for.

25           THE COURT:  Well, with an $85 billion bailout, I would

14kQbroC

1    assume that there was a great deal of communication over time

2    only monitoring the use of the funds and the like.

3              MR. ASCHER:  Your Honor, it may be helpful just to put

4    on the table some of the specific things that happened in the

5    second bailout to explain this request.  The first bailout was

6    $85 billion.  The second phase of the bailout had several

7    different components that did a great deal to shore up AIG's

8    balance sheet.  So, for example, some of the debt -- some of

9    the loans that the government had extended to AIG were

10   converted from debt into equity, so that helped AIG's balance

11   sheet, and that was, I think, $30 billion, maybe more.

12             In addition, a number of liabilities were taken off of

13   AIG's balance sheet and put into the Maiden Lane II and Maiden

14   Lane III vehicles, and, in addition, more credit was made

15   available to AIG.

16             So, when you look at all of those things together, it

17   cries out for -- it suggests very strongly that AIG believed it

18   was balance sheet insolvent and needed to do a series of things

19   to restructure its situation with the federal government.

20             So while we appreciate charts that will show that AIG

21   needed to borrow more money, it's more than just borrowing more

22   money.  So we are really looking for not only communications

23   with the government but internally within AIG.  There may have

24   been someone within the accounting department, the finance

25   department who was looking at AIG's balance sheet in between

14kQbroC

1    the corridor and saying, look at our balance sheet, we need to

2    restructure this.

3         MR. SHIELDS:  Your Honor, to the extent that these

4    documents exists, they are going to be in the files of the

5    custodians we are searching.  What Mr. Ascher is suggesting is

6    not some minor incident in the company's day-to-day activities

7    but an incredibly major incident that will necessarily be

8    covered by emails of the treasurer, the CEO and other senior

9    members of the company, and as well should be reflected in all

10   the financial documents that we've given them and will continue

11   to give them.

12        THE COURT:  I guess what I'm saying is I don't see a

13   need to search every custodian at the company, but in the

14   logical places where documents of this sort would reside, you

15   do need to undertake a search.  You know, again, it may deal

16   with prioritization and the like but it certainly seems logical

17   to me, as it does to Brookfield, that there ought to be some

18   documents that reflect why there was further financial

19   involvement of the government and why it took the various forms

20   that were just described.

21        MR. BROWN:  Your Honor, I would just like to make a

22   point.  When Mr. Shields says that he believes these documents

23   will be among the custodians they're already searching, and

24   Mr. Pickhardt says they're searching 40 custodians, every one

25   of those custodians is someone Brookfield proposed and that

14kQbroC

1    AIG's proposal in response to this request --

2              THE COURT:  And I proposed a guy named Murray, and

3    I've now said several times that if Murray has documents that

4    are responsive to this, his files need to be searched, and that

5    has to be based upon a good faith effort to discover whether

6    there is somebody named Murray who has responsive documents.

7    And if past August 31 you make a convincing case through the

8    sorts of depositions that presumably you will be taking, that

9    (A) there is a guy named Murray, (B) his files were never

10   searched, and (C) he has important documents on the AIG side,

11   there is going to be hell to pay.  So, I certainly think

12   Mr. Pickhardt and Mr. Shields understand that.

13             It's fine for you to look in from the outside or for

14   me to hypothesize about what might have occurred, but this was

15   obviously an unusual time period in the history of this

16   company, and it may be not specific to this request, but it may

17   be that a lot of discussions were oral by design and that there

18   is very little documentation.  As to this request, certainly

19   because it requires interfacing with various government

20   agencies, I would assume that there are documents.  As I said,

21   if they're not among the 40 custodians but at this high level

22   of decision making these documents exist, I expect they will be

23   produced.

24             MR. PICKHARDT:  Yes, your Honor.

25             THE COURT:  I don't know what else I can say on this

14kQbroC

1    issue.

2              MR. PICKHARDT:  We certainly understand our

3    obligations, your Honor.  And Mr. Brown's statement that, you

4    know, we are limiting ourselves to custodians that have been

5    identified by Brookfield is just wrong.

6              As we've indicated specifically in response to this,

7    we are going to a number of members of the office of the

8    corporate secretary.  They were never identified by Brookfield.

9    We are going through additional custodians we are searching

10   that were not identified by Brookfield.  So that is just not an

11   accurate statement, and we do understand our obligations, your

12   Honor, and we will continue to work to comply with those in

13   response to this request as we did with others.

14             THE COURT:  Requests 36 and 37, which I guess relates

15   to 200 or so transactions principally.

16             MR. ASCHER:  Yes, your Honor.  You will recall at our

17   last telephonic conference, we discussed account fact that the

18   balance sheet solvency sheet analysis we are conducting will

19   not go through all 150,000 transactions that AIGFP had on the

20   books in September 2008.  There really is a reasonably limited

21   universe of transactions that we think is going to be the most

22   important for valuation purposes.  These are the transactions

23   in which AIGFP lost the most amount of money, on which it had

24   multi-billion dollar collateral call disputes with its

25   counterparties indicating essentially that the rest of Wall

14kQbroC

1    Street was valuing these positions very, very differently from

2    AIG, which is what gives us the basis to believe that they were

3    overvalued on AIGFP's books.  And we have been able to focus in

4    on what we believe will be no more than about 200 transactions.

5            In order for our experts to do the valuation work that

6    they would do as part of a routine balance sheet solvency

7    analysis, there are certain types of transaction documents that

8    they need.  They need prospectuses, they need confirmations.

9    They will also need trustee reports and documents like that

10   showing how these deals performed.

11           AIG's only objection here is burden.  I don't see a

12   relevance objection.  And the basis for their burdensomeness

13   objection is, well, we at AIG didn't do a very good job of

14   maintaining these in a centralized location.  We left it to

15   individual traders to maintain their own records, and,

16   therefore, it would be too burdensome for us to go back to

17   those traders.

18           Yet, AIG has given us absolutely no information to

19   substantiate the nature and scope of that burden.  We don't

20   know how many different traders there are.  We don't know how

21   many different in-house lawyers were responsible for

22   maintaining the legal documents associated with these

23   transactions, and, frankly, to us it doesn't sound like 200

24   transactions gathering six or seven different types of

25   documents is all that burdensome.  It might take some people a

1    few days or a couple weeks, but in the context of the magnitude

2    of this case, it sounds like a very reasonable request.

3              MR. SHIELDS:  Your Honor, although, we don't take the

4    position that these requests are wholly irrelevant, they are

5    certainly at the edges of the irrelevant.  None of the

6    documents that they are seeking -- prospectuses, term sheets,

7    confirmations -- in and of themselves relate to the value of

8    these deals much less the value of these deals during the

9    relevant time period.

10             So, although if these documents were particularly easy

11   to get, we would pick them up and hand them to Brookfield,

12   there are some significant burdens here, and given the limited

13   relevance of them, these burdens become -- suggest that this is

14   not an area where they should be pushing us on.

15             THE COURT:  Put yourself in my shoes where there is

16   your position and then there is Brookfield's position.

17   Brookfield indicates that its experts believe that these are

18   the categories of documents it needs to do the sort of report

19   that Brookfield is commissioning as to whether or not AIG or

20   AIGFP were solvent.  How do I second-guess that?

21             MR. SHIELDS:  One thing you may ask them is an

22   explanation for why these documents are so pertinent.  Again,

23   we are talking about things like prospectuses and term sheets

24   that predate the relevant time period, in some cases by as much

25   as 10 or 15 years.  So it is not clear, given all of the

14kQbroC

financial data with respect to these deals and to the company

in general that are going to be giving them, that this the key

magic document -- these are the key magic documents they need

in order to engage in their analysis.

        And, again, the burdens here are quite significant.

AIGFP did not keep the broad categories of the documents which

they are seeking in any centralized type of database.  We are

going to be searching -- rummaging in many cases through the

paper files of a number of different people at FP, many of whom

are no longer there, in order to dig out these documents.

        To the extent that a portion of these documents are

sitting in something called an electric file cabinet, those

documents are very much so as described in the deposition that

Mr. Ascher took of FP's CFO, Mr. Balfan, are not organized in a

way that's are very easy to get on an across-the-board basis.

        Moreover, there are a number of privileged and

irrelevant documents or non-responsive documents intermingled

among the documents which they seek or which are in that

electronic file cabinet.  To give you sort of a sense of it,

for a particular deal, there will be one big PDF that could be

as many as 3-, 400 pages of the documents related to that deal

that are in that particular system.

        THE COURT:  Generated at what point?

        MR. SHIELDS:  At different points.  So it's an odd

setup.  So rather than -- let's say you have your original deal

1      documents, let's say they're 50 pages or 80 pages, what have

2      you, and over time they add things to it.

3                THE COURT:  Suppose somebody adds another 20 pages?

4                MR. SHIELDS:  It actually adds it into the one PDF.

5                THE COURT:  That's what I was trying to get at.

6                MR. SHIELDS:  It's not separate PDFs.  They're not

7      easily broken down.  What we would have to do for each of these

8      deals -- again, this is just for those particular documents --

9      take that PDF for that one deal and then go deal by deal by

10     deal by deal, break it down, unitize it, then review it to take

11     out the privileged communications and non-relevant documents,

12     and then begin to produce only a subset of the documents of

13     which they are seeking, at which point we have to go spread

14     around the rest of FP and rummage through files of people no

15     longer at the company and try to figure out where the rest of

16     this stuff is.

17                Given that the documents which they seek are at the

18     far edges of the documents they could possibly need to figure

19     out whether a company of the size of AIG and AIGFP were

20     solvent, that is quite a burden, particularly given the

21     discovery burdens that AIG is taking on in general in this

22     case.

23                MR. ASCHER:  Your Honor, I must confess, I don't

24     understand AIG's relevance argument here.  These are the

25     transactions that were most responsible for $180 billion

14kQbroC

1    governmental bailout.  Not the only category of transactions --

2              THE COURT:  What Mr. Shields said is that some of

3    these documents are ten or 15 old.

4              MR. ASCHER:  Yes, your Honor, and my understanding

5    from speaking with our experts, and it's now quite reasonable

6    to me, is you that can't value an asset without understanding

7    the terms of the transaction, and it's as simple as that in

8    terms of getting the prospectuses and the confirmations.

9              The other categories of documents that they are asking

10   for, things like trustee reports.  A trustee report is a

11   quarterly or monthly report that would show how the asset

12   performed in the most recent period and the current status of

13   the asset.  And while we may not need trustee reports from the

14   period 1995 to 2008, if it's a transaction that started in

15   1995, we certainly do need it for the recent period leading up

16   to the valuation.

17             THE COURT:  Well, as to this I, think the two sides

18   should confer.  Trustee reports, for example, the concessions

19   you've just made may narrow the effort, and there may be other

20   things like that that can be explored; but what I may do going

21   forward is require a submission from your expert that explains

22   to me the same way as he or she just explained or it was

23   explained to you why various documents are necessary for this

24   analysis, give AIG an opportunity to weigh in on the same

25   issues, and if the representation is that this is highly

14kQbroC

```
 1    burdensome, I may end up requiring the parties to kick in for a

 2    court-appointed expert who I consult so I can decide who is

 3    right or the extent to which you are right.

 4             MR. ASCHER:  Your Honor, the other aspect on the

 5    burden -- I think we've raised one issue, and I would like to

 6    raise another one now.  We believe that AIG has collected a lot

 7    of these materials in the past.  That is something that I

 8    gather hasn't been investigated till now, so I don't know how

 9    far we can take that today.

10             THE COURT:  Certainly if that sort of collection has

11    been produced previously, that would undercut the argument, but

12    Mr. Pickhardt's letter says, at least as of April 18, they're

13    not aware of such a trove.

14             MR. SHIELDS:  No, your Honor, we're certainly not.

15    This is first time there is any suggestion, either from our

16    side or theirs, that there may have been some sort of

17    collection of these particular kinds of documents at all, and

18    it certainly is our understanding that there has never been a

19    collection or there has not been a collection of these types of

20    documents for litigation purposes or production of governmental

21    entities as part of any investigation.

22             We will look into it, although I would note that two

23    of the three entities for which Brookfield suggests these

24    documents may have been given are law firms.  To the extent

25    there was a collection -- I don't know that there has been --
```

14kQbroC

1    but to the extent there was a collection at the direction of

2    counsel of a subset of these types of documents, the

3    compilation of those documents would be covered by attorney

4    work product, and we have to find some way of dealing with that

5    concern.

6             MR. ASCHER:  Your Honor, it's our understanding --

7             THE COURT:  Wait.  But I'm not sure -- I'm familiar

8    with cases like Sport v. Steel and some of the others, but if

9    the underlying documents are conveniently located at Weil or

10   Cadwallader in unannotated form and they can be gotten back,

11   that sort of undercuts your burdensomeness argument.

12            I don't know that Brookfield cares where they come

13   from or having the source identified.  They could be produced

14   without an indication that they came from Cadwallader or Weil,

15   an accounting firm, and just be produced directly from AIG.

16            MR. SHIELDS:  Sure.

17            MR. ASCHER:  Your Honor, I'm sorry, I also seriously

18   doubt that those documents were collected in contemplation of

19   litigation.  From the documents that we've seen, we believe

20   that Weil Gotshal and Cadwallader were retaining -- excuse me

21   -- were retained in order to analyze AIGFP's collateral

22   obligations and certain other financial terms of the very same

23   portfolio that our experts are purporting to analyze here.

24            THE COURT:  But if it is in the same time period,

25   wouldn't it have been -- I think the ship was potentially

14kQbroC

1    sinking and, therefore, it was not unreasonable to think

2    litigation was in the offing?

3          MR. ASCHER:  I think they were looking into what their

4    financial obligations were and they were trying to get a

5    handle.

6          One of the very important parts of this story, your

7    Honor, is that AIGFP completely lost track of the fact that it

8    had an obligation to post collateral to its counterparties.  So

9    in late 2007 for the first time, AIG management realizes that

10   its subsidiary AIGFP has obligations under this enormous

11   portfolio to produce -- excuse me -- to post collateral if

12   market prices moved against AIGFP, and suddenly AIG and its

13   accountants auditors started to focus very clearly on this

14   liquidity request --

15         THE COURT:  I assume Weil was brought in as bankruptcy

16   counsel.

17         MR. ASCHER:  I think they were doing a lot of

18   different things, your Honor.  They were involved before a

19   bankruptcy --

20         THE COURT:  One of the things they were doing, since

21   bankruptcy by definition involves litigation, it's hard to see

22   how it wouldn't be in contemplation of litigation.

23         MR. SHIELDS:  Your Honor, I think we may be -- and

24   this is probably my fault -- we may be putting the cart before

25   the horse.  We haven't finished our investigation yet.  We

1    don't know that anything has been collected for litigation

2    purpose or not.  So maybe the best thing for us to do is to

3    figure that out and determine if there is a problem.

4            THE COURT:  I think you should make those

5    determinations.  The two sides should confer in an effort to

6    narrow the request.  But I certainly don't have enough

7    experience in this area to know what the right answer is.

8    Perhaps your expert can persuade me, perhaps an expert for AIG

9    can convince me that your expert is wrong, but probably it's

10   going to require me gaining more information than I have today

11   in order to make any decisions about this.

12           MR. SHIELDS:  Although, your Honor, I think you should

13   keep in mind that these deals are valued on a regular basis.

14           THE COURT:  But their theory is that your valuations

15   are wrong, and that certainly an issue they are entitled to

16   explore.

17

18           MR. ASCHER:  The only point I was making, your Honor,

19   is if we do end up making a submission, we think it should

20   include quite a bit more information about burden as well as

21   relevance.

22           THE COURT:  Sure.  That brings us to the time period

23   for the requests which is something you are just drawing to my

24   attention but not seeking relief on today.

25           MR. BROWN:  That's right, your Honor.  So, as you can

14kQbroC

1    see from the pre-conference correspondence, the parties

2    disagree as to the appropriate time period that should be

3    applied to Brookfield's document requests.  I think the parties

4    agree that that time period may differ from request to request,

5    but as a general matter, Brookfield believes its entitled to

6    documents, it's asked for documents from April of 2008 to June

7    of 2009.

8           AIG refuses to produce documents from beyond -- again,

9    with a few exceptions -- from beyond the time frame agreed upon

10   for the first phase of document discovery.

11          So even though we have agreed to deal with this issue

12   on a request-by-request basis, we wanted to flag it for your

13   Honor because of the issue's importance to Brookfield and

14   because we do anticipate coming to you promptly should the

15   parties be unable to agree for any particular request.  So that

16   said, there are a couple of points as to the time frame that we

17   wanted to raise for you.

18          THE COURT:  OK.

19          MR. BROWN:  The first of which is that there is

20   absolutely no reason why Brookfield should be limited to the

21   time frame that was applied to the first phase of document

22   discovery.

23          The first phase of document discovery was limited, and

24   it was understood that should Brookfield's claims survive AIG's

25   motion to dismiss, that additional discovery would be

14kQbroC

appropriate.  Brookfield did not agree to phasing discovery in this way, with the understanding that it would be limited to the requests, to the custodians or to the time frame that it agreed on for the first phase of document discovery.  There is no reason why going forward subsequent discovery should be limited to the discovery that took place during this first limited phase.

So, second, as to the time frame itself, going back to April of 2008 is very important for the balance sheet solvency analysis.  Our experts tell us when you are performing a solvency analysis for a mid quarter date, the customary method is to take the audited financial statements from the two quarters that bookend that date and roll forward and roll back from those audited financial statements based on your understanding of what happened during that quarter.

So AIG's right that we allege that AIG was most likely balance sheet insolvent during a period beginning in mid September of 2008.  The starting point for that analysis would be a rolling forward from the second quarter of 2008 audited financial statements.  But, as you've just pointed out, one of the major premises of this litigation is that AIG's financial statements are not reliable, and for that reason we are entitled to have access to documents and information that is going to allow us to get behind the numbers that are reported in the audited financial statements.  For that reason, we want

14kQbroC

1    to roll forward from the second quarter of 2008 audited

2    financial statements, we need to know what happened during the

3    second quarter of 2008.  So we think it is very reasonable to

4    ask for documents and for discovery beginning in April of 2008.

5            As to the back end of our time period, we have asked

6    for production of documents through June 30 of 2009.  There are

7    two reasons for this.  First of all, it's important to note

8    that throughout the entire financial crisis, AIG's stock hit

9    its lowest point in March of 2009, and credit spreads on AIG

10   debt were at their widest point in May of 2009.  We think that

11   we're certainly entitled to discovery from that time period

12   when the markets believed that AIG was at its weakest and was

13   most likely to suffer the sort of financial distress that we've

14   alleged in our complaint.

15           Second, it's important to keep in mind that the third

16   and final government bailout occurred in March of 2009.  We

17   think it's very likely that in the weeks and months after that

18   bailout there will be correspondence in retrospective analyses

19   that are going to show us and give us more information as to

20   what happened in March and what made that third bailout

21   necessary.  We think it's completely reasonable to ask for

22   discovery that's going just a couple months beyond the final

23   date in which the government thought that it needed to step in

24   and provide AIG assistance.

25           I would just point out that in the first phase of

14kQbroC

1    discovery and in the documents we've received so far, some of

2    the most important documents as to what happened in September

3    of 2008 were created in late October and beyond.  So there is

4    no reason to believe that stopping discovery at the point of

5    the third government bailout is a reasonable thing to do.

6         MR. PICKHARDT:  Your Honor, as Mr. Brown, I think,

7    acknowledges, the complaint, if you look at the actual factual

8    allegations in the complaint, all of those relate to the period

9    from August of 2008 through March of 2009.  We do think that

10   was a reasonable general sort of default time period for us to

11   use for document request during the first phase.  We think that

12   that applies equally to the amended complaint which continues

13   to allege facts in that time period.

14        We don't really disagree that there are specific

15   requests for which we should go beyond that time period, and in

16   fact we don't even disagree with Mr. Brown's suggestion that

17   there should be some bookending that happens with respect to

18   financial statements.

19        So if that is the time period we're focused on, then

20   you have financial statements that were issued at the end of

21   June, at the end of the second quarter of 2008, we are agreeing

22   and in fact already have produced a lot of documents related to

23   the financial statements from that period.  You go up through

24   March, there's financial statements that are issued at the end

25   of March, end of the first quarter of 2009.  That provides book

14kQbroC

1    ending on that end.

2            So, I think we have already agreed that there should

3    be, you know, some bookending with respect to documents related

4    to the financial statement process, so you can see where the

5    company was before and you can see where the company was after

6    the, you know, allegations that are being asserted.

7            Brookfield is not making any specific application to

8    the Court with respect to any particular request.  I would just

9    note that we have not been, you know, insisting that we would

10   not go beyond the August to March time period in total and our

11   looking at it on a request-by-request basis and would suggest

12   the Court take this up at a later time if there are specific

13   issues on that.

14           MR. BROWN:  We agree with that.  I am not going to

15   take issue with anything Mr. Pickhardt said.  I just want to

16   correct myself.  I said that the quarterly financial statements

17   are audited, and of course only annual financial statements are

18   audited.  I just wanted to correct the record, but I think you

19   understand where the parties are on this issue.

20           THE COURT:  I take it we don't have any further

21   conferences scheduled, is that right?

22           MR. PICKHARDT:  That's correct, your Honor.

23           THE COURT:  When ought we to schedule the next one?

24           MR. ASCHER:  We have been on a monthly schedule, and

25   Brookfield believes that that's productive and helpful.

14kQbroC

1              (Pause)

2              THE COURT:  May 19 at 2:00, a Thursday.

3              MR. ASCHER:  That's fine for Brookfield, your Honor.

4              MR. PICKHARDT:  I believe that will work, your Honor.

5              THE COURT:  OK.

6              MR. ZIEGLER:  2:30 would be better.

7              THE COURT:  2:30 is fine.

8              MR. PICKHARDT:  May 19 at 2:30, your Honor?

9              THE COURT:  Yes, it will be in courtroom 20A.  For the

10    record, I don't like this courtroom because of the mounting of

11    lighting fixtures.

12             MR. ASCHER:  Thanks for enduring it so patiently, your

13    Honor.

14             MR. PICKHARDT:  We also would like to congratulate

15    Mr. Ziegler in having sat silently.  I think it was quite an

16    accomplishment.

17             THE COURT:  I would too.  Thank you all.

18             (Adjourned)

19

20

21

22

23

24

25